UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| In Re: | CASE NO. 25-53640-PMB |
| GLOBAL CONCESSIONS, INC., | CHAPTER 11 |
| Debtor. | |

**DEBTOR'S MOTION FOR ENTRY OF AN
ORDER (A) AUTHORIZING DEBTOR TO PAY PREPETITION
CLAIMS OF CRITICAL VENDORS AND (B) GRANTING RELATED RELIEF**

Global Concessions, Inc. ("**Global Concessions**," "**GCI**," or the "**Debtor**"), files this motion (the "**Motion**") for the entry of an order, substantially in the form attached hereto as **Exhibit A**, (a) authorizing, but not directing, the Debtor to pay certain prepetition claims (each a "**Critical Vendor Claim**" and, collectively, the "**Critical Vendor Claims**") of certain essential vendors and service providers (each, a "**Critical Vendor**" and, collectively, the "**Critical Vendors**") and (b) granting related relief. In support of this Motion, the Debtor respectfully states as follows:

### BACKGROUND

1. Founded in 1991, Global Concessions has grown into a leading name in the hospitality industry, specializing in innovative and high-quality dining experiences. GCI began with the opening of Gyro Wrap (now Great Wraps) at Hartsfield-Jackson Atlanta International Airport (the "**Airport**") and since expanded its presence with a diverse portfolio of restaurants and brands.

2. Over the years, GCI introduced well-known brands such as Nathan's Famous to the airport, while also developing its own unique concepts like Sojourner's Café and the acclaimed Sweet Georgia's Juke Joint. The Debtor now employs over 300 employees in 16 restaurants at the

Atlanta airport, operating as a franchisee or licensee with over a dozen different franchisors/licensors in addition to several homegrown concepts. GCI's commitment to excellence has earned it multiple industry accolades, including nominations for Airport Revenue News awards recognizing superior customer service and operational excellence.

3. In January 2015, the city of Atlanta (the "**City**") began the contracting process for a new food court at the airport. In November 2016, the City announced Global Concessions as the winning firm for the Concourse C food court project. However, on June 20, 2017, the City canceled the deal with Global Concessions, citing that the cancellation was in the best interests of the City. Global Concessions responded by writing to Mayor Kasim Reed on July 27, 2017, detailing the significant investments it had made, including attracting partners, staffing efforts, and hundreds of thousands of dollars in preparations. GCI requested the city rescind the cancellation and allow them to continue with the Concourse C project.

4. After Mayor Reed's term ended, GCI reached out to Mayor Keisha Lance Bottoms to request the cancellation be rescinded and stressed that moving forward with the project would be in the city's best interest. The City later informed Global Concessions that it would proceed with the project, acknowledging the prior administration's cancellation was improper.

5. The cancellation severely impacted GCI's financial position. Due to the City's actions, GCI lost its financing and had to secure new funds at additional costs, not including expenses related to the appeal process. The total financial burden from pre-cancellation expenses, additional financing, and appeal costs amounted to roughly $2 million. This put GCI in a difficult position, especially as it missed out on the rent-free period typically granted to new concessionaires. GCI had to bear rent costs amounting to approximately $1.1 million before the stores even opened.

6. When the project finally resumed, the company faced further challenges due to the COVID-19 pandemic and staffing issues. The pandemic was particularly devastating to the restaurant and travel industries, and GCI sits at the crossroads of both. On March 20, 2020, nearly all of the debtor's restaurant locations were forced to close, leaving only one in operation. The extended closures lasted through mid-2022, with full operations not resuming until 2023. The prolonged shutdown led to significant revenue losses, while fixed costs such as rent and maintenance continued to accrue. This crisis placed extraordinary financial strain on GCI's business and its balance sheet.

7. Despite the Debtor's efforts, the mounting debt started consuming its resources and depleting its cash reserves. Faced with these insurmountable challenges, the Debtor finds itself filing for chapter 11 to restructure and stabilize its operations.

8. On April 2, 2025 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtor has continued in possession of its property and has operated and managed its affairs as a debtor-in-possession pursuant to the provisions of Sections 1107 and 1108 of the Bankruptcy Code. No creditors' committee, trustee, or examiner has been appointed in this case.

## JURISDICTION AND VENUE

9. The United States Bankruptcy Court for the Northern District of Georgia (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtor confirms its consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 105(a) and 363 of Title 11 of the Bankruptcy Code (the "**Bankruptcy Code**"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## CRITICAL VENDORS

11. The Debtor is in the food industry, operating restaurants within the Atlanta airport (the "**Business**"). In connection with these services, the Debtor relies on certain vendors that provide unique and necessary products that are crucial to the Business. Without access to these products, the Debtor would be unable to continue providing the services that its customers have come to expect, and it would experience a significant loss of revenue and customer goodwill that could jeopardize its reorganization efforts.

12. The Business relies on continuing access to and relationships with various suppliers and a network of other vendors and service providers. Any disruption in the Debtor's access to services and the provision of critical supplies to the Debtor would have a far-reaching and adverse economic and operational impact on its business.

13. In addition, the Debtor operates as a Franchisee at several of its locations an is required by the respective franchisors to use specified vendors (the "**Critical Vendors**," and their claims (the "**Critical Vendors Claims**").

14. The Debtor believes that it would be extremely difficult, if not impossible, to replace the Critical Vendors within a reasonable time without severe disruption to the Business. Such harm would likely far outweigh the cost of payment of the Critical Vendor Claims.

15. Hence, it is essential to the success of the Debtor's restructuring efforts that it be able to maintain the flow of supplies and services to its business.

16. The Debtor has undertaken a process to identify the Critical Vendors using the following criteria: (i) whether a vendor is a sole-source or primary provider of services or products; (ii) whether certain specifications or volume requirements prevent the Debtor from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe; and (iii) if a vendor is not a sole-source or primary provider of services or products, whether the Debtor can continue to operate in the ordinary course while a replacement vendor is secured. As a result of its review and evaluation, the Debtor identified a narrow subset of vendors as Critical Vendors.

17. Debtor propose to pay the Critical Vendor Claims listed in **Exhibit B** attached hereto based on the criteria outlined above.

18. Nonpayment of the Critical Vendor Claims creates a significant risk of disruption to the Debtor's operations. If the Debtor lost access to these supplies and products, its ability to generate revenue would decline drastically, making it difficult if not impossible for the Debtor to fund distributions to creditors.

### CONDITIONS TO PAYMENT

19. Subject to the Court's approval, the Debtor intends to pay the Critical Vendor Claims only to the extent necessary to preserve the Business as a going concern. To that end, in return for paying the Critical Vendor Claims, the Debtor proposes that it be authorized to require that the Critical Vendors provide favorable trade terms for the post-petition delivery of supplies and services. Specifically, the Debtor may choose to condition the payment of the Critical Vendor Claims upon the Critical Vendors' agreement to continue providing supplies and services to the Debtor in accordance with trade terms at least as favorable as those practices and programs (including credit limits, pricing, timing of payments, availability, and other terms) in place twelve

months prior to the Petition Date, or such other trade terms that are acceptable to the Debtor in its discretion (the "**Customary Trade Terms**").

20. In addition, the Debtor requests that if the Critical Vendors accept payment pursuant to the relief requested by this Motion and thereafter do not continue to provide supplies or services on Customary Trade Terms, then: (a) the Debtor may then take any and all appropriate steps to cause such Critical Vendors to repay payments made to them on account of their prepetition claim to the extent that such payments exceed the post-petition amounts then owing to such Critical Vendors; (b) upon recovery by the Debtor, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding post-petition balance due from the Debtor to such party, the Debtor may elect to re-characterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding post-petition balance and such supplier or vendor will be required to repay to the Debtor such paid amounts that exceed the post-petition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

## RELIEF REQUESTED

21. The Debtor requests that the Court authorize (but not direct) them to pay the Critical Vendor Claims to ensure the Debtor's ability to generate revenue is not interrupted.

22. As a prerequisite to payment of any Critical Vendor Claims, the Debtor intends to require the Critical Vendor to agree to transact with the Debtor on a post-petition basis on the same or similar credit and pricing terms as existed prior to the Petition Date.

## BASIS FOR RELIEF

23. Section 1107(a) of the Bankruptcy Code, which provides that a Debtor-in-possession shall perform all the functions and duties of a trustee, contains an implied duty that a

Debtor-in-possession act as a fiduciary "to protect and preserve the estate, including an operating business's going-concern value," on behalf of the Debtor's creditors and other parties in interest. *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (*quoting In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).

24. Pursuant to section 105(a) of the Bankruptcy Code, "[t]he [C]ourt may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). The purpose of section 105(a) is to "assure the bankruptcy court's power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction." COLLIER ON BANKRUPTCY ¶ 105.01 (15th ed. rev. 2007). Section 105(a) of the Bankruptcy Code thus empowers the Court to issue any order "necessary or appropriate" to allow a Debtor-in-possession to fulfill its duty to preserve the going-concern value of the business, including an order authorizing payment in full or in part of certain pre-petition claims of unsecured creditors prior to confirmation of a plan. *See CoServ*, 273 B.R. at 496–97; *see also In re Mirant Corp., et al.*, 296 B.R. 427, 429–30 (Bankr. N.D. Tex. 2003).

25. Courts have long recognized that payment of some categories of pre-petition obligations outside the plan of reorganization is often necessary to realize the paramount goal of rehabilitation of the Debtor. *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175, 177 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the Debtor is not a novel concept.") (citation omitted); *see also In re Lehigh & New England Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (noting that the "doctrine of necessity" permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid"); *In re Boston & ME. Corp.*, 634 F.2d 1359, 1382

(1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to the Debtor's continued operation); *CoServ*, 273 B.R. at 500 (permitting chapter 11 debtor to pay the claims of a pre-petition general unsecured creditor in full because the "[d]ebtor very likely must deal with [such creditor] or risk harm to its estate or their going concern value").

26. Courts routinely authorize pre-plan payment of pre-petition unsecured claims when such claims are entitled to priority status under the Bankruptcy Code and it is reasonable to believe such payments will benefit the Debtor's estate and creditors. *See, e.g.*, *In re CEI Roofing*, 315 B.R. at 59–61. In *CEI Roofing,* the court authorized payment of pre-petition employee wage claims to the extent that such claims would have been entitled to priority status, and likely payment in full, at the time of plan confirmation, *see* 11 U.S.C. § 503(a)(3), because early payment of the claims was "common sense" in that it prevented the Debtors' employees from leaving and thus preserved their businesses. *CEI Roofing*, 315 B.R. at 61. As claims entitled to priority status will likely be paid in full, courts frequently authorize early payment of priority status claims when such timing and early payment is intended to prevent some harm or to procure some benefit for the estate. *See id.* at 60–61 (stating that as long as higher priority creditors fail to timely object, authorization of early payment in full of priority claims does not trigger concerns of upsetting the priority scheme of the Bankruptcy Code nor of unfairly discriminating amongst general unsecured creditors); *see also CoServ*, 273 B.R. at 483 (implying that a bankruptcy court may authorize early payment of pre-petition claims accorded priority treatment in instances where nonpayment could impair a Debtor's ability to operate); *Equalnet Comms. Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) (stating that a court may authorize pre-plan payment of certain priority status claims, to the extent

~ 8 ~

the Bankruptcy Code affords priority status to such claims, because "the need to pay these claims in an ordinary course of business time frame is simple common sense").

27. In addition, many courts have authorized chapter 11 debtors to make payment in full or in part of the pre-petition claims of nonpriority general unsecured creditors where necessary to preserve or enhance the value of the Debtors' estates to the benefit of all creditors. *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821 (D. Del. 1999) (authorizing payment of certain critical trade vendors); *In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15 (M.D. Fla. 2005) (authorizing payment of amounts owing to certain critical vendors); *Mirant Corp.*, 296 B.R. at 429–30 (granting chapter 11 Debtor authorization to pay pre-petition claims of certain classes of "critical" vendors); *CoServ,* 273 B.R. at 497 (noting that "it is only logical that the bankruptcy court be able to use section 105(a) of the Code to authorize satisfaction of the pre-petition claims in aid of preservation or enhancement of the estate").

28. Courts in other jurisdictions routinely authorize debtors to pay critical vendor claims where essential to the debtor's continued operation. *See, e.g.*, *In re Syntax- Brillian Corp., et al.*, Case No. 08-11407 (BLS) (Bankr. D. Del. July 9, 2008) [Docket No. 50]; *In re JHT Holdings, Inc., et al.*, Case No. 08-11267 (BLS) (Bankr. D. Del. June 25, 2008) [Docket No. 48]; *In re American Home Mortgage Holdings, Inc.*, Case No. 07-11047 (CSS) (Bankr. D. Del. Aug. 7, 2007) [Docket No. 64]; *In re Werner Holding Co. (DE) Inc., et al.*, Case No. 06-10578 (KJC) (Bankr. D. Del. June 13, 2006) [Docket No. 54]; *In re Pliant Corp., et al.*, Case No. 06-10001 (MFW) (Bankr. D. Del. Jan. 4, 2006) [Docket No. 26]; *In re Meridian Auto. Sys.-Composite Operations, et al.*, Case No. 05-11168 (MFW) (Bankr. D. Del. May 27, 2005) [Docket No. 183]; *In re Maxide Acquisitions, Inc., et al.*, Case No. 05-10429 (MFW) (Bankr. D. Del. Feb. 15, 2005) [Docket No. 33].

29. In the present case, a significant portion of the Critical Vendor Claims would be entitled to priority status as administrative expenses and likely payment in full pursuant to section 503(b)(9) of the Bankruptcy Code because such claims arise from the delivery of goods to the Debtor, in the ordinary course of business, within the 20-day period preceding the Petition Date. Section 503(b)(9) provides that:

> After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
>
> ****
>
> (9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under [title 11] in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

11 U.S.C. § 503(b)(9). Accordingly, the Critical Vendor Claims would likely be entitled to administrative expense status and to payment in full ahead of general unsecured creditors. Therefore, authorization of payment of many of the Critical Vendor Claims would not unfairly discriminate against the Debtor's other unsecured creditors and raises merely an issue of timing.

30. It appears that payment of the Critical Vendor Claims is necessary for the Debtor's reorganization, the Critical Vendor may otherwise refuse to do business with the Debtor, and other creditors will be as well off (or perhaps better off) if the Critical Vendor Claims are paid. *See In re News Publ'g Co.*, 488 B.R. 241, 244 (Bankr. N.D. Ga. 2013).

31. The Debtor believes that authority, but not direction, to pay the Critical Vendor Claims, if and when such payments become necessary, is crucial for the Debtor's seamless transition into chapter 11, will avoid immediate and irreparable harm, and will serve the best interests of the Debtor, its estate, and its creditors.

32. Based on the foregoing, the Debtor submits the relief requested is necessary and appropriate, is in the best interests of its estate and creditors, and should be granted.

33. The Debtor further submits that because the relief requested in this motion is necessary to avoid immediate and irreparable harm to the Debtor for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted.

34. The Debtor further seeks a waiver of any stay of the effectiveness of an order approving this motion. As set forth above, the relief requested herein is essential to prevent immediate and irreparable damage to the Debtor's operations and their efforts to pursue a reorganization.

35. Accordingly, the relief requested herein is appropriate under the circumstances and under Bankruptcy Rules 6003 and 6004(h).

## CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: April 3, 2025                                **KECK LEGAL, LLC**

*/s/ Maysen E. Moorehead*
Benjamin R. Keck, Ga. Bar No. 943504
Maysen E. Moorehead, Ga. Bar No. 451298
2801 Buford Highway NE, Suite 115
Atlanta, Georgia 30329
(470) 826-6020
bkeck@kcklegal.com
mmoorehead@kecklgeal.com
*Proposed Counsel for Debtor*

**Exhibit A**

Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **In Re:** | **CASE NO. 25-53640-PMB** |
| **GLOBAL CONCESSIONS, INC.,** | **CHAPTER 11** |
| Debtor. | |

**ORDER (A) AUTHORIZING DEBTOR TO PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS AND (B) GRANTING RELATED RELIEF**

This matter came before the Court on _____, 2025 for hearing (the "**Hearing**") on the Motion of above-captioned Debtor and Debtor-in-possession (the "**Debtor**") for the entry of an order (the "**Order**"), (a) authorizing the Debtor to pay Critical Vendor Claims, and (b) granting related relief; all as more fully set forth in the Motion. Upon consideration of the Motion, representations of counsel at the Hearing, and all other matters of record; and it appearing that this

Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of the chapter 11 case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having determined that the relief requested in the Motion is in the best interests of the Debtor, its estate, creditors, and other parties-in-interest; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. For the reasons set forth on the record at the Hearing, the Motion is GRANTED as set forth herein.[1]

2. The Debtor is authorized, but not directed, in its sole discretion, to pay or otherwise satisfy the Critical Vendor Claims, in whole or in part, upon such terms and in the manner provided in this Order; provided that, if any Critical Vendor accepts payment hereunder and does not continue providing supplies, goods, or services to the Debtor in accordance with trade terms at least as favorable to the Debtor as those practices and programs (including credit limits, pricing, cash discounts, timing of payments, allowances, availability, and other programs) in place twelve months prior to the Petition Date, or such other trade terms that are acceptable to the Debtor (collectively, the "**Customary Trade Terms**"), then: (a) the Debtor may then take any and all appropriate steps to cause such Critical Vendor to repay payments made to it on account of its prepetition claim to the extent that such payments exceed the post-petition amounts then owing to such Critical Vendor; (b) upon recovery by the Debtor, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding post-

---

[1] All capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

~ 2 ~

petition balance due from the Debtor to such party, the Debtor may elect to re-characterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding post-petition balance and such supplier or vendor will be required to repay to the Debtor such paid amounts that exceed the post-petition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

3. Nothing in the Motion or this Order shall impair the Debtor's right to contest the validity or amount of the Critical Vendor Claims, and all of the Debtor's rights with respect thereto are hereby reserved.

4. Nothing in this Order or any action taken by the Debtor in furtherance of the implementation hereof shall be deemed to constitute an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, and all of the Debtor's rights with respect to such matters are expressly reserved.

5. Nothing in this Order nor the Debtor's payment of claims pursuant to this Order shall be construed as (a) an agreement or admission by the Debtor as to the validity of any claims on any grounds, (b) a waiver or impairment of any of the Debtor's rights to dispute any claims on any grounds, (c) a promise by the Debtor to pay any claims, or (d) an implication or admission by the Debtor that such claims are payable pursuant to this Order. Nothing herein shall acknowledge, grant, or otherwise permit any right of offset or recoupment by a non-Debtor with respect to any claims asserted against the Debtor.

6. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented

for payment, and all such banks and financial institutions are authorized to rely on the Debtor's designation of any particular check or electronic payment request as approved by this Order.

7. The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

8. Notice of the Motion as provided herein shall be deemed good and sufficient and such notice satisfies the requirements of Bankruptcy Rule 6004(a) and the Local Rules.

9. Notwithstanding the possible applicability of Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

10. The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

11. The Court retains jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Order.

### END OF ORDER ###

**Prepared and presented by:**

**KECK LEGAL, LLC**

*/s/ Benjamin R. Keck*
Benjamin R. Keck, Ga. Bar No. 943504
Maysen E. Moorehead, Ga. Bar No. 451298
2801 Buford Highway NE, Suite 115
Atlanta, Georgia 30329
(470) 826-6020
bkeck@kcklegal.com
mmoorehead@kecklgeal.com
*Proposed Counsel for Debtor*

**Distribution List**

Office of the United States Trustee
Attn: Jonathan Adams
Suite 362, Richard B. Russell Building
75 Ted Turner Drive, SW
Atlanta, Georgia 30303

**Exhibit B**

**Critical Vendor Claims**

**[To be supplemented]**

~ 5 ~