## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **Case No. 25-53640-PMB** |
| | ) | |
| **GLOBAL CONCESSIONS, INC.,** | ) | **Chapter 11** |
| | ) | |
| **Debtor.** | ) | |
| _____ | ) | |

## EMERGENCY MOTION TO COMPEL DEBTOR TO
## COMPLY WITH POST-PETITION RENT OBLIGATIONS

The City of Atlanta (the "City") moves on an emergency basis to compel the

Debtor, Global Concessions, Inc. (the "Debtor"), to comply with Section 365(d)(3)

of the Bankruptcy Code and timely perform its obligations under the non-

residential real-property leases between the City and the Debtor, specifically

including the payment of rent arising from and after the order for relief. In support

of this Motion, the City shows the Court the following:

### Jurisdiction and Venue

1.      This Court has jurisdiction to hear this Motion pursuant to 28 U.S.C.

§§ 157 and 1334. Venue of these proceedings and this Motion in this district are

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

2.      The Debtor, a concessionaire at Hartsfield-Jackson Atlanta

International Airport (the "Airport"), filed a voluntary petition constituting an order

SGR/80315477.1

for relief initiating this Chapter 11 case on April 2, 2025 (the "<u>Petition Date</u>"). The Debtor continues to operate its business a debtor in possession.

3.    The Debtor leases retail restaurant space from, among others,[1] the City under two lease agreements: the *Agreement for Concourses "B" & "F" Food and Beverage Concessions at Hartsfield-Jackson Atlanta International Airport* (the "<u>B/F Lease</u>") dated March 12, 2012, as amended from time to time; and *Concessions Lease Agreement for Food and Beverage Concessions on Concourse C Midpoint at Hartsfield-Jackson Atlanta International Airport* (the "<u>Concourse C Lease</u>"; together with the B/F Lease, the "<u>Leases</u>") dated September 5, 2018. Accurate copies of the Leases are attached as Exhibits "A" and "B." The Debtor is also a party to the *Hartsfield-Jackson Atlanta International Airport Temporary Space Permit*, dated July 1, 2023 (the "<u>Space Permit</u>"). An accurate copy of the Space Permit is attached hereto as Exhibit "C."

4.    The Leases each provide that rent shall be the greater of a Minimum Annual Guarantee rent ("<u>MAG</u>") and a percentage rent calculated based on receipts ("<u>Percentage Rent</u>").[2] *See* B/F Lease, §5.1.1; Concourse C Lease, § 5.1.1. The Debtor is required to pay MAG in advance in one-twelfth installments on the first day of the month. *See* B/F Lease, §5.1.4; Concourse C Lease, § 5.1.4. On the

---

[1] In addition to the Leases with the City, the Debtor leases space in the Airport from sublessors who have leases with the City.

[2] The calculation for Percentage Rent varies slightly between the two Leases.

tenth day of month, the Debtor is required to submit a report of gross receipts for the prior month, from which Percentage Rent is determined by the formulae in the respective Leases. *Id.* The Debtor is required to pay Percentage Rent, less previously paid MAG, on the tenth day of the month (together with the report). *Id.* Percentage Rent is late on the twenty-fifth. *Id.*

5.     The Debtor is currently due for Percentage Rent under both Leases for April 2025. Because the Debor did not pay MAG for April, Percentage Rent is not reduced.

6.     The Debtor is also due for MAG for May 2025.[3]

7.     The amount due prepetition under the Concourse B/F Lease is $2,034,160.68. The amount due prepetition under the Concourse C Lease is $2,547,798.32. The amount due postpetition under the Concourse B/F Lease is $117,853.94 (April Percentage Rent of $20,243.12 plus May MAG of $97,610.82). The amount due postpetition under the Concourse C Lease is $132,179.91 (April Percentage Rent of $34,527.62 plus May MAG of $97,652.29). The amount due prepetition under the Space Permit, for storage space that supports the operation of both leases, is $470,753.50. The amount due postpetition for such storage space is $21,118.44. Attached hereto as Exhibit "D" is a summary of the invoices

---

[3] At its Meeting of Creditors, the Debtor's representative testified that May rent would be paid to the City on May 8, 2025.

supporting these prepetition and postpetition amounts due for Concourse B/F, Concourse C, and the storage space.

8.     The Debtor has not rejected either of the Leases and continues to operate in the Airport.

### Basis for Relief

9.     Section 365(d)(3) requires that the Debtor "timely perform all the obligations . . . except those specified in section 365(b)(2) [not relevant here], arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." 11 U.S.C. § 365(d)(3). The timely performance of all obligations includes paying rent. *See, e.g., In re Manis Lumber Co*., 430 B.R. 269, 277 (Bankr. N.D. Ga. 2009) (explaining that "Congress enacted § 365(d)(3) to require payment of postpetition rent … at the contract rate on a timely basis without regard to the 'actual, necessary' requirement of § 503(b)(1)" and that "the estate must pay for its right to possession until rejection terminates that right—whether or not the right to possession is actually exercised, regardless of the value of that right to the estate, and on a timely basis"); and *In re CHS Elecs*., Inc. 265 B.R. 339, 341 (Bankr. S.D. Fla. 2001) (ordering payment of post-petition rent "[b]ased upon a plain reading of § 365(d)(3)").

SGR/80315477.1

10.    April MAG came due on April 1, 2025, one day before the Petition Date. Because April MAG was not paid, the full amount of April Percentage Rent came due on April 10, 2025, unquestionably after the Petition Date. April Percentage Rent remains due and unpaid. May MAG came due on May 1, 2025 and remains unpaid.

11.    The Debtor continues to benefit from the Leases, which appear to be critical to the Debtor's continued operation and preservation of the estate. Because the Debtor is failing to meet its post-petition rent obligations, the Court should order the Debtor to pay those obligations as Section 365(d)(3) commands.

12.    The City requests that the Court set this Motion to be heard on an emergency basis at 9:30 a.m. on May 12, 2025—the same day as a number of other hearings in this case. Counsel for the City raised the issue of April Percentage Rent with counsel for the Debtor on April 11, 2025, and again on April 29, 2025. In an effort to avoid litigation, the City agreed to allow the Debtor until May 7, 2025 to propose a resolution for unpaid rent on the condition that if the City were constrained to file a motion to compel payment by May 7, 2025, the Debtor would agree that such Motion could be heard on May 12, 2025.

WHEREFORE, the City respectfully requests that the Court

　　a.  place this Motion for hearing on May 12, 2025 at 9:30 a.m.;

    b.  enter an Order compelling the Debtor to pay April Percentage Rent

       and May MAG immediately;

    c.  grant such other relief the Court determines to be just and proper.

Respectfully submitted May 7, 2025.

SMITH, GAMBRELL & RUSSELL, LLP

By: */s/ Michael F. Holbein*
    Michael F. Holbein
    Ga. Bar No. 360070
1105 W. Peachtree St. N.E.
Suite 1000
Atlanta, Georgia 30309
Tel: (404) 815-3500
Fax: (404) 815-3509
mholbein@sgrlaw.com

*Counsel for the City of Atlanta*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing EMERGENCY MOTION TO COMPEL DEBTOR TO COMPLY WITH POST-PETITION RENT OBLIGATIONS with the Clerk of Court using the CM/ECF system, which will automatically send an e-mail notification of such filing to all attorneys of record.

This 7th day of May, 2025.

*/s/ Michael F. Holbein*
Michael F. Holbein

SGR/80315477.1

# EXHIBIT A

# AGREEMENT FOR

# CONCOURSES "B" & "F" FOOD AND BEVERAGE CONCESSIONS

# AT

# HARTSFIELD-JACKSON ATLANTA INTERNATIONAL AIRPORT

## Atlanta, Georgia

\*\*\*

## PACKAGE NO. 7

\*\*\*



**Landlord:  City of Atlanta**

**Concessionaire:  Global Concessions, Inc.**

Contract No. **FC-5467**



H-JAIA DOA DOCUMENT CONTROL

MAR 1 2 2012

## **Table of Contents**

1.    PREMISES: ...................................................................................................1
      1.1    Description of Premises: .............................................................1
      1.2    Relocation, Expansion and Contraction; Reimbursement
             of Certain Costs: ........................................................................1
      1.3    Concourse Closure .....................................................................3
      1.4    Support Space and Access: .......................................................4
      1.5    Deliveries: ...................................................................................4

2.    TERM: .........................................................................................................5
      2.1    Commencement Date; Term:  Commencement Date; Term ......6
      2.2    Renewals: .....................................................................................6
      2.3    Holding Over: ..............................................................................6

3.    USE: ..............................................................................................................6
      3.1    Non Exclusive: .............................................................................6
      3.2    Use of Premises: .........................................................................6
      3.3    [RESERVED] .................................................................................6
      3.4    Pricing: .........................................................................................6
      3.5    Continuous Operation of Premises: .........................................7
      3.6    Hours of Operation: ....................................................................7
      3.7    Customer Service: .......................................................................9
      3.8    Marketing: ....................................................................................9
      3.9    Prohibition of Solicitation: .....................................................10
      3.10   Representative of Concessionaire: ..........................................10
      3.11   Investigation Reports: ..............................................................10
      3.12   Ingress and Egress; Security Regulations: ............................10
      3.13   Reservations by City: ................................................................11
      3.14   Compliance with Laws and Regulations; Licenses and Permits: ..............11
      3.15   Prohibited Uses: ........................................................................11
      3.16   Trash Removal: ..........................................................................12

4.    ASSIGNMENT OR SUBLETTING: ..........................................................12

5.    RENTAL PAYMENTS: ...............................................................................13
      5.1    Rental Payments: ......................................................................14
             5.1.5    Premium Rent: ..........................................................14
      5.2    Books and Records: ..................................................................17
      5.3    Revenue Control: ......................................................................18

6.    TAXES AND LIENS: ..................................................................................19

7.    IMPROVEMENTS: ....................................................................................21
      7.1    Approval of Conceptual Design: ..............................................21
      7.2    Minimum Investment; Base Building Improvements; Reinvestment: ......22
             7.2.1    Minimum Investment: ..............................................22

.

|       | 7.2.2 | Base Building Improvements: ................................................. | 24 |
|       | 7.2.3 | Minimum Reinvestment: .......................................................... | 24 |
|       | 7.2.4 | Liquidated Damages: ............................................................... | 24 |
| 7.3   | Construction of Concessionaire Improvements: ...................................... | | 25 |
| 7.4   | Utilities: ................................................................................... | | 26 |
| 7.5   | Waiver of Damage: .................................................................... | | 26 |
| 7.6   | Maintenance and Repair: ............................................................ | | 27 |
|       | 7.6.1 | Janitorial Service: .................................................................. | 27 |
|       | 7.6.2 | Pest Control: ......................................................................... | 27 |
| 7.7   | Advertising: ............................................................................. | | 27 |

| 8.    | LIABILITY AND INDEMNITY: .................................................... | 27 |
| 8.1   | City's Liabilities: ...................................................................... | 27 |
| 8.2   | Indemnity and Hold Harmless: .................................................... | 28 |
| 8.3   | Indemnity Not Limited By Applicable Insurance: ............................. | 29 |
| 8.4   | Survival: .................................................................................. | 29 |
| 9.    | INSURANCE AND BONDING: ...................................................... | 29 |

| 10.   | DAMAGE OR DESTRUCTION: ..................................................... | 29 |
| 10.1  | Partial Destruction of the Premises: ............................................. | 29 |
|       | 10.1.1 Insured Damage: .............................................................. | 29 |
|       | 10.1.2 Uninsured Damage: ........................................................... | 29 |
| 10.2  | Total Destruction of Premises: .................................................... | 30 |
| 10.3  | Partial Destruction of Concourse: ................................................ | 30 |
| 10.4  | Damage During Last Year of Term or Renewal Period: ...................... | 31 |
| 10.5  | Reduction of Rent: Concessionaire's Remedies: .............................. | 31 |

| 11.   | REDUCTION IN RENT DUE TO CHANGES IN ENPLANEMENTS: ................ | 32 |
| 11.1  | Definitions: .............................................................................. | 32 |
| 11.2  | Reduction in Enplaned Passengers; Reduction of MAG: ..................... | 32 |
| 11.3  | Calculation Examples: ................................................................ | 33 |
| 11.4  | Submission of Claim for Reduction; Reduction Only Available if Concessionaire is Paying MAG; Reduction Not Available if Concessionaire is Paying Percentage Rent: ................................................................ | 33 |
| 11.5  | Certification of Claim for a Reduction: ......................................... | 34 |

| 12.   | DEFAULT BY TENANT: .............................................................. | 34 |
| 12.1  | Events of Default: ..................................................................... | 34 |
| 12.2  | City's Remedies .......................................................................... | 36 |
| 12.3  | Concessionaire Not in Default: .................................................... | 37 |
| 12.4  | Security Interest: ...................................................................... | 37 |

| 13.   | TERMINATION FOR CONVENIENCE: ........................................... | 38 |

| 14.   | FINES FOR VIOLATIONS: ................................................................................ ........39 |

15.  UNAUTHORIZED ACCESS: ..............................................................40

16.  SURRENDER OF PREMISES: ..........................................................40

17.  OWNERSHIP OF INFORMATION; CONFIDENTIALITY: ...................41

18.  HAZARDOUS MATERIALS: ............................................................42

19.  AIRPORT SECURITY REQUIREMENTS: ........................................43
     19.1 Illegal Immigration Reform and Enforcement Act: ...................43

20.  CITY  POLICIES;  AIRPORT  CONCESSIONS  DISADVANTAGED  BUSINESS
     ENTERPRISE    (ACDBE)    BUSINESS    PARTICIPATION    AND    NON-
     DISCRIMINATION PROVISIONS: ...................................................43
     20.1  City's Required Policies: ........................................................43
     20.2  Non-discrimination Certificates: ...........................................44
     20.3  USDOT Non-discrimination Regulation: ................................44
     20.4  Public Use and Federal Grants: ............................................45

21.  MISCELLANEOUS PROVISIONS: ...................................................45
     21.1  Award and Execution of Concessions Agreement: ..................45
     21.2  Identity of Owner and Manager: ...........................................46
     21.3  Delegation of Authority: ......................................................46
     21.4  No Partnership or Joint Venture: ..........................................46
     21.5  Independent Contractor; No Contractual Relationship: .........46
     21.6  Usufruct: ............................................................................46
     21.7  Recording Prohibited: .........................................................46
     21.8  Attorneys' Fees: ..................................................................46
     21.9  Severability: ........................................................................47
     21.10 Gender: ..............................................................................47
     21.11 Exhibits and Attachments: ...................................................47
     21.12 Time of the Essence: ............................................................47
     21.13 Evidence of Authority: .........................................................47
     21.14 Drug-Free Workplace Policy: ................................................47
     21.15 Applicability of Code Provisions: ..........................................47
     21.16 Successors and Assigns: ......................................................47
     21.17 Notices: ..............................................................................48
     21.18 Interpretation: ....................................................................48
     21.19 Section Headings: ...............................................................48
     21.20 Reference to Clause or Section Entitled "_____": ...................48
     21.21 Integrated Concessions Agreement, Modification: ..................48
     21.22 Force Majeure: ....................................................................49
     21.23 Incorporation by Reference: .................................................49

iv

## Exhibits

| Exhibit A | Description/Map of Premises |
| Exhibit B | City Council Resolution |
| Exhibit C | Concessions Compliance Standards |
| Exhibit D | Georgia Department of Revenue Form RD-1062 |
| Exhibit E | Illegal Immigration Reform and Enforcement Act Forms |
| Exhibit F | Business Plan |
| Exhibit G | Transition Plan |
| Exhibit H | Premises Availability Schedule |
| | |
| Appendix A | Office of Contract Compliance Requirements |
| Appendix B | Insurance and Bonding Requirements |
| Appendix C | Maynard H. Jackson, Jr. International Terminal ("Concourse F"); Concessions Construction Coordination Exhibits SK-1, SK2 & SK-3 to Appendix C |
| Appendix D | Construction Safety and Health Plan |

**AGREEMENT FOR ATRIUM AND CONCOURSES "B" & "F"
FOOD AND BEVERAGE CONCESSIONS AT
HARTSFIELD-JACKSON ATLANTA INTERNATIONAL AIRPORT**

This Concessions Agreement (the "Concessions Agreement") is executed this 13th day of _March_, 2012 between the City of Atlanta ("City") and Global Concessions, Inc. ("Concessionaire") who agree as follows:

1. **PREMISES:**

    1.1 **Description of Premises:**

        1.1.1 Concessionaire shall be entitled to occupy and use, for the purposes set forth herein, the following premises ("Premises" hereinafter refer to the total square feet under this agreement on the Commencement Date) consisting of approximately 4,310 square feet in Concourses B & F of Hartsfield-Jackson Atlanta International Airport (the "Airport"), and as further depicted in Exhibit A, as follows:

| Space | Location | Sq/Ft | Initial Concept |
|-------|----------|-------|-----------------|
| B-F12 | B-11 | 1,697 | Michon's Smokehouse |
| B-F14 | B-3 | 1,184 | Coffee Beanery & Wine Bar |
| F-F1 | F-09 | 1,429 | Jekyll Island Seafood Company |

        1.1.2 No easement for light, air or view is granted, given or implied in this Concessions Agreement. Upon completion of the construction contemplated by the Article entitled "Improvements", Concessionaire shall submit to City a current, more detailed description based on final, as-built drawings, which will be incorporated by reference into this Concessions Agreement as a replacement for Exhibit A, without the need for the parties to formally amend this Concessions Agreement.

    1.2 **Relocation, Expansion and Contraction; Reimbursement of Certain Costs:**

        1.2.1 City's Right to Require: City may require that Concessionaire relocate all or part of the Premises within the Airport, or expand or contract the size of the Premises. Concessionaire shall accomplish any such relocation, expansion or contraction expeditiously upon a timetable approved or directed by the Aviation General Manager.

        1.2.2 Reimbursements:

            1.2.2.1 In the event the City requires Concessionaire to relocate all or part of the Premises or contract the size of the Premises, City agrees to reimburse Concessionaire for the reasonable

unamortized construction costs for Concessionaire's improvements within such portion of the Premises affected (based on the current book value of furniture, fixtures and improvements using the straight-line method of depreciation), and moving costs due to relocation.

1.2.2.2 The amount of reimbursed costs made by City pursuant to this Clause is at the City's sole determination. Proof of unamortized costs shall be provided to and verified by the Aviation General Manager prior to reimbursement.

1.2.2.3 City will amortize the construction and moving costs over the remaining term of the Concessions Agreement. This amortization may result in rental credits to future rental payments. No cash reimbursements or credits for any outstanding indebtedness will be provided by City as reimbursement for allowable construction and/or moving costs.

1.2.2.4 Affect on Rental Payment Obligations in the Event of Expansion, Relocation and Contraction: Any such relocation, expansion or contraction required of Concessionaire under this Section may change Concessionaire's obligation to pay rent pursuant to the terms of the Concessions Agreement as follows:

1.2.2.5 If the relocated Premises are deemed unsatisfactory by Concessionaire, then Concessionaire will have the right to terminate the Concessions Agreement in part, as to the relocated Premises, with no further obligation on the part of either Concessionaire or City. In such a case, the City agrees to reimburse Concessionaire for the reasonable unamortized construction costs for Concessionaire improvements within the relocated portion of the Premises (based on the current book value of furniture, fixtures and improvements using the straight-line method of depreciation). Concessionaire shall exercise its right to terminate by tendering written notice to City no later than thirty (30) days after Concessionaire receives notice from City of the required relocation, date of relocation and the location of the new Premises.

1.2.2.6 If contraction of the Premises is required and the amount of contraction is greater than 10% of the gross square footage of the Premises, then the minimum annual guarantee ("MAG") will be decreased in proportion to the amount of the percentage contraction of the gross square footage of the Premises. Contractions of the Premises are deemed cumulative in the

aggregate and are always to be compared with the area of the Premises as described in the section titled "Description of Premises".

1.2.2.6.1 For example, assuming the Premises of this Concessions Agreement is 1000 square feet. If, in contract year 3, the City requires a contraction of the Premises to 950 square feet, the MAG related to the Premises will not be adjusted because the contraction is less than 10% of the original square footage. If, in contract year 4, the City requires a contraction of an additional 100 square feet, the MAG related to the Premises will be reduced by 15% because the resulting Premises will have contracted by 15%, in the aggregate, as compared to the original square footage.

1.2.2.7 If expansion of the Premises is required and the amount of expansion is greater than 10% of the gross square footage of the Premises, then the MAG will be increased in proportion to the amount of the percentage expansion of the gross square footage of the Premises. Expansions of the Premises are deemed cumulative in the aggregate and are always to be compared with the area of the Premises as described in the section titled "Description of Premises".

1.2.2.7.1 For example, assuming the Premises of this Concessions Agreement is 1000 square feet. If, in contract year 3, the City requires an expansion of the Premises to 1050 square feet, the MAG related to the Premises will not be adjusted because the expansion is less than 10% of the original square footage. If, in contract year 4, the City requires an expansion of an additional 100 square feet, the MAG related to the Premises will be increased by 15% because the resulting Premises will have expanded by 15%, in the aggregate, as compared to the original square footage.

1.3. **Concourse Closure:** If a concourse in which any part of the Premises is located is permanently closed to passenger use, upon such closure this Concessions Agreement will terminate as to the portion of the Premises on that concourse and City will reimburse Concessionaire for the reasonable unamortized construction costs for Concessionaire's improvements within the Premises (based on the current book value of furniture, fixtures and improvements using the straight-line method of depreciation). Upon such reimbursement to Concessionaire, title to all such furniture, fixtures and improvements will be deemed conveyed to City and Concessionaire may be required to execute such further documents and instruments to evidence such conveyance. Proof of unamortized costs shall be provided to and verified by the Aviation General Manager prior to reimbursement.

1.4.    **Support Space and Access:**  Throughout the Airport there are certain spaces that may be available to Concessionaire for lease as support spaces for offices, storage or other similar support uses.  Concessionaire may request the use of a portion of such available additional space for purposes relating to the business conducted at the Premises.  Such request shall state the specific intended use of the space by the Concessionaire.  If, in the Aviation General Manager's judgment, space is available for the purpose requested, such space may be provided to Concessionaire on a thirty (30) day revocable basis, at the then current rate charged by City for comparable space at the Airport.  To memorialize the use of any such additional space, the parties will execute a Permit outlining the terms of use.  Such space may be unfinished and Concessionaire may, as a condition to using such space, have to develop and improve the space at its sole cost and without rental credit according to the terms and conditions contained in the Permit.

1.5.    **Deliveries:**

1.5.1 Standard Delivery Policies:  Regular deliveries to the Premises and other spaces at the Airport used by Concessionaire under a Permit will be allowed during hours designated by the Aviation General Manager only and will be scheduled to minimize circulation conflicts with aircraft activity.  Concessionaire is responsible for arranging for the delivery of all goods required for the operation of the business at the Premises.  The Aviation General Manager shall approve deliveries and delivery schedules.

1.5.2 Exceptional Delivery Circumstances: City acknowledges that certain exceptional circumstances may require variations from the designated hours for regular deliveries.  Such deliveries will require the prior written approval of the Aviation General Manager. Concessionaire is prohibited from using the Automated Guide Way Transit System or any of its moving sidewalks without the prior written approval of the Aviation General Manager.

1.5.3 Approval of Delivery Companies:  Only companies approved by the Aviation General Manager with required training, such as Airport security class and drivers' training, insurance and security clearance will be authorized to make deliveries at the Airport.

1.5.4 City's Right to Use Third-Party Contractor:

1.5.4.1 The City may procure a third-party contractor to provide all receiving, handling and transfer/delivery services for all or any portion of the concessionaires operating at the Airport in accordance with policies the Aviation General Manger believes in his/her discretion to be in the best interests of the City.

**FC-5467; Food and Beverage Concessions (Package No. 7)**                                                    4

1.5.2.2 If the City chooses this option, it may direct that Concessionaire to exclusively utilize the services of such third-party contract for all receiving, handling and transfer/delivery services required by Concessionaire concerning the business it operates in the Premises. Concessionaire shall promptly pay all invoices provided to Concessionaire by such third-party contractor for receiving, handling and transfer/delivery services.

1.5.4.3 Charges paid by Concessionaire for these services will be developed by the selected contractor based upon actual costs and will be subject to annual audit by the Aviation General Manager. It is anticipated that a flat rate will be developed and approved by the Aviation General Manager for these services according to concession category, frequency of deliveries, volume of goods delivered, amount of waste handled, etc. These charges are subject to change. Concessionaire should anticipate a charge of up to $40 per square foot of the Premises and other spaces at the Airport used by Concessionaire under a Permit per year if a third-party contractor is used by the City and Concessionaire is directed to use such services.

**2.    TERM:**

2.1    **Commencement Date; Term: Commencement Date; Term:** The term ("Term") of this Agreement is ten (10) years from the Commencement Date at the end of which the Agreement will immediately and automatically terminate, unless renewed by the City of Atlanta pursuant to the Clause entitled "Renewals". The Commencement Date is the date on which the City first makes any portion of the Premises available to Concessionaire. The City expects that the Premises will be made available to Concessionaire in accordance with Exhibit H, "Premises Availability Schedule", but Concessionaire acknowledges that the schedule contained in Exhibit H is subject to change by the City at any time. All rights and obligations of the parties under this Agreement shall commence on the Commencement Date of the Agreement, except for, to the extent any portion of the Premises is made available to Concessionaire after the Commencement Date: (1) the City's obligation to deliver such portion of the Premises to Concessionaire; (2) Concessionaires obligation to pay MAG for such portion of the Premises (prorated based on square footage); (3) Concessionaire's obligation to improve such portion of the Premises; and (4) Concessionaire's obligation to operate such portion of the Premises. These four (4) specific obligations shall all commence on the date each such portion of the Premises is made available to Concessionaire. Notwithstanding the foregoing, Concessionaire shall

begin paying rent for all Concourse F locations upon the date Concourse F is first open to the public.

2.2    **Renewals:**  This Concessions Agreement is subject to a single three (3)-year renewal at the sole option of the City.  Notice of the City's intention to renew the Concessions Agreement will be provided to Concessionaire within thirty (30) days of the end of the seventh anniversary of the Commencement Date.  Renewal shall require the approval of the City Council and, if granted, will require the execution of an appropriate Renewal document.

2.3    **Holding Over:**  If Concessionaire remains in possession of the Premises after the expiration of the Term without permission from the Aviation General Manager, such holding over will not be deemed to operate as an extension of this Concessions Agreement, nor will it create a tenancy at will.  Such holding over will create a month-to-month tenancy at a monthly rate equal to twice the monthly rate existing during the last month of the Term period.  During such month-to-month tenancy, the terms of this Concessions Agreement will continue to govern the relationship of the Parties

3.    **USE:**

3.1    **Non Exclusive:**  Concessionaire will have the non-exclusive rights to engage in the activities described in the Section titled "Use of Premises".

3.2    **Use of Premises:**  Concessionaire shall use the Premises to provide the goods or services identified in the section of this Agreement titled "Premises" or otherwise as may be approved by the Aviation General Manager from time to time.  The Aviation General Manager shall have the right, at any time, to require or authorize Concessionaire to revise or replace the concept at any location within the Premises and may prohibit the sale of any particular products or services or categories of products or services or any particular use of the Premises.

3.3    [RESERVED]

3.4    **Pricing:**  Concessionaire shall submit all of its proposed prices to the Aviation General Manager for review at least thirty (30) days prior to Concessionaire offering its services to the public.  Concessionaire may not charge any prices that have not been approved in writing by the Aviation General Manager, once Concessionaire's initial proposed prices are approved in writing.  Concessionaire shall submit any proposed price changes to the Aviation General Manager for approval prior to implementation.

**FC-5467; Food and Beverage Concessions (Package No. 7)**                                    6

begin paying rent for all Concourse F locations upon the date Concourse F is first open to the public.

2.2 **Renewals:** This Concessions Agreement is subject to a single three (3)-year renewal at the sole option of the City. Notice of the City's intention to renew the Concessions Agreement will be provided to Concessionaire within thirty (30) days of the end of the seventh anniversary of the Commencement Date. Renewal shall require the approval of the City Council and, if granted, will require the execution of an appropriate Renewal document.

2.3 **Holding Over:** If Concessionaire remains in possession of the Premises after the expiration of the Term without permission from the Aviation General Manager, such holding over will not be deemed to operate as an extension of this Concessions Agreement, nor will it create a tenancy at will. Such holding over will create a month-to-month tenancy at a monthly rate equal to twice the monthly rate existing during the last month of the Term period. During such month-to-month tenancy, the terms of this Concessions Agreement will continue to govern the relationship of the Parties

3. **USE:**

3.1 **Non Exclusive:** Concessionaire will have the non-exclusive rights to engage in the activities described in the Section titled "Use of Premises".

3.2 **Use of Premises:** Concessionaire shall use the Premises to provide the goods or services identified in the section of this Agreement titled "Premises" or otherwise as may be approved by the Aviation General Manager from time to time. The Aviation General Manager shall have the right, at any time, to require or authorize Concessionaire to revise or replace the concept at any location within the Premises and may prohibit the sale of any particular products or services or categories of products or services or any particular use of the Premises.

3.3 [RESERVED]

3.4 **Pricing:** Concessionaire shall submit all of its proposed prices to the Aviation General Manager for review at least thirty (30) days prior to Concessionaire offering its services to the public. Concessionaire may not charge any prices that have not been approved in writing by the Aviation General Manager, once Concessionaire's initial proposed prices are approved in writing. Concessionaire shall submit any proposed price changes to the Aviation General Manager for approval prior to implementation.

**FC-5467; Food and Beverage Concessions (Package No. 7)**                    6

3.4.1  Street Plus 10% Pricing: To determine Street Plus 10% Prices, the Aviation General Manager may, at any time, conduct a Market Basket Pricing Survey. This survey shall consist of at least three (3) and up to six (6) Greater Atlanta area same store or similar store locations where residents, travelers or visitors normally shop. Concessionaire's price on any specific item may not exceed the average price of those locations plus an additional 10%. The Aviation General Manager has the sole discretion to determine whether a price is reasonable.

3.5   **Continuous Operation of Premises:** Concessionaire shall operate the Premises uninterrupted, throughout the Term, including renewals, and provide all required services, to the extent permitted by law and provided that Concessionaire is lawfully entitled to possession of the Premises.

3.6   **Hours of Operation:**

3.6.1  Premises shall be open for business 365 days a year and by 11:00 a.m., unless designated to serve three-meal daily. The three-meal designated spaces in the Concourse B shall open one half (1/2) hour prior to the first scheduled departure from Concourse B.

3.6.2  Concourse F Premises shall be open 365 days a year and open for business at least two (2) hours before the first scheduled departing flight from Concourse F and remain open until the last scheduled departure from Concourse F, unless otherwise specified by the Aviation General Manger

3.6.3  The Hours of Operation will be posted on each store location in a format approved by Aviation General Manger. Concessionaire may be required to keep its stores open for additional hours, including around the clock, with very limited notice under circumstances warranting such additional hours, as determined by the Aviation General Manager in his/her discretion.

3.6.4 The Aviation General Manager, at his/her sole discretion, may allow a concessionaire to operate at an abbreviated daily or weekly schedule, subject to the following conditions:

3.6.4.1      the restaurant shall be co-located in a food court or other similarly multi-store area allowing for adequate coverage of any exposed day part; and

**FC-5467; Food and Beverage Concessions (Package No. 7)**                                    7

3.6.4.2                    the subject concessionaire shall be able to demonstrate through previous example that the Airport will not suffer significantly less revenues as a result of its abbreviated operation.

3.7    **Customer Service:**

3.7.1   The Aviation General Manager shall have the right to make reasonable objections to the quality of articles sold, the character of the service rendered to the public, the prices charged and the appearance and condition of the Premises. Concessionaire agrees to promptly discontinue or remedy any objectionable practice. Concessionaire shall also comply with the Concessions Compliance Standards established by the Aviation General Manager. The Concessions Compliance Standards are attached as Exhibit C, which is incorporated into this Concessions Agreement as if fully published herein, and can be located on the Airport's website (www.atlanta-airport.com).

3.7.2   <u>Customer Service Quality Assurance and Mystery Shopper Standards:</u> The City's mission is to operate the World's Best Airport by Exceeding Customer Expectations.  Well-defined and highly effective customer service programs are expected from all concessionaires. All Concessionaires will undergo scheduled and unscheduled monthly quality assurance audits in order to ensure optimal customer service performance. Basic standards of customer service include and are not limited to the following: promptly greeting the customer with a smile; making eye contact; being friendly and knowledgeable about the Airport; listening and responding politely; presenting a receipt and the correct change to the customer; and thanking the customer with a smile. In addition, the Concessionaire shall understand and agree that its operation at the Airport necessitates the rendering of the following passenger services: making reasonable change; offering passenger directions and assistance; and accepting 4 major credit cards (Visa, MasterCard, Discover, and American Express) as payment for any debit or credit transaction. Further, the DOA highly encourages and may ultimately require the implementation of expedited payment options, which may include but is not limited to MasterCard PayPass® technology as well as "Mystery Shopper Services" to ensure consistent performance.

The DOA requires Concessionaire and its staff to attend customer service training and all other such classes at the Concessionaire's expense, and/or as directed by the Aviation General Manager or his or her designee. All training as provided by the Concessionaire to its

associates shall comply with the Airport's compliance standards of customer service. The cost associated with such additional training is the sole responsibility of Concessionaire. More information is contained in Exhibit C, Concessions Compliance Standards, which is incorporated into this Concessions Agreement as if fully published herein.

The Airport believes that a high quality and stable work force is key to providing outstanding customer service. The City is seeking organizations that are "employers of choice". Concessionaire is expected to maintain a positive work environment that encourages the development and growth of all employees. Concessionaire is expected to maintain favorable turnover rates compared to like businesses in the industry. Failure to do so may result in non-renewal or termination of this Concessions Agreement.

Concessionaire's staff shall be aware of the time sensitive nature of Airport patrons. All of Concessionaire's employees shall be courteous and helpful to the public.

Concessionaire shall conduct its operation in a businesslike manner. A sufficient quantity of inventory shall be carried to ensure that the premises will be fully stocked and available to passengers at all times. All inventories shall be top quality and displayed in an "opening day fresh" manner. In addition a dress code should be strictly adhered to for all operating staff.

Concessionaire agrees to offer "take out" packaging to enable customers to more easily transport items through the Airport. Concessionaire shall use compostable serviceware along with consumer facing packaging and source separate all food service wastes for direct transport to off-airport composting facilities. Costs attributable to Concessionaire for complying with the waste separation initiative will not exceed $10 per square foot over and above trash removal and recycling costs, including labor and dumpster fees, assessed to concessionaires in 2011.

3.8 **Marketing**: In order to support and fuel the Airport's concessions program, Concessionaire shall pay to the City a marketing fee equivalent to .5% of Concessionaire's Gross Revenues. The marketing fee will cover development of signage and other promotional materials and programs including, but not limited to, advertising, employee incentives and brochures/informational materials and technology to communicate the program offerings. The use and application of the marketing fees will be at the sole discretion of the Aviation General Manager. Concessionaire

shall support marketing programs by providing concept information, logos or initiating promotional materials as requested. Costs for any new materials will be supported by the collected marketing fees. Concessionaire will not be required to offer discounts outside of the established pricing policy.

3.9 **Prohibition of Solicitation:** Concessionaire is strictly prohibited from engaging in any activities outside the Premises within the Airport for the recruitment or solicitation of business. Concessionaire may not place or install any carts, kiosks, inline store, racks, stands, and display merchandise or trade fixtures outside the boundaries of the Premises without the express written consent of the Aviation General Manager.

3.10 **Representative of Concessionaire:** Concessionaire shall, at all reasonable times, retain in the Airport at least one (1) qualified representative, authorized to represent and act for it in matters pertaining to this Concessions Agreement and its operations at the Airport and shall keep the Aviation General Manager informed in writing of the identity of each such person.

3.11 **Investigation Reports:** Concessionaire shall, if required in writing by the Aviation General Manager, employ, at its own cost and expense, an investigative organization approved by the Aviation General Manager for the purpose of making investigations and observations and preparing a written report on the carrying out of any pricing policies, revenue control and operational techniques being used at the Premises. Concessionaire shall cause such investigation and observation to be made at reasonable times and in the manner set forth in the Aviation General Manager's written directive to Concessionaire, and the investigator shall deliver to the Aviation General Manager a true and complete written copy of any such report made to Concessionaire within the timeframe designated by the Aviation General Manager.

3.12 **Ingress and Egress; Security Regulations:** Concessionaire possesses the right of ingress to and egress from the Airport as may be necessary to fulfill its obligations under this Concessions Agreement, subject to Airport rules and regulations, and agrees that the exercise of such right shall not impede or interfere unduly with the operation of the Airport by City, its Concessionaires, contractors, airline passengers, the public or other authorized occupants. Concessionaire agrees that its rights under this Concessions Agreement are subject to all security regulations or restrictions that may exist or come into existence and be imposed by any governmental entity having jurisdiction over the Airport and security matters pertaining to it. Concessionaire will have no claim for relief of rent or other remedies as a result of the imposition of such security

regulations, other than as specifically identified in the Section entitled "Reduction in Rent Due to Change in Enplanements".

**3.13    Reservations by City:**

3.13.1    City has the right, without any obligation to do so, at any reasonable time and as often as it considers necessary:

3.13.1.1 to inspect any portion of the Premises;

3.13.1.2   to enter the Premises and make ordinary repairs;

3.13.1.3 to take such action in the event of an emergency concerning the Premises  as may be required for the protection of persons or property.  In the event the need to take such emergency action is caused by acts or      omissions      of Concessionaire, Concessionaire will reimburse City for the   City's costs  associated  with  such  emergency  actions.      Further, Concessionaire  shall  assure  City  of  emergency  access  to  the Premises  by  providing  emergency  telephone  numbers  at  which Concessionaire's  representative(s)  may  be  reached  on  24-hour basis.

3.14   Compliance with Laws and Regulations; Licenses and Permits:

3.14.1   Concessionaire shall at all times during the Term and any renewal term comply with all the applicable federal and state laws, local ordinances,   codes,   rules   and   regulations   respecting Concessionaire's use and occupation of the Premises issued by any governmental  entity  having  jurisdiction  over  the  Airport, including,  but  not  limited  the  City  and  the  Aviation  General Manager.

3.14.2   Concessionaire shall be solely responsible for the cost of obtaining and maintaining all licenses and permits necessary to operate at the Airport and perform all required services.

**3.15    Prohibited Uses:**  The Premises may not be used except for the purposes specified  in  the  Clause  entitled  "Use".    Concessionaire  may  not  do,  or cause or permit anything to be done in or about the Premises, or bring or keep anything on the Premises:

3.15.1 increasing in any way the rate of fire insurance or other insurance applicable to the Airport or its concourses, or any of its contents; or

3.15.2 creating a nuisance; or

3.15.3 in any way obstructing or interfering with the rights of others in the Airport, or injuring or annoying them; or

3.15.4 allowing any sale by auction on the Premises; or

3.15.5 committing any waste upon the Premises; or

3.15.6 using or allowing the Premises to be used for any improper, immoral, unlawful or objectionable purpose; or

3.15.7 placing any loads upon the floor, walls or ceiling which endanger the structure; or

3.15.8 obstructing the sidewalk, passageways, stairways or escalators in front of, within or adjacent to the Airport, its concourses or other facilities; or

3.15.9 doing or permitting to be done anything in any way tending to injure the reputation of City or the appearance of the Airport, its concourses or other facilities.

3.16 **Trash Removal:** All waste matter shall be stored and disposed of in a manner satisfactory to the Aviation General Manager, and Concessionaire agrees to arrange for the timely disposal of all waste material at its own expense. Concessionaire will be responsible for the removal of Concessionaire's trash from the Premises and transfer to designated waste receptacles. Concessionaire will be billed for all costs associated with trash removal from designated waste receptacles.

## 4. ASSIGNMENT OR SUBLETTING:

4.1 Concessionaire may not assign, transfer or encumber its interest in this Concessions Agreement or any other right, privilege or license conferred by this Concessions Agreement, either in whole or in part, without the prior written consent of Aviation General Manager. Furthermore, Concessionaire may not sublet or encumber the Premises, or any part of it, without the prior written consent of Aviation General Manager. Any attempted assignment, transfer, encumbrance or sublease without the prior written consent of Aviation General Manager is voidable at City's election.

4.2    If Concessionaire is a partnership or joint venture, a withdrawal or change (whether voluntary, involuntary or by operation of law) of the partner/joint venture or partners/joint ventures owning more than 50% (as measured by interests in capital, profits or such other measurement as City may reasonably designate) of the partnership/joint venture, or the dissolution of the partnership/joint venture, will be deemed an assignment subject to this Clause.

4.3    If Concessionaire is a corporation, any dissolution, merger, consolidation or other reorganization of Concessionaire, or the sale or other transfer of a controlling percentage of the capital stock of Concessionaire, or the sale of more than 50% of the value of the assets of Concessionaire, will be deemed an assignment subject to this Clause. The phrase "controlling percentage" means the ownership of, and the right to vote, stock possessing more than 50% of the total combined voting power of all classes of Concessionaire's capital stock issued, outstanding and entitled to vote for the election of directors. This paragraph will not apply to corporations the stock of which is traded through an exchange or over the counter.

## 5.    RENTAL PAYMENTS:

### 5.1    Rental Payments:

5.1.1    The total rental payment for the first year of this Concessions Agreement is the greater of:(1) Concessionaire's MAG ("MAG") of One Million One Hundred Seventy-Three Thousand Four Hundred and Thirty-Seven Dollars ($1,173,437); or (2) the percent of the Concessionaire's Gross Receipts (Percentage Rent") specified below, over the first year, combined with any Premium Rent, as described in section 5.1.5 over the first year as follows:

| Rent Percentages | | | |
|---|---|---|---|
| Branded Food/ Non-Alcohol | Non-Branded Food/Non Alcohol | Alcohol | Retail (As a merchandise Type) |
| 14.50% | 16.50% | 18.00% | 15% |

5.1.1.1. In each subsequent year during the Term of this Concessions Agreement (including any years during a renewal Term) the MAG for the applicable year will equal the higher of (1) the previous year's MAG; or (2) 85% of the total rent owed by Concessionaire during the previous year.

5.1.2    Rent to be paid each month under this Concessions Agreement will be the higher of one twelfth (1/12th) of the MAG or Percentage Rent (Percentage of Gross Receipts per Category as outlined in the Section of Part 2 of the RFP titled "Financial Offer").

    5.1.2.1  Rent to be paid for Food Merchandising Units (FMUs) shall be Percentage Rent and, in the event Concessionaire's Rent for any month is 1/12 of the MAG, shall be in addition to such Rent.

5.1.3    The term "Gross Receipts" shall include all monies paid or payable to Concessionaire or concessionaire's subconcessionaire for sales made or services rendered at or from the Airport, regardless of when, where, or whether the business transaction occurs on or off of the Airport property as well as any other revenues of any type arising out of or in connection with Concessionaire's operations at the Airport, provided, however, that any taxes imposed by law which are separately stated to and paid by the customer and directly payable to the taxing authority by Concessionaire shall be excluded.

5.1.4    Rent will be paid monthly in advance, beginning on the Commencement Date, except as provided in the section titled "Commencement Date; Term" and as provided in section 7.3.2. Concessionaire will pay one-twelfth (1/12th) of the MAG on the first day of each month.  By the 10th day of each month, Concessionaire will submit a report, in a form provided by the Department of Aviation, of actual Gross Receipts received during the previous month along with  the calculation of Percentage Rent for such previous month and if greater than the previously paid MAG, a check representing the additional rent owed as a result of such Percentage Rent calculation.

    5.1.4.1 Annual Rent for each contract year will be trued up in the first quarter of the following contract year.  Any overpayments will be reimbursed in the following year through rent credits.

5.1.5    **Premium Rent:**  In addition to the category rent percentages specified in the RFP, beginning on the first anniversary of the Commencement Date, Premium Rent of 25% will be due on sales that exceed the Concessionaires revenue projections for the Premises, as submitted on the Business Plan Forms attached as Exhibit F, by 25% for each lease year.  For example:  At the end of the lease year, revenues generated from operations were $1,500,000 and the revenue projected for that year was $1,000,000. The threshold revenue for that year would be

$1,250,000 (25% over projection) and additional rent would be due on the sales of $250,000 ($1,500,000 actual sales -$1,250,000 threshold sales). If total rent paid on base sales was $247,500, or 16.5%, additional rent would be due of 8.5% (25% - 16.5%) on the $250,000 or $21,250. Premium Rent is payable within 30 days of the final true up in each year.

5.1.5.1 Concessionaire Revenue Projections True Up:  For the purposes of calculating Premium Rent, beginning after the end of the second year of operations, if Concessionaire revenue projection, submitted on the business plan form, exceeds Concessionaire Actual Revenues by 10% or more for two consecutive years, then each year of the Concessionaire revenue projections for the remainder of the Concessions Agreement will be adjusted downward based on the formula shown below:

$$\frac{(\text{Actual revenues}_A + \text{Actual revenues}_B)}{(\text{Projected revenues}_A + \text{Projected revenues}_B)} \times \textbf{Concessionaire Projected Revenues}_x,$$

where subscripts A and B denote the first and second consecutive years of excess Concessionaire revenue projections, and subscript X represents Concessionaire Projected Revenues for each year of the Concessions Agreement.  Such adjustment will be retroactive to years A & B and Concessionaire shall be required to pay Premium Rent to the City for years A & B, if required based on the adjusted projections, no later than March 31 of the year following year B.

**Example:** Concessionaire actual revenues in years three and four of the lease agreement are $1,060,000 and $1,092,727, respectively, while Concessionaire revenue projections for the same years are $1,220,035 and $1,256,636, respectively.  Both Concessionaire revenue projections exceed actual revenues by more than 10% (in this example, 15%) so the formula is applied, and the resulting Concessionaire Adjusted Projected Revenues (shown in the table below) are used to calculate Premium Rent the remaining years of the Concessions Agreement:

$$\frac{(\$2,152,727)}{(\$2,476,671)} \times \textbf{Concessionaire Projected Revenues}_x$$

| Contract Year | Concessionaire Projected Revenues | Concessionaire Adjusted Projected Revenues |
|---|---|---|
| 3 | $1,256,636 | $1,092,270 |
| 4 | $1,294,335 | $1,125,038 |
| 5 | $1,333,165 | $1,158,789 |
| 6 | $1,373,160 | $1,193,553 |
| 7 | $1,414,355 | $1,229,360 |
| 8 | $1,456,786 | $1,266,241 |
| 9 | $1,500,489 | $1,304,228 |
| 10 | $1,545,504 | $1,343,355 |

5.1.5.2 Premium Rent Obligations of Subconcessionaires:  Under no circumstances shall Concessionaire require payment of Premium Rent from its subconcessionaire(s) in excess of the amount of Premium Rent attributable to such subconcessionaire. subconcessionaires shall pay no more than their respective share of Premium Rent prorated based on how much each subconcessionaire contributed to the excess revenues.

5.1.6 MAG rental paid after the 10th of the month, Percentage Rent paid after the 25th day of the following month will be deemed a late payment and shall incur interest as additional rent at the rate of 1/10th of one percent (0.1%) compounded daily from the date due until the date received by the City.

5.1.7 The Marketing Fee is due by the 20th day of the each month and shall be paid to the City separately from any payment of rent.  Marketing Fee payments made more than ten days after they become due will incur interest at the rate set forth in Section 5.1.6.

**5.1.8 Method of Payment:**

5.1.8.1 Rental for a portion of a month shall be prorated, if applicable. Rental payments shall be made in lawful money of the United States, free from all claims, demands, set-offs or counterclaims of any kind against City.  All rental payments shall be payable at:

City of Atlanta Department of Aviation
P.O. Box 920500
Atlanta, Georgia 30392

**FC-5467; Food and Beverage Concessions (Package No. 7)**

16

5.1.8.2 City may require payment at such other place as the Aviation General Manager may from time to time designate to Concessionaire in writing.

5.1.8.3 No payment by Concessionaire or receipt by City of a lesser amount than the correct rent shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction.  City may accept such check or payment without prejudice to City's right to recover the balance or to pursue any other remedy in this Concessions Agreement or otherwise provided by applicable law or equity.

**5.2     Books and Records:**

5.2.1  Concessionaire shall maintain throughout the Term of this Concessions Agreement and for a three (3) year period after the Term, including renewals, or, in the event of a claim by City, until such claim of City for payments hereunder shall have been fully ascertained, fixed and paid, separate and accurate, daily records of Gross Revenues from all activity conducted under this Concessions Agreement in accordance with generally accepted accounting principles, showing in detail all business on or transacted in, about, from or pertaining to the Premises, and Concessionaire shall enter all receipts arising from such business in regular books of account, and all entries in any such records shall be made at or about the time the transactions occur.

5.2.2  In addition, Concessionaire shall maintain weekly, monthly and annual reports of Gross Revenues and transactions derived from its operations under this Concessions Agreement, using a form and method as directed by the Aviation General Manager.  Concessionaire, throughout the Term, shall employ such forms and methods.  Upon the Aviation General Manager's written request, Concessionaire shall make available immediately at the Airport, for inspection and copying by the Aviation General Manager or his or her designated representative, any and all books, records and accounts pertaining to its operations or performance of its obligations under this Concessions Agreement.  The intent and purpose of the provisions of this Section are that Concessionaire shall keep and maintain records which will enable City to ascertain, determine and audit, if so desired by City, clearly and accurately, with its obligation under this Concessions Agreement and the share of Gross Revenues received by City, and that the form and method of Concessionaire's reporting of Gross

Revenue will be adequate to provide a control and test check of all Gross Revenue derived by Concessionaire under this Concessions Agreement.

5.2.2.1 The City reserves the right to perform credit reviews of the Concessionaire, its principals and subcontractors at any time.

5.2.3  Should any examination, inspection or audit of Concessionaire's books and records by City disclose an underpayment by Concessionaire in excess of 2% of the total annual consideration due, Concessionaire shall promptly pay City the amount of such underpayment, plus interest thereon at the rate of 1.5% per month, from the date due until the date collected, and shall reimburse City for all costs incurred in the conduct of such examination, inspection, or audit.  If City deems it necessary to utilize the services of legal counsel in connection with collecting the reimbursement for such examination, inspection or audit, then Concessionaire shall reimburse City for reasonable attorneys' fees and litigation expenses as part of the costs incurred.

5.2.4  Not later than ninety (90) days after each annual anniversary of the Commencement Date, Concessionaire shall furnish to the Aviation General Manager an unqualified report, certified by a Certified Public Accountant of the Gross Revenues.  Concessionaire shall also furnish the Aviation General Manager with such other financial or statistical reports as the Aviation General Manager from time to time may request.

5.2.5  Upon request by the Aviation General Manager, Concessionaire shall furnish to City copies of its quarterly State of Georgia sales and use tax returns covering the Premises as well as Concessionaire's Georgia and federal income tax returns at the time of filing, and any amendments.  All copies of such returns shall be certified as exact copies of the original documents by a Certified Public Accountant.  Concessionaires shall also promptly notify the Aviation General Manager of and furnish to City copies of any audit reports covering the Premises conducted by the Department of Revenue of the State of Georgia or the Internal Revenue Service.  All of the books, records and accounts required by this Section to be maintained by Concessionaire, or true and complete copies of them, shall be maintained by Concessionaire in the greater Atlanta area.

**5.3    Revenue Control:**

5.3.1    All business transactions, which occur in the Premises, shall be completed by an approved Point of Sale System ("POS") register transaction and a receipt shall be offered to each customer.  However, during the Term of the Concessions Agreement, the City reserves the right,

at its expense, to purchase and/or implement a computerized ("POS") and to further modify the system from time to time. Concessionaire shall cooperate fully in the development and implementation of such a system. Upon implementation, the Aviation General Manager may dictate a new method of collection and payment by providing written notice to Concessionaire. Concessionaire shall cooperate with the City in implementing such modified collection procedures. If the new POS system requires replacement of existing cash registers within the Premises, the City will reimburse Concessionaire for the unamortized cost thereof (based on the then current book value, using the straight-line method of depreciation) less the salvage value of such cash registers. The City will determine the type of registers to be used in the newly implemented POS system.

5.3.2   In order to facilitate implementation of the point of sale system, all POS terminals used in the operation of businesses within the Premises shall have, at a minimum, the features outlined below:

   5.3.2.1 A minimum of sixty (60) segregated sales categories;

   5.3.2.2 The input device may either be a keyboard, scanner, touch screen, other approved input technology or any combination thereof;

   5.3.2.3 The patron fee display shall be of sufficient size and legibility to be readily observed by the patron during the processing of the transaction;

   5.3.2.4 The POS register, terminal or POS control server(s) shall be capable of secure, encrypted data transmission using TCP/IP or RS-232 communications protocol; and

   5.3.2.5 The register or data collection device shall have a secure transaction audit tape or a detailed digital ASCII transaction journal log file stored on a USB (flash) drive or other suitable media.

   5.3.2.6 Concessionaire shall also comply and remain current with all Payment Card Industry Data Security Standard (PCI-DSS) requirements as detailed at

   https://www.pcisecuritystandards.org/security_standards/pci_dss.shtml

**6.**   **TAXES AND LIENS:**  Concessionaire is liable for all taxes levied or assessed against any interest of Concessionaire in the Premises and any improvements, personal property, furniture or fixtures placed by Concessionaire in the Premises. Concessionaire agrees not to permit or suffer any liens to be imposed upon the

**FC-5467; Food and Beverage Concessions (Package No. 7)**

Premises, the Airport or any other part of them as a result of its activities without promptly discharging them, provided, however, that Concessionaire may, if Concessionaire so desires, contest the legality of any such liens. In the event of a contest, Concessionaire shall provide a bond in an amount and form acceptable to City in order to clear the record of any such liens.

6.1    Notwithstanding the foregoing, the Aviation General Manager may authorize Concessionaire to pass through to the customer certain possessory interest taxes payable by Concessionaire directly to various taxing authorities, provided that such pass-through is reflected as a separate line itemization on each invoice or receipt issued to the customer. Concessionaire must follow the following guidelines in implementing the collection of such taxes at point of sale.

6.1.1    In year one, to determine the possessory interest tax (% of sales receipts) to collect at each transaction in the upcoming 12-month period, divide the tax assessment received by tax authority by the projected annual sales receipts for the same time period

*Tax Assessment / projected annual sales receipts = possessory tax.*

6.1.1.1    The calculation along with tax assessment invoices must be submitted to, and approved by, the Department of Aviation prior to implementation of collection of taxes at point of sale related to these taxes.

6.1.2    Apply the calculated possessory tax to all sale receipts. The collection of this tax may only be used to pay possessory interest tax obligations only

6.1.3    Tax collection in subsequent years:

6.1.3.1    In the situation where one year's collections exceed the amount of possessory interest taxes due ("collection surplus"), the remaining balance must be used as a credit against the following year's taxes. Therefore concessionaire must deduct the previous year's collection surplus from the following tax assessment received before dividing it by the applicable projected annual sales.

*Tax Assessment – collection surplus / projected annual sales receipts = applicable possessory tax for the upcoming  year.*

6.1.3.2    In the situation where one year's collections fail to raise the amount of possessory interest taxes due ("collection

shortfall"), the collection shortfall must be used as a debit against the following year's taxes. Therefore concessionaire must add the previous year's collection shortfall to the current year's tax assessment received before dividing it by the applicable projected annual sales.

*Tax Assessment + collection shortfall / projected annual sales receipts = applicable possessory tax for the upcoming year*

6.1.3.3   Reconciliation of prior year taxes collected along with calculation of new tax rate and supporting tax assessment notices must be submitted to, and approved by, the Department of Aviation prior to any adjustment being made to the tax rate at the point of sale.

## 7.   IMPROVEMENTS:

### 7.1    Approval of Conceptual Design:

7.1.1   The initial layout and design of all Concessionaire improvements to be made or installed within the Premises and any subsequent refurbishments shall conform to the Department of Aviation Airport Design Criteria (the "Airport Design Criteria") which shall be made available to Concessionaire upon the Airport's website (www.atlanta-airport.com) and shall be subject to change from time to time by the Aviation General Manager.

7.1.2   Prior to the commencement of initial construction, or subsequent refurbishment of, or other work with respect to Concessionaire Improvements, Concessionaire shall submit detailed plans and specifications to the Aviation General Manager for approval. Concessionaire shall include with its plans and specifications schematic renderings of the Premises, materials, a color board or boards and a detailed layout of the overall merchandising plan. Approval by City will extend to and include architectural and aesthetic matters and City reserves the right to reject any designs submitted and to require Concessionaire to resubmit designs and layout proposals until they meet City's approval.    The Commencement Date or other date upon which rent for any portion of the Premises is first due shall not be extended if City elects to reject any designs or layout proposals submitted.    If City and Concessionaire fail to agree on plans and specifications for Concessionaire Improvements within thirty (30) days after the Commencement Date or, regarding any portion of the Premises not

made available to Concessionaire on the Commencement Date, such other date on which a portion of the Premises is made available to Concessionaire, City may terminate this Concessions Agreement.

7.1.3   In the event of disapproval by City of any portion of the plans and specifications, Concessionaire will promptly submit necessary modifications and revisions. Concessionaire will make no changes or alterations in the plans or specifications after approval, and no structural alterations or improvements will be made to or upon the Premises without the prior written approval of the Aviation General Manager.   City agrees to act promptly upon such plans and specifications and upon requests for approval of changes or alterations in the plans or specifications.  One copy of plans and specifications for all Concessionaire Improvements or subsequent changes or alterations will, within fifteen (15) days after approval by the Aviation General Manager, be signed by Concessionaire and delivered to the City.

## 7.2    Minimum Investment; Base Building Improvements; Reinvestment:

### 7.2.1   Minimum Investment:

7.2.1.1 Within the Premises, Concessionaire shall perform all demolition required and shall at its own expense construct all improvements and install all trade fixtures according to the procedures and standards specified in the Airport Design Criteria.

7.2.1.2 Within thirty (30) days of receiving a Certificate of Occupancy, Concessionaire is required to submit to the Aviation General Manager as-built drawings.

7.2.1.3 Within one hundred and fifty (150) days of the Commencement Date or, in the case of any portion of the Premises not delivered to Concessionaire on the Commencement Date, within one hundred and fifty (150) days of the date on which such portion is made available to Concessionaire, or otherwise pursuant to a Transition Plan approved by the Aviation General Manager, attached hereto as Exhibit G and incorporated herein by reference, as may be updated and reincorporated from time to time as the City approves new transition plans, Concessionaire shall construct, decorate and finish to professional  Food and Beverage concessions standards the interior and exterior of the Premises.  The design and theme shall be submitted to the Aviation General Manager, and

FC-5467; Food and Beverage Concessions (Package No. 7)                                    22

he/she shall approve them prior to implementation. The public visible area of the Premises shall be improved at a "Minimum Investment" of $350.00 per square foot. In addition, Concessionaire is responsible for demolition necessary to accommodate all improvements. The $350.00 Minimum Investment calculation shall include all construction costs, mechanical, electrical and plumbing (whether in areas visible to the public or not), finishes, furnishings, furniture, equipment, casework, or other fixtures, signs, store fronts, as well as all architectural and engineering fees.

7.2.1.4 Within thirty (30) days of receiving a certificate of occupancy, Concessionaire shall provide the City a statement certified by its architect, setting forth the total construction costs, with appropriate detail showing the costs and useful lives of elements of decoration, furnishings or fixtures. Concessionaire shall make available to Aviation General Manager paid invoices for labor and materials covering all construction and trade fixtures, including furniture, fixtures and architectural and engineering fees. The $350.00 Minimum Investment may not include financial costs, interest, inventory, pre-opening expenses or intra-company charges related to construction. If the actual investment cost incurred by the Concessionaire is less than the Minimum Investment required, in addition to any other remedy available to the City, Concessionaire will pay the difference to City within sixty (60) days after receipt of Certificate of Occupancy. If the City disputes the amount of investment claimed by Concessionaire, the City may, at its expense, hire an independent appraiser to determine the cost of the investment. If the independent appraiser determines that the investment is less than the minimum required, the difference, as well as City's costs of hiring such independent appraiser, will be paid to the City by Concessionaire within sixty (60) days of the appraiser's determination.

7.2.1.5 Notwithstanding the work to be performed pursuant to this Section, Concessionaire shall begin paying rent on the Commencement Date, except as provided in the section titled "Commencement Date; Term", and Concessionaire shall document any and all costs of improvements made to the Premises subsequent to the Commencement Date. The documentation shall be in a form and detail satisfactory to the Aviation General Manager, and shall be submitted for review and approval within thirty (30) calendar days following completion of the work, for the purpose of establishing the unamortized costs of improvements to

**FC-5467; Food and Beverage Concessions (Package No. 7)**                    **23**

be reimbursed to Concessionaire in the event of termination for convenience by the City.

7.2.2 **Base Building Improvements:** Concessionaire shall pay all costs for required modifications and/or construction of certain base building conditions necessary to bring the concession spaces to a condition ready to receive Concessionaire improvements. Improvements shall include but not be limited to the following: demolition of existing storefronts and finishes and removal of debris, construction or relocation of demising partitions, construction of servicing/delivery corridors or other support spaces, and extension or modification of building systems or other work. In locations in which construction of service corridors will be necessary to improve operations at the Airport, the required corridors shall be constructed by the Concessionaire.

7.2.3 **Minimum Reinvestment:** As provided in the Section entitled "Renewals", this Concessions Agreement shall be subject to a single 3 year renewal at the option of the City. If the renewal option is exercised, the City will notify the Concessionaire of its intention to renew within thirty (30) days of the seventh anniversary of the Commencement Date. In such case, Concessionaire shall refurbish the public areas of the Premises at a minimum cost of $200 per square foot within one hundred and twenty (120) days of the execution of the Renewal or within such longer time period as may be approved by the Aviation General Manager. In the event this Concessions Agreement is not renewed, Concessionaire shall refurbish the public areas of their Premises at a minimum investment of $100 per square foot by the earlier occurring of: (1) 150 days after the seventh anniversary of the Commencement Date; or (2) 120 days from the date the City notifies Concessionaire in writing that the Concessions Agreement will not be renewed. If the City disputes the amount of reinvestment claimed by Concessionaire, the City may, at its expense, hire an independent appraiser to determine the cost of the reinvestment. If the independent appraiser determines that the reinvestment is less than the minimum required, the difference, as well as City's costs of hiring such independent appraiser, will be paid to the City by Concessionaire within sixty (60) days of the appraiser's determination.

7.2.4 **Liquidated Damages:** Failure by Concessionaire to complete the construction in the timeframe provided in the transition plan attached as Exhibit G, as may be updated and reincorporated from time to time as the City approves new transition plans, or, with respect to locations on Concourse F, by May 15, 2012 shall result in the payment of liquidated damages of $5,000 per location per day, which shall be in addition to the payment of the required Rent and which the parties acknowledge is a reasonable estimated of the estimate of the damage incurred by the City

for such delay.  Failure by the Concessionaire to complete the construction in the timeframe as outlined in section 7.2.3 as required during the renewal shall result in the payment of liquidated damages of $3,000 per location per day, which shall be in addition to the payment of the required Rent and which the parties acknowledge is a reasonable estimate of the damage incurred by the City for such delay.

7.3    **Construction of Concessionaire Improvements:**

7.3.1  Concessionaire shall, at its sole cost and expense, design, erect, construct and install all of the following ("Concessionaire Improvements"): fixtures, furnishings, carpeting, decorations, finishings, equipment, counters, and all other improvements for the operation of business within the Premises pursuant to this Concessions Agreement.

7.3.2  Notwithstanding anything else in this Concessions Agreement, all aspects of Concourse F construction shall be completed by May 15th of 2012.  If Concessionaire completes construction and is ready for business at ALL Concourse F locations within the Premises on or before May 1, 2012, Concessionaire shall be entitled to operate its Concourse F locations within the Premises rent-free for the first three (3) months. Concessionaire shall pay O&M charges, marketing fees, and other non-rental charges during this period.

7.3.3  Concessionaire shall perform all demolition required and construct and install all Concessionaire Improvements at its own expense and shall hire contractors that are acceptable to City.  Prior to the commencement of any construction work, Concessionaire shall provide to City a fixed price contract or contracts for all work to be performed within the Premises, which contract(s) shall be insured by, and Concessionaire shall provide to City, a payment and performance bond in an amount equal to one hundred percent (100%) of the total contract value of such contract. Concessionaire shall also comply with all other requirements of Appendix B.

7.3.4  City's sole responsibility with regard to improvements within the Premises shall be to deliver the Premises to Concessionaire in the condition set forth in the Airport Design Criteria.  Concessionaire may not undertake any work within or about the Premises unless City, pursuant to the Airport Design Criteria, requires such work.   Prior to the commencement of any work, Concessionaire shall confirm to the Aviation General Manager in writing that: (1) Concessionaire accepts the Premises for the intended uses; and (2) the Premises are in the condition set forth in the Airport Design Criteria.

7.3.5  All aspects of Concourse F concessions build-out shall:

7.3.5.1  comply with the Silver Leadership in Energy and Environmental Design (LEED) Certification; and

7.3.5.2  comply with Appendices C and D attached.

**7.4    Utilities:**

7.4.1  Utility Connections: The City will provide the source for certain utility connections for the concession spaces as specified in the Airport Design Criteria.  Generally, electrical service will be provided to each concession's rear or side demising wall and stubbed off.    Connection and distribution throughout the concession space shall be at the Concessionaire's expense.  All utilities to the concession space will be separately metered.

7.4.2  Concessionaire shall pay the whole cost for all utility services as invoiced to Concessionaire by the Airport or its designee and for such other special services which it may require in the Premises, and Concessionaire expressly waives the right to contest any utility rates; provided that Concessionaire will not be charged for the supply of heat, ventilation, and air conditioning for the Premises.

7.4.3  Heating, Ventilation and Air Conditioning ("HVAC"):  The City will provide the base system for HVAC.  However, Concessionaire shall install separate equipment for HVAC requirements specifically related to Concessionaire's operations.    In such event, Concessionaire will pay for utility usage in the concession spaces for HVAC requirements.    Concessionaire will pay for all utilities without exception necessary in the operation of its business including telephone, electricity, water, sewage, gas and other fuels.  All charges including but not limited to deposits and all service charges for utility services metered directly to the concession space shall be paid by Concessionaire, regardless of whether such utility services are furnished by the City or other utility service corporations.

**7.5    Waiver of Damage:**  Concessionaire expressly waives all claims for damages arising out of or resulting from failures or interruptions of utility services furnished by City including, but not limited to, electricity, water, plumbing, sewage, telephone, communications, heat, ventilation, air conditioning, or for the failure or interruption of any public or passenger conveniences.

**FC-5467; Food and Beverage Concessions (Package No. 7)**

7.6 **Maintenance and Repair:** Concessionaire agrees, at its own expense, to keep the Premises and all Concessionaire Improvements in good repair and in a clean, neat, safe and sanitary condition and in good order at all times. If it becomes reasonably necessary during the Term of this Concessions Agreement, as determined by the Aviation General Manager, Concessionaire will, at its own expense, redecorate and paint fixtures and the interior of the Premises and improvements, and replace fixtures, worn carpeting, curtains, blinds, drapes, or other furnishings. Additionally, Concessionaire shall pay its pro rata share of Airport Operations and Maintenance ("O&M") costs to be billed monthly by the City or its designee.

7.6.1 **Janitorial Service:** Concessionaire will provide sufficient janitorial services to ensure that the Premises is at all times maintained in a clean attractive and sanitary manner including, but not limited to, equipment, utensils, fixtures, grease traps, service counters and display units.

7.6.2 **Pest Control:** Concessionaire shall use the pest-exterminating contractor engaged by the Airport to implement a comprehensive, ongoing pest control program. Concessionaire shall provide the City with reports indicating compliance with pest control standards, in such form as the Aviation General Manager may dictate from time to time and shall maintain manifest reports on file at each store, at all times.

7.7 **Advertising:** Concessionaire may, at its own expense, install and operate necessary and appropriate identification signs on the Premises, subject to the approval of the Aviation General Manager as to the number, size, height, location, color and the general type and design. Such approval shall be subject to revocation by the Aviation General Manager at any time. Without express written consent of the Aviation General Manager, Concessionaire may not display any advertising, promotional or informational pamphlets, circulars, brochures or similar materials.

## 8. LIABILITY AND INDEMNITY:

8.1 **City's Liabilities:** City will not be liable or responsible to Concessionaire for any loss (es), damage(s) or expense(s) that Concessionaire may sustain or incur if either the quantity or character of any services to be provided by City is changed or is no longer available or is no longer suitable for Concessionaire's requirements. City will not be liable or responsible to Concessionaire for any loss (es), damage(s) or expense(s) arising out of, resulting from, relating to or concerning, directly or indirectly, acts of

terrorism, including, but not limited to, loss (es), damage(s) or expense(s) sustained or incurred by Concessionaire as a result of:

8.1.1    a change in the Airport's or Concessionaire's business resulting from such terrorist acts;

8.1.2    the enactment of laws responding to or concerning such terrorist acts; or

8.1.3    any other detrimental effect upon Concessionaire or its business resulting from such terrorist acts.

8.2    **Indemnity and Hold Harmless:**    Concessionaire agrees to defend, indemnify and hold harmless City, its officers, agents, officials and employees (collectively, "Indemnified Parties") from and against:

8.2.1 all liability for injuries to or deaths of persons or damage to property arising from Concessionaire's activities under this Concessions Agreement or in or about the Premises; and

8.2.2 all loss(es), expense(s), demand(s), suit(s) and claim(s) against the Indemnified Parties sustained or alleged to have been sustained arising out of or relating to the negligence or willful misconduct of Concessionaire or any other individual or entity under Concessionaire's control (contractual or otherwise) and their officers, agents or employees; and

8.2.3 all loss(es), expense(s), demand(s), suit(s) and claim(s) against the Indemnified Parties sustained or alleged to have been sustained arising out of or relating to any liens and charges of any kind that may at any time be established against the Premises or this Concessions Agreement, or any part of it, as a consequence of any act or omission of Concessionaire or as a consequence of the existence of Concessionaire's interest under this Concessions Agreement; and

8.2.4 all loss(es), expense(s), demand(s), suit(s) and claim(s) against the Indemnified Parties sustained or alleged to have been sustained arising out of or relating to Concessionaire's violation or alleged violation of the Clause entitled "Hazardous Materials". This indemnification obligation includes, but is not limited to fines assessed against Concessionaire, City, or others for whom City may be responsible, diminution in value of the Airport, damages for the loss of use of rentable or usable space or of any amenity of the Airport, damages arising from any adverse impact on marketing of space in the Airport, and sums paid in settlement of claims, attorneys' fees, consultant fees, and expert fees which arise during or after the Term of this Concessions Agreement, including any renewals, as a

result of such violation. This indemnification of City by Concessionaire also includes, without limitation, costs incurred in connection with any investigation of site conditions or any cleanup, remediation, removal, or restoration work required by any federal, state or local governmental agency or political subdivision because of Hazardous Material present in the soil or ground water on or under the Airport which results from such a violation; and

8.2.5 any and all loss(es), claim(s), damage(s), action(s) and suit(s) alleging that any good and/or service sold by Concessionaire infringes upon one or more United States Patent(s), copyright(s) or trademark(s) owned by anyone other than Concessionaire, or violates any provision of the Lanham Act.

8.3 **Indemnity Not Limited By Applicable Insurance:** Concessionaire further agrees that this Concessions Agreement to indemnify and hold harmless the Indemnified Parties will not be limited to the limits or terms of the liability insurance, if any, required under this Concessions Agreement.

8.4 **Survival:** This clause entitles "Indemnity and Harmless" shall survive any termination or expiration of this Concessions Agreement.

9. **INSURANCE AND BONDING:** Concessionaire shall comply with all insurance and bonding requirements set forth in Appendix B.

10. **DAMAGE OR DESTRUCTION:**

10.1 **Partial Destruction of the Premises:**

10.1.1 **Insured Damage:** If the Premises are damaged by any casualty which is insurable under an insurance policy of the type required to be maintained by Concessionaire pursuant to this Concessions Agreement, regardless of whether the Premises is tenantable or practically usable for the purpose for which it was formerly used, then Concessionaire shall repair such damage as soon as reasonably possible and this Concessions Agreement will continue in full force and effect.

10.1.2 **Uninsured Damage:** If the Premises are damaged by any casualty not insurable under an insurance policy of the type required to be maintained pursuant to this Concessions Agreement, and such casualty is not caused by an act or omission of Concessionaire, its agents, servants or employees, then City's options are, either:

10.1.2.1 repair such damage as soon as reasonably possible at City's expense, in which event this Concessions Agreement will continue in full force and effect; or give written notice to Concessionaire within thirty (30) days after the date of occurrence of such damage of City's intention to terminate this Concessions Agreement effective as of the date of the occurrence of the damage.   If City elects to terminate this Concessions Agreement, Concessionaire will have the right, within ten(10) days of the date of the City's notice to notify, City in writing of Concessionaire's intention to repair such damage.   If Concessionaire fails to repair the damage to City's satisfaction within a reasonable period of time, this Concessions Agreement will automatically terminate effective as of the date of the occurrence of such damage.

10.1.3  In no event shall City be required to repair any injury or damage of fire or other cause, or to make any restoration or replacement of any paneling, decorations, office fixtures, partitions, railings, ceilings, floor covering, equipment, machinery or fixtures or any other improvements or property installed in the Premises by Concessionaire or at the direct or indirect expense of Concessionaire,  Concessionaire shall restore or replace the same in the event of damage provided that this Concessions Agreement is not terminated pursuant to this Section.

10.1.4 If the Premises are damaged by any casualty not insurable under an insurance policy of the type required to be maintained pursuant to this Concessions Agreement, and such casualty is caused by an act or omission of Concessionaire, its agents, servants or employees, then Concessionaire shall repair the damage to the City's satisfaction within a reasonable period of time, in which event this Concessions Agreement will continue in full force and effect.

10.2   **Total Destruction of Premises:**  If the Premises is totally destroyed during the Term from any cause whether or not covered by the insurance required under this Concessions Agreement (including any destruction required by any authorized public authority), this Concessions Agreement will automatically terminate, effective as of the date of such total destruction.

10.3   **Partial Destruction of Concourse:**  If 50% or more of any concourse on which the Premises are located is damaged or destroyed by an insured risk, or if 15% or more of any concourse on which the Premises are located

**FC-5467; Food and Beverage Concessions (Package No. 7)**                                                    **30**

is damaged or destroyed by an uninsured risk, notwithstanding that the Premises may be unaffected, City may, but is not obligated to, terminate this Concessions Agreement within ninety (90) days from the date of occurrence of such damage or destruction. If the City elects to terminate this Concessions Agreement within such ninety (90) day period, it will notify Concessionaire in writing and the termination will be effective upon the date of such notice. After the Concessions Agreement is terminated, Concessionaire shall surrender the Premises to City within ten (10) days.

10.4    **Damage During Last Year of Term or Renewal Period:** If during the last year of the Term, including any renewal term, the Premises are partially destroyed or damaged and are not covered under an insurance policy required to be maintained pursuant to this Concessions Agreement, City may terminate this Concessions Agreement, effective as of the date of occurrence of such damage, by giving written notice to Concessionaire within thirty (30) days after the date of occurrence of such damage. If City elects to terminate this Concessions Agreement, Concessionaire will have the right, within ten (10) days of the date of the City notice, to notify City in writing of Concessionaire's intention to repair such damage at Concessionaire's expense, without reimbursement from City, in which event this Concessions Agreement shall continue in full force and effect and Concessionaire shall proceed to make such repairs as soon as reasonably possible.

10.5    **Reduction of Rent: Concessionaire's Remedies:**

10.5.1 If the Premises are partially destroyed or damaged physically and the City is obligated to repair the Premises pursuant to this Concessions Agreement, the rent attributable to such partially destroyed or damaged Premises and payable for the period during which such damage and repair continues will be reduced in proportion to the extent to which Concessionaire's use of the Premises is impaired, calculated on a square foot basis, in accordance with the discretion and determinations of the Aviation General Manager. For example, if one-half of the Premises is unusable by Concessionaire as a result of such physical damage or destruction, then the rent payable for each month during which it exists and is being repaired will be reduced by one-half. Except for a reduction rent (if any), Concessionaire shall have no claim against the City for any damage suffered by reason of any such damage, destruction or repair.

10.5.2 If the City shall be obligated to repair the Premises under this Section and shall not commence such repair or restoration within forty five (45) days after such obligation shall accrue,

Concessionaire at Concessionaire's option may cancel and terminate this Concessions Agreement by written notice to the City at any time prior to the commencement of such repair. In such event this Concessions Agreement shall terminate as of the date of such notice.

**11.    REDUCTION IN RENT DUE TO CHANGES IN ENPLANEMENTS:**

11.1    **Definitions:**  These definitions apply to this Section entitled "Reduction in Rent Due to Changes in Enplanements".

11.1.1 Affected Concourse means a Concourse in which Concessionaire operates Concessions under the Concessions Agreement and is limited, in this case, to Concourses B & F;

11.1.2 Atrium means the facility at the Airport located between the North and South Terminals at which the Airport's Main Security Checkpoint is located.

11.1.3 Enplaned Passenger means and includes each passenger boarding an airplane from an Affected Concourse, whether such passenger has paid a fare for his/her ticket, is flying on frequent flyer miles, boards under a buddy pass, or otherwise;

11.1.4       Year means a 365 day period beginning on the effective date of the Concessions Agreement.  For example, a Year under a Concessions Agreement effectively dated January 1, 2011, will be the period from January 1, 2011, through December 31, 2011, and a Year under a Concessions Agreement effectively dated August 1, 2011, will be the period from August 1, 2011, through July 31, 2012.

11.2    **Reduction in Enplaned Passengers; Reduction of MAG:**

11.2.1       Rules Applicable to Concessions Located in Concourses:

11.2.1.1  If the total number of Enplaned Passengers departing an Affected Concourse, as documented by the City's Department of Aviation in monthly reports received from Airlines departing flights from such Affected Concourse, for any whole month in the second or any subsequent Year during the term of the Concessions Agreement decreases by more than 25% from the same month of the previous Year, then MAG rent payments due under this Concessions Agreement will be reduced (the "Reduction") in the following manner:

11.2.1.1.1    MAG Monthly Installment:   the monthly installment of the MAG due for the following month (and for that month only) will be reduced by the month over month percentage decrease in the number of Enplaned Passengers for the month experiencing the decrease; and

11.2.1.1.2    Concessions Agreement Year MAG: the MAG for the Concessions Agreement Year in which the reduced monthly payment amount falls will also be reduced by the dollar amount by which the monthly installment of the MAG was reduced.  The same test and calculation shall apply each month thereafter until the first month that the reduction in Year over Year monthly enplanements is less than 25% at which time the adjusted MAG in effect prior to the adjustment provided for herein shall be reinstated.

11.3    **Calculation Examples:**    For example, if the number of Enplaned Passengers for the month of July 2011 declined by 30% over the number of Enplaned Passengers for the month of July 2010, then:

11.3.1   the MAG amount payable for the month of August 2011 will reduce by 30%;

11.3.2   the MAG for the Concessions Agreement Year in which August 2011 falls will decrease by the dollar amount of the reduction.

11.4    **Submission of Claim for Reduction; Reduction Only Available if Concessionaire is Paying MAG; Reduction Not Available if Concessionaire is Paying Percentage Rent:**  Claims for a Reduction may only be submitted quarterly and may only include entire monthly periods.  Reduction in Enplaned Passengers for partial monthly periods will not qualify for a Reduction.  If, during any month in which Enplaned Passengers are reduced, Concessionaire is required to pay percentage rent, a claim for a Reduction will not be available.  A claim for a Reduction shall be submitted by the last day of the month following the last month in the quarter for which a Reduction is sought.   For example, if there is a reduction in the number of Enplaned Passengers for an Affected Concourse or the Airport as a whole (depending on the location of the affected Premises) beginning on August 15, 2011, and continuing through December 31, 2011, a claim for a Reduction may only be made for the months of September, October, November and December 2011, and shall be submitted by January 31, 2012.

11.5 **Certification of Claim for a Reduction:** If Concessionaire desires to submit a claim for a Reduction, it shall submit on forms developed by DOA.

## 12. DEFAULT BY TENANT:

12.1 **Events of Default:** Concessionaire will be in default under this Concessions Agreement if:

12.1.1 Concessionaire fails to pay rent or any other payment required under this Concessions Agreement when due to City, and that failure continues for a period of thirty (30) days after such rent or other payment is due whether or not the City has invoiced or provided Concessionaire with notice of any amount due or overdue.; or

12.1.2 Concessionaire:

12.1.2.1 becomes insolvent, or seeks the benefit of any present or future insolvency statute; or

12.1.2.2 makes a general assignment for the benefit of creditors; or

12.1.2.3 files a voluntary petition in bankruptcy; or

12.1.2.4 files a petition or answer seeking an arrangement for its reorganization or the readjustment of its indebtedness under the federal bankruptcy laws, or under any other law or statute of the United States or of any other State; or

12.1.2.5 consents to the appointment of a receiver, trustee, or liquidator of any of its property; or

12.1.2.6 files a petition under any part of the federal bankruptcy laws, or an action under any present or future insolvency law or statute, is involuntarily filed against Concessionaire and not dismissed within sixty (60) days after the filing; or

12.1.2.7 transfers its interest under this Concessions Agreement, without the prior written approval of City, by reason of death, operation of law, assignment, sublease Concessions Agreement or otherwise, to any other person, firm or corporation; or

12.1.2.8 abandons, deserts or vacates the Premises, including, but not limited to, ceasing to provide its services at the Premises for thirty (30) days or more; or

12.1.2.9 files any lien against the Premises because of any act or omission of Concessionaire, and is not discharged by Concessionaire by payment, bond or otherwise within 20 days after receipt of notice of the lien by Concessionaire; or

12.1.2.10 fails to comply with the requirements set forth in Appendix B; Insurance and Bonding Requirements; or

12.1.2.11 fails to keep, perform or observe any term, covenant or condition of this Concessions Agreement; or

12.1.2.12 uses or gives its permission to any person to use any portion of Premises for any illegal purpose or purpose in violation of this Concessions Agreement; or

12.1.2.13 (including any venture partner of Concessionaire), or any of their respective officers, directors, principal shareholder(s) or affiliates, is convicted of or pleads guilty to any crime in any way related to the operation of the Premises or the Airport or a public sector, governmental or quasi-governmental project or contract or related to the safety and/or security of any Airport, governmental entity or its citizens. For purposes of this Concessions Agreement:

12.1.2.13.1 "Principal Shareholder" means an owner of shares (or equity interest, if other than a corporation) representing 10% of the voting control and/or participation (through dividends or other distributions) in the profits of an entity:

12.1.2.13.2 "Affiliate" means any person or entity which directly or indirectly controls or is controlled by, or is under common control with an entity; and

12.1.2.13.3 "Control" or "Controlling" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity whether through the ownership of voting securities, by contract or otherwise; or

12.1.2.14 intentionally or willfully misrepresents to City any material fact; or

**FC-5467; Food and Beverage Concessions (Package No. 7)** 35

12.1.2.15 made any material misrepresentation or failed to make full and accurate disclosure to City in the documents, questionnaires and other materials submitted by Concessionaire with its Proposal pursuant to which this Concessions Agreement was awarded to Concessionaire, or failed to comply with all requirements, including without limitation, the ethical standards policy, set forth in the RFP; or

12.1.2.16 acts or fails to act results in the suspension or revocation of, for a period of more than thirty (30) days, of any rights, powers, licenses, permits or authorities necessary for the operation of its business at the Premises; or

12.1.2.17 fails to pay any lawful tax or assessments required to be paid under this Concessions Agreement.

12.2 **City's Remedies:**  If Concessionaire is in default, City will notify Concessionaire in writing of the nature of the default. If Concessionaire, where a specific time period for the cure is provided in the applicable subsection of this Concessions Agreement, does not cure the default within that period or, where a time period for the cure is not specifically provided in the applicable subsection, does not cure the default within seven (7) days from receipt of notice from City, City may, without notice to Concessionaire's sureties, if any, elect to exercise any of the following remedies:

12.2.1 Allow this Concessions Agreement to continue in full force and effect and to enforce all of City's rights and remedies under it, including, without limitation, the right to assess fines and the right to collect rent as it becomes due together with interest at the rate of 1.5% per month.

12.2.2 Continue this Concessions Agreement in full force and effect and enter the Premises and relet all or any portion of it to other parties for Concessionaire's account.  Concessionaire shall pay to City on demand all costs City incurs in entering the Premises and reletting it, including, without limitation, brokers' commissions, and expenses for repairs and remodeling, attorneys' fees and all other actual costs.  Reletting may be for a period shorter or longer than the remaining Term.   During the term of any reletting, Concessionaire shall pay to City the rent due under this Concessions Agreement on the date due, less any net rents City receives from any reletting.

12.2.3  Terminate Concessionaire's rights under this Concessions Agreement at any time and recover from Concessionaire all costs, expenses, losses and damages recoverable under this Concessions Agreement or applicable law as a result of Concessionaire's default and the termination.

12.2.4   Cure any default at Concessionaire's cost.  If City at any time, by reason of Concessionaire's default, pays any sum to cure any default, the sum paid by City shall be immediately due from Concessionaire to City on demand, and shall bear interest at the rate of 1.5% per month from the date paid by City until the date City is fully reimbursed by Concessionaire.

12.2.5 Exercise any and all other rights or remedies available under this Concessions Agreement or at law or in equity.

12.3   **Concessionaire Not in Default**:  If, after termination for default, it is determined for any reason that Concessionaire was not in default, the rights and obligations of the parties will be the same as if the Concessions Agreement had been terminated pursuant to the Section entitled "Termination for Convenience".

12.4   **Security Interest:**

12.4.1   In addition to the statutory landlord's lien, Concessionaire grants to City a valid security interest in all goods, wares, equipment, fixtures, furniture, improvements and other personal property located now or in the future within the Premises, including the proceeds of such items, to secure payment of all rentals and other sums of money becoming due from Concessionaire under this Concessions Agreement, and to secure payment of any damages or losses that City may suffer by reason of the breach by Concessionaire of this Concessions Agreement. Concessionaire may not remove such goods, wares, equipment, fixtures, furniture, improvements and other personal property located now or in the future within the Premises from the Premises without the written consent of City until all arrearages in rent, as well as any other sums of money then due to City under this Concessions Agreement, have been paid and discharged and all the covenants, Concessions Agreements and conditions of this Concessions Agreement have been fully complied with and performed by Concessionaire.

12.4.2 Upon the occurrence of an event of default by Concessionaire, City may, in addition to any other remedies

provided in this Concessions Agreement, enter upon the Premises and take possession of any goods, wares, equipment, fixtures, furniture, improvements and other personal property of Concessionaire situated on the Premises, without liability for trespass or conversion, and sell them at public or private sale, with or without having such property at the sale, after giving Concessionaire reasonable notice of the time and place of any public sale or of the time after which any private sale is to be made, at which sale City or its assigns my purchase the property unless otherwise prohibited by law. The requirement of reasonable notice to Concessionaire will be met if such notice is given in the manner prescribed in the Section entitled "Notices", at least five(5) days before the date of the sale.

12.4.3  The proceeds from any such sale, less any expenses of the City connected with the taking of possession, holding and selling of the property (including reasonable attorneys' fees and other expenses), will be applied as a credit against the debts payable by Concessionaire, or as otherwise required by law; and Concessionaire will pay any deficiencies immediately.

12.4.4  Upon request by City, Concessionaire agrees to execute and deliver to City a financing statement in a form sufficient to perfect the security interest of City in the property and the proceeds under the provisions of the Uniform Commercial Code in force in the State of Georgia. By accepting a grant of the security interest set forth in this provisions, the parties agree that the City is not waiving its rights under any statutory lien for the payment of rent granted under this Concessions Agreement or applicable law.

## 13.   TERMINATION FOR CONVENIENCE:

13.1   The City shall have the right to terminate the Contract without cause at any time during the Term by giving written notice to Concessionaire at least thirty(30) days prior to the date such termination is to be effective. Should the City terminate the Contract prior to its expiration, the City shall reimburse the Concessionaire for the reasonable and proper unamortized costs of the capital Improvements, made by or at the cost of the Concessionaire, and approved in writing by the Aviation General Manager. Concessionaire shall document the costs of any and all capital Improvements in a form and detail satisfactory to the Aviation General Manager and submit same within thirty (30) calendar days following completion of the work for review and approval, for the purpose of establishing the unamortized costs of the Improvements. The capital costs of the Improvements shall be amortized based upon a straight-line

depreciation schedule over the initial Term of the Contract, with zero salvage value.

13.2 Reimbursement for unamortized costs of capital improvements shall be the Concessionaire's sole remedy in the event of Termination for Convenience. Concessionaire shall waive, in the Contract, any claims for damages, including loss of anticipated profits, in the event that they City terminates the Contract for convenience.

## 14.    FINES FOR VIOLATIONS

If Concessionaire defaults under or violates material provisions of this Concessions Agreement, in lieu of, or in addition to, any other available remedy, the Aviation General Manager may elect to impose the charges described below on a per diem basis per violation:

| Infractions: | Fine per Day | | |
|---|---|---|---|
| | 1st | 2nd | 3rd |
| Violation of Space Use | $500 | $750 | $1000 |
| Failure to Maintain required Hours of Operation | $500 | $750 | $1000 |
| Failure to Submit Required Documents and Reports | $500 | $750 | $1000 |
| Failure to remedy Customer Service, Cleanliness, Quality Assurance, Operations, and/or Facility standards | $500 | $750 | $1000 |
| Infractions within 48 hrs (As measured from the date of Each written notification) | $500 | $750 | $1000 |
| Failure to provide pest control Records on a monthly basis And/or display manifest reports On file in each store | $500 | $750 | $1000 |
| Unauthorized Advertising, Signage (as defined as Written, printed Blade or storefront) | $500 | $750 | $1000 |

**FC-5467; Food and Beverage Concessions (Package No. 7)**                    **39**

| | | | |
|---|---|---|---|
| Destruction of airport public Facility deemed caused by Associates or associate travel In unauthorized areas | $500 | $750 | $1000 |
| Failure to comply with any and all published DOA, basic terms of the lease, Federal, State Local Policies, Regulations, Directives or Standards | $500 | $750 | $1000 |

Repeated violations of the above listed infractions may result in the Concessionaire being in default of the Concessions Agreement.

**15.    UNAUTHORIZED ACCESS:**  Concessionaire is responsible for preventing unauthorized persons from gaining access to restricted areas of the Airport or any other part of the Airport through the Premises or any door under Concessionaire's control.  If federal security regulations are violated as a result of trespass by unauthorized persons into restricted areas of the Airport or any other part of the Airport through the Premises or any door under Concessionaire's control, or if such door is left unsecured in violation of federal security regulations, and City is subjected to any liability, including, but not limited to, a fine(s) by the Transportation Security Administration ("TSA"), Concessionaire shall reimburse City for the full amount of such fines promptly upon receipt of an invoice from City and pay for any liability assessed against City as a result of such unauthorized access.

**16.    SURRENDER OF PREMISES:**

16.1    Concessionaire shall yield and deliver peaceably to City possession of the Premises and all Concessionaire improvements in good condition, reasonable wear and tear accepted, upon the expiration or earlier termination of this Concessions Agreement.

16.2    Concessionaire shall remove Concessionaire's signs and trade fixtures from the Premises and shall surrender the Premises in clean and presentable condition.  City will retain Concessionaire's Performance and Payment Bond(s) or other securities required under Appendix B until such time as all conditions of this Concessions Agreement have been satisfied, all keys to the Premises are delivered to the Aviation General Manager by Concessionaire, the Aviation General Manager determines that the Premises are clean and in good repair and the applicable period for filing liens or other claims has passed.  Concessionaire will be liable to City for

City's costs for storing, removing and disposing of any alterations or Concessionaire's personal property, and of restoration of the Premises.

## 17. OWNERSHIP OF INFORMATION; CONFIDENTIALITY

17.1 All reports, information, data or other documents given to, prepared by or assembled by Concessionaire arising out of the work performed under this Concessions Agreement are the exclusive property of City – with the exception of employee data covered under the Privacy Act- and will be kept confidential and may not be made available to any individual or organization by Concessionaire without the prior written approval of City, provided however that these provisions shall not apply to data that is in the public domain; was previously known to Concessionaire; or was independently acquired by Concessionaire from third parties who are under no obligation to City to keep said data and information confidential. These provisions shall not apply to information in whatever form that comes into the public domain through no fault of Concessionaire, nor shall they be interpreted in any way to restrict Concessionaire from complying with a legally enforceable court order to provide information or data; provided, however, Concessionaire shall immediately place City on notice of such court order to permit City the opportunity to determine whether a protective order shall be filed. This restriction includes, but is not limited to, press releases, presentations, promotional materials and other public disclosures.

17.1.1 Except as provided in the preceding paragraph, Concessionaire shall keep confidential, and shall require its employees, agents, subordinates, subcontractors, or sublessees to keep confidential all information disclosed by City or its consultants to Concessionaire or developed by Concessionaire or Concessionaire's employees, agents, subordinates, subcontractors, or sublessees in the performance of services hereunder. Disclosure of any such information shall constitute a material breach of this Concessions Agreement and shall entitle City to recover from Concessionaire any damages City incurs because of such breach.

17.1.2 City shall have the right to any specifications, computer programs, technical reports, operating manuals and similar work product developed and paid for under this Concessions Agreement. If research or development is furnished in connection with the performance of this Concessions Agreement and if in the course of such research or development patentable subject matter is produced by Concessionaire, its officers, agents, employees, subcontractors, or sublessees, City shall have, without cost or expense to it, an irrevocable, nonexclusive royalty-free license to make, have made and use, either itself or by anyone on its behalf, such subject matter in connection with any activity now or

hereafter engaged in or permitted by City. Promptly upon request by City, Concessionaire shall furnish or obtain from the appropriate person a form of license satisfactory to City, but it is expressly understood and agreed that, as between City and Concessionaire the license herein provided for shall nevertheless arise for the benefit of City immediately upon the production of said subject matter, and shall not await formal exemplification in a written license Concessions Agreement as provided for above. Such license Concessions Agreement may be transferred by City to its successors immediate, or otherwise, in the operation or ownership of any real or personal property now or hereafter owned or operated by City, but such license shall not be otherwise transferable.

## 18.  HAZARDOUS MATERIALS:

18.1    Concessionaire shall not cause or permit any Hazardous Material to be brought, kept or used in or about the Premises or the Airport by Concessionaire, its agents, employees, contractors, or invitees. Without limiting the foregoing, if the presence of any Hazardous Material in the Airport caused or permitted by Concessionaire results in any contamination of the Airport, Concessionaire shall promptly take all actions at its sole expense as are necessary to return the Airport to the conditions existing prior to the introduction of such Hazardous Material to the Airport; provided that City's approval of such actions, and the contractors to be used by Concessionaire in connection therewith, shall first be obtained.

18.2    The term "Hazardous Material" means any hazardous or toxic substance, material, or waste, which is or becomes regulated by any local governmental authority or the United States Government. The term "Hazardous Material" includes, without limitation, any material or substance which is (i) defined as a "hazardous waste", "extremely hazardous waste", or "restricted hazardous waste" or similar term under any laws now or hereafter enacted by the United States or the State of Georgia or any political subdivision thereof, or (ii) designated a "hazardous substance" pursuant to the Federal Water Pollution Control Act, 33 U.S.C. § 1317, or (iii) defined as a "hazardous waste" pursuant to the Federal Resource Conservation and Recovery Act, 42 U.S.C.§ 6901 et seq., or (iv) defined as a "hazardous substance" pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.

18.3    In addition to, and independent of any other right of entry provided herein, City and its employees, representatives and agents shall have access to the Premises during reasonable hours and upon reasonable notice to Concessionaire

in order to conduct periodic environmental inspections and tests of Hazardous Material contamination in the Premises.

19. **AIRPORT SECURITY REQUIREMENTS:** Concessionaire shall comply, at its own expense, with the TSA and the City's security requirements for the Airport including, but not limited to employee training and badging. At some point during the installation of the Concessionaire Improvements on Concourse F, that facility will become a Security Identification Display Area. City will provide Concessionaire written notice 30 days prior to Concourse F becoming a Security Identification Display Area, at which time Concessionaire may commence appropriate activities (e.g. training and badging) necessary to become compliant with TSA and the City's security requirements. Concessionaire shall cooperate with the TSA and the City on all security matters and shall promptly comply with any project security arrangements established by City. Compliance with such security requirements shall not relieve Concessionaire of its responsibility for maintaining proper security for the above-noted items, nor shall it be construed as limiting in any manner Concessionaire's obligation with respect to all applicable federal, state and local laws and regulations and its duty to undertake reasonable action to establish and maintain secure conditions at and around the Premises and throughout the Airport. Additional airport security information is available on the Airport Security's web site: (**www.atlanta-airport/business/security**).

19.1 **ILLEGAL IMMIGRATION REFORM AND ENFORCEMENT ACT:** In compliance with the Illegal Immigration Reform and enforcement Act of 2011, O.C.G.A. § 13-10-90, et. seq., Concessionaire has executed documents attached as Exhibit E, which fully executed documents are incorporated into this Concessions Agreement by reference.

20. **CITY POLICIES; AIRPORT CONCESSIONS DISADVANTAGED BUSINESS ENTERPRISE (ACDBE) BUSINESS PARTICIPATION AND NON-DISCRIMINATION PROVISIONS:**

20.1 **City's Required Policies:** Concessionaire acknowledges that Concessionaire has reviewed, is familiar with and agrees to comply with:

20.1.1 City's Airport Concessions Disadvantaged Business Enterprise Policy (See Appendix A);

20.1.1.1 In addition to its compliance with the ACDBE Policy, as demonstrated in Appendix A, Concessionaire shall work in good faith with the City's Office of Contract Compliance ("OCC") to maximize opportunities in the utilization of certified DBE firms during the construction build-out of the concession space(s), as well as any on-going supply opportunities. Any submittals provided by Concessionaire to the OCC previous or subsequent to the execution

of this Concessions Agreement related to the utilization of such firms shall be incorporated herein by reference;

20.1.2 City's Equal Employment Opportunity Policy (See Code Sections 2-1200 and 2-1414; Appendix A);

20.1.3 City's Business Non-Discrimination Policy (See Code Sections 2-1358 and 2-1387; Appendix A);

20.1.4 City's Atlanta Workforce Agency/First Source Jobs Policy and Concessions Agreement (See Code Section 2-1655; Appendix A);

20.1.5 City's Ethics in Public Contracting Policy (See Code Sections 2-1481 through 2-1490);

20.1.6 City's Conflicts of Interest Policy (See Code Section 2-1482);

20.1.7 City's Prohibition against Predatory Lending (See Code Section 2-1213); and

20.1.8 City's Green Initiatives (Atlanta Sustainable Building Ordinance (ASBO))

20.2  **Non-discrimination Certificates:**    By the execution of this Concessions Agreement, Concessionaire certifies as follows:

The services covered by this Concessions Agreement will not discriminate in any way in connection with this Concessions Agreement against any employee or applicant for employment because of race, color, religion, sex, national original or physical handicap, and Concessionaire will take affirmative action to insure that applicants are employed, and those employees are treated during employment without regard to their race, color, religion, sex, national origin or physical handicap.  Concessionaire shall state in all advertisements and solicitations that it is an equal employment opportunity employer.

20.3  **USDOT Non-discrimination Regulation:**  This Concessions Agreement is subject to the requirements of the U.S. Department of Transportation's regulations, 49 CFR part 23, subpart F.  Concessionaire agrees that it will not discriminate against any business owner because of the owner's race, color, national origin or sex in connection with the award or performance of any Concessions Agreement covered by 49 CFR part 23. Concessionaire agrees to include the above statements in any subcontracts or subsequent Concessions Agreements that it enters into and cause those businesses to similarly include the statements in subsequent agreements.

20.4 **Public Use and Federal Grants:**

20.4.1 To the best of Concessionaire's knowledge, the Premises are subject to the terms of those certain sponsor's assurances made to guarantee the public use of the Airport as incidental to grant Concessions Agreements between City of Atlanta and the United States of America, as amended. City and Concessionaire represent that none of the provisions of this Concessions Agreement violates any of the provisions of the Sponsor's Assurance Concessions Agreement.

20.4.2 It is further covenanted and agreed that nothing contained in this Concessions Agreement shall be construed to grant or authorize the granting of an exclusive right within the meaning of Section 308 of the Federal Aviation Act of 1958.

20.4.3 Concessionaire for itself, its subconcessionaires, personal representatives, successors in interest and assigns, as a part of the consideration hereof, does hereby covenant and agree that (1) no person on the grounds of race, color, or national origin shall be excluded from participation in, denied the benefit of, or be otherwise subjected to discrimination in the use of said facilities; (2) in the construction of any improvements on, over, or under the Premises and the furnishings of services thereon, no person on the grounds of race, color, or national original shall be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination; (3) Concessionaire shall use the Premises in compliance  with all other requirements imposed by or pursuant to the Code of Federal Regulations for the Department of Transportation at Title 49, Subtitle A, Office of the Secretary of Transportation, Part 21, titled "Nondiscrimination in Federally Assisted Programs of the Department of Transportation — Effectuation of Title VI of the Civil Rights Act of 1964", and as said regulations may be amended; and (4) in the event of breach of any of the above nondiscrimination covenants, City shall have the right to terminate this Concessions Agreement thereon, and hold the same as if this Concessions Agreement had never been made or issued.   Provision (4) shall not be effective until the procedures of 49 CFR Subtitle A, Part 21 are followed and completed, including the exercise or expiration of appeal rights.

21. **MISCELLANEOUS PROVISIONS:**

21.1 **Award and Execution of Concessions Agreement:** The award and execution of this Concessions Agreement by City is authorized by Resolution No. 11-R-1845, adopted by City's Council on January 3, 2012, and approved by City's Mayor on January 5, 2012, attached to this

Concessions Agreement as Exhibit B. This Concessions Agreement will not become binding on City and City will incur no liability under it until it has been duly executed by Concessionaire, returned to City with all required submittals, including insurance and bonding, executed by the Mayor, attested to by the Municipal Clerk, approved by City Attorney as to form and delivered to Concessionaire.

21.2 **Identity of Owner and Manager:** The owner of record of the property of which the Premises is a part is City. The person authorized to manage the property, which includes the Premises, is the Aviation General Manager of the Department of Aviation.

21.3 **Delegation of Authority:** Any act(s), whether discretionary or ministerial, that the Aviation General Manager is authorized or required to perform under this Concessions Agreement may be performed by such person(s) as the Aviation General Manager shall designate in writing to perform such act(s).

21.4 **No Partnership or Joint Venture:** City and Concessionaire are not and shall not be deemed to be, for any purpose, partners or joint ventures with each other.

21.5 **Independent Contractor; No Contractual Relationship:** Concessionaire will perform under this Concessions Agreement as an independent entity and not as an agent or employee of City. No contractual relationship between City and any subconcessionaire, subcontractor, or subconsultant is created by an approval of City for use under this Concessions Agreement.

21.6 **Usufruct:** The rights of Concessionaire hereunder constitute a usufruct, which is not subject to levy or sale. No estate shall pass out of City.

21.7 **Recording Prohibited:** Neither City nor Concessionaire shall be entitled to record this Concessions Agreement, any memorandum or short form of this Concessions Agreement or any affidavit with respect to this Concessions Agreement.

21.8 **Attorneys' Fees:** If City should bring any action under this Concessions Agreement or consult or place this Concessions Agreement, or any amount payable to Concessionaire pursuant to this Concessions Agreement, with an attorney concerning or for enforcement of any of City's rights hereunder, then Concessionaire agrees in each and any such case to pay to City all costs, including, but not limited to, court costs and reasonable attorneys' fees, incurred by City in connection therewith.

21.9  **Severability:**  If any provision of this Concessions Agreement or the application thereof to any person or circumstances shall become invalid or unenforceable to any extent, such provision shall be struck and severed and the remainder of this Concessions Agreement shall not be affected and shall continue to be enforceable to the greatest extent of the law.  Each covenant and Concessions Agreement contained in this Concessions Agreement shall be construed to be a separate and independent covenant and Concessions Agreement and the breach of any such covenant or Concessions Agreement by City shall not discharge or relieve Concessionaire from Concessionaire's obligation to perform each and every covenant and Concessions Agreement of this Concessions Agreement to be performed by Concessionaire.

21.10  **Gender:**  Words of any gender used in this Concessions Agreement shall be held and construed to include any other gender and words in the singular number shall be held to include the plural, unless the context otherwise requires.

21.11  **Exhibits and Attachments:**  All exhibits, appendices, attachments, riders and addenda referred to in this Concessions Agreement are incorporated into this Concessions Agreement and made a part hereof for all intents and purposes.

21.12  **Time of the Essence:**  Time is of the essence with regard to each provision of this Concessions Agreement.

21.13  **Evidence of Authority:**  If Concessionaire is other than a natural person, Concessionaire shall deliver to City such legal documentation as City may request to evidence the authority of those signing this Concessions Agreement to bind Concessionaire.

21.14  **Drug-Free Workplace Policy:**  Concessionaire acknowledges that pursuant to the Federal Drug-Free Workplace Act of 1989, the unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance is prohibited on City's Premises.

21.15  **Applicability of Code Provisions:**  All terms of this Concessions Agreement shall be governed by and shall be subject to all the provisions of the Code of Ordinances of City of Atlanta, Georgia, now and as may be amended from time to time.

21.16  **Successors and Assigns:**  Each and all of the conditions and covenants of this Concessions Agreement shall extend to and bind and inure to the benefit of City and Concessionaire, and the legal representatives, successors and assigns of either or both of them.

**FC-5467; Food and Beverage Concessions (Package No. 7)**

47

21.17  **Notices:**  All notices required to be given to City hereunder shall be in writing and given by postage prepaid registered or certified mail, return receipt requested, addressed to the Aviation General Manager of the Airport, Office of the General Manager, P.O. Box 20509, Atlanta, Georgia 30320.  No notices shall be effective if transmitted by telex, fax or other electronic delivery.  All notices required to be given to Concessionaire hereunder shall be sent to the following address:

> Global Concessions, Inc.
> Attn:  Terrence D. Harps, President
> 7700 Spine Road
> Concourse T, Third Floor
> Atlanta, GA 30310

21.18  **Interpretation:**  The language of this Concessions Agreement shall be construed according to its fair meaning, and not strictly for or against either City or Concessionaire.  This Concessions Agreement shall be construed and performed according to the laws of the State of Georgia.  In the event of a dispute with regard to interpretation of any provision of this Concessions Agreement, the parties agree to bring suit and be subject to the jurisdiction of the Fulton County Superior Court.

21.19  **Section Headings:**  The section headings contained herein are for the convenience of City and Concessionaire and are not to be used to construe the intent of this Concessions Agreement or any part thereof, nor to modify, amplify, or aid in the interpretation or construction of any of the provisions thereof.

21.20  **Reference to Clause or Section Entitled "_____":**  When reference in this Concessions Agreement is made to a specific clause with a specific title set forth in a section heading or section number, such reference will include all sections and subsections of such clause.

21.21  **Integrated   Concessions   Agreement,   Modification:**   This Concessions Agreement contains all the Concessions Agreements of the parties and cannot be further amended or modified except by written Concessions Agreement.  If the parties hereto previously have entered into or do enter into any other lease, license, permit or Concessions Agreement covering Premises or facilities at the Airport, this Concessions Agreement and the terms, conditions, provisions and covenants hereof shall apply only to the Premises herein particularly described, and this Concessions Agreement or any of the terms, conditions, provisions or covenants hereof shall not in any way or in any respect change, amend, modify, alter, enlarge, impair or prejudice any of the rights, privileges, duties or

obligations of either of the parties hereto under or by reason of any other said lease, permit, license or other Concessions Agreement between said parties.

21.22 **Force Majeure:**  Neither party shall be deemed to be in breach of this Concessions Agreement by reason of a failure to perform any of its obligations hereunder to the extent that such failure is caused by strike or labor troubles, unavailability of materials or utilities, riots, rebellion, terrorist attack, insurrection, invasion, war, action or interference of governmental authorities, acts of God, or any other cause whether similar or dissimilar to the foregoing which is reasonably beyond the control of the parties (collectively "Force Majeure Event"). If either party claims the occurrence of a Force Majeure Event, such party shall promptly give notice to the other of the existence of such Force Majeure Event, the nature and extent thereof, the obligation hereunder affected thereby and the actions to be taken to abate or terminate such event. Notwithstanding the existence of any Force Majeure Event, this Clause shall not apply to and Concessionaire shall not be relieved of its obligation to pay rent or other sums due hereunder, such obligation being absolute and unconditional.

21.23 **Incorporation by Reference:**  Request for Proposals FC-5467, and the proposal submitted by Concessionaire in response thereto are incorporated into this Concessions Agreement by this reference.  In the event of any inconsistency between this Concessions Agreement and the RFP or proposal, this Concessions Agreement shall control.

**CONCESSIONAIRE:**

By: _____

Name: _Terrance D. Harps_____

Title: _CEO_____

*ATTEST:*

By: _____

Name: _Kenneth Syphoe_____
Title: Secretary/Assistant Secretary (SEAL)

**CITY:**

_____
Mayor

*APPROVED:*

_____
Chief Procurement Officer

*ATTEST:*

_____
Municipal Clerk (SEAL)

*APPROVED:*

_____
Aviation General Manager

*APPROVED AS TO FORM:*

_____
City Attorney (Sr Ast)

Control No.  **K021319**

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
315 West Tower
#2 Martin Luther King, Jr. Dr.
Atlanta, Georgia 30334-1530

# CERTIFICATE
# OF
# EXISTENCE

I, Karen C Handel, Secretary of State and the Corporations Commissioner of the state of Georgia, hereby certify under the seal of my office that

## GLOBAL CONCESSIONS, INC.

### Domestic Profit Corporation

was formed or was authorized to transact business on 11/20/1990 in Georgia. Said entity is in compliance with the applicable filing and annual registration provisions of Title 14 of the Official Code of Georgia Annotated and has not filed articles of dissolution, certificate of cancellation or any other similar document with the office of the Secretary of State.

This certificate relates only to the legal existence of the above-named entity as of the date issued. It does not certify whether or not a notice of intent to dissolve, an application for withdrawal, a statement of commencement of winding up or any other similar document has been filed or is pending with the Secretary of State.

This certificate is issued pursuant to Title 14 of the Official Code of Georgia Annotated and is prima-facie evidence that said entity is in existence or is authorized to transact business in this state.



WITNESS my hand and official seal of the City of Atlanta and the State of Georgia on 31st day of July, 2009

*Karen C Handel*

Karen C Handel
Secretary of State

Certification Number: 4516317-1   Reference:
Verify this certificate online at http://corp.sos.state.ga.us/corp/soskb/verify.asp

# GRECIAN FOODS, INC.

## BYLAWS

## ARTICLE I

## OFFICES

The Corporation shall at all times maintain a registered office in the State of Georgia and a registered agent at that address but may have other offices located within or without the State of Georgia as the Board of Directors may determine.

## ARTICLE II

## SHAREHOLDERS' MEETINGS

2.1.  Annual Meeting.  A meeting of shareholders of the Corporation shall be held annually.  The annual meeting shall be held at such time and place on such date as the directors shall determine from time to time and as shall be specified in the notice of the meeting.

2.2.  Special Meetings.  Special meetings of the shareholders may be called at any time by the Board of Directors, the President or any holder or holders of at least 25 percent of the outstanding capital stock of the Corporation.  Special meetings shall be held at such time and place and on such date as shall be specified in the notice of the meeting.

2.3.  Place.  Annual or special meetings of shareholders may be held within or without the State of Georgia.

2.4.  Notice. Notice of annual or special shareholders meetings stating the place, day and hour of the meeting shall be given in writing not less than 10 nor more than 50 days before the date of the meeting, either mailed to the last known address or personally given to each shareholder.  Notice of a meeting may be waived by an instrument in writing executed before or after the meeting.  The waiver need not specify the purpose of the meeting or the business transacted, unless one of the purposes of the meeting concerns a plan of merger or consolidation, in which event the waiver shall comply with the further requirements of law concerning such waivers. Attendance at such meeting in person or by proxy shall constitute a waiver of notice thereof unless the shareholder shall provide written notice to the Corporation prior to the taking of any action by the shareholders at such meeting that his attendance is not to be deemed a waiver of the requirement that such notice be given or of the adequacy of any notice that may have been given to such shareholder.  Notice of any

special meeting of shareholders shall state the purpose or purposes for which the meeting is called. The notice of any meeting at which amendments to or restatements of the Articles of Incorporation, merger or consolidation of the Corporation, or the disposition of corporate assets requiring shareholder approval are to be considered shall state such purpose, and further comply with all requirements of law.

2.5. <u>Quorum</u>. At all meetings of shareholders a majority of the outstanding shares of stock shall constitute a quorum for the transaction of business, and no resolution or business shall be transacted without the favorable vote of the holders of a majority of the shares represented at the meeting and entitled to vote. A lesser number may adjourn from day to day, and shall announce the time and place to which the meeting is adjourned.

2.6. <u>Action in Lieu of Meeting</u>. Any action to be taken at a meeting of the shareholders of the Corporation, or any action that may be taken at a meeting of the shareholders, may be taken without a meeting if a consent in writing setting forth the action so taken shall be signed by all of the shareholders entitled to vote with respect to the subject matter thereof and any further requirements of law pertaining to such consents have been complied with.

## ARTICLE III

## BOARD OF DIRECTORS

3.1. <u>Management</u>. Subject to these bylaws, or any lawful agreement between the shareholders, the full and entire management of the affairs and business of the Corporation shall be vested in the Board of Directors, which shall have and may exercise all of the powers that may be exercised or performed by the Corporation.

3.2. <u>Number of Directors</u>. The shareholders shall fix by resolution the precise number of members of the Board of Directors; provided that the Board of Directors shall consist of not fewer than three members unless at any time all of the shares of the Corporation shall be held beneficially and of record by fewer than three shareholders, in which case the number of directors may be fewer than three but not fewer than the number of shareholders; and provided further, that if at least a majority of the outstanding shares of capital stock of the Corporation having the power to vote for the election of directors is owned of record by one shareholder, the shareholders may determine to have only one member of the Board of Directors. Directors shall be elected at each annual meeting of the shareholders and shall serve for a term of one

year and until their successors are elected. A majority of said directors shall constitute a quorum for the transaction of business. All resolutions adopted and all business transacted by the Board of Directors shall require the affirmative vote of a majority of the directors present at the meeting.

3.3. <u>Vacancies</u>. The directors may fill the place of any director which may become vacant prior to the expiration of his term, by vote of a majority of the remaining directors, though less than a quorum, or by the sole remaining director, as the case may be. Any such director elected to fill a vacancy shall be elected for the unexpired term of the director whose place has become vacant.

3.4. <u>Meetings</u>. The directors shall meet annually, without notice, following the annual meeting of the shareholders. Special meetings of the directors may be called at any time by the President or by any director, on two days, written notice to each director, which notice shall specify the time and place of the meeting. Notice of any such meeting may be waived by an instrument in writing executed before or after the meeting. Directors may attend and participate in meetings either in person or by means of conference telephones or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting by means of such communication equipment shall constitute presence in person at any meeting. Attendance in person at such meeting shall constitute a waiver of notice thereof.

3.5. <u>Action in Lieu of Meeting</u>. Any action to be taken at a meeting of the directors, or any action that may be taken at a meeting of the directors, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the directors and any further requirements of law pertaining to such consents have been complied with.

3.6. <u>Interested Directors and Officers</u>. An interested director or officer is one who is a party to a contract or transaction with the Corporation or who is an officer or director of, or has a financial interest in, another corporation, partnership, association or other entity which is a party to a contract or transaction with the Corporation. Contracts and transactions between the Corporation and one or more interested directors or officers shall not be void or voidable solely because of the involvement or vote of such interested persons as long as (i) the contract or transaction is approved in good faith by the Board of Directors or appropriate committee by the affirmative vote of a majority of disinterested directors, even if the disinterested directors be less than a quorum, at a meeting of the Board or committee at which the material facts as to the interest of the interested person or persons and the contract or transaction are

-3-

disclosed or known to the Board or committee prior to the vote; or (ii) the contract or transaction is approved in good faith by the shareholders after the material facts as to the interest of the interested person or persons and the contract or transaction have been disclosed to them; or (iii) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified by the Board, committee, or shareholders. Interested directors may be counted in determining the presence of a quorum at a meeting of the Board or committee which authorizes the contract or transaction.

   3.7.  <u>Authority to Execute Documents and Agreements</u>.  The President and any other officer or officers of the Corporation as may be designated in writing by the President or by resolution of the Board of Directors shall have authority, acting alone and without the necessity of further action by the Board of Directors or the shareholders, to enter into contracts and agreements of every nature on behalf of the Corporation, or on behalf of any general or limited partnership, joint venture or trust in which the Corporation is a general or limited partner, joint venturer, or trustee, and to cause the Corporation to be bound by the terms thereof. Such authority shall include, without limitation, the authority to enter into, on behalf of the Corporation or on behalf of the Corporation acting in its capacity as a general or limited partner, joint venturer, or trustee of any general or limited partnership, joint venture or trust of which the Corporation is a general or limited partner, joint venturer, or trustee: contracts for purchase or sale of real or personal property; options for purchase or sale of real or personal property; deeds, bills of sale or other instruments of conveyance; notes or other evidences of indebtedness; mortgages, security deeds, security agreements or other security instruments or security assignments; loan agreements; development agreements; general partnership agreements; limited partnership agreements; certificates of limited partnership; joint venture agreements;  trust agreements; guaranty agreements; powers of attorney; certificates; and all other instruments, agreements, and documents incidental to any of the foregoing; and any amendments or supplements thereto or to any thereof; and to make on behalf of the Corporation any representations, warranties (including warranties of title), covenants and certificates contained in any of the foregoing. Any of such contracts, agreements and instruments executed on behalf of the Corporation or on behalf of the Corporation in its capacity as a general or limited partner, joint venturer, or trustee of any general or limited partnership, joint venture or trust in which the Corporation is a general or limited partner, joint venturer, or trustee, by the President or any other officer of the Corporation designated in writing by the President or by resolution of the Board of Directors shall constitute the act of and be binding on the Corporation in accordance with its terms, and execution of any thereof as aforesaid by any such officer shall be conclusive evidence of such authority, and may be relied upon by all persons dealing

with the Corporation without the necessity of any further inquiry until actual receipt of written notice of the revocation of the authority of any such officer by the President or by resolution of the Board of Directors. The execution by any such officer of any such contract, agreement, instrument or document on behalf of the Corporation may be attested by the Secretary or any Assistant Secretary of the Corporation and the seal of the Corporation affixed thereto, but no such attestation or affixation of the seal of the Corporation shall be necessary to the effectiveness thereof. The Secretary and each Assistant Secretary of the Corporation shall be authorized to provide a certified copy of this provision and a certification of the names and specimen signatures of the person or persons authorized to act hereunder from time to time to all persons and entities transacting or proposing to transact business with the Corporation, and each such person and entity shall be entitled to rely on the continuing effectiveness of such authorization until receipt of a further certification by the Secretary or any Assistant Secretary as to such authority or of written notification signed by the President or a certified copy of a resolution adopted by the Board of Directors indicating that such authority has been modified or terminated.

## ARTICLE IV

## OFFICERS

4.1. <u>General Provisions</u>. The officers of the Corporation shall consist of a President, a Secretary and a Treasurer who shall be elected by the Board of Directors, and such other officers as may be elected by the Board of Directors or appointed as provided in these bylaws. Each officer shall be elected or appointed for a term of office running until the meeting of the Board of Directors following the next annual meeting of the shareholders of the Corporation, or such other term as provided by resolution of the Board of Directors or the appointment to office. Each officer shall serve for the term of office for which he is elected or appointed and until his successor has been elected or appointed and has qualified or his earlier resignation, removal from office or death. Any two or more offices may be held by the same person, except the offices of President and Secretary.

4.2. <u>President</u>. The President shall be the chief executive officer of the Corporation and shall have general and active management of the operation of the Corporation. He shall be responsible for the administration of the Corporation, including general supervision of the policies of the Corporation and general and active management of the financial affairs of the Corporation, and shall execute bonds, mortgages or other contracts in the name and on behalf of the Corporation.

# ARTICLE VI

## BANK ACCOUNTS

The President, the Treasurer and any Vice President or Assistant Treasurer, as may from time to time be designated by the President, shall have authority, without the necessity of further action by the Board of Directors or the shareholders, to deposit any funds of the Corporation in such banks or trust companies as shall from time to time be selected by any such officer. Any of such officers or any agent of the Corporation designated in writing by any of such officers may withdraw any or all of the funds of the Corporation so deposited in any such bank or trust company, upon checks, drafts or other instruments or orders for the payment of money drawn against the account in the name of the Corporation, and made or signed by such officers or agents. Each bank or trust company with which funds of the Corporation are so deposited is authorized to accept, honor, cash and pay, without limit as to amount, all checks, drafts or other instruments or orders for the payment of money, when drawn, made or signed by any officer or agent so designated until written notice of the revocation of the authority of any such officer or agent by the President or by resolution of the Board of Directors shall have been received by such bank or trust company.

Unless the terms of any designation of officers or agents of the Corporation authorized to act under authority of this provision shall otherwise require, any action taken under authority of this provision (including, without limitation, execution of checks, drafts, or other orders for the payment of money) may be taken upon authorization by, and shall require execution by, only one of such officers or agents so designated. The Secretary shall provide a certified copy of this provision and a certification of the names and specimen signatures of the person or persons authorized to act hereunder from time to time to the banks or trust companies in which bank accounts of the Corporation are proposed to be established or in which funds Of the Corporation are deposited, and each such bank or trust company shall be entitled to rely on the continuing effectiveness of such authorization until receipt by such bank or trust company of a further certification by the Secretary as to such authority or of written notification signed by the President or Treasurer or a certified copy of a resolution adopted by the Board of Directors indicating that such authority has been modified or terminated.

## ARTICLE VII

### SEAL

The seal of the Corporation shall be in such form as the Board of Directors may from time to time determine.  In the event it is inconvenient to use such a seal at any time, the signature of the Corporation followed by the word "Seal" enclosed in parentheses or scroll shall be deemed the seal of the Corporation.  The seal shall be in the custody of the Secretary and affixed by him or by his assistants on the share certificates and other appropriate papers.

## ARTICLE VIII

### AMENDMENT

These bylaws may be amended by majority vote of the Board of Directors of the Corporation or by majority vote of the shareholders, provided that the shareholders may provide by resolution that any bylaw provision repealed, amended, adopted or altered by them may not be repealed, amended, adopted, or altered by the Board of Directors.

H:\WPDOCS\WIP.OL\BYLAWS.GFI                                    -8-

# ARTICLES OF INCORPORATION

of

# GRECIAN FOODS, INC.

## ARTICLE I

The name of the corporation is "*Grecian Foods, Inc.*"

## ARTICLE II

The number of shares the Corporation is authorized to issue is not more than 1,000,000 shares of common stock, having a par value of $.01 per share. The Corporation shall have authority to issue not more than 1,000,000 shares of preferred stock. The Board of Directors shall have the authority to divide any or all shares of preferred stock into series and to fix and determine the relative rights and preferences of the shares of any series so established, in accordance with Section 14-2-81 of the Georgia Business Corporation Code.

## ARTICLE III

The street address of the initial registered office of the Corporation is: 167 Trinity Avenue, Atlanta, Fulton County, Georgia 30303. The initial registered agent of the Corporation at such address shall be Mitchell Martin.

## ARTICLE IV

The name and address of each incorporator is as follows:

Oliver Lee
Troutman Sanders Lockerman & Ashmore
Suite 1400
127 Peachtree Street, N.E.
Atlanta, Georgia 30303-1810

Mitchell Martin
Grecian Foods, Inc.
167 Trinity Avenue
Atlanta, Georgia 30303

## ARTICLE V

The mailing address of the initial principal office of the Corporation is: 167 Trinity Avenue, Atlanta, Georgia 30303.

## ARTICLE VI

The Corporation is organized pursuant to the provisions of the Georgia Business Corporation Code.

## ARTICLE VII

The Corporation shall have perpetual duration.

## ARTICLE VIII

The Corporation is a corporation for profit and is organized for the following general purposes:  To engage in any lawful for profit business including, but not limited to, the operation of a Gyro Wraps Restaurant in Hartsfield International Airport and to provide such other foods and beverage service as may be appropriate to the operation of that business; and to carry on any lawful business or activity relating thereto; and to engage in any other lawful act or activity for which corporation may be organized under the Georgia Business Corporation Code.

## ARTICLE IX

In addition to, but not in limitation of, the general powers conferred by law, the Corporation shall have the power to make distributions to its shareholders out of its capital surplus, to purchase its own shares out of its reserves and restricted capital surplus available therefor.

## ARTICLE X

The holders of shares of the Corporation's stock shall have preemptive rights to acquire any unissued shares of its capital stock.

## ARTICLE XI

The Corporation shall not commence business until it shall have received at least $500.00 in payment for the issuance of shares of its stock.

- 2 -

## ARTICLE XII

The initial Board of Directors shall consist of three members, who shall be and whose addresses are set forth below:

Mitchell Martin
167 Trinity Avenue
Atlanta, Georgia 30303

Tommie Ingram, Jr.
c/o Tommie's Package Store
3121 Campbellton Road
Atlanta, Georgia 30311

Terry Harps
167 Trinity Avenue
Atlanta, Georgia 30303

## ARTICLE XIII

In addition to, but not in limitation of, any other provisions of the Georgia Business Corporation Code and the Bylaws of the Corporation, any action required by the Georgia Business Corporation Code to be taken at a meeting of the shareholders of the Corporation or any action which may be taken at a meeting of the shareholders of the Corporation may be taken without a meeting if written consent, setting forth the action so taken, shall be signed by persons who would be entitled to vote at a meeting those shares having voting power to cast not less than the minimum number (or numbers, in the case of voting by classes) of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote were present and voted; provided; however, that action by less than unanimous written consent may not be taken with respect to any election of directors as to which shareholders would be entitled to cumulative voting, and provided further that such no such consent shall be effective unless the requirements of Georgia Code Section 14-2-112(d) have been met.

**IN WITNESS WHEREOF,** the undersigned has executed these Articles of Incorporation as of the ___27th___ day of ___October___ 1990.

_____
Oliver Lee, Incorporator

- 3 -

H:\WPDOCS\WIP.OLI.AOLGFI

# Secretary of State
## Corporations Division
### 315 West Tower
### #2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

```
DOCKET NUMBER  : 021680934
CONTROL NUMBER : K021319
EFFECTIVE DATE : 05/23/2002
REFERENCE      : 0044
PRINT DATE     : 06/17/2002
FORM NUMBER    : 611
```

```
PATTY F. CLARK
EPSTEIN BECKER & GREEN, P.C.
945 EAST PACES FERRY RD, STE 2700
ATLANTA,  GA  30326
```

## CERTIFICATE OF NAME CHANGE AMENDMENT

I, Cathy Cox, the Secretary of State and the Corporations Commissioner of the State of Georgia, do hereby certify under the seal of my office that

### GRECIAN FOODS, INC.
### A DOMESTIC PROFIT CORPORATION

has filed articles of amendment in the Office of the Secretary of State changing its name to

### GLOBAL CONCESSIONS, INC.

and has paid the required fees as provided by Title 14 of the Official Code of Georgia Annotated. Attached hereto is a true and correct copy of said articles of amendment.

WITNESS my hand and official seal in the City of Atlanta  and  the State of Georgia on the date set forth above.



Cathy Cox
Secretary of State

EXHIBIT "A"

**ARTICLES OF AMENDMENT TO THE
ARTICLES OF INCORPORATION OF GRECIAN FOODS, INC.
TO
CHANGE CORPORATE NAME**

I.

Article I of the Articles of Incorporation is hereby amended to read as follows:

The name of the Corporation is GLOBAL CONCESSIONS, INC.

II.

The change made by these Articles of Amendment shall be effective upon the filing of these Articles of Amendment with the Secretary of State of Georgia.

III.

These Articles of Amendment were duly approved by the board of directors of the Corporation without necessitating the approval by the shareholders of the Corporation as authorized under Section 14-2-1002 of the Georgia Business Corporation Code, and in accordance with (a) the Articles of Incorporation as they existed prior to these Articles of Amendment, and (b) the By-Laws of the Corporation.

IN WITNESS WHEREOF, the Corporation has caused these Articles of Amendment to be executed and attested by its duly authorized officers on _April 25_, 200_2_.

GLOBAL CONCESSIONS, INC.

By: _____
      President

Attest: _____
      Secretary

[CONTINUED ON NEXT PAGE]

AT:85261.1                                    3

## GRECIAN FOODS, INC.
## UNANIMOUS WRITTEN CONSENT BY
## THE BOARD OF DIRECTORS

The undersigned, constituting all of the directors of Grecian Foods, Inc., a Georgia corporation, pursuant to Section 14-2-821 of the Georgia Business Corporation Code, hereby consent to and take the following action and adopt unanimously the following resolutions, as if the same were done at a duly called and properly held meeting of the Board of Directors of Grecian Foods, Inc.

**WHEREAS**, the Board of Directors has determined that it is in the best interests of the Corporation and its shareholders to amend the Corporation's Articles of Incorporation, as permitted under Section 14-2-1002 of the Georgia Nonprofit Corporation Code, by amending Article I to read as set forth in the attached Exhibit "A";

**RESOLVED**, that the Board of Directors does hereby approve the amendment of Article I of the Corporation's Articles of Incorporation to read as set forth in the attached Exhibit "A", and the appropriate officers are authorized and directed to execute appropriate Articles of Amendment on behalf of the Corporation in the form attached to this Consent Action as Exhibit "A", to file the same with the Georgia Secretary of State, and to take any and all further actions and execute, acknowledge, seal and file any and all instruments and documents deemed necessary or proper in connection with the adoption of the proposed amendment to effect the changes contemplated by such amendment.

**FURTHER RESOLVED**, that the Secretary of the Corporation is directed to file a copy of this Consent Action with the minutes of the proceedings of the Board of Directors.

This Consent Action may be executed in two or more counterparts, each of which shall be an original and all of which together shall constitute one and the same Consent Action.

Done this _25_ day of _April_, 200_2_.

DIRECTORS:

_April 25_, 200_2_.                          _Henry Brown_
                                             Henry Brown

_April 25_, 200_2_.                          _Terrance Harps_
                                             Terrance Harps

_April 25_, 200_2_.                          _Martin Jeffries_
                                             Martin Jeffries

[SIGNATURES CONTINUED ON NEXT PAGE]

AT:85261.1

April 25 , 200 2 .

Mitchell Martin

April 25 , 200 2

Erich Randolph

April 25 , 200 2

Kenneth Syphoe

April 25, , 200 2 .

Fred Williams

**Exhibit A: Description/Map of Premises**



7



Hartsfield-Jackson
Atlanta International Airport

FOOD & BEVERAGE
H-JAIA LEASE AGREEMENT

CONCOURSE B - BOARDING LEVEL

EXHIBIT 'A'

DATE: 11/29/10

1 of 1



CITY COUNCIL
ATLANTA, GEORGIA

**A SUBSTITUTE RESOLUTION**
**BY TRANSPORTATION COMMITTEE**
**AS AMENDED BY FULL COUNCIL**

**11-R-1845**

**A RESOLUTION AUTHORIZING THE MAYOR TO AWARD AND EXECUTE THE FOLLOWING AIRPORT CONCESSIONS AGREEMENTS: FC-5461 FOOD AND BEVERAGE PACKAGE #1 WITH HOJEIJ BRANDED FOODS, INC., FC-5462 FOOD AND BEVERAGE PACKAGE #2 WITH CONCESSIONS/H&H JV, FC-5463 FOOD AND BEVERAGE PACKAGE #3 WITH HOST+ATLCHEFS JV3, FC-5464 FOOD AND BEVERAGE PACKAGE #4 WITH DNCTHS ATLANTA PARTNERS, FC-5465 FOOD AND BEVERAGE PACKAGE #5 WITH HOST+ATLCHEFS JV5, FC-5466 FOOD AND BEVERAGE PACKAGE #6 WITH ATLANTA RESTAURANT PARTNERS, LLC, FC-5467 FOOD AND BEVERAGE PACKAGE #7 WITH GLOBAL CONCESSIONS, INC., FC-5468 FOOD AND BEVERAGE PACKAGE #8 WITH MACK, INC., FC-5469 FOOD AND BEVERAGE PACKAGE #9 WITH VIDA VELOCITY MANAGEMENT, LLC FOR FOOD AND BEVERAGE CONCESSIONS AT HARTSFIELD-JACKSON ATLANTA INTERNATIONAL AIRPORT; AND FOR OTHER PURPOSES.**

**WHEREAS,** the City of Atlanta ("City") owns and operates Hartsfield-Jackson Atlanta International Airport ("Airport"); and

**WHEREAS,** the Department of Procurement solicited proposals for FC-5461. FC-5462, FC-5463, FC-5464, FC-5465 (collectively, "Large Food Packages"); and FC-5466, FC-5467, FC-5468 and FC-5469 (collectively, "Small Food Packages") for Food and Beverage Concessions on behalf of the Department of Aviation; and

**WHEREAS,** with regard to the Large Food Packages, thirty-two (32) proposals from eight (8) qualified firms were received in response to the solicitation for the right to provide food and beverage services at the Airport; and

**WHEREAS,** with regard to the Small Food Packages, sixty-eight (68) proposals from thirty-two (32) qualified firms were received in response to the solicitation for the right to provide food and beverage services at the Airport; and

**WHEREAS,** the proposals were received and evaluated and the Aviation General Manager and the Chief Procurement Officer have recommended that Concessions Agreements be awarded as follows:

1. FC-5461, Food & Beverage Package #1 to Hojeij Branded Foods, Inc.
2. FC-5462, Food & Beverage Package #2 to Concessions/H&H JV
3. FC-5463, Food & Beverage Package #3 to Host+ATLchefs JV3
4. FC-5464, Food & Beverage Package #4 to DNCTHS Atlanta Partners

1

     FC-5465, Food & Beverage Package #5 to Host+ATLchefs JV5
6. FC-5466, Food & Beverage Package #6 to Atlanta Restaurant Partners. LLC
7. FC-5467, Food & Beverage Package #7 to Global Concessions, Inc.
8. FC-5468, Food & Beverage Package #8 to Mack, Inc.; and
9. FC-5469, Food & Beverage Package #9 to Vida Velocity Management, LLC

**WHEREAS,** the City has determined that it is desirable and in its best interest to make these recommended awards and execute Concessions Agreements as provided herein.

**NOW, THEREFORE, BE IT RESOLVED BY THE COUNCIL OF THE CITY OF ATLANTA, GEORGIA,** that the Mayor is authorized to award and execute the following Food & Beverage Concessions Agreements:

1. FC-5461, Food & Beverage Package #1 to Hojeij Branded Foods. Inc.
2. FC-5462, Food & Beverage Package #2 to Concessions/H&H JV
3. FC-5463, Food & Beverage Package #3 to Host+ATLchefs JV3
4. FC-5464, Food & Beverage Package #4 to DNCTHS Atlanta Partners
5. FC-5465, Food & Beverage Package #5 to Host+ATLchefs JV5
6. FC-5466, Food & Beverage Package #6 to Atlanta Restaurant Partners. LLC
7. FC-5467, Food & Beverage Package #7 to Global Concessions. Inc.
8. FC-5468, Food & Beverage Package #8 to Mack, Inc.; and
9. FC-5469, Food & Beverage Package #9 to Vida Velocity Management, LLC

**BE IT FURTHER RESOLVED,** that each Food & Beverage Concessions Agreement will have an initial term of ten (10) years, with a single option to renew for an additional three (3) years, to be exercised at the City's sole discretion.

**BE IT FURTHER RESOLVED,** that the City Attorney is directed to prepare appropriate Concessions Agreements, consistent with the form agreement included in the RFP, for execution by the Mayor.

**BE IT FINALLY RESOLVED,** that said Concessions Agreements shall not become binding on the City, nor will the City incur any liability under them, until they have been executed by the Mayor, attested to by the Municipal Clerk, approved by the City Attorney as to form and delivered to the appropriate concessionaire.

---

A true copy,

*Rhonda Dauphin Johnson*

**Municipal Clerk**

**ADOPTED** by the Atlanta City Council
**APPROVED** by Mayor Kasim Reed

Jan. 03, 2012
Jan. 05, 2012

**<u>Exhibit C: Concessions Compliance Standards</u>**

TO REVIEW THIS EXHIBIT, GO TO:

<u>WWW.ATLANTA-AIRPORT.COM</u>

CLICK ON BUSINESS INFORMATION;

CLICK ON: CONCESSION BID OPPORTUNITY; AND

CLICK ON: CONCESSIONS COMPLIANCE STANDARD

**<u>Exhibit D; Georgia Department of Revenue Form RD-1062</u>**

RD 1062
(Revised 8/2011)
Georgia Department of Revenue
Email: taxadv@dor.ga.gov
Fax: (404) 417-6651



**Mailing Address:**
Georgia Department of Revenue
PO Box 49708
Atlanta, GA 30359-0708

## Disclosure Authorization Form

*Print or Type*

| 1. Taxpayer Information<br>Taxpayer(s) name(s) and address | Enter only those that apply |
|---|---|
| Global Concessions, Inc.<br>P. O. Box 20905<br>Atlanta, Georgia 30320 | Federal Employer ID No.　58-1914731 |
| | Social Security No. |
| | Georgia State Tax ID No.　20012373670 |
| | Georgia Sales Tax Registration No.　200-034240 |
| Daytime Telephone Number　(404) 209-0907 | Georgia Withholding Tax No.　1446425-WZ |

| 2. Appointee Information<br>Appointee name and address<br>City of Atlanta<br>Director of Airport Concessions<br>Hartsfield-Jackson Atlanta International Airport<br>6000 North Terminal Parkway<br>P.O. Box 20509<br>Atlanta, GA 30320 | Provide one of the following identification numbers<br>State and State Attorney Bar Number |
|---|---|
| | Social Security or other identification number<br>(for other ID provide number and type) |
| Daytime Telephone Number | State and Certified Public Accountant Number |

**3. Tax Matters.** The appointee is authorized to receive confidential information for the tax matter listed below:

| Tax Type | [ ] | Year(s) or Period (s) |
|---|---|---|
| Personal Income Tax...................................... | ☐ | |
| Sales and Use Tax ........................................ | ☒ | 2012-2021 |
| Corporate Income Tax.................................... | ☒ | 2012-2021 |
| Withholding Tax............................................. | ☒ | 2012-2021 |
| Other (specify) | ☐ | |

**4. Revocation of Earlier Authorization(s).** This disclosure authorization form does not revoke any prior authorization forms on file with the Department unless the following box is checked: ☐ If the box is checked, the revocation will be effective as to all earlier authorizations on file with the Department of Revenue except

*(please specify):*

**5. Signature of or for the Taxpayer.** I hereby certify that the Georgia Department of Revenue is authorized to disclose and/or discuss confidential information or records concerning the undersigned taxpayer to the appointee named above for the tax type(s) and period(s) named above. If signed by a corporate officer, member, partner, trustee or executor/executrix, I certify that I have the authority to execute this authorization form on behalf of the taxpayer. I understand that to willfully prepare or present a document that is fraudulent or false is a misdemeanor under O.C.G.A. § 48-1-6.

Signature: _____　Date: 2/2/2012

Print Name: Terrance D. Harps　Title (if applicable): CEO

The person signing as or for the taxpayer appeared this day before a notary public and acknowledged this disclosure authorization form as a voluntary act or deed.

Signature of Notary _____　Date 2/2/2012　NOTARY SEAL

1

**<u>Exhibit E; Illegal Immigration Reform and Enforcement Act Forms</u>**

## Contractor Affidavit under O.C.G.A. § 13-10-91(b)(1)

By executing this affidavit, the undersigned contractor verifies its compliance with O.C.G.A. § 13-10-91, stating affirmatively that the individual, firm or corporation which is engaged in the physical performance of services on behalf of the City of Atlanta has registered with, is authorized to use and uses the federal work authorization program commonly known as E-Verify, or any subsequent replacement program, in accordance with the applicable provisions and deadlines established in O.C.G.A. § 13-10-91. Furthermore, the undersigned contractor will continue to use the federal work authorization program throughout the contract period and the undersigned contractor will contract for physical performance of services in satisfaction of such contract only with subcontractors who present an affidavit to the contractor with the information required by O.C.G.A. § 13-10-91(b). Contractor hereby attests that its federal work authorization user identification number and date of authorization are as follows:

408558

Federal Work Authorization User Identification Number

April 14, 2011

Date of Authorization

Name of Contractor:    Global Concessions, Inc.

Name of Project:    FC-5467, Food and Beverage Concessions - Package 7

Name of Public Employer:    City of Atlanta

**I hereby declare under penalty of perjury that the forgoing is true and correct.**

Executed on  February  ,  3 , 2012 in  Atlanta          (city),  Georgia  (state)

Signature of Authorized Officer or Agent

Terrance D. Harps

Printed name and Title of Authorized Officer or Agent

SUBSCRIBED AND SWORN BEFORE
ME ON THIS THE 3rd, DAY OF February, 2012

NOTARY PUBLIC

My Commission Expires: _____

Form 7: Business Plan Form
Projected Sales, Net Income and Cash Flow

FC-5467; Food and Beverage Concessions (Package No 7 ) at Hartsfield-Jackson Atlanta International Airport

Provided projection of sales, expenses, net income and cash flow for each store location. Projected gross sales growth in years 2 thru 10 should not exceed 10% of the prior year projections; however, Proponent shall be allowed to exceed 10% growth for the year following the remodeling year only. Projected gross sales growth shall not exceed 25% of the remodeling year.

Describe major assumptions. Use the following format for a separate projection for each location. Attached additional sheets as necessary.
Also provide a grand total to include total operation of all of the locations.

Store Operator Global Concessions, Inc All Units       Store Location BF12, BF14, FF1

Store Name: Midori's Smokehouse, CoffeeBeanery&WineBar, Jekyll Island Seafood Company

| Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Sales | 11,563,696 | 11,910,607 | 12,267,925 | 12,635,963 | 13,015,041 | 13,275,342 | 13,540,849 | 13,811,666 | 14,087,899 | 14,369,657 |
| Less: Cost of Goods Sold | 2,727,292 | 2,809,111 | 2,893,384 | 2,980,186 | 3,069,591 | 3,130,983 | 3,193,603 | 3,257,475 | 3,322,624 | 3,389,077 |
| Gross Margins | 8,836,404 | 9,101,496 | 9,374,541 | 9,655,777 | 9,945,450 | 10,144,359 | 10,347,246 | 10,554,191 | 10,765,275 | 10,980,581 |
| **Operations Expenses:** | | | | | | | | | | |
| Rent to the City | 1,775,966 | 2,028,650 | 2,089,510 | 2,152,195 | 2,216,761 | 2,261,096 | 2,306,318 | 2,352,444 | 2,399,493 | 2,447,483 |
| Employee Benefits | 520,825 | 536,450 | 552,543 | 569,119 | 586,193 | 597,917 | 609,875 | 622,073 | 634,514 | 647,204 |
| Employee Salaries/Wages | 2,267,644 | 2,335,674 | 2,405,744 | 2,477,916 | 2,552,254 | 2,603,299 | 2,655,365 | 2,708,472 | 2,762,642 | 2,817,894 |
| Utilities and Telephone | 55,437 | 57,002 | 57,059 | 57,116 | 57,173 | 57,230 | 57,287 | 57,344 | 57,402 | 57,459 |
| Maintenance/Cleaning/Supplies | 278,849 | 281,638 | 284,454 | 282,202 | 282,484 | 282,766 | 283,049 | 283,332 | 283,615 | 283,899 |
| Insurance | 53,379 | 53,912 | 53,966 | 54,020 | 54,074 | 54,128 | 54,182 | 54,237 | 54,291 | 54,345 |
| Marketing/Advertising | 269,499 | 271,438 | 277,533 | 283,769 | 290,151 | 292,693 | 295,269 | 297,881 | 300,528 | 303,212 |
| Franchise/Royalty Fees | 500,773 | 510,063 | 523,453 | 537,207 | 551,335 | 559,319 | 567,448 | 575,724 | 584,150 | 592,730 |
| General & Administration | 1,503,280 | 1,503,280 | 1,533,346 | 1,564,013 | 1,595,293 | 1,643,152 | 1,692,447 | 1,743,220 | 1,795,517 | 1,849,382 |
| Interest | 99,709 | 101,395 | 92,584 | 83,090 | 72,859 | 61,833 | 49,952 | 37,148 | 23,350 | 8,481 |
| Depreciation and Amortization | 215,513 | 221,513 | 231,393 | 242,353 | 251,353 | 174,928 | 545,376 | 547,996 | 556,536 | 557,036 |
| Other ( See below ?) | 688,357 | 639,133 | 669,674 | 700,998 | 734,683 | 783,354 | 608,828 | 618,477 | 625,450 | 636,753 |
| Total Expenses | 8,229,332 | 8,540,148 | 8,768,724 | 9,003,998 | 9,246,612 | 9,371,715 | 9,725,396 | 9,898,347 | 10,077,488 | 10,255,878 |
| | | | | | | | | | | |
| Net Income | 607,071 | 561,348 | 605,816 | 651,779 | 700,838 | 772,644 | 621,850 | 655,844 | 687,787 | 724,702 |
| | | | | | | | | | | |
| Add: Depreciation and Amortization | 215,513 | 221,513 | 231,393 | 242,353 | 251,353 | 174,928 | 545,376 | 547,996 | 556,536 | 557,036 |
| Equals: Cash Flow from Operations | 822,584 | 782,861 | 837,209 | 894,132 | 952,191 | 947,572 | 1,167,226 | 1,203,839 | 1,244,323 | 1,281,738 |
| | | | | | | | | | | |
| Beginning Cash Balance | 2,024,104 | 1,017,273 | 1,656,647 | 2,321,459 | 3,029,000 | 3,794,168 | 4,543,292 | 4,036,996 | 5,025,602 | 6,039,393 |
| Add: Cash Flow from Operations | 2,846,688 | 1,800,134 | 2,493,856 | 3,215,591 | 3,981,191 | 4,741,740 | 5,710,517 | 5,240,836 | 6,269,925 | 7,321,131 |
| Less: Debt Service (Principal Only) | 106,311 | 113,487 | 122,297 | 131,791 | 142,023 | 153,048 | 164,930 | 177,734 | 191,532 | 206,401 |
| Less: Capital Expenditures | 1,724,104 | 30,000 | 50,100 | 54,800 | 45,000 | 45,000 | 1,508,591 | 37,500 | 39,000 | 9,500 |
| Equals: Ending Cash Balance | 1,017,273 | 1,656,647 | 2,321,459 | 3,029,000 | 3,794,168 | 4,543,292 | 4,036,996 | 5,025,602 | 6,039,393 | 7,105,230 |

*Taxes/ Licenses/Owners Distributions
Assumptions:

Consolidation of all 3 units. See individual projections for assumptions.

**Form 7: Business Plan Form**

**Projected Sales, Net Income and Cash Flow**

**FC-5467: Food and Beverage Concessions (Package No 7 ) at Hartsfield-Jackson Atlanta International Airport**

Provided projection of sales, expenses, net income and cash flow for each store location. Projected gross sales growth in years 2 thru 10 should not exceed 10% of the prior year projections; however, Proponent shall be allowed to exceed 10% growth for the year following the remodeling the remodeling year only. Projected gross sales growth shall not exceed 25% of the remodeling year.

Describe major assumptions. Use the following format for a separate projection for each location. Attached additional sheets as necessary.
Also provide a grand total to include total operation of all of the locations.

Store Operator: Global Concessions, Inc.

Store Name: Jekyll Island Seafood Company          Store Location: EF1

| Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Sales | 3,822,539 | 3,937,215 | 4,055,331 | 4,176,591 | 4,302,301 | 4,388,347 | 4,476,114 | 4,565,636 | 4,656,949 | 4,750,088 |
| Less:Cost of Good Sold | 879,184 | 905,559 | 932,726 | 960,708 | 989,529 | 1,009,320 | 1,029,506 | 1,050,096 | 1,071,098 | 1,092,520 |
| Gross Margins | 2,943,355 | 3,031,656 | 3,122,605 | 3,216,283 | 3,312,772 | 3,379,027 | 3,446,608 | 3,515,540 | 3,585,851 | 3,657,568 |
| **Operations Expenses:** | | | | | | | | | | |
| Rent to the City | 466,611 | 680,941 | 701,370 | 722,411 | 744,083 | 758,965 | 774,144 | 789,627 | 805,419 | 821,528 |
| Employee Benefits | 175,072 | 180,324 | 185,734 | 191,306 | 197,045 | 200,986 | 205,006 | 209,106 | 213,288 | 217,554 |
| Employee Salaries/Wages | 764,508 | 787,443 | 811,066 | 835,398 | 860,460 | 877,669 | 895,223 | 913,127 | 931,390 | 950,018 |
| Utilities and Telephone | 18,745 | 18,932 | 18,951 | 18,970 | 18,989 | 19,008 | 19,027 | 19,046 | 19,065 | 19,084 |
| Maintenance/Cleaning /Supplies | 92,279 | 93,202 | 93,295 | 93,389 | 93,482 | 93,576 | 93,669 | 93,763 | 93,857 | 93,950 |
| Insurance | 17,735 | 17,912 | 17,930 | 17,948 | 17,966 | 17,984 | 18,002 | 18,020 | 18,038 | 18,056 |
| Marketing/Advertising | 114,676 | 114,676 | 116,970 | 119,309 | 121,695 | 122,304 | 122,915 | 123,530 | 124,147 | 124,768 |
| Franchise/Royalty Fees | 191,127 | 191,127 | 194,949 | 198,848 | 202,825 | 203,840 | 204,859 | 205,883 | 206,912 | 207,947 |
| General & Administration | 496,930 | 496,930 | 506,869 | 517,006 | 527,346 | 543,167 | 559,462 | 576,245 | 593,533 | 611,339 |
| Interest | 33,127 | 33,688 | 39,760 | 27,606 | 24,207 | 20,543 | 16,596 | 12,342 | 7,758 | 2,818 |
| Depreciation and Amortization | 71,439 | 73,439 | 75,839 | 79,319 | 82,319 | 58,443 | 180,762 | 182,528 | 185,548 | 185,548 |
| Other (See below *) | 289,280 | 196,075 | 202,327 | 208,271 | 214,699 | 223,032 | 158,172 | 153,495 | 148,103 | 144,136 |
| Total Expenses | 2,731,529 | 2,884,690 | 2,956,060 | 3,029,781 | 3,105,117 | 3,139,516 | 3,247,836 | 3,296,712 | 3,347,058 | 3,396,746 |
| | | | | | | | | | | |
| Net Income | 211,826 | 146,966 | 166,545 | 186,502 | 207,655 | 239,511 | 198,772 | 218,828 | 238,793 | 260,822 |
| | | | | | | | | | | |
| Add: Depreciation and Amortization | 71,439 | 73,439 | 75,839 | 79,319 | 82,319 | 58,443 | 180,762 | 182,528 | 185,548 | 185,548 |
| Equals: Cash Flow from Operations | 283,265 | 220,405 | 242,384 | 265,821 | 289,974 | 297,955 | 379,534 | 401,356 | 424,341 | 446,371 |
| | | | | | | | | | | |
| Beginning Cash Balance | 671,512 | 348,276 | 520,976 | 710,028 | 914,664 | 1,142,452 | 1,369,558 | 1,194,222 | 1,524,028 | 1,871,735 |
| Add: Cash Flow from Operations | 954,777 | 568,681 | 763,360 | 975,850 | 1,204,638 | 1,440,407 | 1,749,092 | 1,595,578 | 1,948,369 | 2,318,105 |
| Less: Debt Service (Principal Only) | 34,989 | 37,705 | 40,632 | 43,786 | 47,186 | 50,849 | 54,796 | 59,050 | 63,635 | 68,575 |
| Less: Capital Expenditures ) | 571,512 | 10,000 | 12,700 | 17,400 | 15,000 | 20,000 | 500,073 | 12,500 | 13,000 | 3,000 |
| Equals: Ending Cash Balance | 348,276 | 520,976 | 710,028 | 914,664 | 1,142,452 | 1,369,558 | 1,194,222 | 1,524,028 | 1,871,735 | 2,246,531 |

*Taxes/ Licenses/Owners Distributions

Assumptions:          See attached:

Form 7: Business Plan Form

Projected Sales, Net Income and Cash Flow

FC-5467; Food and Beverage Concessions (Package No 7 ) at Hartsfield-Jackson Atlanta International Airport

Provided projection of sales, expenses, net income and cash flow for each store location. Projected gross sales growth in years 2 thru 10 should not exceed 10% of the prior year projections; however, Proponent shall be allowed to exceed 10% growth for the year following the remodeling year only. Projected gross sales growth shall not exceed 25% of the remodeling year.

Describe major assumptions. Use the following format for a separate projection for each location. Attached additional sheets as necessary.

Also provide a grand total to include total operation of all of the locations.

Store Operator: Global Concessions, Inc

Store Location: BFJ2

Store Name: Michon's Smokehouse

| Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Sales | 4,509,472 | 4,644,756 | 4,784,099 | 4,927,621 | 5,075,450 | 5,176,959 | 5,280,498 | 5,336,108 | 5,493,830 | 5,603,707 |
| Less: Cost of Good Sold | 1,104,821 | 1,137,965 | 1,172,104 | 1,207,267 | 1,243,485 | 1,268,355 | 1,293,722 | 1,319,597 | 1,345,988 | 1,372,908 |
| Gross Margins | 3,404,651 | 3,506,791 | 3,611,994 | 3,720,354 | 3,831,965 | 3,908,604 | 3,986,776 | 4,056,512 | 4,147,842 | 4,230,799 |
| Operations Expenses: | | | | | | | | | | |
| Rent to the City | 779,913 | 803,311 | 827,410 | 852,232 | 877,799 | 895,355 | 913,262 | 931,527 | 950,158 | 969,161 |
| Employee Benefits | 228,765 | 235,628 | 242,697 | 249,978 | 257,478 | 262,627 | 267,880 | 273,237 | 278,702 | 284,276 |
| Employee Salaries/Wages | 856,800 | 882,504 | 908,979 | 936,248 | 964,336 | 983,622 | 1,003,295 | 1,023,361 | 1,043,828 | 1,064,704 |
| Utilities and Telephone | 21,025 | 21,235 | 21,256 | 21,277 | 21,299 | 21,320 | 21,341 | 21,362 | 21,384 | 21,405 |
| Maintenance/Cleaning /Supplies | 108,118 | 109,199 | 109,308 | 109,418 | 109,527 | 109,637 | 109,746 | 109,856 | 109,966 | 110,076 |
| Insurance | 20,946 | 21,156 | 21,177 | 21,198 | 21,219 | 21,240 | 21,262 | 21,283 | 21,304 | 21,326 |
| Marketing/Advertising | 90,189 | 90,189 | 91,993 | 93,833 | 95,710 | 96,188 | 96,669 | 97,153 | 97,638 | 98,127 |
| Franchise/Royalty Fees | 180,379 | 185,790 | 191,364 | 197,105 | 203,018 | 207,078 | 211,220 | 215,444 | 219,753 | 224,148 |
| General & Administration | 586,231 | 586,231 | 597,956 | 609,915 | 622,113 | 640,777 | 660,000 | 679,800 | 700,194 | 721,200 |
| Interest | 39,127 | 39,788 | 36,331 | 32,605 | 28,591 | 24,264 | 19,602 | 14,577 | 9,163 | 3,328 |
| Depreciation and Amortization | 84,850 | 86,850 | 90,850 | 94,330 | 97,330 | 65,930 | 212,418 | 212,584 | 215,604 | 216,604 |
| Other (See below * ) | 195,380 | 218,988 | 231,085 | 245,833 | 260,538 | 283,583 | 217,863 | 225,490 | 231,891 | 239,512 |
| Total Expenses | 3,191,723 | 3,280,870 | 3,371,306 | 3,463,972 | 3,558,957 | 3,611,621 | 3,754,555 | 3,825,675 | 3,899,585 | 3,973,367 |
| Net Income | 212,928 | 225,921 | 240,689 | 256,382 | 273,008 | 296,983 | 232,221 | 240,837 | 248,257 | 256,932 |
| Add: Depreciation and Amortization | 84,850 | 86,850 | 90,850 | 94,330 | 97,330 | 65,930 | 212,418 | 212,584 | 215,604 | 216,604 |
| Equals: Cash Flow from Operations | 297,778 | 312,771 | 331,539 | 350,712 | 370,338 | 362,913 | 444,638 | 453,421 | 463,861 | 473,536 |
| Beginning Cash Balance | 778,800 | 356,452 | 614,690 | 878,238 | 1,159,834 | 1,459,441 | 1,749,596 | 1,535,564 | 1,906,741 | 2,282,443 |
| Add: Cash Flow from Operations | 1,076,577 | 669,223 | 946,229 | 1,228,950 | 1,530,172 | 1,822,354 | 2,194,235 | 1,948,986 | 2,370,603 | 2,755,980 |
| Less: Debt Service (Principal Only) | 41,325 | 44,533 | 47,991 | 51,716 | 55,731 | 60,658 | 64,720 | 69,745 | 75,159 | 80,994 |
| Less: Capital Expenditures | 678,800 | 10,000 | 20,000 | 17,400 | 15,000 | 12,700 | 593,950 | 12,500 | 13,000 | 4,000 |
| Equals: Ending Cash Balance | 356,452 | 614,690 | 878,238 | 1,159,834 | 1,459,441 | 1,749,596 | 1,535,564 | 1,906,741 | 2,282,443 | 2,670,986 |

*Taxes/Licenses/Owners Distributions

Assumptions:    See attached:

**Form 7: Business Plan Form**

**Projected Sales, Net Income and Cash Flow**

FC-S4/67; Food and Beverage Concessions (Package No 7) at Hartsfield-Jackson Atlanta International Airport

Provided projection of sales, expenses, net income and cash flow for each store location. Projected gross sales growth in years 2 thru 10 should not exceed 10% of the prior year projections; however, Proponent shall be allowed to exceed 10% growth for the year following the remodeling year only. Projected gross sales growth shall not exceed 25% of the remodeling year.

Describe major assumptions. Use the following format for a separate projection for each location. Attached additional sheets as necessary.

Also provide a grand total to include total operation of all of the locations.

Store Operator: Global Concessions, Inc

Store Name: Coffee Beanery & Wine Bar                Store Location: BF14

| Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Sales | 3,231,685 | 3,328,636 | 3,428,495 | 3,531,350 | 3,637,290 | 3,710,036 | 3,784,237 | 3,889,921 | 3,937,120 | 4,015,862 |
| Less: Cost of Good Sold | 743,288 | 765,586 | 788,554 | 812,210 | 836,577 | 853,308 | 870,374 | 887,782 | 905,538 | 923,648 |
| Gross Margins | 2,488,398 | 2,563,050 | 2,639,941 | 2,719,139 | 2,800,713 | 2,856,728 | 2,913,862 | 2,972,139 | 3,031,582 | 3,092,214 |
| | | | | | | | | | | |
| **Operations Expenses:** | | | | | | | | | | |
| Rent to the City | 528,542 | 544,398 | 560,730 | 577,552 | 594,879 | 606,776 | 618,912 | 631,290 | 643,916 | 656,794 |
| Employee Benefits | 116,387 | 120,497 | 124,112 | 127,835 | 131,670 | 134,303 | 136,989 | 139,729 | 142,524 | 145,374 |
| Employee Salaries/Wages | 646,337 | 665,727 | 685,699 | 706,270 | 727,458 | 742,007 | 756,847 | 771,984 | 787,424 | 803,172 |
| Utilities and Telephone | 16,668 | 16,835 | 16,852 | 16,868 | 16,885 | 16,902 | 16,919 | 16,936 | 16,953 | 16,970 |
| Maintenance/Cleaning /Supplies | 78,452 | 79,237 | 79,316 | 79,395 | 79,475 | 79,554 | 79,634 | 79,713 | 79,793 | 79,873 |
| Insurance | 14,698 | 14,845 | 14,860 | 14,874 | 14,889 | 14,904 | 14,919 | 14,934 | 14,949 | 14,964 |
| Marketing/Advertising | 64,634 | 66,573 | 68,570 | 70,627 | 72,746 | 74,201 | 75,685 | 77,198 | 78,742 | 80,317 |
| Franchise/Royalty Fees | 129,267 | 133,145 | 137,140 | 141,254 | 145,492 | 148,401 | 151,369 | 154,397 | 157,485 | 160,634 |
| General & Administration | 420,119 | 420,119 | 425,521 | 437,092 | 445,834 | 459,209 | 472,985 | 487,175 | 501,790 | 516,843 |
| Interest | 27,455 | 27,919 | 25,493 | 22,879 | 20,062 | 17,026 | 13,754 | 10,229 | 6,429 | 2,335 |
| Depreciation and Amortization | 59,224 | 61,224 | 64,704 | 68,704 | 71,704 | 50,554 | 152,196 | 152,883 | 155,383 | 154,883 |
| Other ( See below *) | 203,697 | 224,070 | 235,363 | 246,894 | 259,446 | 276,740 | 232,795 | 239,492 | 245,457 | 253,105 |
| Total Expenses | 2,306,080 | 2,374,589 | 2,441,359 | 2,510,245 | 2,580,539 | 2,620,578 | 2,723,005 | 2,775,961 | 2,830,845 | 2,885,266 |
| | | | | | | | | | | |
| Net Income | 182,317 | 188,461 | 198,582 | 208,894 | 220,175 | 236,150 | 190,857 | 196,179 | 200,737 | 206,948 |
| | | | | | | | | | | |
| Add: Depreciation and Amortization | 59,224 | 61,224 | 64,704 | 68,704 | 71,704 | 50,554 | 152,196 | 152,883 | 155,383 | 154,883 |
| Equals: Cash Flow from Operations | 241,541 | 249,685 | 263,286 | 277,598 | 291,879 | 286,704 | 343,054 | 349,062 | 356,120 | 361,831 |
| | | | | | | | | | | |
| Beginning Cash Balance | 573,792 | 312,544 | 520,980 | 733,192 | 954,502 | 1,192,275 | 1,424,137 | 1,307,210 | 1,594,833 | 1,885,215 |
| Add: Cash Flow from Operations | 815,333 | 562,229 | 784,267 | 1,010,791 | 1,246,381 | 1,478,979 | 1,767,191 | 1,656,272 | 1,750,953 | 2,247,046 |
| Less: Debt Service (Principal Only) | 28,997 | 31,249 | 33,674 | 36,289 | 39,106 | 42,142 | 45,413 | 48,939 | 52,738 | 56,832 |
| Less: Capital Expenditures | 473,792 | 10,000 | 17,400 | 20,000 | 15,000 | 12,700 | 414,568 | 12,500 | 13,000 | 2,500 |
| Equals: Ending Cash Balance | 312,544 | 520,980 | 733,192 | 954,502 | 1,192,275 | 1,424,137 | 1,307,210 | 1,594,833 | 1,885,215 | 2,187,713 |

*Taxes/ Licenses/Owners Distributions

Assumptions:                See attached:

# Transition Plan

Contract:

Your Company Name:

GLOBAL CONCESSIONS, INC.

| Current Space | Space Number | HMS/SUB | Current Description | New Description | Transition Date | Construction Date | Open Date | Days of Construction | Comments/Notes |
|---|---|---|---|---|---|---|---|---|---|
| Wendy's | ATR-F2 | HMS/SUB | Wendy's | Teriyaki Experience | 4/6/2012 | 4/7/2012 | 7/7/2012 | 91 | Sojourner's Café Kiosk |
| Domino's | ATR-F4 | HMS/SUB | Domino's | Shane's BB | 4/6/2012 | 4/7/2012 | 7/7/2012 | 91 | Sojourner's Café Kiosk |
| Edy's | ATR-F5 | HMS/SUB | Edy's | Picnic | 4/6/2012 | 9/10/2012 | 12/15/2012 | 96 | Great Wraps Kiosk |
| New Space | ATR-F12 | HMS/SUB | New Space | Picnic | 10/1/2012 | 9/10/2012 | 12/15/2012 | 96 | Sojourner's Café Kiosk |
| Sweetwater | BF-12 | GCI PRIME | Sweetwater Brewery | Michon's Smokehouse | 4/6/2012 | 9/10/2012 | 12/15/2012 | 96 | Sweet Georgia Juke Joint Kiosk |
| Seattle's Best | BF-14 | GCI PRIME | Seattle's Best | Coffee Beanery/Wine | 4/6/2012 | 4/7/2012 | 6/1/2012 | 55 | Sojourner's Café Kiosk |
| Sam Adam's | CF-9 | HMS/SUB | Sam Adam's | Sweet GA's Juke Joint | 4/6/2012 | 9/10/2012 | 12/10/2012 | 91 | Sweet Georgia Juke Joint Kiosk |
| New Space | CF-31 | HMS/SUB | New Space | Fresh Healthy Café | 4/1/2012 | 4/1/2012 | 6/1/2012 | 61 | Sojourner's Café Kiosk |
| New Space | F-F1 | GCI PRIME | New Space | Jekyll Island Seafood | 2/15/2012 | 2/15/2012 | 5/1/2012 | 76 | N/A |

**<u>Exhibit H; Premises Availability Schedule</u>**

# Exhibit H
## Premises Availability Schedule

**Packages**                                    **Premises Availability Dates**

### Food and Beverage

| Packages | Premises Availability Dates |
|---|---|
| Package #1 | April 1, 2012 |
| Package #2 | April 1, 2012 |
| Package #3 | April 1, 2012 |
| Package #4 | |
| D-F1, D-F2, D-F7, D-8a, D-F9, D-F9a, D-F10, D-F11 | April 1, 2012 |
| D-KF1, D-KF2, D-KF3, Concourse T | April 1, 2012 |
| D-F3, D-F4, D-F5, D-F6, D-F14, D-F15, D-F16 | Third QRT 2013 |
| D-F17, D-F18 | Third QRT 2013 |
| Package #5 | |
| Atrium | April 1, 2012 |
| ATR-F5, ATR-F13 | Third Quarter 2012 |
| Concourse F | Contract Execution Date |
| Package #6 | April 1, 2012 |
| Package #7 | April 1, 2012 |
| Package #8 | April 1, 2012 |
| Package #9 | April 1, 2012 |

### Retail

| Packages | Premises Availability Dates |
|---|---|
| Package #1 | |
| Concourse E | March 1, 2012 |
| Concourse F | Contract Execution Date |
| Package #2 | |
| Concourse E | March 1, 2012 |
| Concourse F | Contract Execution Date |

**<u>Appendix A: Office of Contract Compliance Requirements</u>**

## CITY OF ATLANTA CONTRACT COMPLIANCE CERTIFICATE

The undersigned has prepared and submitted all the documents attached hereto. The documents have been prepared with a full understanding of the City's goals and objectives with respect to increased opportunity in the proposed work to e undertaken in performance of this project. It is the company's intent to achieve the airport Concessions Disadvantaged Business Enterprise goals, the Equal Employment Opportunity goals, and the First Source Jobs Employment goals.

All information and representations contained herein and submitted with this bid or proposal are true and correct.

_____
Witness

_____
Signature
Company Authorized Representative

Date: _____October 10, 2011_____

Company Name: ___Global Concessions, Inc.___

FC Number: ___FC-5467___

Project Name: ___Food and Beverage Concessions (Package No. 7)___

**ACDBE -1**

# Contact info for FC-5467 ~ Package #7 _____

| Prime Concession Company Name | Sub-tenant Company Name | Description of Work | Diversity Category (ACDBE or Non-ACDBE) | Concessionaire Contact Name | Concessionaire Address | Concessionaire's Contact Number | Proposed Operating Location | Projected Year 1 Revenue | | ACDBE Participation Percentage |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Prime/ Sub-tenant Projected Revenue | | |
| Global Concessions, Inc | N/A | Food and Beverage Concessions | ACDBE | Terrance D. Harps | P. O. Box 20905 Atlanta, GA 30320 | (770) 322-0029 | HJAIA | $11,563,696 | | 100% |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

## Contact info for FC- 5467 ~ Package #7

| | | | | | | | | | PROPOSED TOT⟩ PARTICIPATIO⟩ |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 1006 |

Codes: AABE ~ African American Enterprise; HABE~ Hispanic American Business Enterprise; ABE ~ Asian (Pacific Islander) American Business Enterprise
***Note: EBO certification does not qualify for ACDBE projects

Proponent's Company Name:    Global Concessions, Inc.

Proponent's Contact Number: (770) 322-0029

Project Name: Food and Beverage Concessions (Package No. 7)  FC#:5467

Date:10/19/11

Signature:

(Please Print)      ACDBE-3
TERRANCE D. HARPS

# FIRST SOURCE JOBS INFORMATION FORM

Company Name:          Global Concessions, Inc.

FC Number:             FC-5467

Project Name:          Food and Beverage Concessions (Package No. 7)

The following entry-level positions will become available as a result of the above referenced contract with the City of Atlanta:

1.    Sales Associate

2.    Line Cook

3.    Server

4.    Bartender

5.    Host

Include a job description and all required qualifications for each position listed above.

Identify a company representative and contact phone number who will be responsible for coordinating with the First Source Jobs Program.

Company Representative:  _____ Valorie M. Salahuddin

Phone: _____  (404) 209-0907, ext. 4

---

**FORM 4**

THIS AGREEMENT REGARDING THE USE OF THE FIRST SOURCE JOBS PROGRAM BY CONTRACTORS WITH THE CITY OF ATLANTA TO FILL ENTRY LEVEL JOBS is made and entered into by Global Concessions, Inc.

**This 10th day of October, 2011.**

The City of Atlanta requires the immediate beneficiary or primary contractor for every eligible project to enter into a First Source Jobs employment agreement. The contractor agrees to the following terms and conditions:

- The first source for finding employees to fill all entry level jobs Created by the eligible project will be the First Source Program.

- The contractor will make every effort to fill 50% of the entry level jobs created by this eligible project with applicants from the First Source Program.

- The contractor shall make good faith effort to reach the goal of this employment agreement.

- Details as to the number and description of each entry level job must me provided with the bid.

- The contractor shall comply with the spirit of the First Source Jobs Policy beyond the duration of this agreement and continue to make good faith attempts to hire employees of similar backgrounds to those participating in the First Source Program.

- The contractor as a condition of transfer, assignment or otherwise shall require the transferee to agree in writing to the terms of the employment Agreement.

Upon a determination that a beneficiary or contractor has failed to comply with the terms of this Agreement, the City may impose the following penalties based on the severity of the non-compliance:

- The City of Atlanta may withhold payment from the contractor.

- The City of Atlanta may withhold 10 percent of all future payments on the contract until the contractor is in compliance

- The City of Atlanta may refuse all future bids on city projects or applications for financials assistance in any form from the City until the contractor demonstrated that the First Source requirements have been met, or cancellation of the eligible project.

- The City of Atlanta may cancel the eligible project.

All terms stated herein can be found in the City of Atlanta Code of Ordinances Sections 5-8002 through 5-8005.

The undersigned hereby agrees to the terms and conditions set forth in this agreement.

Contractor                                   FORM 5

## Appendix B: Insurance and Bonding Requirements

**Appendix B**
**INSURANCE/BONDING REQUIREMENTS**
**FC-5467 Food and Beverage Concessions (Package No. 7)**
**at Hartsfield - Jackson Atlanta International Airport**

A.  <u>General Preamble</u>

     The following general requirements apply to any and all leases at Hartsfield-Jackson Atlanta International Airport.  Compliance is required by all Lessees and Sub-Lessees of any tier.  Insurance/Bonding requirements are based on information received as of date of lease. **The City of Atlanta reserves the right to adjust or waive any or all requirements based on receipt of additional information pertinent to this contract.**

1.  <u>Evidence of Insurance Required Before any modification Work Begins</u>

     No Lessee or Sub-Lessee shall commence any work of any kind under this contract until all Insurance and Bond requirements contained in this lease shall have been complied with as outlined below, and until evidence of such compliance satisfactory to the City as to form and content has been filed with the City. **The Acord Certificate of Insurance or a pre-approved substitute is the required form in all cases where reference is made to a Certificate of Insurance or an approved substitute.** In addition; if the Lessee or Sub-Lessee is a joint venture, the insurance certificate or pre-approved substitute should name the joint venture, rather than the joint venture partners individually, as the primary insured**.**

2.  <u>Minimum Financial Security Requirements</u>

     Any and all companies providing insurance required by this lease must meet certain minimum financial security requirements set forth below.  These requirements conform to the ratings published by A.M. Best & Co. in the current <u>Best's Key Rating Guide - Property-Casualty.</u>  The ratings for each company must be indicated on the Acord Certificate of Insurance Form.

     For all Contracts, regardless of size, companies providing Insurance of Bonds under this contract must have a current:

    i)    Best's Rating not less than <u>A-</u> and current
    ii)   Best's Financial Size Category not less than <u>Class IX</u>.
    iii)  Companies must be authorized to conduct and transact insurance contracts by the Insurance Commissioner, State of Georgia, furthermore, all bid, performance and payment bonds must

be a U.S. Treasury Circular 570 listed company.

If the issuing company does not meet these minimum requirements, or for any other reason shall be or become unsatisfactory to the City, written notification shall be mailed by the City to the lessor who shall promptly obtain a new policy or bond issued by an insurer acceptable to the City, and shall submit evidence of the same to the City as required herein.

Upon failure of the lessor to furnish, deliver and maintain such insurance or bonds as herein provided, this lessor, at the election of the City, may be declared forthwith suspended, discontinued or terminated. Failure of the lessor to take out and/or to maintain any required insurance or bonds shall not relieve the lessor from any liability under the contract, nor shall these requirements be construed to conflict with the obligation of the lease concerning indemnification.

3.    Insurance Required for Duration of Contract

Any and all Insurance and Bonds required by this lease shall be maintained during the entire length of this lease, including any extensions thereto, and until all work has been completed to the satisfaction of the City. The City shall have the right to inquire into the adequacy of the insurance coverages set forth in this lease and to negotiate such adjustments as reasonable appear necessary.

4.    Mandatory 30-Day Notice of Cancellation or Material Change

The City of Atlanta shall, without exception, be given not less than thirty (30) days notice prior to cancellation for other than non-payment of premium or for material change of any Insurance or Bond required by this contract. Non-payment of premium shall require ten (10) days notice of cancellation. Confirmation of this mandatory 30 days notice of cancellation shall appear on the Acord Certificate of Insurance and on any and all Bonds and Insurance policies required by this contract. Please send cancellation notice to **Risk Management at 68 Mitchell Street, Suite 9100 Atlanta, GA 30303**

5.    City of Atlanta as Additional Insured

The City of Atlanta shall be covered as Additional Insured under any and all Insurance and Bonds required by this contract, and such insurance shall be primary with respect to the Additional Insured. Confirmation of this shall appear on the Acord Certificate of Insurance, and on any and all applicable Bonds and Insurance policies. **Lessee must also submit to City an Additional Insured**

**Endorsement evidencing City's rights as an Additional Insured for each policy of insurance under which it is required to be an additional insured pursuant to this Appendix B.** However, this requirement does not apply to Workers' Compensation, Professional Liability Insurance or Payment and Performance Bonds.

6.    Mandatory Sub-Lessee Compliance

Lessee shall incorporate a copy of these Insurance and Bond requirements in each and every contract with each and every Sub-Lessee of any tier, and shall require each and every Sub-Lessee of any tier to comply with all such requirements. Lessor agrees that if for any reason Sub-Lessee fails to procure and maintain Insurance and Bonds as required, all such required Insurance and Bonds shall be procured and maintained by lessor at Lessee's expense.

7.    Authorization and Licensing of Agent

Each and every agent acting as Authorized Representative on behalf of a Company affording coverage under this lease shall warrant when signing the Acord Certificate of Insurance that specific authorization has been granted by the Companies for the agent to bind coverage as required and to execute the Acord Certificate of Insurance as evidence of such coverage. City of Atlanta coverage requirements may be broader than the original policies, these requirements have been conveyed to the Companies for these terms and conditions.

In addition, each and every agent shall warrant when signing the Acord Certificate of Insurance that the agent is licensed to do business in the State of Georgia and that the Company or Companies are currently in good standing in the State of Georgia.

B.    Workers' Compensation and Employer's Liability Insurance

The Lessee shall procure and maintain Workers' Compensation and Employer's Liability Insurance in the following limits, such insurance to cover each and every employee who is or may be engaged in work under the contract:

**Workers' Compensation . . . . . . . . Statutory**

**Employer's Liability**
**Bodily Injury by Accident/Disease**    $500,000 each accident
**Bodily Injury by Accident/Disease**    $500,000 each employee
**Bodily Injury by Accident/Disease**    $500,000 policy limit

C.    <u>Commercial General Liability Insurance</u>

The Lessee shall procure and maintain General Liability Insurance on form (CG 00 00 01 or equivalent) in an amount not less than **$1,000,000 per occurrence subject to a $2,000,000 aggregate** for Bodily Injury and Property Damage. The following specific extensions of coverage shall be provided and shall be indicated on the Acord Certificate of Insurance:

1.    Comprehensive Form
2.    Contractual Insurance - (Blanket or specific applicable to this contract)
3.    Personal Injury
4.    Broad Form Property Damage
5.    Premises – Operations
6.    Products- Completed Operations

D.    <u>Liquor Liability Insurance</u>

Lessee shall purchase Liquor Liability if Lessee is in the business of serving or selling alcohol for a fee with limits of at least $1,000,000 Per Occurrence Bodily Injury and Property Damage. Coverage may also be satisfied through an endorsement to your Commercial General Liability Policy.

E.    <u>Automobile Liability Insurance</u>

The Lessee shall procure and maintain Automobile Liability Insurance with not less than **$1,000,000** Bodily Injury and Property Damage combined single limit. The following extensions of coverage shall be provided and shall be indicated on the Certificate of Insurance:

1.    Comprehensive Form
2.    Owned, Hired, Leased and Non-owned vehicles to be covered.
3.    Waiver of Subrogation in favor of the City of Atlanta

**In the event the Lessee does not own any automobiles in the corporate name, non-owned vehicle coverage shall apply and must be endorsed on either the Lessee's personal automobile policy or the Comprehensive General Liability coverage (c) required under this contract.**

**In addition and in accordance with Section 22-181(b) of Chapter 22, Code of Ordinances of the City of Atlanta, all vehicles requiring access to the restricted areas of the airport must be covered by an automobile liability policy in the minimum amount of ten million ($10,000,000) combined single limit for personal injury and property damage. The $10,000,000 limit of liability will also be imposed on any parties transporting workers, materials and/or equipment to the Airport site from parking lots or similar facilities.**

F.    Property Insurance

Lessee shall procure and maintain Property Insurance covering all forms of risk on all Tenant Improvements and any other interests of Lessee, if applicable, in or about the Leased Premises, including inventory, supplies, and other property of Lessee located at said Premises, insuring against the perils of fire, lightning, extended coverage, perils vandalism, malicious mischief, glass breakage and sprinkler leakage, in an amount equal to the full replacement value of Tenant Improvements and any other interests of Lessee in or about said Premises.

G.    Performance and Payment Bonds

Tenant must, within thirty (30) days of the Commencement Date, at its own expense, deliver to the Aviation General Manager a Performance Bond in an amount equal to twelve (12) months of the then current total Minimum Annual Guarantee under this Agreement payable to the City, naming the City as co-obligee and issued by a surety company or companies in such form as approved by the City's Attorney, which surety bond or bonds must be renewed annually, at the then current total Minimum Annual Guarantee. The bonds must be kept in full force and effect during the Term and any renewals. In lieu of a Performance Bond, Tenant may submit to the City an Irrevocable Letter of Credit in a form acceptable to City, in it sole discretion.

OR (low MAG & costly construction)

Tenant must, within thirty (30) days of the Commencement Date, at its own expense, deliver to the Aviation General Manager a Performance Bond in an amount equal to twelve (12) months of the then current total Minimum Annual Guarantee under this Agreement. The Performance bonds must be kept in full force and effect during the Term and any renewals and must be renewed annually, at the then current total Minimum Annual Guarantee. In addition during periods of construction, a Payment bond for 100% of the total construction value must also be issued and kept in effect during any period of construction and until work is completed and satisfactory to the Owner. Each must be made payable to the City, naming the City as co-obligee and issued by a surety company or companies in such form as approved by the City's Attorney. In lieu of a Performance Bond, Tenant may submit to the City an Irrevocable Letter of Credit in a form acceptable to City, in it sole discretion.

1.      In addition, prior to the commencement of any construction work by or at the instance of Tenant within the Premises, it must provide to City a fixed price contract or contracts for all work to be performed within the Premises, which contract(s) shall be insured by, and Tenant shall provide to the City, a Performance and a Payment Bond in an amount equal to 100% of the work specified in such contract(s) and acceptable to the City's Chief Financial Officer and in such form as approved by the City Attorney.  The Performance and Payment Bond shall name the City as the Obligee, shall meet the other requirements of the Agreement, and shall remain in full force and effect until: (i) all Tenant Improvements are completely and fully paid for, (ii) certificates of occupancy have been issued for the Premises, (iii) final lien waivers have been obtained from all contractors and subcontractors; (iv) the City has approved the final construction of the Tenant Improvements; and (v) the applicable limitations period under Georgia law for the commencement of a suit against the Performance and Payment Bond has lapsed.

2.      The bonds must be issued as security for the faithful performance of this Agreement, including, maintenance and guarantee provisions, its covenants, stipulations and agreements of the Agreement, the payment of all bills and obligations arising out of the performance its obligations under the Agreement, which bills and obligations might or would in any manner become a claim against the City, and guaranteeing all services and work set forth in the Agreement against faulty materials or poor workmanship, or both, in accordance with any warranty provisions of the Agreement.

3.      The surety company issuing the bonds must give the Aviation General Manager notice in writing by registered mail at least sixty (60) days prior to an anniversary date of the bonds of its intention not to renew or to terminate the bonds.

4.      A Corporate Surety that is satisfactory to City, authorized to do business in the State of Georgia, and listed in the latest issue of U.S. Treasury Circular 570 must execute the bonds.

5.      An agent of the Surety residing in the State of Georgia must execute the bonds. The date of the Bonds must be the same as the date of execution of the Agreement by City.  The Surety must appoint an agent for service in Atlanta, Georgia upon whom all notices must be shown on each Bond.  The person executing the Bonds on behalf of the Surety must file with the Bonds a general power of attorney unlimited as to amount and type of Bonds covered by such power of attorney, and certified to by an official of said Surety.  The Bonds must be on forms provided by City.  The Agreement will not be executed by City until after the approval of the Bonds by City's Attorney.

ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

GLOBA-2 OP ID: C

DATE (MM/DD/YYYY) 02/03/12

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER Brown & Brown Ins. of Georgia 3483 Satellite Blvd, Suite 100 Duluth, GA 30096 Clay Collins | 770-512-5000 770-512-5050 | CONTACT NAME: Cathy Hansard | | |
|---|---|---|---|---|
| | | PHONE (A/C, No, Ext): 770-512-5063 | | FAX (A/C, No): 770-512-5050 |
| | | E-MAIL ADDRESS: chansard@bbatlanta.com | | |
| | | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| INSURED Global Concessions Inc. Global Concessions II, LLC PO Box 20905 Atlanta, GA 30320 | | INSURER A : Maryland Casualty Company | | 19356 |
| | | INSURER B : Accident Fund Ins Co America | | 10166 |
| | | INSURER C : | | |
| | | INSURER D : | | |
| | | INSURER E : | | |
| | | INSURER F : | | |

## COVERAGES    CERTIFICATE NUMBER:    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY X COMMERCIAL GENERAL LIABILITY CLAIMS-MADE X OCCUR | X | | PPS004592962 | 12/31/11 | 12/31/12 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 250,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY PRO-JECT LOC | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 1,000,000 |
| | | | | | | | | $ |
| A | AUTOMOBILE LIABILITY ANY AUTO ALL OWNED AUTOS X SCHEDULED AUTOS X HIRED AUTOS X NON-OWNED AUTOS | | | PPS004592962 | 12/31/11 | 12/31/12 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR EXCESS LIAB CLAIMS-MADE DED X RETENTION $ | | | PPS004592962 | 12/31/11 | 12/31/12 | EACH OCCURRENCE | $ 10,000,000 |
| | | | | | | | AGGREGATE | $ 10,000,000 |
| | | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | | N/A | WCV607975800 | 12/31/11 | 12/31/12 | X WC STATU-TORY LIMITS OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| A | Liquor Liability | | | PPS04592962 | 12/31/11 | 12/31/12 | | 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)
RE: FC-5467, Food and Beverage Concessions-Package 7 at Hartsfield-Jackson
Atlanta International Airport

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| City of Atlanta 68 Mitchell Street Atlanta, GA 30320 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE Linda A Slaft |

ACORD 25 (2010/05)    © 1988-2010 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

| NOTEPAD: | HOLDER CODE | | GLOBA-2 | PAGE 2 |
| --- | --- | --- | --- | --- |
| | INSURED'S NAME | Global Concessions Inc. | OP ID: CA | DATE 02/03/12 |

The City of Atlanta is Additional Insured as respects to General Liability
as required per written contract.  45 day Notice of Cancellation endorsed
for Additional Insured.   Subject to policy terms, conditions and
exclusions.

Bond No.105741323

## CONCESSIONAIRE'S BOND

**KNOW ALL MEN BY THESE PRESENTS,** That we, Global Concessions, Inc, 7700 Spine Road,  Concourse T-3rd Floor Atlanta, GA 30320 as Principal, and Travelers Casualty & Surety Company of America as Surety, are hereby held and firmly bound unto City of Atlanta in the penal sum of One Million One Hundred Seventy Three Thousand & Four Hundred Thirty Seven Dollars  ($1,173,437.00) for the payment of which well and truly to be made, we hereby jointly and severally bind ourselves, our heirs, executors, administrators, successors, and assigns.

**WHEREAS** the above named Principal did, on the _____ day of _____, 2012 enter into an agreement with said  City of Atlanta to render the services required thereby and mentioned therein, and which agreement is by reference made a part hereof and is hereinafter referred to as the Agreement.

**NOW THEREFORE,** the condition of this obligation is such that if the above named Principal shall well and truly execute all and singular the stipulations by the Principal to be executed, and shall fully perform all and singular the terms, conditions and requirements of the Agreement and shall indemnify and save harmless said City of Atlanta from all liens, charges, claims demands, loss, costs and damages of every kind of nature whatsoever, then this obligation to be null and void, otherwise to remain in full force and effect, it being understood that the liability of the Surety for any and all claims hereunder shall in no event exceed the penal amount of this obligation as hereunder stated.

**IT BEING FURTHER UNDERSTOOD** that this bond may be cancelled by the Surety by its mailing written notice of such cancellation to the City of Atlanta stating when, not less than thirty (30) days thereafter, such cancellation shall be effective.  In no event shall the Surety be liable for any payment due and payable as a result of Principal's failure to meet any obligation in the Agreement after the effective date of cancellation.

Neither nonrenewable nor cancellation by the Surety, nor failure, nor inability of the Principal to file a replacement bond shall constitute loss to the Obligee recoverable under this bond.  The Surety's liability under this bond shall not be cumulative and shall in no event exceed the amount as set forth in this bond or in any additions, riders or endorsements properly issued by the Surety as supplement thereto.

**THIS BOND SHALL BE EFFECTIVE February 6, 2012.**

**WITNESS OUR HANDS AND SEALS THIS _____ DAY OF _____, 2012.**

_____

Principal

By:_____

Travelers Casualty and Surety Company of America Surety

By:_____
            Attorney-in-Fact

Bond No.105741323

## CONCESSIONAIRE'S BOND

**KNOW ALL MEN BY THESE PRESENTS,** That we, Global Concessions, Inc, 7700 Spine Road, Concourse T-3rd Floor Atlanta, GA 30320 as Principal, and Travelers Casualty & Surety Company of America as Surety, are hereby held and firmly bound unto City of Atlanta in the penal sum of One Million One Hundred Seventy Three Thousand & Four Hundred Thirty Seven Dollars ($1,173,437.00) for the payment of which well and truly to be made, we hereby jointly and severally bind ourselves, our heirs, executors, administrators, successors, and assigns.

**WHEREAS** the above named Principal did, on the _____ day of _____, 2012 enter into an agreement with said City of Atlanta to render the services required thereby and mentioned therein, and which agreement is by reference made a part hereof and is hereinafter referred to as the Agreement.

**NOW THEREFORE,** the condition of this obligation is such that if the above named Principal shall well and truly execute all and singular the stipulations by the Principal to be executed, and shall fully perform all and singular the terms, conditions and requirements of the Agreement and shall indemnify and save harmless said City of Atlanta from all liens, charges, claims demands, loss, costs and damages of every kind of nature whatsoever, then this obligation to be null and void, otherwise to remain in full force and effect, it being understood that the liability of the Surety for any and all claims hereunder shall in no event exceed the penal amount of this obligation as hereunder stated.

**IT BEING FURTHER UNDERSTOOD** that this bond may be cancelled by the Surety by its mailing written notice of such cancellation to the City of Atlanta stating when, not less than thirty (30) days thereafter, such cancellation shall be effective. In no event shall the Surety be liable for any payment due and payable as a result of Principal's failure to meet any obligation in the Agreement after the effective date of cancellation.

Neither nonrenewable nor cancellation by the Surety, nor failure, nor inability of the Principal to file a replacement bond shall constitute loss to the Obligee recoverable under this bond. The Surety's liability under this bond shall not be cumulative and shall in no event exceed the amount as set forth in this bond or in any additions, riders or endorsements properly issued by the Surety as supplement thereto.

**THIS BOND SHALL BE EFFECTIVE February 6, 2012.**

WITNESS OUR HANDS AND SEALS THIS ____12th____ DAY OF __March__ 2012.

_____
Principal

By:_____

Travelers Casualty and Surety Company of America Surety

By_____
Attorney-in-Fact

Approved as to form
_____
Sr Asst. City Atty

WARNING: THIS POWER OF ATTORNEY IS INVALID WITHOUT THE RED BORDER

**TRAVELERS**

## POWER OF ATTORNEY

| | |
|---|---|
| Farmington Casualty Company | St. Paul Mercury Insurance Company |
| Fidelity and Guaranty Insurance Company | Travelers Casualty and Surety Company |
| Fidelity and Guaranty Insurance Underwriters, Inc. | Travelers Casualty and Surety Company of America |
| St. Paul Fire and Marine Insurance Company | United States Fidelity and Guaranty Company |
| St. Paul Guardian Insurance Company | |

Attorney-In Fact No.        222765

Certificate No. **003876405**

**KNOW ALL MEN BY THESE PRESENTS**: That St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company and St. Paul Mercury Insurance Company are corporations duly organized under the laws of the State of Minnesota, that Farmington Casualty Company, Travelers Casualty and Surety Company, and Travelers Casualty and Surety Company of America are corporations duly organized under the laws of the State of Connecticut, that United States Fidelity and Guaranty Company is a corporation duly organized under the laws of the State of Maryland, that Fidelity and Guaranty Insurance Company is a corporation duly organized under the laws of the State of Iowa, and that Fidelity and Guaranty Insurance Underwriters, Inc., is a corporation duly organized under the laws of the State of Wisconsin (herein collectively called the "Companies"), and that the Companies do hereby make, constitute and appoint

Linda A. Slafta, Debra H. Stone, and Clay L. Collins, Jr.

of the City of _____Duluth_____, State of_____Georgia_____, their true and lawful Attorney(s)-in-Fact, each in their separate capacity if more than one is named above, to sign, execute, seal and acknowledge any and all bonds, recognizances, conditional undertakings and other writings obligatory in the nature thereof on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

**IN WITNESS WHEREOF**, the Companies have caused this instrument to be signed and their corporate seals to be hereto affixed, this _____8th_____ day of _____September_____ _____2010_____.

| | |
|---|---|
| Farmington Casualty Company | St. Paul Mercury Insurance Company |
| Fidelity and Guaranty Insurance Company | Travelers Casualty and Surety Company |
| Fidelity and Guaranty Insurance Underwriters, Inc. | Travelers Casualty and Surety Company of America |
| St. Paul Fire and Marine Insurance Company | United States Fidelity and Guaranty Company |
| St. Paul Guardian Insurance Company | |

State of Connecticut
City of Hartford ss.

By: _____
George W. Thompson, Senior Vice President

On this the _____8th_____ day of _____September_____, _____2010_____, before me personally appeared George W. Thompson, who acknowledged himself to be the Senior Vice President of Farmington Casualty Company, Fidelity and Guaranty Insurance Company, Fidelity and Guaranty Insurance Underwriters, Inc., St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company, St. Paul Mercury Insurance Company, Travelers Casualty and Surety Company, Travelers Casualty and Surety Company of America, and United States Fidelity and Guaranty Company, and that he, as such, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing on behalf of the corporations by himself as a duly authorized officer.



**In Witness Whereof,** I hereunto set my hand and official seal.
My Commission expires the 30th day of June, 2011.

_____
Marie C. Tetreault, Notary Public

58440-4-09 Printed in U.S.A.

WARNING: THIS POWER OF ATTORNEY IS INVALID WITHOUT THE RED BORDER

## Appendix C; Maynard H. Jackson, Jr. International Terminal ("Concourse F"); Concessions Construction Coordination

## Appendix C; Maynard H. Jackson, Jr. International Terminal ("Concourse F"); Concessions Construction Coordination

The following details will apply to Concessionaire Improvements performed by Concessionaire and/or its subcontractors, etc. (collectively, "Concessionaire"):

1. Anticipated Concourse F Turnover Schedule:

   1.1. Club Level T– upon final execution of Concessions Agreement; and
   1.2. Arrivals and Departures Levels– upon final execution of Concessions Agreement.

2. Access, Site Logistics and Concessionaire Responsibilities:

   - Concourse F Prime Access:  All access will be through the Automated Guideway Transit System ("AGTS") Level Loading Dock Area ("Loading Dock") depicted on Exhibits SK-1 thru 3 attached;
   - Material deliveries to the Loading Dock will need to be coordinated with  the Base Terminal Building Contractor ("HMMH");
   - Concessionaire will be provided an area near the Loading Dock for dumpster placement; Concessionaire is responsible for providing its own dumpsters for use in constructing Concessionaire Improvements.  Concourse F dumpsters will not be available for use by Concessionaire;
   - 8000 Pound capacity Service Elevators (#508 and #509) available for shared use with other Concourse F contractors during normal working hours (7:00 AM to 3:30 PM; M-F).  During such shared use times, HMMH qualified elevator operators will provide elevator service. If Concessionaire intends to work during periods other than normal working hours when HMMH's qualified elevator operators are available, Concessionaire shall provide, at its own cost, its own qualified elevator operators to operate Service Elevator #'s 508 and 509;
   - Concessionaire is responsible for providing, at its own costs, its own Sanitary Facilities.  Temporary toilets shall be located in the same area of the Loading Dock designated for the Dumpsters. Concourse F restroom facilities will not be available for Concessionaire's use;
   - Concessionaire shall provide all temporary enclosures, protection, dust containment, etc., as required, around the perimeter of the concession work areas to protect existing Concourse F finishes and operating MEP systems from damage or contamination and, as may be required, to maintain LEED Certification requirements throughout Concourse F;
   - Concessionaire shall protect all existing finishes along path from work area through Concourse F;

- Concessionaire shall coordinate with HMMH any Work not directly within the Concourse F Premises but that is necessary for Concessionaire to complete the Concessionaire Improvements. Concessionaire shall return all areas in Concourse F in which Work is done outside of the Premises to the condition they were prior to Concessionaire's Work;

- Concessionaire shall perform all surveying, field dimensioning, slab x-ray of all structural penetrations and layout that is required to complete the Concessionaire Improvements;

- Concourse F MEP systems will be provided only as identified on the Concourse F HMMH Contract Documents. All other provisions, systems, penetrations, supports or other items required by Concessionaire to complete the Concessionaire Improvements shall be provided by Concessionaire;

- Concessionaire may not store materials outside of the Premises where it is installing the Concessionaire Improvements; all Concessionaire materials shall be stored in the Premises where the Concessionaire Improvements are being installed;

- All Concessionaire workers shall park offsite in the MHJIT subcontractor employee parking lot, with bussing to be provided by Concessionaire, at its own cost. There is very limited onsite parking for Concessionaire's supervisory personnel. Concessionaire shall coordinate use of such onsite parking with HMMH;

- Concessionaire is responsible, at its own cost, for providing temporary power during the installation of the Concessionaire Improvements;

- Concessionaire shall, at its own cost, replace all finishes damaged or removed to facilitate MEP/Special Systems or any other Work scope that occurs outside of the Premises where the Concessionaire Improvements are installed;

- All personnel shall have an employee photo ID displayed on the outermost garment, waist high or above. The employee badge shall contain the employee's name, Contractor's name and project number or name. Once Concourse F becomes a Security Identification Display Area ("SIDA"), all escorted personnel shall remain under the control of person(s) with an ATL SIDA badge at all times while in the SIDA; and

- Exhibits: Exhibits SK-1 through SK-3 are attached for Concessionaire's reference.

**Exhibits SK-1, SK-2 & SK-3 to Appendix C**







Departures Level

## **Appendix D: Construction Safety and Health Plan**

## Appendix D: Construction Safety and Health Plan

**1.0**    **Safety and Health Plan.**  City has established this Construction Safety and Health Plan ("Plan") to promote safety and to minimize and control hazards and risks associated with construction projects at the Airport.  In this Plan, City's safety representative is _____ and any other individual City designates in writing to Concessionaire (collectively, "Safety Representative(s)")

**2.0**    **Plan Highlights**.  The substance of this Plan addresses:

2.1    Periodic inspection by City of Concessionaire's Work, Jobsites and storage areas to assure safe conditions and practices.

2.2    The training of all employees in all Plan requirements.

2.3    Immediate reporting to City's Safety Representative(s) of any death, injury or damage to property at any Jobsite or Work storage area on or off the Airport at which Work is performed.

2.4    Full cooperation in inspections by City's Safety Representative(s) or other governmental or non-governmental agencies exercising jurisdiction over the Work. A copy of any notice or other written documentation received by Concessionaire from any agency shall be submitted to the City's Safety Representative(s) immediately upon receipt.

2.5    Use of approved regulatory and City required safety equipment and protection devices, as described in the Plan.

2.6    Immediate correction by Concessionaire of any unsafe conditions or acts by its employees.

2.7    Medical surveillance requirements for personnel exposed to hazardous substances, e.g. radiation badges.

2.8    Safety requirements and procedures for decontamination facilities, e.g. protective clothing and warning signs.

2.9    The use of forms concerning this Plan that City may direct Concessionaire to use.

**3.0**    **Pass Down Provisions.**  Concessionaire shall include the obligations of this Plan in all contracts or other similar documents utilized by it to obtain goods and services concerning this Contract and the Work.

**4.0    General.** Concessionaire shall:

4.1    develop a Site-Specific Safety Plan that addresses all Work activities, i.e. fall exposures, excavations, cranes, etc., including the requirement for a 100% fall protection program for all work performed 6 feet or more above ground or finished floor level, operating criteria for motorized equipment and an emergency and evacuation plan.

4.2    This Site-Specific Safety Plan shall be submitted to the Safety Representative(s) and reviewed for approval prior to start of the Work. If any Safety Representative(s) determines that the Site-Specific Safety Plan is deficient in any manner, Concessionaire shall, prior to commencing any Work, correct such deficiencies upon receipt of notice from the Safety Representative(s).

4.3    Provide safety data information to the Safety Representative(s), as required.

4.4    Report all accidents and incidents to City's Representative(s) on a State of Georgia First Report of Injury Form. Incident Reports shall be submitted on a Supervisor's Incident Report Form. Only City-approved forms will be accepted for reporting accidents or incidents.

4.5    Provide weekly man-hour reports to the Safety Representative(s) on the Monday following the end of each Work week.

**5.0    Concessionaire's Safety Manager.** Concessionaire shall appoint a Safety Manager during the period when Work is performed. Concessionaire's Safety Manager shall perform daily safety inspections of all Jobsites to eliminate unsafe acts and/or conditions and ensure compliance with the Contract. Concessionaire's Safety Manager shall also perform the following:

5.2    Assist in investigating all accidents and implementing immediate corrective actions.

5.1    Control the availability and use of necessary safety equipment, including personal protective for all employees.

5.2    Cooperate with Safety Managers of other contractors, and take necessary steps to promptly implement appropriate safety recommendations.

5.3    Attend safety meetings.

**6.0    Miscellaneous Safety Requirements.**

6.1 **Safe Operations.** Concessionaire shall conduct all operations under this Contract to avoid the risk of health endangerment health, bodily harm to individuals and damage to property. Concessionaire shall continually and diligently inspect all equipment, materials and Work to discover any conditions that might involve such risks and correct those conditions.

6.2 **Safety Orders.** Concessionaire shall have copies of appropriate Federal, State and Local Safety Regulations at all Jobsites available for employees to review.

6.3 **General Safety Provisions.** Concessionaire shall protect the health and safety of employees, the public and other persons, prevent damage to property, materials, supplies and equipment and avoid interrupting the normal operation of the Airport.

6.4 **Fire Protection.** Concessionaire shall establish a Fire Prevention Plan incorporating, as a minimum, OSHA and NFPA standards. Only approved safety cans may be used for flammable and combustible liquids. "No Smoking Or Open Flame" signs and fire extinguishers shall be provided where required or as directed by City. Approved safety cans shall be metal with flash arresters and spring-loaded tops.

6.5 **Scaffolding:** Concessionaire shall:

6.5.1 Ensure that all employees working on, erecting, dismantling or modifying any scaffolding are trained by a competent Person and maintain documentation concerning all training at the Project.

6.5.2 Ensure that a complete guardrail system is utilized on scaffolding at all working heights and fall protection plan implemented over six (6) feet.

6.6 **Protection of the Public and Property.** Concessionaire shall take all steps necessary to ensure protection of the public and property.

7.0 **Fall Protection Requirements.** These fall protection requirements are mandatory for all trades performing Work on the Project.

7.1 Concessionaire shall take all practical measures to eliminate, prevent and control fall hazards. The Project shall be surveyed prior to the commencement of any Work to identify all hazards of Personnel falling from elevations. First consideration shall be given to the elimination of those hazards. If a fall hazard cannot be practically eliminated, second consideration shall be given to implementing effective permanent means of fall protection.

7.2   If a fall hazard cannot be eliminated or fall prevention assured, then effective fall protection means shall be planned, implemented and carefully monitored to control the risks of personal injury due to falling. Fall protection systems shall be continuous by design and Concessionaire shall control against intermittent or improper use.

7.3   All employees who are working where fall hazards cannot be eliminated or falls prevented shall be uniformly equipped and trained.

7.4   All employees shall utilize a full body harness with two (2) shock-absorbing lanyards to allow continuous protection.

7.5   Floor or wall openings shall be properly barricaded at all times. Floor covers, on openings greater than three feet, may not be used to protect open holes without the additional protection of a complete handrail system.

7.6   Guardrail systems consisting of a top rail, mid-rail and toe plate shall be installed on perimeter edges or scaffolding.

7.7   Personal fall arrest systems such as vertical lifelines, retractable and shock absorbing lanyards, full body harnesses, netting, etc. shall be provided in compliance with OSHA CFR 29, 1926, Subpart M, or as directed by City.

**8.0   Eye, Face and Head Protection Policy.** All employees shall, at all times, wear American National Standard Institute (ANSI) approved safety glasses with side shields on the Jobsite.

**9.0   Accident Investigation and Reporting.**

9.1   All accidents or incidents resulting in personal injury or property damage shall be <u>immediately</u> reported verbally to the Safety Representative(s) and followed by a written report within 24 hours of the occurrence.

9.2   Emergency Telephone Numbers. Concessionaire shall post a list of emergency telephone numbers; to include doctor and ambulance, fire, etc., next to telephones at the Project.

9.3   Critical Injuries. City shall be notified immediately in the following cases utilizing the Hartsfield Emergency Notification procedures:

       9.3.1        Spinal cord injury;
       9.3.2        Head trauma;
       9.3.3        Amputations;
       9.3.4        Fatality;
       9.3.5        Severe burns;
       9.3.6        Heart attack; and

9.3.7        Hospitalizations.

9.4    Concessionaire shall secure the affected area immediately after the accident in order to prevent any alteration of the scene before the investigation. This includes immediately contacting the Safety Representative(s). The area is to be cordoned off and an individual posted by Concessionaire to restrict unauthorized personnel as necessary

9.5    Concessionaire shall not make any news releases or statements to the public regarding any matters related to the Project.

9.6    Witness Statements.  Concessionaire shall assist the City in obtaining witness statements when there has been an accident1.  All statements are to be recorded and then typed.  The witness shall sign and date the statement after it is typed.

9.7    The Incident/Accident Report form shall be filed within twenty-four (24) hours of the occurrence.

9.8    Appropriate drug screening shall be conducted after the incident or accident.

**10.0    Fire Prevention Program.** A Fire Prevention Program shall be submitted in writing to City for review and coordination with other Jobsite activities prior to commencing Work. Such program shall include:

10.1    Restriction of burning to designated areas. No unauthorized fires shall be permitted on Jobsite.

10.2    Assignment of fire watches, trained and equipped to prevent or control fires, for all welding and burning operations.  Fires should be monitored for three hours after the burning.

10.3    Proper identification, storing, handling and use of flammable Material to prevent accidental ignition.

10.4    Adequate fire extinguishing equipment appropriate for the operations being performed shall be provided and employees shall be trained in the maintenance and use of such equipment.

10.5    Evacuation procedures and fire drills as required by City.

**FIRST AMENDMENT TO MASTER CONCESSIONS AGREEMENT**
**WITH GLOBAL CONCESSIONS, INC. FOR CONCOURSES "B" & "F" FOOD & BEVERAGE**
**CONCESSIONS**
**AT HARTSFIELD-JACKSON ATLANTA INTERNATIONAL AIRPORT**

This First Amendment to Master Concessions Agreement with Global Concessions, Inc. for Concourses "B" & "F" Food & Beverage Concessions at Hartsfield-Jackson Atlanta International Airport ("First Amendment") dated as of April 27, 2014, is entered into by and between the City of Atlanta, a municipal corporation of the State of Georgia ("City") and Global Concessions Inc., a Domestic Profit Corporation ("Concessionaire").

WHEREAS, the City and Concessionaire entered into that certain Master Concessions Agreement with Concessionaire for Concourses "B" & "F" Food & Beverage Concessions at Hartsfield-Jackson Atlanta International Airport dated as of March 12, 2012 ("Original Agreement"), together with the Original Agreement and the First Amendment are collectively referred to herein as the "Concessions Lease Agreement", for contract number FC-5467, which was authorized by the City Council pursuant to Resolution Numbers 11-R-1845, the terms and conditions of the Concessions Lease Agreement are incorporated herein by this reference;

WHEREAS, the City entered into those certain lease agreements with contract numbers of FC-5461 through FC-5469 with certain food and beverage concessionaires, including, without limitation, the Concessionaire to provide food and beverage concession services in the Hartsfield-Jackson Atlanta International Airport ("Airport");

WHEREAS, the infrastructure of the Airport requires that additional equipment (e.g., grease interceptors, gas line extensions, electrical grounding plates, stainless steel waste lines and related equipment) be purchased and installed in order to satisfy certain codes, ordinances and regulations;

WHEREAS, the City will only reimburse Concessionaire for eligible construction costs actually incurred by Concessionaire for permanently affixed base building infrastructure improvements in accordance with this First Amendment;

WHEREAS, this First Amendment has been authorized by City Council on December 2, 2013 pursuant to Resolution 13-R-3794 and approved as a matter of law pursuant to City Charter Section 2-403 on December 12, 2013.

**NOW, THEREFORE,** in consideration of the mutual premises and obligations set forth herein, and for other good and valuable consideration, the receipt and legal sufficiency of which is acknowledged by Concessionaire and the City, the parties, intending to be legally bound, hereby agree as follows:

(a) <u>Concessionaire's Work.</u> Concessionaire must, as its sole cost and expense, design, erect, construct and install all of the improvements that have been approved, in writing, by the Aviation General Manager, which are incorporated herein by this reference and in accordance with the terms and conditions of the Concessions Lease Agreement. For purposes of this Amendment, the term '<u>Concessionaire's Work</u>' shall include, but not be limited to, all work and equipment related to the installation of the grease interceptors, gas line extensions, electrical grounding plates, and stainless steel waste lines installed pursuant to the design and specifications approved by the Aviation General Manager. For purposes of the Concessions Lease Agreement, the term '<u>Concessionaire Improvements</u>' shall include, but not be limited to, the Concessionaire's Work. Concessionaire acknowledges and agrees that it must maintain, at its sole cost and expense, all of the Concessionaire's Work and Concessionaire Improvements in accordance with the terms and conditions of the Concessions Lease Agreement.

(b) <u>Reimbursement</u>. The total amount the City will reimburse Concessionaire pursuant to this First Amendment shall not exceed seventy nine thousand, five hundred and forty and 00/100 U.S. Dollars ($79,540.00) in accordance with the Schedule of Values attached hereto as <u>Exhibit A</u> and incorporated herein by this reference, provided Concessionaire complies with the terms of this Amendment and is in compliance with the terms and conditions of the Concessions Lease Agreement, including, without limitation, each of the following:

    (1) Concessionaire must submit invoices, proof of payment and lien release waivers from Concessionaire and all of Concessionaire's contractors and subcontractors for Concessionaire's Work (as defined in Section (a) above);

    (2) Concessionaire must submit a certificate executed by Concessionaire's architect and/or engineer that Concessionaire's Work in place is complete and in conformance with the plans and specifications;

    (3) Concessionaire must submit as-built plans and specifications of Concessionaire's Work within thirty (30) days of completion of all of Concessionaire's Work;

    (4) Concessionaire must receive the City's Aviation General Manager (or his/her designee) ("<u>Aviation General Manager</u>" or "<u>AGM</u>") approval of the Concessionaire's Work and final schedule of values; and

(5) Concessionaire must not be in monetary default (or otherwise fail to make arrangements to timely cure such default) in accordance with the terms and conditions of the Concessions Agreement.

(c)   Limit on Reimbursement of Soft Costs. Concessionaire acknowledges and agrees that it may request reimbursement for costs related (a) architectural and engineering design, (b) construction management/overhead expenses and (c) interest expenses related to Concessionaire's Work provided that the:

    (1)   Architectural and engineering design fees shall not exceed ten percent (10%) of the total actual hard construction costs of the Concessionaire's Work;

    (2)   Construction management/overhead expenses shall not exceed four percent (4%) of the total actual hard construction costs of the Concessionaire's Work;

    (3)   Interest expenses shall not exceed six percent (6%) of the total actual hard construction costs of the Concessionaire's Work;

    (4)   In no event, shall the total reimbursement amount due Concessionaire exceed the amount set forth in Section (b) above; and

    (5)   Notwithstanding anything to the contrary set forth above, Concessionaire acknowledges and agrees that it may not charge the costs set forth Sections (c)(1) through (c)(3) with respect to electrical grounding plates, and stainless steel waste lines.

(d)   Liens. Concessionaire shall not do any act which shall in any way encumber the title of the City in and to the Airport, nor shall the interest or estate of the City be in any way subject to any claim by the way of lien or encumbrance, whether by operation of law, by virtue of any express or implied contract by Concessionaire, or by reason of any other act or omission of Concessionaire.  Any claim to, or lien upon, the Premises or the Airport arising from any act or omission of Concessionaire shall accrue only against any interest of Concessionaire as a result of this Concessions Lease Agreement and shall be subject and subordinate to the paramount title and rights of the City in and to the Airport pursuant to the Concessions Lease Agreement.  Without limiting the generality of the foregoing, Concessionaire shall not permit the Premises, Airport or City to become subject to any mechanics', laborers' or materialmen's lien on account of labor or material furnished to Concessionaire or claimed to have been furnished to Concessionaire in connection with work of any character performed or claimed to have been performed by, or at the direction or sufferance of, Concessionaire.

(e)    <u>Compliance with Laws.</u> Concessionaire and its contractors shall comply with all applicable federal, state and local laws, regulations, rules, ordinances and Department of Aviation design guidelines, rules and regulations including, but not limited to, those laws, rules, regulations and ordinances governing environmental standards.

(f)    <u>Professional Standards.</u> Concessionaire Improvements shall be constructed, installed and performed in a professional and workmanlike manner in accordance with the standards imposed by applicable law and the practices and professional standards used in well managed operations performing work similar to Concessionaire's Work. Notwithstanding anything to the contrary contained in the Concessions Lease Agreement, Concessionaire acknowledges and agrees that the Department of Aviation has no obligation to reimburse Concessionaire for any costs incurred that relate corrective and non-industry standard work to Concessionaire's Work.

(g)    <u>Materials and Equipment.</u> Any equipment or materials provided by Concessionaire must be new, of clear title, not subject to any lien or encumbrance, of the most suitable grade of its respective kinds for its intended uses, must be free of any defect in design or workmanship and must be of merchantable quality and fit for the purposes for which they are intended.

(h)    <u>City's Obligations.</u>

(1) <u>Payment.</u> Within thirty (30) calendar days after the City receives a properly formatted invoice that includes all required supporting documentation, the City will pay all undisputed reimbursable amounts to the Concessionaire minus any amount disputed by the City.

(2) <u>Disputed Charges.</u> If City in good faith disputes any portion of a properly formatted invoice, the City may withhold such disputed amount and notify Concessionaire in writing of the basis for any dispute within thirty (30) calendar days of the later of: (a) receipt of the invoice or (b) discovery of the basis for any such dispute. City and Concessionaire agree to use all commercially reasonable efforts to resolve any disputed amount in any invoice within thirty (30) days of the date City notifies Concessionaire of the disputed amount. If such dispute is not resolved within thirty (30) calendar days, either party may pursue all rights and remedies available to it under the Concessions Lease Agreement, at law or in equity with respect thereto.

(3) <u>Payment of Other Persons.</u> Prior to the issuance of final payment from City, Concessionaire must certify to City in writing, in a form satisfactory to City, that all contractors, subcontractors, materialmen, suppliers and similar firms or persons engaged by Concessionaire in connection with this Concessions Lease

Agreement have been paid in full or will be paid in full utilizing the monies constituting final payment to Concessionaire.

(4) <u>Permitting.</u> The City will provide Concessionaire with commercially reasonable assistance in processing City permit applications and obtaining permits for the Concessionaire Improvements.

(5) <u>DOA Reimbursement Representative.</u> The Aviation General Manager will designate a representative to serve as the primary point of contact for processing the Concessionaire's reimbursement request.

(i) <u>Third Party Consent.</u> The City and Concessionaire each represent and warrant to the other that no consent of any third party is required for either party to execute or be bound by the terms and conditions contained in this First Amendment.

(j) <u>Governing Law.</u> This Amendment shall be governed by and construed in accordance with the laws of the State of Georgia. Except as amended by this First Amendment, all other terms and conditions of the Agreement shall remain in full force and effect and continue to be binding on the City and Concessionaire and their respective successors and assigns.

(k) <u>Counterparts.</u> The parties may execute this First Amendment in counterparts, each of which constitutes an original, and all of which taken together, constitute only one agreement. The signatures of all of the parties need not appear on the same counterpart, and delivery of an executed counterpart signature page by facsimile, electronic mail or portable document format (i.e., .pdf) is as effective as executing and delivering this First Amendment in the presence of the other parties to this First Amendment. Any party delivering an executed counterpart of this First Amendment by facsimile, electronic mail or portable document format (i.e., .pdf) shall also deliver a manually executed original counterpart of this First Amendment, but the failure to do so does not affect the validity, enforceability, or binding effect of this First Amendment.

(l) <u>Modifications.</u> The provisions of this Amendment may only be modified, amended or waived by a written instrument, executed by Concessionaire and the City.

(m) The City's obligations pursuant to this First Amendment will not become binding upon the City, and the City will incur no liability pursuant to this First Amendment, until it is approved as to form by the City Attorney, executed by the Aviation General Manager and delivered to Concessionaire.

**[SIGNATURE PAGE FOLLOWS]**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**Page 5**

The parties hereto have executed this First Amendment, by their respective authorized representatives, on and as of the date first above written.

**CONCESSIONAIRE:**

**Global Concessions**,

a Georgia Corporation

By: _____

Print Name: Terrance D. Harps

Title:    President

*ATTEST*:

By: _____

Print Name:    V. Salahuddin

Title:    Director, Human Resources

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

Page 6

CITY:

CITY OF ATLANTA, GEORGIA

_____
Mayor

ATTEST:                                                APPROVED:

_____                      _____
Municipal Clerk (SEAL)                                 Chief Procurement Officer
                    FORIS WEBB III
                    DEPUTY MUNICIPAL CLERK
                                                       _____
RECOMMENDED:                                           Interim Aviation General Manager

_____
Assistant Aviation General Manager

APPROVED AS TO FORM:

_____
Sr. Assistant City Attorney

**[END OF SIGNATURES]**

GLOBA-2   OP ID: CA

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
05/21/2014

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | | |
|---|---|---|---|
| Brown & Brown Ins. of Georgia<br>3483 Satellite Blvd, Suite 100<br>Duluth, GA 30096<br>Clay Collins | Phone: 770-512-5000<br>Fax: 770-512-5050 | CONTACT NAME: Cathy Hansard | |
| | | PHONE (A/C, No, Ext): 770-512-5063 | FAX (A/C, No): 770-512-5050 |
| | | E-MAIL ADDRESS: chansard@bbatlanta.com | |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED | INSURER A : The Burlington Insurance Compa | |
| Global Concessions Inc<br>Global Concessions II, LLC<br>PO Box 20905<br>Atlanta, GA 30320 | INSURER B : Navigators Insurance Company | 42307 |
| | INSURER C : Cincinnati Casualty Company | 28665 |
| | INSURER D : Accident Fund Ins Co America | 10166 |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES        CERTIFICATE NUMBER:        REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY**<br>X COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS-MADE X OCCUR | X | X | HGL0036873 | 12/31/2013 | 12/31/2014 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>X POLICY ☐ PRO-JECT ☐ LOC | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | Emp Ben. | $ 1,000,000 |
| C | **AUTOMOBILE LIABILITY**<br>X ANY AUTO<br>☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS<br>X HIRED AUTOS X NON-OWNED AUTOS | | | EBA 0173434 | 12/31/2013 | 12/31/2014 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| B | X UMBRELLA LIAB X OCCUR<br>☐ EXCESS LIAB ☐ CLAIMS-MADE | | | HO13EXC771674IV | 12/31/2013 | 12/31/2014 | EACH OCCURRENCE | $ 9,000,000 |
| | ☐ DED X RETENTION $ | | | | | | AGGREGATE | $ 9,000,000 |
| D | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y/N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? ☐ (Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | N/A | WCV6079758 | 12/31/2013 | 12/31/2014 | X WC STATU-TORY LIMITS ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| A | Liquor Liability | | | HGL0036873 | 12/31/2013 | 12/31/2014 | Liquor | 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)
Concessions at Hartsfield Jackson Atlanta International Airport

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| City of Atlanta<br>Dept of Aviation<br>6000 N. Terminal Pkwy<br>Atrium, Suite 4000<br>Atlanta, GA 30320 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Linda A Dafsh* |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)        The ACORD name and logo are registered marks of ACORD

**NOTEPAD:**

| HOLDER CODE | | GLOBA-2 | PAGE 2 |
|---|---|---|---|
| INSURED'S NAME | Global Concessions Inc | OP ID: CA | DATE 05/21/14 |

City Of Atlanta is Additional Insured as respects to general liability
on a primary and non-contributory basis as required per written contract.
Subject to policy terms, conditions and exclusions.

CITY COUNCIL
ATLANTA, GEORGIA

13- R -3794

A RESOLUTION C. T. Martin
BY ~~TRANSPORTATION COMMITTEE~~

A RESOLUTION AUTHORIZING THE MAYOR TO EXECUTE
REIMBURSABLE AGREEMENTS WITH FOOD & BEVERAGE
CONCESSIONAIRES FOR BASE BUILDING COSTS ASSOCIATED WITH
THE CONSTRUCTION OF THE NEW FOOD & BEVERAGE LOCATIONS
WHICH INCLUDE GREASE INTERCEPTORS, EXTENSION OF GAS LINES,
ELECTRICAL GROUNDING PLATES, MAKE-UP AIR UNITS AND
STAINLESS STEEL WASTE LINES IN AN AMOUNT NOT TO EXCEED
COLLECTIVELY $10,000,000 TO BE CHARGED TO AND PAID FROM
PTAEO: 18111301 (TERMINAL & ATRIUM PROJECTS) D0500041 (FOOD &
BEVERAGE 2012) 550291249 (DOA R N E 9999) 5414002 (FACILITIES OTHER
THAN BLDGS) and FDOA: 5502 (AIRPORT RENEWAL AND EXTENSION
FUND) 180201 (DOA AVIATION CAPITAL PLANNING & DEVELOPMENT)
5414002 (FACILITIES OTHER THAN BLDGS) 7563000 (AIRPORT) 111301
(TERMINAL & ATRIUM PROJECTS) 91249 (DOA R N E 9999); AND FOR
OTHER PURPOSES.

**WHEREAS,** the City of Atlanta, Georgia ("City") owns and operates Hartsfield-
Jackson Atlanta International Airport ("Airport"); and

**WHEREAS,** the City entered into Lease Agreements FC-5461 through FC-5469 with
food & beverage concessionaires commencing on May 1, 2012, to provide food &
beverage concessions services at the Airport in the Atrium and on Concourses A, B, C,
D, and E; and

**WHEREAS,** the new food & beverage concessionaires began the construction of the
151 new locations and have found that in most cases the infrastructure of the airport and
new requirements by the health departments requires additional equipment to be
purchased and installed in order to complete the construction; and

**WHEREAS,** the additional equipment includes grease interceptors, gas line extensions,
electrical grounding plates, make-up air units and stainless steel waste lines; and

**WHEREAS,** the City will benefit from the permanent addition of this equipment to the
buildings located at the Hartsfield-Jackson Atlanta International Airport; and

**WHEREAS,** the City is responsible for the permanent infrastructure improvements at
the Airport; and

**WHEREAS,** the City would like to enter into reimbursable agreements with the food
and beverage concessionaires for base building costs associated with the construction of
the new grease interceptors, gas line extensions, electrical work, make-up air
conditioning units and stainless steel waste lines in an amount not to exceed collectively
$10,000,000.

1

**NOW, THEREFORE BE IT RESOLVED BY THE COUNCIL OF THE CITY OF ATLANTA**, that the Mayor is authorized on behalf of the City to execute Reimbursable Agreements with food & beverage concessionaires under Food and Beverage Concessions Packages 1-9, FC-5461 -- FC-5469, to compensate the respective food & beverage concessionaires for its appropriate share of the cost of base building equipment associated with the new food and beverage locations in an amount not to exceed $10,000,000.

**BE IT FURTHER RESOLVED** the Food & Beverage concessionaires will be compensated upon substantial completion of the improvements as documented by the Department of Aviation.

**BE IT FURTHER RESOLVED** that all funds will be charged to and paid from PTAEO: 18111301 (Terminal & Atrium Projects) D0500041 (Food & Beverage 2012) 550291249 (DOA R N E 9999) 5414002 (Facilities Other Than Bldgs) and FDOA: 5502 (Airport Renewal and Extension Fund) 180201 (DOA Aviation Capital Planning & Development) 5414002 (Facilities Other Than Bldgs) 7563000 (Airport) 111301 (Terminal & Atrium Projects) 91249 (DOA R N E 9999).

**BE IT FURTHER RESOLVED** that the City Attorney is directed to prepare the reimbursable agreements and any other appropriate agreements for execution by each of the concessionaires set forth hereinabove and the Mayor.

**BE IT FINALLY RESOLVED** that said reimbursable agreements shall not become binding upon the City, and the City shall incur no obligation or liability until same has been signed by the Mayor, attested to by the Municipal Clerk, approved as to form by the City Attorney and delivered to the food & beverage concessionaires.

A true copy,

**Deputy Clerk**

ADOPTED by the Atlanta City Council                    DEC 02, 2013
APPROVED as per City Charter Section 2-403             DEC 11, 2013

2

**EXHIBIT A**

**SCHEDULE OF VALUES**

See attached.

| Submitted Date | Project Space No | Prime Tenant | Sub-Tenant | Concept | Contract Package # | Cost Notes | Submitted Natural Gas Labor - Geotrace Rptd | Submitted Grease Interceptor Reimbursement | Design Cost | OM Fees | Interest | SS Grease Waste Line Upcharge | Grounding |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | F-F1 | Global | Global | | PC-5467 | | N/A | MHHT Provided | N/A | N/A | N/A | $25,931.00 | $48,185.45 |
| | B-F-14 | Global | Global | | PC-5457 | | N/A | N/A | N/A | N/A | N/A | N/A | $30,146.00 |
| | BF-12 | Global | Global | | PC-5447 | | N/A | N/A | N/A | N/A | N/A | N/A | $8,115.15 |
| | | | | | | | | $0.00 | $0.00 | $0.00 | $0.30 | $25,931.00 | $46,376.30 |

Total Reimbursable Amount    $72,508.30

Contingency @ 10%    $7,230.83

Not to Exceed Amount    $79,539.13

# EXHIBIT B

# CONCESSIONS LEASE AGREEMENT FOR

# FOOD AND BEVERAGE CONCESSIONS ON
# CONCOURSE C MIDPOINT
# AT
# HARTSFIELD-JACKSON ATLANTA INTERNATIONAL AIRPORT



**Landlord:  City of Atlanta**

**Concessionaire:  Global Concessions, Inc.**

**Contract No. FC-8484**

## Table of Contents

1.  PREMISES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3
2.  TERM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
3.  USE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
4.  ASSIGNMENT OR SUBLETTING. . . . . . . . . . . . . . . . . . . . . . . . . .  12
5.  RENTAL PAYMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
6.  TAXES AND LIENS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17
7.  IMPROVEMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17
8.  LIABILITY AND INDEMNITY. . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
9.  INSURANCE AND BONDING. . . . . . . . . . . . . . . . . . . . . . . . . . . .  23
10. DAMAGE OR DESTRUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . .  23
11. REDUCTION IN RENT DUE TO CHANGES IN ENPLANEMENTS. . . . . . . . .  25
12. DEFAULT BY TENANT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27
13. TERMINATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
14. FINES FOR VIOLATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32
15. UNAUTHORIZED ACCESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33
16. SURRENDER OF PREMISES. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33
17. OWNERSHIP OF INFORMATION; CONFIDENTIALITY. . . . . . . . . . . . . . .  33
18. HAZARDOUS MATERIALS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35
19. AIRPORT SECURITY REQUIREMENTS. . . . . . . . . . . . . . . . . . . . . . .  35
20. CITY POLICIES; AIRPORT CONCESSIONS DISADVANTAGED BUSINESS
    ENTERPRISE (ACDBE) BUSINESS PARTICIPATION AND NON-
    DISCRIMINATION PROVISIONS. . . . . . . . . . . . . . . . . . . . . . . . . . .  36
21. MISCELLANEOUS PROVISIONS. . . . . . . . . . . . . . . . . . . . . . . . . . .  41

## EXHIBITS

| | |
|---|---|
| **Exhibit A** | **Scope of Services and Map of Premises** |
| **Exhibit A1** | **Financial Offer** |
| **Exhibit B** | **City Council Resolution** |
| **Exhibit C** | **Definitions** |
| **Exhibit D** | **Insurance and Bonding Requirements** |
| **Exhibit D1** | **Performance and Payment Bonds** |
| **Exhibit E** | **Business Plan** |
| **Exhibit F** | **Concessions Compliance Standards** |
| **Exhibit G** | **Airport Access, Security and Safety** |
| **Exhibit H** | **Construction Safety and Health Plan** |
| **Exhibit I** | **Dispute Resolution Procedures** |
| | |
| **Appendix A** | **Office of Contract Compliance Requirements** |
| **Appendix B** | **[RESERVED]** |
| **Appendix C** | **Illegal Immigration Reform and Enforcement Act Forms** |
| **Appendix D** | **Georgia Department of Revenue Form RD-1062** |

## CONCESSIONS LEASE AGREEMENT

This Concessions Lease Agreement ("**Agreement**") is entered into and made effective on this 5ᵗʰ day of September, 2019 ("**Commencement Date**," as further defined at Section 2.1 herein), between the City of Atlanta ("**City**") and Global Concessions, Inc. ("**Concessionaire**") who agree as follows:

1. **PREMISES**

1.1    **Description of Premises.**

1.1.1    Concessionaire shall be entitled to occupy and use, for the purposes set forth herein, the following premises ("Premises" hereinafter refer to the total square feet under this Agreement on the Commencement Date) consisting of approximately 8,112 square feet on Concourse C Midpoint at Hartsfield-Jackson Atlanta International Airport (the "**Airport**"), and as further depicted in **Exhibit A**, as follows:

| Space | Location | Approximate Square Footage |
|---|---|---|
| C-F41 | Midpoint | 1,201 sq. ft. |
| C-F42 | Midpoint | 1,295 sq. ft. |
| C-F43 | Midpoint | 900 sq. ft. |
| C-F44 | Midpoint | 428 sq. ft. |
| C-F45 | Midpoint | 398 sq. ft. |
| C-F46 | Midpoint | 3,890 sq. ft. |
| | | |
| **Total square footage:** | | **8,112  square feet** |

1.1.2    No easement for light, air or view is granted, given or implied in this Agreement. Upon completion of the construction contemplated by the Section entitled "**Improvements**," Concessionaire must submit to City a current, more detailed description based on final, as-built drawings, which will be incorporated by reference into this Agreement as a supplement to **Exhibit A**, without the need for the parties to formally amend this Agreement.

1.2    **Relocation, Expansion and Contraction; Reimbursement of Certain Costs.**

1.2.1    **City's Right to Require.**  City may require that Concessionaire relocate all or part of the Premises within the Airport, or expand or contract the size of the Premises. Concessionaire must accomplish any such relocation, expansion or contraction expeditiously upon a timetable approved or directed by the Aviation General Manager ("**AGM**").

**1.2.2  Reimbursements.**

**1.2.2.1** In the event the City requires Concessionaire to relocate all or part of the Premises or contract the size of the Premises, City agrees to reimburse Concessionaire for the reasonable unamortized construction costs for Concessionaire's improvements within such portion of the Premises affected (based on the current book value of furniture, fixtures and improvements using the straight-line method of depreciation), and moving costs incurred due to relocation.

**1.2.2.2** The amount of reimbursed costs allowed by City pursuant to this Section is at the City's sole determination. Proof of unamortized costs must be provided to and verified by the Aviation General Manager prior to reimbursement.

**1.2.2.3** City will amortize the construction and moving costs over the remaining term of the Agreement. This amortization may result in rental credits to future rental payments. No cash reimbursements or credits for any outstanding indebtedness will be provided by City as reimbursement for allowable construction and/or moving costs.

**1.2.2.4** Affect on Rental Payment Obligations in the Event of Relocation, Contraction or Expansion. Any such relocation, contraction or expansion required of Concessionaire under this Section may change Concessionaire's obligation to pay rent pursuant to the terms of the Agreement as follows:

**1.2.2.4.1 Relocation.** If the relocated Premises is deemed unsatisfactory by Concessionaire, then Concessionaire will have the right to terminate this Agreement with no additional obligation on the part of either Concessionaire or City; except that City agrees to reimburse Concessionaire for the reasonable unamortized construction costs for Concessionaire improvements within the Premises (based on the current book value of furniture, fixtures and improvements using the straight-line method of depreciation). Concessionaire must exercise its limited right to terminate under this Section by tendering written notice to City no later than thirty (30) days after Concessionaire receives notice from City of the required relocation, date of relocation and the location of the new Premises.

**1.2.2.4.2 Contraction.** If contraction of the Premises is required and the amount of contraction is greater than ten percent (10%) of the gross square footage of the Premises, then the Minimum Annual Guarantee will be decreased in proportion to the amount of the percentage contraction of the gross square footage of the Premises. Contractions of the Premises are deemed cumulative in the aggregate and are to be compared with the area of the Premises as originally let on the Commencement Date.

**1.2.2.4.2.1** For example, assuming the Premises of this Agreement on the Commencement Date is one thousand (1,000) square feet. If, in contract year three (3), the City requires a contraction of the Premises to nine hundred and fifty (950)

square feet, the MAG related to the Premises will not be adjusted because the contraction is less than ten percent (10%) of the original square footage. If, in contract year four (4), the City requires a contraction of an additional one hundred (100) square feet, the MAG related to the Premises will be reduced by fifteen percent (15%) because the resulting Premises will have contracted by fifteen percent (15%), in the aggregate, as compared to the original square footage.

1.2.2.4.3  **Expansion.**  If expansion of the Premises is required and the amount of expansion is greater than ten percent (10%) of the gross square footage of the Premises, then the Minimum Annual Guarantee will be increased in proportion to the amount of the percentage expansion of the gross square footage of the Premises.  Expansions of the Premises are deemed cumulative in the aggregate and are to be compared with the area of the Premises as originally let on the Commencement Date.

1.2.2.4.3.1  For example, assuming the Premises of this Agreement on the Effective Date is one thousand (1,000) square feet.  If, in contract year three (3), the City requires an expansion of the Premises to one thousand and fifty (1,050) square feet, the MAG related to the Premises will not be adjusted because the expansion is less than 10% of the original square footage. If, in contract year four (4), the City requires an expansion of an additional one hundred (100) square feet, the MAG related to the Premises will be 2increased by fifteen percent (15%) because the resulting Premises will have expanded by fifteen percent (15%), in the aggregate, as compared to the original square footage.

**1.3.    Concourse Closure.**  If a concourse in which any part of the Premises is located is permanently closed to passenger use, upon such closure this Agreement will terminate as to the portion of the Premises on that Concourse C and City will reimburse Concessionaire for the reasonable unamortized construction costs for Concessionaire's improvements within the Premises (based on the current book value of furniture, fixtures and improvements using the straight-line method of depreciation).  Upon such reimbursement to Concessionaire, title to all such furniture, fixtures and improvements will be deemed conveyed to City and Concessionaire may be required to execute such further documents and instruments to evidence such conveyance.  Proof of unamortized costs must be provided to and verified by the Aviation General Manager prior to reimbursement.

**1.4.    Support Space and Access.**  Throughout the Airport there are certain spaces that may be available to Concessionaire for lease as support space for offices, storage or other similar support uses.  Concessionaire may request the use of a portion of such available additional space for purposes relating to the business conducted at the Premises.  Such request must state the specific intended use of the space by the Concessionaire.  If the Aviation General Manager determines that space is available for the purpose requested, such space may be provided to Concessionaire on a thirty (30) day revocable basis, at the then current rate charged by City for comparable space at the Airport.  To memorialize the use of any such additional space, the parties will execute a permit outlining the terms of use.  Such space may be unfinished and Concessionaire may be required, as a condition to using such space, to develop and improve

the space at its sole cost and without rental credit according to the terms and conditions contained in the permit.

**1.5.    Deliveries.**

**1.5.1    Standard Delivery Policies.**  Regular deliveries to the Premises and other spaces at the Airport used by Concessionaire under a permit will be allowed during hours designated by the Aviation General Manager only and will be scheduled to minimize circulation conflicts with aircraft activity.   Concessionaire is responsible for arranging for the delivery of all goods required for the operation of the business at the Premises.  The Aviation General Manager must approve deliveries and delivery schedules.

**1.5.2    Exceptional Delivery Circumstances.**  City acknowledges that certain exceptional circumstances may require variations from the designated hours for regular deliveries.  Such deliveries will require the express prior written approval of the Aviation General Manager. Concessionaire is prohibited from using the Automated Guide Way Transit System or any of its moving sidewalks.

**1.5.3    Approval of Delivery Companies.**   Only companies approved by the Aviation General Manager with required training, such as Airport security class and drivers' training, insurance and security clearance will be authorized to make deliveries at the Airport.

**1.5.4    City's Right to Use Third-Party Contractor.**

**1.5.4.1** The City may procure a third-party contractor to provide all receiving, handling and transfer/delivery services for all or any portion of the concessionaires operating at the Airport in accordance with policies the Aviation General Manger believes at his/her discretion to be in the best interests of the City.

**1.5.4.2** If the City chooses this option, it may direct the Concessionaire to exclusively utilize the services of such third-party contractor for all receiving, handling and transfer/delivery services required by Concessionaire concerning the business it operates in the Premises.   Concessionaire will be required to promptly pay all invoices provided to Concessionaire by such third-party contractor for receiving, handling and transfer/delivery services.

**1.5.4.3** Charges paid by Concessionaire for these services will be developed by the selected contractor based upon actual costs and will be subject to annual audit by the Aviation General Manager.  It is anticipated that a flat rate will be developed and approved by the Aviation General Manager for these services according to concession category, frequency of deliveries, volume of goods delivered, amount of waste handled, etc. These charges are subject to change. Concessionaire should anticipate a charge of up to fifty dollars ($50.00) per square foot of the Premises and other spaces at the Airport used by Concessionaire under a Permit per

year if a third-party contractor is used by the City and Concessionaire is directed to use such services.

## 2.    TERM

**2.1    Commencement Date.**  Pursuant to the City of Atlanta Code of Ordinances ("**Code**"), this Agreement will not become binding upon the City and the City will incur no liability under it until it has been duly executed by the Concessionaire, returned to the City with all required submittals, including insurance and bonding, executed by the Mayor, attested to by the Municipal Clerk, approved by the City Attorney as to form and delivered to the Concessionaire, which shall be the effective date of this Agreement ("**Commencement Date**").

**2.2    Term.**  The term ("**Term**") of this Agreement shall begin on the Commencement Date and shall end on April 30, 2025 at the end of which the Agreement will immediately and automatically terminate, unless earlier cancelled or terminated in accordance with this Agreement.  All rights and obligations of the parties under this Agreement shall commence on the Commencement Date of the Agreement, except for, to the extent that City is unable to turn over possession of any part of the Premises to Concessionaire on the Commencement Date: (1.) the City's obligation to deliver such portion of the Premises to Concessionaire; (2.) Concessionaire's obligation to pay rent for such portion of the Premises; (3.) Concessionaire's obligation to improve such portion of the Premises; and (4.) Concessionaire's obligation to operate such portion of the Premises. These four (4) specific obligations shall all commence on the date the City makes such portion(s) of the Premises available to the Concessionaire.

**2.3    Renewals.**  This Agreement is not subject to a renewal.

**2.4    Holding Over.**  If Concessionaire remains in possession of the Premises after the expiration of the Term, or any renewals, without written permission from the City, such holding over will not be deemed to operate as a renewal or extension of this Agreement, nor will it create a tenancy at will.  Such holding over will create a month-to-month tenancy at a monthly rate equal to twice the monthly rate existing during the last month of the Term or the renewal period. During such month-to-month tenancy, the terms of this Agreement and any amendments hereto will continue to govern the relationship of the Parties.

## 3.    USE

**3.1    Non-Exclusive.**  Concessionaire will have the exclusive rights to provide Food & Beverage Concessions at the Premises.  However, the parties hereto agree that Concessionaire's rights hereunder are not exclusive to the Airport.

**3.2    Use of Premises.**  Concessionaire must use the Premises to manage and operate a Food and Beverage Concessions as referenced above including associated products and services, all in accordance with the terms and conditions contained herein, including but not limited to the Scope of Services delineated on the attached **Exhibit A**.

**3.3    Pricing.**  Concessionaire must submit all of its proposed prices to the Aviation General Manager for review at least thirty (30) days prior to Concessionaire offering its services to the public.  Concessionaire may not charge any prices that have not been approved in writing by the Aviation General Manager, once Concessionaire's initial proposed prices are approved in writing.  Concessionaire must submit any proposed price changes to the Aviation General Manager for approval prior to implementation.

**3.3.1    Street Plus Ten Percent (10%) Pricing.**  To determine Street Plus Ten Percent (10%) Prices, the Aviation General Manager may, at any time, conduct a Market Basket Pricing Survey. This survey shall consist of at least three (3) and up to six (6) Metropolitan Atlanta area same store or similar store locations where residents, travelers or visitors normally shop. Concessionaire's price on any specific item or service may not exceed the average price of those locations plus an additional ten percent (10%).  The Aviation General Manager has the sole discretion to determine whether a price is reasonable.

**3.3.2    Same Store Pricing.**  For any operations where Concessionaire currently operates the same or similar store in the Metropolitan Atlanta area, Concessionaire may not charge higher prices at the Airport for like or similar items and services.  The Aviation General Manager has the right to survey prices at those stores and to use these prices for same or similar items as the primary basis for pricing in the Premises.  If the same brand does not exist in Metropolitan Atlanta area, the Concessionaire shall charge Street Plus Ten Percent (10%) Price.

**3.4    Continuous Operation of Premises.**  Concessionaire must operate the Premises without interruption, throughout the Term, including renewals, and provide all required Services to the extent permitted by law and provided that Concessionaire is lawfully entitled to possession of the Premises.

**3.5    Hours of Operation.**  The Premises must be open for business three hundred sixty-five (365) days a year 30 minutes prior to the first flight on Concourse C until 30 minutes prior to the final departure on Concourse C or unless otherwise specified by the Aviation General Manager. The specific hours of operation are intended to represent the minimum operating hours.

**3.5.1**  The Hours of Operation must be posted at each store location in a format approved by Aviation General Manger. Concessionaire may be required to keep its stores open for additional hours, including without limitation, up to twenty-four (24) hours a day, with very limited notice, under circumstances warranting such additional hours, as determined by the Aviation General Manager in his/her sole discretion.

**3.6    Customer Service.**

**3.6.1**  The Aviation General Manager shall have the right to make reasonable objections to the quality of articles sold, the character of the service rendered to the public, the

prices charged and the appearance and condition of the Premises. Concessionaire agrees to promptly discontinue or remedy any objectionable practice. Concessionaire must also comply with the Concessions Compliance Standards established by the Aviation General Manager. A copy of the Concessions Compliance Standards, which are by this reference incorporated herein and are subject to amendment by City at any time, are available on the Airport's website (www.atl.com) under Business Information.

    **3.6.2  Customer Service Quality Assurance and Mystery Shopper Standards.** The City's mission is to operate the world's best airport by exceeding customer expectations. Well-defined and highly effective customer service programs are expected from all concessionaires. All Concessionaires will undergo scheduled and unscheduled monthly quality assurance audits in order to ensure optimal customer service performance. Basic standards of customer service include and are not limited to the following: promptly greeting the customer with a smile; making eye contact; being friendly and knowledgeable about the Airport; listening and responding politely; presenting a receipt and the correct change to the customer; and thanking the customer with a smile. In addition, the Concessionaire must understand and agree that its operation at the Airport necessitates the rendering of the following passenger services: making reasonable change; offering passengers directions and assistance; and accepting four (4) major credit cards (Visa, MasterCard, Discover, and American Express) as payment for any debit or credit transaction. Further, the Department of Aviation ("**DOA**") highly encourages and may ultimately require the implementation of expedited payment options, which may include but is not limited to MasterCard PayPass® technology as well as "Mystery Shopper Services" to ensure consistent performance.

    **3.6.2.1** The DOA requires Concessionaire and its staff to attend customer service training and all other such classes at the Concessionaire's expense, and/or as directed by the Aviation General Manager. All training as provided by the Concessionaire to its associates must comply with the Airport's compliance standards of customer service. Any cost associated with such additional training is the sole responsibility of Concessionaire.

    **3.6.2.2** A high quality and stable work force is key to providing outstanding customer service. Concessionaire is expected to maintain a positive work environment that encourages the development and growth of all employees. Concessionaire is expected to maintain favorable turnover rates compared to like businesses in the industry. Failure to do so may result in non-renewal or termination of this Agreement.

    **3.6.2.3** Concessionaire's staff must be aware of the time sensitive nature of Airport patrons. Concessionaire's employees shall be courteous and helpful to the public.

    **3.6.2.4** Concessionaire shall conduct its operation in a business-like manner. Concessionaire must carry a sufficient quantity of inventory to ensure that the Premises will be fully stocked and available to passengers at all times. All inventories must be top quality and displayed in an "opening day fresh" manner. In addition, a dress code should be strictly adhered to for all operating staff.

3.6.2.5 Concessionaire agrees to offer "take out" packaging to enable customers to more easily transport items through the Airport. Environmentally friendly and/or innovative packaging or transportation devices that facilitate travel are highly encouraged. Concessionaire shall use compostable serviceware along with consumer facing packaging and source separate all service wastes for direct transport to off-airport composting facilities. Concessionaire is required to adhere to the Airport's sustainability policies and programs.

**3.7    Marketing.**    In order to support and fuel the Airport's concessions program, Concessionaire shall pay a marketing fee equivalent to one-half of one percent (0.5%) of Concessionaire's Gross Revenues. The marketing fee will cover development of signage and other promotional materials and programs including, but not limited to, advertising, employee incentives and brochures/informational materials and technology to communicate the program offerings. The use and application of the marketing fees will be at the sole discretion of the Aviation General Manager. Concessionaire must support marketing programs by providing concept information, logos or initiating promotional materials as requested. Costs for any new materials will be supported by the collected marketing fees. Tenant will not be required to offer discounts outside of the established pricing policy.

**3.8    Prohibition of Solicitation.**    Concessionaire is strictly prohibited from engaging in any activities outside the Premises within the Airport for the recruitment or solicitation of business. Concessionaire may not place or install any carts, kiosks, inline store, racks, or stands, or display merchandise or trade fixtures outside the boundaries of the Premises without the express written consent of the Aviation General Manager.

**3.9    Representative of Concessionaire.**    Concessionaire must at all reasonable times retain in the Airport at least one (1) qualified representative, authorized to represent and act for it in matters pertaining to this Agreement and its operations at the Airport and must keep the Aviation General Manager informed in writing of the identity of each such person.

**3.10    Investigation Reports.**    Concessionaire must, if required in writing by the Aviation General Manager, employ, at its own cost and expense, an investigative organization approved by the Aviation General Manager for the purpose of making investigations and observations and preparing a written report on the carrying out of any pricing policies, revenue control and operational techniques being used at the Premises. Concessionaire must cause such investigation and observation to be made at reasonable times and in the manner set forth in the Aviation General Manager's written directive to Concessionaire, and the investigator must deliver to the Aviation General Manager a true and complete written copy of any such report made to Concessionaire within the timeframe designated by the Aviation General Manager.

**3.11    Ingress and Egress; Security Regulations.**    Concessionaire possesses the right of ingress to and egress from the Airport as may be necessary to fulfill its obligations under this Agreement, subject to Airport rules and regulations, and agrees that the exercise of such right must not impede or interfere unduly with the operation of the Airport by City, its tenants,

contractors, airline passengers, the public or other authorized occupants. Concessionaire agrees that its rights under this Agreement are subject to all security regulations or restrictions that may exist or come into existence and be imposed by any governmental entity having jurisdiction over the Airport and security matters pertaining to it. Concessionaire will have no claim for relief of rent or other remedies as a result of the imposition of such security regulations, other than as specifically identified in the Section entitled "Reduction in Rent Due to Change in Enplanements," or as otherwise allowed herein.

**3.12    Reservations by City.**

**3.12.1** City has the right, without any obligation to do so, at any reasonable time and as often as it considers necessary:

**3.12.1.1** to inspect any portion of the Premises;

**3.12.1.2** to enter the Premises and make ordinary repairs;

**3.12.1.3** to take such action in the event of an emergency concerning the Premises as may be required for the protection of persons or property. In the event the need to take such emergency action is caused by acts or omissions of Concessionaire, Concessionaire will reimburse City for the City's costs associated with such emergency actions. Further, Concessionaire must assure City of emergency access to the Premises by providing emergency telephone numbers at which Concessionaire's representative(s) may be reached on a twenty-four (24)-hour basis.

**3.13    Compliance with Laws and Regulations; Licenses and Permits.**

**3.13.1** Concessionaire must at all times during the Term and any renewal term comply with all the applicable federal and state laws, local ordinances, codes, rules and regulations respecting Concessionaire's use and occupation of the Premises issued by any governmental entity having jurisdiction over the Airport, including, but not limited the City and the Aviation General Manager.

**3.13.2** Concessionaire shall be solely responsible for the cost of obtaining and maintaining all licenses and permits necessary to operate at the Airport and perform all required Services.

**3.14    Prohibited Uses.** The Premises may not be used except for the purposes specified in the Section entitled "Use." Concessionaire may not do, or cause or permit anything to be done in or about the Premises, or bring or keep anything on the Premises:

**3.14.1** increasing in any way the rate of fire insurance or other insurance applicable to the Airport or its concourses, or any of its contents;

**3.14.2** creating a nuisance;

**3.14.3** in any way obstructing or interfering with the rights of others in the Airport, or injuring or annoying them;

**3.14.4** allowing any sale by auction on the Premises;

**3.14.5** committing any waste upon the Premises;

**3.14.6** using or allowing the Premises to be used for any improper, immoral, unlawful or objectionable purpose;

**3.14.7** placing any loads upon the floor, walls or ceiling which endanger the structure;

**3.14.8** obstructing the sidewalk, passageways, stairways or escalators in front of, within or adjacent to the Airport, its concourses or other facilities; or

**3.14.9** doing or permitting to be done anything in any way tending to injure the reputation of City or the appearance of the Airport, its concourses or other facilities.

**3.15    Trash Removal.** All waste matter must be stored and disposed of in a manner satisfactory to the Aviation General Manager, and Concessionaire agrees to arrange for the timely disposal of all waste material at its own expense. Concessionaire will be responsible for the removal of Concessionaire's trash from the Premises and transfer to designated waste receptacles. Concessionaire will be billed proportionately for all costs associated with trash removal from designated waste receptacles.

**3.16    Food Court.** The Food Court is a common area benefiting the customers of all tenants leasing space surrounding the Food Court, as shown on Exhibit A hereto. The Food Court is to be used for Food Court circulation, queuing and seating. It may not be used for displays, freestanding signs, carts or other display/sales activities except upon prior approval of the Aviation General Manager. Management, maintenance and operations of the Premises, to the Lease Line, are the sole responsibility of the Tenant. However, the management, maintenance and operations of the Food Court are the "Prime Tenant's" responsibility. The "Prime Tenant" is defined as the tenant who controls the majority of the leased space surrounding the Food Court.

**4.    ASSIGNMENT OR SUBLETTING**

**4.1**    Concessionaire may not assign, transfer or encumber its interest in this Agreement or any other right, privilege or license conferred by this Agreement, either in whole or in part, without the prior written consent of City. Furthermore, Concessionaire may not sublet or encumber the Premises, or any part of it, without the prior written consent of City. Any

attempted assignment, transfer, encumbrance or sublease without the prior written consent of City is voidable at City's election.

4.2    If Concessionaire is a partnership or joint venture, a withdrawal or change (whether voluntary, involuntary or by operation of law) of the partner/joint venturer or partners/joint venturers owning more than fifty percent (50%) (as measured by interests in capital, profits or such other measurement as City may reasonably designate) of the partnership/joint venture, or the dissolution of the partnership/joint venture, will be deemed an assignment subject to this Section.

4.3    If Concessionaire is a corporation, any dissolution, merger, consolidation or other reorganization of Concessionaire, or the sale or other transfer of a controlling percentage of the capital stock of Concessionaire, or the sale of more than fifty percent (50%) of the value of the assets of Concessionaire, will be deemed an assignment subject to this Section.  The phrase "controlling percentage" means the ownership of, and the right to vote, stock possessing more than fifty percent (50%) of the total combined voting power of all classes of Concessionaire's capital stock issued, outstanding and entitled to vote for the election of directors.   This paragraph will not apply to corporations the stock of which is publicly traded through an exchange or over the counter.

## 5.    RENTAL PAYMENTS

### 5.1    Rental Payments.

5.1.1    The total rental payment for the first year of this Agreement shall be the greater of Concessionaire's Minimum Annual Guarantee ("MAG") of $1,815,308 or Fifteen percent (15%) of Food and Beverage Gross Receipts and eighteen percent (18%) of Alcoholic Beverages gross receipts ("Percentage Rent") over the first year, whichever is higher.  In each subsequent year during the Term of this Agreement the MAG for the applicable year will be adjusted to equal the higher of (1) the previous year's MAG; or (2) eighty-five percent (85%) of the total rent owed by Concessionaire during the previous year.

5.1.2    Rent to be paid each month under this Agreement will be the higher of one twelfth (1/12th) of the MAG or Percentage Rent (Percentage of Gross Receipts) as stated above.

5.1.3    The term "Gross Receipts" shall include all monies paid or payable to Concessionaire or concessionaire's subconcessionaire for sales made or services rendered at or from the Airport, regardless of when, where, or whether the business transaction occurs on or off of the Airport property as well as any other revenues of any type arising out of or in connection with Concessionaire's operations at the Airport under this Agreement, provided, however, that any taxes imposed by law which are separately stated to and paid by the customer and directly payable to the taxing authority by Concessionaire shall be excluded.

**5.1.4**   Rent will begin to accrue on the 181st day following the Commencement Date or on the date the concession opens for business, whichever is sooner.  Concessionaire will pay one-twelfth (1/12th) of the MAG on the first day of each month.  By the tenth (10th) day of each month, Concessionaire will submit a report, in a form provided by DOA, of actual Gross Receipts received during the previous month along with the calculation of Percentage Rent for such previous month and if greater than the previously paid MAG a check representing the additional rent owed to the City as a result of such Percentage Rent calculation.

**5.1.4.1** Annual Rent for each contract year will be trued up in the first quarter of the following contract year in conjunction with the annual report due from Concessionaire to City under Section 5.2.4 of this Agreement. Any overpayments made to the City will be reimbursed in the following year through rent credits.

**5.1.5**   Minimum Annual Guarantee rental paid after the tenth (10th) of the month and Percentage Rent and marketing fee paid after the twenty-fifth (25th) day of the following month will be deemed a late payment and shall incur interest as additional rent at the rate of one-tenth (1/10th) of one percent (0.1%) compounded daily from the date due until the date received by the City.

**5.1.6**   The Marketing Fee is due by the tenth (10th) day of  each month and shall be paid to the City separately from any payment of rent.

**5.1.7**   **Method of Payment.**

**5.1.7.1 Electronic Funds Transfer.**  Any payments made in accordance with this Agreement shall be made by Electronic Funds Transfer (EFT), if available, as follows:

> **Bank: Wells Fargo Bank**
> **Account Name: City of Atlanta – DOA**
> **Routing Number: 121000248**
> **Account Number: 2000132044372**

If EFT is not available, rental payments shall be made in lawful money of the United States, free from all claims, demands, set-offs abatement or counterclaims of any kind against City.  All rental payments shall be payable at:

> **City of Atlanta**
> **Department of Aviation**
> **P.O. Box 920500**
> **Atlanta, Georgia 30392**

**5.1.7.2** City may require payment at such other place as the Aviation General Manager may from time to time designate to Concessionaire in writing. City may also request that all payments to the City be made electronically and will instruct Concessionaire accordingly.

**5.1.7.3** No payment by Concessionaire or receipt by City of a lesser amount than the correct rent shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction. City may accept such check or payment without prejudice to City's right to recover the balance or to pursue any other remedy in this Agreement or otherwise provided by applicable law or equity.

**5.2    Books and Records.**

**5.2.1**   Concessionaire must maintain throughout the Term of this Agreement and for a three (3) year period after the Term, including renewals, or, in the event of a claim by City, until such claim of City for payments hereunder shall have been fully ascertained, fixed and paid, separate and accurate, daily records of Gross Revenues from all activity conducted under this Agreement in accordance with generally accepted accounting principles, showing in detail all business on or transacted in, about, from or pertaining to the Premises, and Concessionaire must enter all receipts arising from such business in regular books of account, and all entries in any such records shall be made at or about the time the transactions occur.

**5.2.2**   In addition, Concessionaire shall maintain weekly, monthly and annual reports of Gross Revenues and transactions derived from its operations under this Agreement, using a form and method as directed by the Aviation General Manager. Concessionaire, throughout the Term of this Agreement, including renewals, shall employ such forms and methods. Upon the Aviation General Manager's written request, Concessionaire must make available immediately at the Airport, for inspection and copying by the Aviation General Manager, any and all books, records and accounts pertaining to its operations or performance of its obligations under this Agreement. The intent and purpose of the provisions of this Section are that Concessionaire must keep and maintain records which will enable City to ascertain, determine and audit, if so desired by City, clearly and accurately, Concessionaire's obligations under this Agreement and the share of Gross Revenues received by City, and that the form and method of Concessionaire's reporting of Gross Revenue will be adequate to provide a control and test check of all Gross Revenue derived by Concessionaire under this Agreement.

**5.2.3**   Should any examination, inspection or audit of Concessionaire's books and records by City disclose an underpayment by Concessionaire in excess of 2% of the total annual consideration due, Concessionaire must promptly pay City the amount of such underpayment, plus interest thereon at the rate of one and one-half percent (1.5%) per month, from the date due until the date collected, and shall reimburse City for all costs incurred in the conduct of such examination, inspection or audit. If City deems it necessary to utilize the services of legal counsel in connection with collecting the reimbursement for such examination, inspection or

audit, then Concessionaire must reimburse City for reasonable attorneys' fees and litigation expenses as part of the costs incurred.

**5.2.4**  Not later than 90 (ninety) days after each annual anniversary of the Commencement Date, Concessionaire must furnish to the Aviation General Manager an unqualified report, certified by a Certified Public Accountant of the Gross Revenues. Concessionaire must also furnish the Aviation General Manager with such other financial or statistical reports as the Aviation General Manager from time to time may request. Concessionaire's obligation under this Section shall survive termination, cancellation or expiration of this Agreement.

**5.2.5**  Upon request by the Aviation General Manager, Concessionaire must furnish to City copies of its quarterly State of Georgia sales and use tax returns covering the Premises as well as Concessionaire's Georgia and federal income tax returns at the time of filing, and any amendments.  All copies of such returns must be certified as exact copies of the original documents by a Certified Public Accountant.  Tenants shall also promptly notify the Aviation General Manager of and furnish to City copies of any audit reports covering the Premises conducted by the Department of Revenue of the State of Georgia or the Internal Revenue Service.  All of the books, records and accounts required by this Section to be maintained by Concessionaire, or true and complete copies of them, shall be maintained by Concessionaire in the Metropolitan Atlanta area.

## 5.3  Revenue Control

**5.3.1**  All business transactions, which occur in the Premises, must be completed by an approved Point of Sale ("**POS**") system (e.g., transaction register) and a receipt must be offered to each customer.  However, during the Term of the Agreement, including any renewals, the City reserves the right, at its expense, to purchase and/or implement a computerized POS system and to further modify the system from time to time.  Concessionaire must cooperate fully in the development and implementation of such a system.  Upon implementation, the Aviation General Manager may dictate a new method of collection and payment by providing written notice to Concessionaire.  Concessionaire must cooperate with the City in implementing such modified collection procedures. If the new POS system requires replacement of existing cash registers within the Premises, the City will reimburse Concessionaire for the unamortized cost thereof (based on the then current book value, using the straight-line method of depreciation) less the salvage value of such cash registers.  The City will determine the type of registers to be used in the newly implemented POS system.

**5.3.2**  In order to facilitate implementation of the POS system, all POS terminals used in the operation of businesses within the Premises must have, at a minimum, the features outlined below:

**5.3.2.1**  A minimum of sixty (60) segregated sales categories;

5.3.2.2   The input device may either be a keyboard, scanner, touch screen, other approved input technology or any combination thereof;

5.3.2.3   The patron fee display shall be of sufficient size and legibility to be readily observed by the patron during the processing of the transaction;

5.3.2.4   The POS register, terminal or POS control server(s) shall be capable of secure, encrypted data transmission using TCP/IP or RS-232 communications protocol; and

5.3.2.5   The register or data collection device shall have a secure transaction audit tape or a detailed digital ASCII transaction journal log file stored on a USB (flash) drive or other suitable media.

5.3.3   Concessionaire must also comply with the most current Payment Card Industry Data Security Standard (PCI-DSS) requirements as detailed at https://www.pcisecuritystandards.org/security_standards/pci_dss.shtml

6.     **TAXES AND LIENS.**  Concessionaire is liable for all taxes levied or assessed against any interest of Concessionaire in the Premises and any improvements, personal property, furniture or fixtures or equipment placed by Concessionaire in the Premises.  Concessionaire agrees not to permit or suffer any liens to be imposed upon the Premises, the Airport or any other part of them as a result of its activities without promptly discharging them, provided, however, that Concessionaire may, if Concessionaire so desires, contest the legality of any such liens.  In the event of a contest, Concessionaire must provide a bond in an amount and form acceptable to City in order to clear the record of any such liens.

7.     **IMPROVEMENTS**

7.1    **Approval of Conceptual Design.**

7.1.1   The initial layout and design of all Concessionaire Improvements to be made or installed within the Premises and any subsequent refurbishments shall conform to the Department of Aviation Airport Design Criteria ("**Airport Design Criteria**") which shall be made available to Concessionaire upon the Airport's website (www.atl.com) and shall be subject to amendment from time to time by the Aviation General Manager.

7.1.2   Prior to the commencement of initial construction, or subsequent refurbishment of, or other work with respect to Concessionaire Improvements, Concessionaire must submit detailed plans and specifications to the Aviation General Manager for approval.  Concessionaire must include with its plans and specifications schematic renderings of the Premises, materials, a color board or boards and a detailed layout of the overall merchandising plan.  Approval by City will extend to and include architectural and aesthetic matters and City reserves the right to reject any designs submitted and to require Concessionaire to resubmit designs and layout proposals until they meet City's approval.  The Commencement Date shall not be extended if

City elects to reject any designs or layout Proposals submitted.  If City and Concessionaire fail to agree on plans and specifications for Concessionaire Improvements within thirty (30) days after the Commencement Date, City may terminate this Agreement.

       **7.1.3**   In the event of disapproval by City of any portion of the plans and specifications, Concessionaire will promptly submit necessary modifications and revisions.  Concessionaire will make no changes or alterations in the plans or specifications after approval, and no structural alterations or improvements will be made to or upon the Premises without the prior written approval of the Aviation General Manager.  City agrees to act promptly upon such plans and specifications and upon requests for approval of changes or alterations in the plans or specifications. One copy of plans and specifications for all Concessionaire Improvements or subsequent changes or alterations will, within 15 days after approval by the Aviation General Manager, be signed by Concessionaire and delivered to the City.

**7.2**     **Minimum Investment; Base Building Improvements; Reinvestment.**

     **7.2.1**   **Minimum Investment.**

       **7.2.1.1**   Within the Premises defined by demising partitions and/or other boundaries described in the Agreement, Concessionaire shall perform all demolition required and shall at its own expense construct all improvements and install all trade fixtures according to the procedures and standards specified in the Airport Design Criteria.

       **7.2.1.2**   Within thirty (30) days of receiving a certificate of occupancy, Concessionaire is required to submit to the Aviation General Manager as-built drawings.

       **7.2.1.3**   Within one hundred eighty (180) days of the Commencement Date, or otherwise pursuant to a transition plan approved by the Aviation General Manager, Concessionaire shall decorate and finish to approved standards the interior and exterior of the Premises.  The design and theme must be submitted to the Aviation General Manager, and he/she must approve them prior to implementation.  The public visible area of the Premises shall be improved at a Minimum Investment of three hundred and fifty dollars ($350.00) per square foot.   In addition, Concessionaire is responsible for demolition necessary to accommodate all improvements. The three hundred and fifty dollar ($350.00) Minimum Investment calculation shall include all construction costs, mechanical, electrical and plumbing (whether in areas visible to the public or not), finishes, furnishings, furniture, casework, or other fixtures, signs, store fronts, as well as all architectural and engineering fees.

       **7.2.1.4**   Within thirty (30) days of receiving a certificate of occupancy, Concessionaire shall provide the City a statement certified by its architect, setting forth the total construction costs, with appropriate detail showing the costs and useful lives of elements of decoration, furnishings or fixtures.  Concessionaire shall make available to Aviation General Manager paid invoices for labor and materials covering all construction and trade fixtures, including furniture, fixtures and architectural and engineering fees.  The three hundred and fifty

dollar ($350.00) Minimum Investment may not include financial costs, interest, inventory, pre-opening expenses or intra-company charges related to construction. If the actual Investment incurred by the Concessionaire is less than the Minimum Investment required, in addition to any other remedy available to the City, Concessionaire will pay the difference to City within sixty (60) days after receipt of Certificate of Occupancy. If the City disputes the amount of investment claimed by Concessionaire, the City may, at its expense, hire an independent appraiser to determine the cost of the investment. If the independent appraiser determines that the investment is less than the minimum required, the difference, as well as City's costs of hiring such independent appraiser, will be paid to the City by Concessionaire within sixty (60) days of the appraiser's determination.

7.2.1.5    Notwithstanding the work to be performed pursuant to this Section Concessionaire shall begin paying rent on the Commencement Date, and Concessionaire must document any and all costs of Concessionaire Improvements made to the Premises subsequent to the Commencement Date. The documentation must be in a form and detail satisfactory to the Aviation General Manager, and must be submitted for review and approval within thirty (30) calendar days following completion of the work, for the purpose of establishing the unamortized costs of improvements to be reimbursed to Concessionaire in the event of termination for convenience by the City.

7.2.2    **Base Building Improvements.**  Concessionaire shall pay all costs for required modifications and/or construction of certain base building conditions necessary to bring the Premises to a condition ready to receive Concessionaire Improvements. Improvements shall include but not be limited to the following: demolition of existing storefronts and finishes and removal of debris, construction or relocation of demising partitions, construction of servicing/delivery corridors or other support spaces, and extension or modification of building systems or other work. In locations in which construction of service corridors will be necessary to improve operations at the Airport, the required corridors shall be constructed by the Concessionaire.

7.2.3    **Minimum Reinvestment.**    Within thirty (30) days of the end of the fifth (5th) anniversary of the Commencement Date the Concessionaire will be required to refurbish the public areas of the Premises at a minimum cost of two hundred dollars ($200.00) per square foot within one hundred and fifty (150) days of the anniversary or within such longer time period as may be approved by the Aviation General Manager.    If the City disputes the amount of reinvestment claimed by Concessionaire, the City may, at its expense, hire an independent appraiser to determine the cost of the reinvestment. If the independent appraiser determines that the reinvestment is less than the minimum required, the difference, as well as City's costs of hiring such independent appraiser, will be paid to the City by Concessionaire within sixty (60) days of the appraiser's determination.

7.2.4    **Liquidated Damages.**  Failure by Concessionaire to complete the construction in the timeframe as outlined above as required during the term and the renewal shall result in the payment of liquidated damages of One Thousand Dollars ($1,000) per day, which shall be in

addition to the payment of the required Rent and which the parties acknowledge is a reasonable estimate of the damage incurred by the City for such delay.

**7.3     Construction of Concessionaire Improvements.**

      **7.3.1**   Concessionaire must, at its sole cost and expense, design, erect, construct and install all of the following ("**Concessionaire Improvements**"):  fixtures, furnishings, carpeting, decorations, finishing, equipment, counters, and all other improvements for the operation of business within the Premises pursuant to this Agreement.

      **7.3.2**   Concessionaire must perform all demolition required and construct and install all Concessionaire Improvements at its own expense and shall hire contractors that are acceptable to City.  Prior to the commencement of any construction work, Concessionaire must provide to City a fixed price contract or contracts for all work to be performed within the Premises, which contract(s) shall be insured by, and Concessionaire must provide to City, a payment and performance bond in an amount equal to one hundred percent (100%) of the total contract value of such contract.  Concessionaire must also comply with all other requirements of **Exhibit D**.

      **7.3.3**   City's sole responsibility with regard to improvements within the Premises shall be to deliver the Premises to Concessionaire in the condition set forth in the Airport Design Criteria.  Concessionaire may not undertake any work within or about the Premises unless City, pursuant to the Airport Design Criteria, approves such work.  Prior to the commencement of any work, Concessionaire must confirm to the Aviation General Manager in writing that: (1) Concessionaire accepts the Premises for the intended uses; and (2) the Premises are in the condition set forth in the Airport Design Criteria.

**7.4     Utilities.**

      **7.4.1   Utility Connections.**  The City will provide the source for certain utility connections for the concession spaces as specified in the Airport Design Criteria.  Generally, electrical service will be provided to each concession's rear or side demising wall and stubbed off.   Connection and distribution throughout the concession space shall be at the Concessionaire's expense.  All utilities to the concession space will be separately metered.

      **7.4.2**   Concessionaire must pay the whole cost for all utility services as invoiced to Concessionaire by the Airport or its designee and for such other special services which it may require in the Premises, and Concessionaire expressly waives the right to contest any utility rates; provided that Concessionaire will not be charged for the supply of heat, ventilation, and air conditioning for the Premises, except as may be otherwise required as referenced below.

      **7.4.3   Heating, Ventilation and Air Conditioning ("HVAC").**  The City will provide the base system for HVAC.  However, Concessionaire will be required to install separate equipment for HVAC requirements specifically related to Concessionaire's operations.   In such event,

Concessionaire will pay for utility usage in the concession spaces for HVAC requirements. Concessionaire will pay for all utilities without exception necessary in the operation of its business including telephone, electricity, water, sewage, gas and other fuels. All charges including but not limited to deposits and all service charges for utility services metered directly to the concession space must be paid by Concessionaire, regardless of whether such utility services are furnished by the City or other utility service corporations.

**7.5    Waiver of Damages.**  Concessionaire expressly waives all claims for damages arising out of or resulting from failures or interruptions of utility services furnished by City including, but not limited to, electricity, water, plumbing, sewage, telephone, communications, heat, ventilation, air conditioning, or for the failure or interruption of any public or passenger conveniences.

**7.6    Maintenance and Repair.**  Concessionaire agrees, at its own expense, to keep the Premises and all Concessionaire Improvements in good repair and in a clean, neat, safe and sanitary condition and in good order at all times. If it becomes reasonably necessary during the Term of this Agreement, as determined by the Aviation General Manager, Concessionaire will, at its own expense, redecorate and paint fixtures and the interior of the Premises and improvements, and replace fixtures, worn carpeting, curtains, blinds, drapes, or other furnishings. Additionally, Concessionaire shall pay its pro rata share of Airport Operations and Maintenance ("O&M") costs to be billed monthly by the City or its designee.

**7.6.1    Janitorial Service.**  Concessionaire will provide sufficient janitorial services to ensure that the Premises is at all times maintained in a clean attractive and sanitary manner including, but not limited to, equipment, utensils, fixtures, grease traps, service counters and display units.

**7.6.2    Pest Control.**  At any time during the Term of this Agreement, the Aviation General Manager may require Concessionaire to use the pest-exterminating contractor engaged by the Airport to implement a comprehensive, ongoing pest control program. In such case, Concessionaire shall be required to provide the City with reports indicating compliance with pest control standards, in such form as the Aviation General Manager may dictate from time to time and shall be required to maintain manifest reports on file at each store, at all times.

**7.7    Advertising.**  Concessionaire may, at its own expense, install and operate necessary and appropriate identification signs on the Premises, subject to the approval of the Aviation General Manager as to the number, size, height, location, color and the general type and design. Such approval shall be subject to revocation by the Aviation General Manager at any time. Without express written consent of the Aviation General Manager, Concessionaire may not display any advertising, promotional or informational pamphlets, circulars, brochures or similar materials.

## 8.    LIABILITY AND INDEMNITY

**8.1    City's Liabilities.**  City will not be liable or responsible to Concessionaire for any loss, damage or expense that Concessionaire may sustain or incur if either the quantity or character of any services to be provided by City is changed or is no longer available or is no longer suitable for Concessionaire's requirements. City will not be liable or responsible to Concessionaire for any loss, damage or expense arising out of, resulting from, relating to or concerning, directly or indirectly, acts of terrorism, including, but not limited to, any loss, damage or expense sustained or incurred by Concessionaire as a result of:

    **8.1.1**   a change in the Airport's or Concessionaire's business resulting from such terrorist acts;

    **8.1.2**   the enactment of laws responding to or concerning such terrorist acts; or

    **8.1.3**   any other detrimental effect upon Concessionaire or its business resulting from such terrorist acts.

**8.2    Indemnity and Hold Harmless.**  Concessionaire agrees to defend, indemnify and hold harmless City, including, but not limited to, its officers, agents, officials and employees (collectively, "**Indemnified Parties**") from and against:

    **8.2.1**   any liability for injuries to or deaths of persons or damage to property arising from Concessionaire's activities under this Agreement or in or about the Premises; and

    **8.2.2**   any loss, expense, demand, suit or claim against the Indemnified Parties sustained or alleged to have been sustained arising out of or relating to the negligence or willful misconduct of Concessionaire or any other individual or entity under Concessionaire's control (contractual or otherwise) and their officers, agents or employees; and

    **8.2.3**   any loss, expense, demand, suit or claim against the Indemnified Parties sustained or alleged to have been sustained arising out of or relating to any liens or charges of any kind that may at any time be established against the Premises or this Agreement, or any part of it, as a consequence of any act or omission of Concessionaire or as a consequence of the existence of Concessionaire's interest under this Agreement; and

    **8.2.4**   any loss, expense, demand, suit or claim against the Indemnified Parties sustained or alleged to have been sustained arising out of or relating to Concessionaire's violation or alleged violation of the Section entitled "Hazardous Materials." This indemnification obligation includes, but is not limited to fines assessed against Concessionaire, City, or others for whom City may be responsible, diminution in value of the Airport, damages for the loss of use of rentable or usable space or of any amenity of the Airport, damages arising from any adverse impact on marketing of space in the Airport, and sums paid in settlement of claims, attorneys' fees, consultant fees, and expert fees which arise during or after the Term of this

Agreement, including any renewals, as a result of such violation. This indemnification of City by Concessionaire also includes, without limitation, costs incurred in connection with any investigation of site conditions or any cleanup, remediation, removal, or restoration work required by any federal, state or local governmental agency or political subdivision because of Hazardous Material present in the soil or ground water on or under the Airport which results from such a violation; and

8.2.5   any loss, claim, damage, action or suit alleging that any good and/or service sold by Concessionaire infringes upon one or more United States Patents, copyrights or trademarks owned by anyone other than Concessionaire, or violates any provision of the Lanham Act.

8.3   **Indemnity Not Limited by Applicable Insurance.** Concessionaire further agrees that this agreement to indemnify and hold harmless the Indemnified Parties will not be limited to the limits or terms of the liability insurance, if any, required under this Agreement.

8.4   **Survival.** This Section entitled "Indemnity and Hold Harmless" shall survive any cancellation, termination or expiration of this Agreement.

9.   **INSURANCE AND BONDING.** Concessionaire must comply with all insurance and bonding requirements set forth in **Exhibit D.**

10.   **DAMAGE OR DESTRUCTION**

10.1   **Partial Destruction of the Premises.**

10.1.1 **Insured Damage.** If the Premises is damaged by any casualty which is insurable and insured under an insurance policy of the type required to be maintained by Concessionaire pursuant to this Agreement, regardless of whether the Premises is tenantable or practically usable for the purpose for which it was formerly used, then Concessionaire must repair such damage as soon as reasonably possible and this Agreement will continue in full force and effect.

10.1.2 **Uninsured Damage.** If the Premises is damaged by any casualty not insurable under an insurance policy of the type required to be maintained pursuant to this Agreement, and such casualty is not caused by an act or omission of Concessionaire, its agents, servants or employees, then City's options are, either:

10.1.2.1 repair such damage as soon as reasonably possible at City's expense, in which event this Agreement will continue in full force and effect; or

10.1.2.2 give written notice to Concessionaire within thirty (30) days after the date of occurrence of such damage of City's intention to terminate this Agreement effective as of the date of the occurrence of the damage. If City elects to terminate this Agreement, Concessionaire will have the right, within ten (10) days of the date of the City's notice to notify, City in writing of Concessionaire's intention to repair such damage. If Concessionaire fails to

repair the damage to City's satisfaction within a reasonable period of time, this Agreement will automatically terminate effective as of the date of the occurrence of such damage.

**10.1.3** In no event shall City be required to repair any injury or damage of fire or other cause, or to make any restoration or replacement of any paneling, decorations, office fixtures, partitions, railings, ceilings, floor covering, equipment, machinery or fixtures or any other improvements or property installed in the Premises by Concessionaire or at the direct or indirect expense of Concessionaire.  Concessionaire must restore or replace the same in the event of damage provided that this Agreement is not terminated pursuant to this Section.

**10.1.4** If the Premises is damaged by any casualty not insurable under an insurance policy of the type required to be maintained pursuant to this Agreement, and such casualty is caused by an act or omission of Concessionaire, its agents, servants or employees, then Concessionaire must repair the damage to the City's satisfaction within a reasonable period of time, in which event this Agreement will continue in full force and effect.

**10.2    Total Destruction of Premises.**  If the Premises is totally destroyed during the Term of this Agreement, including any renewals, from any cause whether or not covered by the insurance required under this Agreement (including any destruction required by any authorized public authority), this Agreement will automatically terminate, effective as of the date of such total destruction.

**10.3    Partial Destruction of Concourse.**  If fifty percent (50%) or more of any concourse on which the Premises is located is damaged or destroyed by an insured risk, or if fifteen percent (15%) or more of any concourse on which the Premises are located is damaged or destroyed by an uninsured risk, notwithstanding that the Premises may be unaffected, City may, but is not obligated to, terminate this Agreement within ninety (90) days from the date of occurrence of such damage or destruction. If the City elects to terminate this Agreement within such ninety (90) day period, it will notify Concessionaire in writing and the termination will be effective upon the date of such notice.   After the Agreement is terminated, Concessionaire must surrender the Premises to City within ten (10) days.

**10.4    Damage During Last Year of Term or Renewal Period.**  If during the last year of the Term, including any renewal term, the Premises are partially destroyed or damaged and are not covered under an insurance policy required to be maintained pursuant to this Agreement, City may terminate this Agreement, effective as of the date of occurrence of such damage, by giving written notice to Concessionaire within thirty (30) days after the date of occurrence of such damage.  If City elects to terminate this Agreement, Concessionaire will have the right, within ten (10) days of the date of the City notice, to notify City in writing of Concessionaire's intention to repair such damage at Concessionaire's expense, without reimbursement from City, in which event this Agreement shall continue in full force and effect and Concessionaire must proceed to make such repairs as soon as reasonably possible.

**10.5    Reduction of Rent; Concessionaire's Remedies.**

**10.5.1**  If the Premises are partially destroyed or damaged physically and the City is obligated to repair the Premises pursuant to this Agreement, the rent attributable to such partially destroyed or damaged Premises and payable for the period during which such damage and repair continues will be reduced in proportion to the extent to which Concessionaire's use of the Premises is impaired, calculated on a square foot basis, in accordance with the discretion and determinations of the Aviation General Manager.  For example, if one-half (1/2) of the Premises is unusable by Concessionaire as a result of such physical damage or destruction, then the rent payable for each month during which it exists and is being repaired will be reduced by one-half (1/2).  Except for a reduction rent (if any), Concessionaire shall have no claim against the City for any damage suffered by reason of any such damage, destruction or repair.

**10.5.2**  If the City shall be obligated to repair the Premises under this Section and shall not commence such repair or restoration within forty-five (45) days after such obligation shall accrue, Concessionaire at Concessionaire's option may cancel and terminate this Agreement by written notice to the City at any time prior to the commencement of such repair. In such event this Agreement shall terminate as of the date of such notice.

**11.**     **Reduction in Rent Due to Changes in Enplanements.**

**11.1**    **Definitions:**  These definitions apply to this Section entitled "**Reduction in Rent Due to Changes in Enplanements**":

**11.1.1** "Affected Concourse" means a Concourse in which Concessionaire operates Concessions under the Agreement and is limited to Concourse C, if applicable.

**11.1.2** "Enplaned Passenger" means and includes each passenger boarding an airplane from an Affected Concourse, whether such passenger has paid a fare for his/her ticket, is flying on frequent flyer miles, boards under a buddy pass, or otherwise.

**11.1.3** "Year" means a three hundred and sixty-five (365) day period beginning on the effective date of the Agreement.  For example, a Year under an Agreement effectively dated January 1, 2017, will be the period from January 1, 2017, through December 31, 2017, and a Year under an Agreement effectively dated August 1, 2017, will be the period from August 1, 2017, through July 31, 2018.

**11.2**    **Reduction in Enplaned Passengers; Reduction of MAG.**

**11.2.1 Rules Applicable to Concessions Located in Concourses.**

**11.2.1.1**  If the total number of Enplaned Passengers departing an Affected Concourse, as documented by the City's Department of Aviation in monthly reports received from Airlines departing flights from such Affected Concourse, for any whole month in the second or any subsequent Year during the term of the Agreement decreases by more than

twenty-five percent (25%) from the same month of the previous Year, then MAG rent payments due under this Agreement will be reduced (the "Reduction") in the following manner:

11.2.1.1.1    **MAG Monthly Installment:**  the monthly installment of the MAG due for the following month (and for that month only) will be reduced by the month over month percentage decrease in the number of Enplaned Passengers for the month experiencing the decrease; and

11.2.1.1.2    **Agreement Year MAG:**  the Minimum Annual Guarantee for the Agreement Year in which the reduced monthly payment amount falls will also be reduced by the dollar amount by which the monthly installment of the MAG was reduced. The same test and calculation shall apply each month thereafter until the first month that the reduction in Year over Year monthly enplanements is less than twenty-five percent (25%) at which time the adjusted MAG in effect prior to the adjustment provided for herein shall be reinstated.

**11.3    Calculation Examples.**  For example, if the number of Enplaned Passengers for the month of July 2017 declined by thirty percent (30%) over the number of Enplaned Passengers for the month of July 2016, then:

11.3.1  the MAG amount payable for the month of August 2017 will be reduced by thirty percent (30%);

11.3.2  the MAG for the Agreement Year in which August 2017 falls will decrease by the dollar amount of the reduction.

**11.4    Submission of Claim for Reduction; Reduction Only Available if Concessionaire is Paying MAG; Reduction Not Available if Concessionaire is Paying Percentage Rent.**  Claims for a Reduction may only be submitted quarterly and may only include entire monthly periods. Reduction in Enplaned Passengers for partial monthly periods will not qualify for a Reduction. If, during any month in which Enplaned Passengers are reduced, Concessionaire is required to pay percentage rent, a claim for a Reduction will not be available. A claim for a Reduction must be submitted by the last day of the month following the last month in the quarter for which a Reduction is sought. For example, if there is a reduction in the number of Enplaned Passengers for an Affected Concourse or the Airport as a whole (depending on the location of the affected Premises) beginning on August 15, 2017, and continuing through December 31, 2017, a claim for a Reduction may only be made for the months of September, October, November and December 2017, and must be submitted by January 31, 2018.

**11.5    Certification of Claim for a Reduction.**  If Concessionaire desires to submit a claim for a Reduction, it must submit on forms developed by DOA.

## 12. DEFAULT BY TENANT

**12.1    Events of Default.** Concessionaire will be in default under this Agreement if:

**12.1.1** Concessionaire fails to pay rent or any other payment required under this Agreement when due to City, and that failure continues for a period of thirty (30) days after such rent or other payment is due whether or not the City has invoiced or provided Concessionaire with notice of any amount due or overdue; or

**12.1.2** Concessionaire does any of the following:

**12.1.2.1** becomes insolvent, or seeks the benefit of any present or future insolvency statute.

**12.1.2.2** makes a general assignment for the benefit of creditors.

**12.1.2.3** files a voluntary petition in bankruptcy.

**12.1.2.4** files a petition or answer seeking an arrangement for its reorganization or the readjustment of its indebtedness under the federal bankruptcy laws, or under any other law or statute of the United States or of any other State.

**12.1.2.5** consents to the appointment of a receiver, trustee, or liquidator of any of its property.

**12.1.2.6** files a petition under any part of the federal bankruptcy laws, or an action under any present or future insolvency law or statute, is involuntarily filed against Concessionaire and not dismissed within sixty (60) days after the filing.

**12.1.2.7** transfers its interest under this Agreement, without the prior written approval of City, by reason of death, operation of law, assignment, sublease agreement or otherwise, to any other person, firm or corporation.

**12.1.2.8** abandons, deserts or vacates the Premises, including, but not limited to, ceasing to provide its services at the Premises for thirty (30) days or more.

**12.1.2.9** files any lien against the Premises because of any act or omission of Concessionaire, and is not discharged by Concessionaire by payment, bond or otherwise within twenty (20) days after receipt of notice of the lien by Concessionaire.

**12.1.2.10** fails to comply with the requirements set forth in **Exhibit D**; Insurance and Bonding Requirements.

12.1.2.11 fails to keep, perform or observe any term, covenant or condition of this Agreement.

12.1.2.12 uses or gives its permission to any person to use any portion of Premises for any illegal purpose or purpose in violation of this Agreement.

12.1.2.13 (including any venture partner of Concessionaire), or any of their respective officers, directors, principal shareholder(s) or affiliates, is convicted of or pleads guilty to any crime in any way related to the operation of the Premises or the Airport or a public sector, governmental or quasi-governmental project or contract or related to the safety and/or security of any Airport, governmental entity or its citizens. For purposes of this Agreement:

12.1.2.13.1 "Principal Shareholder" means an owner of shares (or equity interest, if other than a corporation) representing 10% of the voting control and/or participation (through dividends or other distributions) in the profits of an entity.

12.1.2.13.2 "Affiliate" means any person or entity which directly or indirectly controls or is controlled by, or is under common control with an entity.

12.1.2.13.3 "Control" or "Controlling" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity whether through the ownership of voting securities, by contract or otherwise.

12.1.2.14 intentionally or willfully misrepresents to City any material fact.

12.1.2.15 made any material misrepresentation or failed to make full and accurate disclosure to City in the documents, questionnaires and other materials submitted by Concessionaire with its Proposal pursuant to which this Agreement was awarded to Concessionaire, or failed to comply with all requirements, including without limitation, the ethical standards policy, set forth in the RFP.

12.1.2.16 acts or fails to act results in the suspension or revocation of, for a period of more than thirty (30) days, of any rights, powers, licenses, permits or authorities necessary for the operation of its business at the Premises.

12.1.2.17 fails to pay any lawful tax or assessments required to be paid under this Agreement.

**12.2    City's Remedies.** If Concessionaire is in default, City will notify Concessionaire in writing of the nature of the default. If Concessionaire, where a specific time period for the cure is provided in the applicable subsection of this Agreement, does not cure the default within that period or, where a time period for the cure is not specifically provided in the applicable subsection, does not cure the default within seven (7) days from receipt of notice from City,

City may, without notice to Concessionaire's sureties, if any, elect to exercise any of the following remedies:

**12.2.1** Allow this Agreement to continue in full force and effect and to enforce all of City's rights and remedies under it, including, without limitation, the right to assess fines and the right to collect rent as it becomes due together with interest at the rate of one and one half percent (1.5%) per month.

**12.2.2** Continue this Agreement in full force and effect and enter the Premises and relet all or any portion of it to other parties for Concessionaire's account. Concessionaire must pay to City on demand all costs City incurs in entering the Premises and reletting it, including, without limitation, brokers' commissions, and expenses for repairs and remodeling, attorneys' fees and all other actual costs. Reletting may be for a period shorter or longer than the remaining Term. During the term of any reletting, Concessionaire must pay to City the rent due under this Agreement on the date due, less any net rents City receives from any reletting.

**12.2.3** Terminate Concessionaire's rights under this Agreement at any time and recover from Concessionaire all costs, expenses, losses and damages recoverable under this Agreement or applicable law as a result of Concessionaire's default and the termination.

**12.2.4** Cure any default at Concessionaire's cost. If City at any time, by reason of Concessionaire's default, pays any sum to cure any default, the sum paid by City shall be immediately due from Concessionaire to City on demand, and shall bear interest at the rate of one and one-half percent (1.5%) per month from the date paid by City until the date City is fully reimbursed by Concessionaire.

**12.2.5** Exercise any and all other rights or remedies available under this Agreement or at law or in equity.

**12.3    Concessionaire Not in Default.** If, after termination for default, it is determined for any reason that Concessionaire was not in default, the rights and obligations of the parties will be the same as if the Agreement had been terminated pursuant to the Section entitled "Termination for Convenience."

**12.4    Security Interest.**

**12.4.1** In addition to the statutory landlord's lien, Concessionaire grants to City a valid security interest in all goods, wares, equipment, fixtures, furniture, improvements and other personal property located now or in the future within the Premises, including the proceeds of such items, to secure payment of all rentals and other sums of money becoming due from Concessionaire under this Agreement, and to secure payment of any damages or losses that City may suffer by reason of the breach by Concessionaire of this Agreement. Concessionaire may not remove such goods, wares, equipment, fixtures, furniture, improvements and other personal property located now or in the future within the Premises from the Premises without

the written consent of City until all arrearages in rent, as well as any other sums of money then due to City under this Agreement, have been paid and discharged and all the covenants, agreements and conditions of this Agreement have been fully complied with and performed by Concessionaire.

**12.4.2** Upon the occurrence of an event of default by Concessionaire, City may, in addition to any other remedies provided in this Agreement, enter upon the Premises and take possession of any goods, wares, equipment, fixtures, furniture, improvements and other personal property of Concessionaire situated on the Premises, without liability for trespass or conversion, and sell them at public or private sale, with or without having such property at the sale, after giving Concessionaire reasonable notice of the time and place of any public sale or of the time after which any private sale is to be made, at which sale City or its assigns my purchase the property unless otherwise prohibited by law.  The requirement of reasonable notice to Concessionaire will be met if such notice is given in the manner prescribed in the Section entitled "Notices", at least five (5) days before the date of the sale.

**12.4.3** The proceeds from any such sale, less any expenses of the City connected with the taking of possession, holding and selling of the property (including reasonable attorneys' fees and other expenses), will be applied as a credit against the debts payable by Concessionaire, or as otherwise required by law; and Concessionaire will pay any deficiencies immediately.

**12.4.4** Upon request by City, Concessionaire agrees to execute and deliver to City a financing statement in a form sufficient to perfect the security interest of City in the property and the proceeds under the provisions of the Uniform Commercial Code in force in the State of Georgia.  By accepting a grant of the security interest set forth herein, the parties agree that the City is not waiving its rights under any statutory lien for the payment of rent granted under this Agreement or applicable law.

## 13.    TERMINATION

**13.1    Termination by City for Cause.**  City may at its option, by giving written notice to Concessionaire, terminate this Agreement:

**13.1.1** for a material breach of the Agreement by Concessionaire that is not cured by Concessionaire within seven (7) days of the date on which City provides written notice of such breach;

**13.1.2** immediately for a material breach of the Agreement by Concessionaire that is not reasonably curable within seven (7) days;

**13.1.3** immediately upon written notice for numerous breaches of the Agreement by Concessionaire that collectively constitute a material breach or reasonable grounds for insecurity concerning Concessionaire's performance; or

**13.1.4** immediately for engaging in behavior that is dishonest, fraudulent or constitutes a conflict of interest with Concessionaire's obligations under this Agreement or is in violation of any City Ethics Ordinances.

**13.2    Re-procurement Costs.** In addition to all other rights and remedies City may have, if this Agreement is terminated by City pursuant to the above subsection entitled "**Termination by City for Cause,**" Concessionaire will be liable for all costs in excess of the Charges for all terminated Services reasonably and necessarily incurred by City in the completion of the Services, including the cost of administration of any agreement awarded to other Persons for completion. If City improperly terminates this Agreement for cause, the termination for cause will be considered a termination for convenience in accordance with the provisions of the Section entitled "**Termination by City for Convenience.**"

**13.3    Termination by City for Insolvency.** City may terminate this Agreement immediately by delivering written notice of such termination to Concessionaire if Concessionaire: (a) becomes insolvent, as that term may be defined under Applicable Law, or is unable to meet its debts as they mature; (b) files a voluntary petition in bankruptcy or seeks reorganization or to effect a plan or other arrangement with creditors; (c) is adjudicated bankrupt or makes an assignment for the benefit of its creditors generally; (d) fails to deny or contest the material allegations of an involuntary petition filed against it pursuant to any Applicable Law relating to bankruptcy, arrangement or reorganization, which is not dismissed within sixty (60) days; or (e) applies for or consents to the appointment of any receiver for all or any portion of its property.

**13.4    Termination by City for Convenience.**

**13.4.1** The City shall have the right to terminate the Agreement without cause at any time during the Term by giving written notice to Concessionaire at least 30 days prior to the date such termination is to be effective. Should the City terminate the Agreement prior to its expiration, the City shall reimburse the Concessionaire for the reasonable and proper unamortized costs of the capital Improvements, made by or at the cost of the Concessionaire, and approved in writing by the Aviation General Manager. Concessionaire must document the costs of any and all capital Improvements in a form and detail satisfactory to the Aviation General Manager and submit same within thirty (30) calendar days following completion of the work for review and approval, for the purpose of establishing the unamortized costs of the Improvements. The capital costs of the Improvements shall be amortized based upon a straight-line depreciation schedule over the initial Term of the Agreement, with zero salvage value.

**13.4.2** Reimbursement for unamortized costs of capital improvements shall be the Concessionaire's sole remedy in the event of Termination by City for Convenience. Concessionaire hereby waives any claims for damages, including loss of anticipated profits, in the event that the City terminates the Agreement for convenience.

**13.5    Termination for Lack of Appropriations.**   If, during the Term of this Agreement, legislation establishing a Maximum Payment Amount for the following year is not enacted, this Agreement will terminate in its entirety on the last day of the term for which a Maximum Payment Amount has been legislatively authorized.

**13.6    Effect of Termination.**    Unless otherwise provided herein, termination of this Agreement, in whole or in part and for any reason, shall not affect: (a) any liabilities or obligations of either Party arising before such termination or out of the events causing such termination; or (b) any remedies to which a Party may be entitled under this Agreement, at law or in equity.   Upon termination of this Agreement, Concessionaire shall immediately: (i) discontinue Services on the date and to the extent specified in the notice and place no further purchase orders or subcontracts to the extent that they relate to the performance of the terminated Services; (ii) inventory, maintain and turn over to City all work product, licenses, equipment, materials, plant, tools, and property furnished by Concessionaire or provided by City for performance of the terminated Services; (iii) promptly obtain cancellation, upon terms satisfactory to City, of all purchase orders, subcontracts, rentals or any other agreements existing for performance of the terminated Services, or assign those agreements, as directed by City; (iv) comply with all other reasonable requests from City regarding the terminated Services; and (v) continue to perform in accordance with all of the terms and conditions of this Agreement any portion of the Services that are not terminated.

**14.    FINES FOR VIOLATIONS**

**14.1**    If Concessionaire defaults under or violates material provisions of this Agreement, in lieu of, or in addition to, any other available remedy, the Aviation General Manager may elect to impose the charges described below on a per diem basis per infraction, as follows:

**14.1.1** Violation of Premises Use;

**14.1.2** Failure to maintain required hours of operation;

**14.1.3** Failure to submit required documents and reports;

**14.1.4** Failure to remedy Customer Service, Cleanliness, Quality Assurance, Operations, and/or Facility standard;

**14.1.5** Infractions within 48 hrs.' notice (as measured from the date of each written notification);

**14.1.6** Failure to provide pest control records on a monthly basis and/or display manifest reports on file in each store;

**14.1.7** Unauthorized Advertising Signage (defined as written, printed blade or storefront); or

**14.1.8** Destruction of Airport public facility deemed caused by associates or associate travel in unauthorized areas;

**14.1.9** Failure to comply with any and all published DOA, basic terms of the Agreement, federal, state, local policies, regulations, the Code, directives or standards.

First offense of any infraction listed above may result in a charge of $500, second offence may result in a charge of $750, and third offense may result in charge of $1,000. Repeated violation of the above-listed infractions may result in the Concessionaire being in default of the Agreement.

**15.     UNAUTHORIZED ACCESS.** Concessionaire is responsible for preventing unauthorized persons from gaining access to restricted areas of the Airport or any other part of the Airport through the Premises or any door under Concessionaire's control. If federal security regulations are violated as a result of trespass by unauthorized persons into restricted areas of the Airport or any other part of the Airport through the Premises or any door under Concessionaire's control, or if such door is left unsecured in violation of federal security regulations, and City is subjected to any liability, including, but not limited to, a fine(s) by the Transportation Security Administration, Concessionaire must reimburse City for the full amount of such fines promptly upon receipt of an invoice from City and pay for any liability assessed against City as a result of such unauthorized access.

**16.     SURRENDER OF PREMISES**

**16.1**     Concessionaire must yield and deliver peaceably to City possession of the Premises and all Concessionaire improvements in good condition, reasonable wear and tear accepted, upon the expiration or earlier termination of this Agreement.

**16.2**     Concessionaire must remove Concessionaire's signs and trade fixtures from the Premises and must surrender the Premises in clean, orderly and presentable condition. City will retain Concessionaire's Performance and Payment Bond(s) or other securities required under **Exhibit D** until such time as all conditions of this Agreement have been satisfied, all keys to the Premises are delivered to the Aviation General Manager by Concessionaire, the Aviation General Manager determines that the Premises are clean and in good repair and the applicable period for filing liens or other claims has passed. Concessionaire will be liable to City for City's costs for storing, removing and disposing of any alterations or Concessionaire's personal property, and of restoration of the Premises.

**17.     OWNERSHIP OF INFORMATION; CONFIDENTIALITY**

**17.1**     All reports, information, data or other documents given to, prepared by or assembled by Concessionaire arising out of the work performed under this Agreement are the exclusive property of City – with the exception of employee data covered under the Privacy Act – and will

be kept confidential and may not be made available to any individual or organization by Concessionaire without the prior written approval of City, provided however that these provisions shall not apply to data that is in the public domain; was previously known to Concessionaire; or was independently acquired by Concessionaire from third parties who are under no obligation to City to keep said data and information confidential. These provisions shall not apply to information in whatever form that comes into the public domain through no fault of Concessionaire, nor shall they be interpreted in any way to restrict Concessionaire from complying with a legally enforceable court order to provide information or data; provided, however, Concessionaire shall immediately place City on notice of such court order to permit City the opportunity to determine whether a protective order shall be filed. This restriction includes, but is not limited to, press releases, presentations, promotional materials and other public disclosures.

**17.1.1** Except as provided in the preceding paragraph, Concessionaire shall keep confidential, and shall require its employees, agents, subordinates, subcontractors, or sublessees to keep confidential all information disclosed by City or its consultants to Concessionaire or developed by Concessionaire or Concessionaire's employees, agents, subordinates, subcontractors, or sublessees in the performance of services hereunder. Disclosure of any such information shall constitute a material breach of this Agreement and shall entitle City to recover from Concessionaire any damages City incurs because of such breach.

**17.1.2** City shall have the right to any specifications, computer programs, technical reports, operating manuals and similar work product developed and paid for under this Agreement. If research or development is furnished in connection with the performance of this Agreement and if in the course of such research or development patentable subject matter is produced by Concessionaire, its officers, agents, employees, subcontractors, or sublessees, City shall have, without cost or expense to it, an irrevocable, nonexclusive royalty-free license to make, have made and use, either itself or by anyone on its behalf, such subject matter in connection with any activity now or hereafter engaged in or permitted by City. Promptly upon request by City, Concessionaire shall furnish or obtain from the appropriate person a form of license satisfactory to City, but it is expressly understood and agreed that, as between City and Concessionaire the license herein provided for shall nevertheless arise for the benefit of City immediately upon the production of said subject matter, and shall not await formal exemplification in a written license agreement as provided for above. Such license agreement may be transferred by City to its successors immediate, or otherwise, in the operation or ownership of any real or personal property now or hereafter owned or operated by City, but such license shall not be otherwise transferable.

**17.1.3 Georgia Open Records Act.** Information provided to the City is subject to disclosure under the Georgia Open Records Act ("**GORA**"). Pursuant to O.C.G.A. § 50-18-72(a)(34), "[a]n entity submitting records containing trade secrets that wishes to keep such records confidential under this paragraph shall submit and attach to the records an affidavit

affirmatively declaring that specific information in the records constitute trade secrets pursuant to Article 27 of Chapter 1 of Title 10 [O.C.G.A § 10-1-760 et seq.]."

## 18.    HAZARDOUS MATERIALS

**18.1**    Concessionaire shall not cause or permit any Hazardous Material to be brought, kept or used in or about the Premises or the Airport by Concessionaire, its agents, employees, contractors, or invitees. Without limiting the foregoing, if the presence of any Hazardous Material in the Airport caused or permitted by Concessionaire results in any contamination of the Airport, Concessionaire shall promptly take all actions at its sole expense as are necessary to return the Airport to the conditions existing prior to the introduction of such Hazardous Material to the Airport; provided that City's approval of such actions, and the contractors to be used by Concessionaire in connection therewith, shall first be obtained.

**18.2**    The term "Hazardous Material" means any hazardous or toxic substance, material, or waste, which is or becomes regulated by any local governmental authority or the United States Government. The term "Hazardous Material" includes, without limitation, any material or substance which is (i) defined as a "hazardous waste," "extremely hazardous waste," or "restricted hazardous waste" or similar term under any laws now or hereafter enacted by the United States or the State of Georgia or any political subdivision thereof, or (ii) designated a "hazardous substance" pursuant to the Federal Water Pollution Control Act, 33 U.S.C. § 1317, or (iii) defined as a "hazardous waste" pursuant to the Federal Resource Conservation and Recovery Act, 42 U.S.C.§ 6901 et seq., or (iv) defined as a "hazardous substance" pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.

**18.3**    In addition to, and independent of any other right of entry provided herein, City and its employees, representatives and agents shall have access to the Premises during reasonable hours and upon reasonable notice to Concessionaire in order to conduct periodic environmental inspections and tests of Hazardous Material contamination in the Premises.

## 19.    AIRPORT SECURITY REQUIREMENTS.
Concessionaire shall comply, at its own expense, with the TSA and the City's security requirements for the Airport including, but not limited to employee training and badging. Concessionaire shall cooperate with the TSA and the City on all security matters and shall promptly comply with any project security arrangements established by City. Compliance with such security requirements shall not relieve Concessionaire of its responsibility for maintaining proper security for the above-noted items, nor shall it be construed as limiting in any manner Concessionaire's obligation with respect to all applicable federal, state and local laws and regulations and its duty to undertake reasonable action to establish and maintain secure conditions at and around the Premises and throughout the Airport. Additional airport security information is available on the Airport Security's web site: (http://www.atl.com/business-information/air-security-services/). See also **Exhibit G**, attached hereto and incorporated herein.

20.    CITY POLICIES; Airport Concessions Disadvantaged Business Enterprise (ACDBE) BUSINESS PARTICIPATION AND NON-DISCRIMINATION PROVISIONS.

20.1    City's Required Policies.    Concessionaire acknowledges that Concessionaire has reviewed, is familiar with and agrees to comply with:

20.1.1 City's Airport Concessions Disadvantaged Business Enterprise Policy (See Appendix A); as the same may be amended from time to time by the City, Georgia Department of Transportation or US Department of transportation ("USDOT").

20.1.1.1    In addition to its compliance with the ACDBE Policy as the same may be amended from time to time by the City, Georgia Department of Transportation or U.S. Department of Transportation, Concessionaire shall work in good faith the City's Office of Contract Compliance ("OCC") (or any other federal, state or local governmental or quasi-governmental agency) to maximize opportunities in the utilization of certified ACDBE firms during the construction build-out of the concessions space(s), as well as any on-going supply opportunities. Any submittals provided by Concessionaire to the OCC prior or subsequent to the execution of this Agreement related to the utilization of such firms shall be incorporated herein by this reference. A copy of the current OCC requirements are attached hereto as Appendix A and incorporated herein by this reference.

20.1.2 City's equal employment opportunity policy (See Code Sections 2-1200 and 2-1414; Appendix A), as follows:

Equal Employment Opportunity (EEO) Provision.    During the performance of the Agreement, Concessionaire agrees as follows:

(a) The Concessionaire shall not discriminate against any employee, or applicant for employment, because of race, color, creed, religion, sex, domestic relationship status, parental status, familial status, sexual orientation, national origin, gender identity, age, disability, or political affiliation. As used here, the words "shall not discriminate" shall mean and include without limitation the following:

*Recruited, whether by advertising or other means; compensated, whether in the form of rates of pay, or other forms of compensation; selected for training, including apprenticeship; promoted; upgraded; demoted; downgraded; transferred; laid off; and terminated.*

*The Concessionaire agrees to and shall post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officers setting forth the provisions of the EEO clause.*

(b) The Concessionaire shall, in all solicitations or advertisements for employees, placed by or on behalf of the Concessionaire, state that all qualified applicants will receive

consideration for employment without regard to race, color, creed, religion, sex, domestic relationship status, parental status, familial status, sexual orientation, national origin, gender identity, age, disability, or political affiliation.

(c) The Concessionaire shall send to each labor union or representative of workers with which the Concessionaire may have a collective bargaining agreement or other contract or understanding a notice advising the labor union or workers' representative of the Concessionaire's commitments under the equal employment opportunity program of the City of Atlanta and under the Code and shall post copies of the notice in conspicuous places available to employees and applicants for employment. The Concessionaire shall register all workers in the skilled trades who are below the journeyman level with the U.S. Bureau of Apprenticeship and Training.

(d) The Concessionaire shall furnish all information and reports required by the contract compliance officer pursuant to the Code, and shall permit access to the books, records, and accounts of the Concessionaire during normal business hours by the contract compliance officer for the purpose of investigation so as to ascertain compliance with the program.

(e) The Concessionaire shall take such action with respect to any sub-Concessionaire as the city may direct as a means of enforcing the provisions of paragraphs (a) through (h) herein, including penalties and sanctions for noncompliance; provided, however, that in the event the Concessionaire becomes involved in or is threatened with litigation as a result of such direction by the city, the city will enter into such litigation as is necessary to protect the interest of the city and to effectuate the equal employment opportunity program of the city; and, in the case of contracts receiving federal assistance, the Concessionaire or the city may request the United States to enter into such litigation to protect the interests of the United States.

(f) The Concessionaire and its sub-Concessionaires, if any, shall file compliance reports at reasonable times and intervals with the city in the form and to the extent prescribed by the contract compliance officer. Compliance reports filed at such times directed shall contain information as to employment practices, policies, programs and statistics of the Concessionaire and its sub-Concessionaires.

(g) The Concessionaire shall include the provisions of paragraphs (a) through (h) of this equal employment opportunity clause in every subcontract or purchase order so that such provisions will be binding upon each sub-Concessionaire or vendor.

(h) A finding, as hereinafter provided, that a refusal by the Concessionaire or sub-Concessionaire to comply with any portion of this program, as herein provided and described, may subject the offending party to any or all of the following penalties:

(1) Withholding from the Concessionaire in violation all future payments under the involved contract until it is determined that the Concessionaire or sub-Concessionaire is in compliance with the provisions of the contract;

(2) Refusal of all future bids for any contract with the City of Atlanta or any of its departments or divisions until such time as the Concessionaire or sub-Concessionaire demonstrates that there has been established and there shall be carried out all of the provisions of the program as provided in the Code;

(3) Cancellation of the public contract;

(4) In a case in which there is substantial or material violation of the compliance procedure herein set forth or as may be provided for by the contract, appropriate proceedings may be brought to enforce those provisions, including the enjoining, within applicable law, of Concessionaires, sub-Concessionaires or other organizations, individuals or groups who prevent or seek to prevent directly or indirectly compliance with the policy as herein provided.

**20.1.3** City's business non-discrimination policy (See Code Sections 2-1358 and 2-1387; **Appendix A**).

**20.1.4** City's Atlanta Workforce Agency/First Source Jobs Policy and Agreement (See Code Section 2-1655; **Appendix A**).

**20.1.5** City's ethics in public contracting policy (See Code Sections 2-1481 through 2-1490);

**20.1.6** City's conflicts of interest policy (See Code Section 2-1482);

**20.1.7** City's prohibition against predatory lending (See Code Section 2-1213), as follows:

**Prohibition against Contracting with Predatory or High Cost Lenders.** By signing below, the Contractor, or its authorized agent, certifies, under penalty of perjury, that this Agreement is made by a person or business entity that is neither a predatory lender nor a high cost lender, nor is the Contractor an affiliate of a predatory lender or a high cost lender, as defined by Code Section 58-102. The undersigned Contractor, or authorized agent, further certifies that he/she is an agent duly authorized to sign this certification on behalf of the Contractor.

**20.1.8** City's Green Initiatives (Atlanta Sustainable Building Ordinance (ASBO)).

**20.1.9** City's prohibition against kickbacks or gratuities (See Code Section 2-1484), as follows:

**Prohibition against Kickbacks or Gratuities.** Concessionaire acknowledges the following prohibitions on kickbacks and gratuities:

(a) It is unethical for any person to offer, give or agree to give any employee or former employee a gratuity or an offer of employment in connection with any decision, approval, disapproval, recommendation, preparation or any part of a program requirement or a purchase request, influencing the content of any specification or procurement standard, rendering of advice, investigation, auditing or in any other advisory capacity in any proceeding or application, request for ruling, determination, claim or controversy or other particular matter pertaining to any program requirement or a contract or subcontract or to any solicitation or proposal therefor.

(b) It is unethical for any employee or former employee to solicit, demand, accept or agree to accept from another person a gratuity or an offer of employment in connection with any decision, approval, disapproval, recommendation, preparation or any part of a program requirement or a purchase request, influencing the content of any specification or procurement standard, rendering of advice, investigation, auditing or in any other advisory capacity in any proceeding or application, request for ruling, determination, claim or controversy or other particular matter pertaining to any program requirement or a contract or subcontract or to any solicitation or proposal therefor.

(c) It is also unethical for any payment, gratuity or offer of employment to be made by or on behalf of a subcontractor under a contract to the prime contractor or higher tier subcontractor or any person associated therewith as an inducement for the award of a subcontract or order.

**20.1.10** City's prohibition against and reporting of anti-competitive practices (See Code Section 2-1210, as follows:

The Concessionaire certifies and warrants that it has not employed or retained any company or person, other than a bona fide employee working for the Concessionaire, to solicit or secure this Agreement; and that the Concessionaire has not paid or agreed to pay any person, company, association, corporation, individual or firm, other than a bona fide employee working for the Concessionaire, any fee, commission, percentage, gift or any other consideration contingent upon or resulting from the award or making of this Agreement. For the breach or violation of the above warranty, and upon a finding after notice and hearing, the City shall have the right to terminate the Agreement without liability, and, at its discretion, to deduct from the Agreement, or otherwise recover the full amount of, such fee, commission, percentage, gift or consideration.

**20.2    Non-discrimination Certificates.**  By the execution of this Agreement, Concessionaire certifies as follows:

The Concessionaire or the Services covered by this Agreement will not discriminate in any way in connection with this Agreement against any employee or applicant for employment because of race, color, religion, sex, national original or physical handicap, and Concessionaire will take affirmative action to ensure that applicants are employed, and those employees are treated during employment without regard to their race, color, religion, sex, national origin or physical handicap.  Concessionaire shall state in all advertisements and solicitations that it is an equal employment opportunity employer.

**20.3    USDOT Non-discrimination Ordinance.**  This Agreement is subject to the requirements of the U.S. Department of Transportation's regulations, 49 CFR part 23.  Concessionaire agrees that it will not discriminate against any business owner because of the owner's race, color, religion, sex, national origin, or physical handicap in connection with the award or performance of any agreement covered by 49 CFR part 23.  Concessionaire agrees to include the above statements in any subcontract or subsequent agreement that it enters into and cause those businesses to similarly include the statements in subsequent agreements.

**20.4    Public Use and Federal Grants.**

**20.4.1** To the best of Concessionaire's knowledge, the Premises is subject to the terms of those certain sponsor's assurances made to guarantee the public use of the Airport as incidental to grant agreements between City of Atlanta and the United States of America, as amended.  City and Concessionaire represent that none of the provisions of this Agreement violates any of the provisions of the Sponsor's Assurance Agreement.

**20.4.2** The parties hereto further covenant and agree that nothing contained in this Agreement shall be construed to grant or authorize the granting of an exclusive right within the meaning of Section 308 of the Federal Aviation Act of 1958.

**20.4.3** Concessionaire for itself, its sub-Concessionaires, personal representatives, successors in interest and assigns, as a part of the consideration hereof, does hereby covenant and agree that (1) no person on the grounds of race, color, or national origin shall be excluded from participation in, denied the benefit of, or be otherwise subjected to discrimination in the use of said facilities; (2) in the construction of any improvements on, over, or under the Premises and the furnishings of services thereon, no person on the grounds of race, color, or national original shall be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination; (3) Concessionaire shall use the Premises in compliance  with all other requirements imposed by or pursuant to the Code of Federal Regulations for the Department of Transportation at Title 49, Subtitle A, Office of the Secretary of Transportation, Part 21, titled "Nondiscrimination in Federally Assisted Programs of the Department of Transportation — Effectuation of Title VI of the Civil Rights Act of 1964," and as said regulations

may be amended; and (4) in the event of Concessionaire's breach of any of the above nondiscrimination covenants, City shall have the right to terminate this Agreement therefore, and hold the same as if this Agreement had never been made or issued. Provision (4) shall not be effective until the procedures of 49 CFR Subtitle A, Part 21, are followed and completed, including the exercise or expiration of appeal rights.

## 21.    MISCELLANEOUS PROVISIONS

**21.1    Award and Execution of Agreement.**  The award and execution of this Agreement by City is authorized by Resolution No. 16-R-4680, adopted by City's Council on November 21, 2016, and approved by City's Mayor by Operation of Law on November 30, 2016, a copy of which is attached to this Agreement as **Exhibit B**. This Agreement will not become binding on City and City will incur no liability hereunder until it has been duly executed by Concessionaire, returned to City with all required submittals, including insurance and bonding, executed by the Mayor, attested to by the Municipal Clerk, approved by the City Attorney, or his or her designee, as to form and delivered to Concessionaire.

**21.2    Identity of Owner and Manager.**  The City is the owner of record of the property of which the Premises is a part. The person authorized to manage the property, which includes the Premises, is the Aviation General Manager of the Department of Aviation.

**21.3    Delegation of Authority.**  Any act(s), whether discretionary or ministerial, that the Aviation General Manager is authorized or required to perform under this Agreement may be performed by such person(s) as the Aviation General Manager shall designate in writing to perform such act(s).

**21.4    No Partnership or Joint Venture.**  City and Concessionaire are not and shall not be deemed to be, for any purpose, partners or joint venturers with each other.

**21.5    Independent Concessionaire; No Contractual Relationship.**  Concessionaire will perform under this Agreement as an independent entity and not as an agent or employee of City. No contractual relationship between City and any sub-Concessionaire or sub-consultant is created by an approval of City for use under this Agreement.

**21.6    Usufruct.**  The rights of Concessionaire hereunder constitute a usufruct, which is not subject to levy or sale. No estate shall pass out of City.

**21.7    Recording Prohibited.**  Neither City nor Concessionaire shall be entitled to record this Agreement, any memorandum or short form of this Agreement or any affidavit with respect to this Agreement.

**21.8    Attorneys' Fees.**  If City should bring any action under this Agreement or consult or place this Agreement, or any amount payable to Concessionaire pursuant to this Agreement, with an attorney concerning or for enforcement of any of City's rights hereunder, then

Concessionaire agrees in each and any such case to pay to City all costs, including, but not limited to, court costs and reasonable attorneys' fees, incurred by City in connection therewith.

**21.9    Severability.** If any provision of this Agreement or the application thereof to any person or circumstance shall become invalid or unenforceable to any extent, such provision shall be struck and severed and the remainder of this Agreement shall not be affected and shall continue to be enforceable to the greatest extent of the law.  Each covenant and agreement contained in this Agreement shall be construed to be a separate and independent covenant and agreement and the breach of any such covenant or agreement by City shall not discharge or relieve Concessionaire from Concessionaire's obligation to perform each and every covenant and agreement of this Agreement to be performed by Concessionaire.

**21.10   Gender; Singularity.**  Words of any gender used in this Agreement shall be held and construed to include any other gender and words in the singular number shall be held to include the plural, unless the context otherwise requires.

**21.11   Exhibits and Attachments.**  All exhibits, appendices, attachments, riders and addenda referred to in this Agreement are incorporated into this Agreement and made a part hereof for all intents and purposes, including the following:

|  |  |
|---|---|
| 21.11.1 | **Exhibit A** – Scope of Services and Map of Premises |
| 21.11.2 | **Exhibit A.1** – Financial Offer Form |
| 21.11.3 | **Exhibit B** – City Council Resolution |
| 21.11.4 | **Exhibit C** – Definitions |
| 21.11.5 | **Exhibit D** – Insurance and bonding Requirements |
| 21.11.6 | **Exhibit D.1** – Performance and Payment Bonds |
| 21.11.7 | **Exhibit E** – Business Plan |
| 21.11.8 | **Exhibit F** – Concessions Compliance Standards |
| 21.11.9 | **Exhibit G** – Airport Access, Security and Safety |
| 21.11.10 | **Exhibit H** – Construction Safety and Health Safety |
| 21.11.11 | **Exhibit I** – Dispute Resolution Procedures |
| | |
| 21.11.12 | **Appendix A** – Office of Contract Compliance Requirements |
| 21.11.13 | **Appendix B** – [RESERVED] |
| 21.11.14 | **Appendix C** – Illegal Immigration Reform & Enforcement Act Affidavits |
| 21.11.15 | **Appendix D** – Georgia Department of Revenue Form RD-1062 |

**21.12   Time of the Essence.**  Time is of the essence with regard to each provision of this Agreement.

**21.13   Evidence of Authority.** If Concessionaire is other than a natural person, Concessionaire shall deliver to City such legal documentation as City may request to evidence the authority of those signing this Agreement to bind Concessionaire.

**21.14  Drug-Free Workplace Policy.**  Concessionaire acknowledges that pursuant to the Federal Drug-Free Workplace Act of 1989, the unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance is prohibited on any City property, including, but not limited to, the Premises.

**21.15  Applicability of Code Provisions.**  All terms of this Agreement shall be governed by and shall be subject to all the provisions of the Code of Ordinances of City of Atlanta, Georgia, now and as may be amended from time to time.

**21.16  Successors and Assigns.**  Each and all of the conditions and covenants of this Agreement shall extend to and bind and inure to the benefit of City and Concessionaire, and the legal representatives, successors and assigns of either or both of them.

**21.17  Notices.**  All notices required to be given to City hereunder shall be in writing and given by postage prepaid registered or certified mail, return receipt requested, addressed as follows:

Concessions Director
Department of Aviation
Hartsfield-Jackson Atlanta International Airport
P.O. Box 20509
Atlanta, Georgia 30320
Office:  404-209-2100
Facsimile: 404-684-8932
E-mail:

City Attorney
City of Atlanta Law Department
55 Trinity Ave S.W.
Suite 5000
Atlanta, GA 30303

Notices hereunder may be transmitted by e-mail or other electronic delivery with confirmation of transmission, delivery and receipt.

Mr. Terrance Harps
Global Concession, Inc.
P.O. Box 20905
Airport Mail Facility
Atlanta, Georgia 30320
Phone: 770-322-0029
Phone: 770-332-7917
E-mail: tdharps@bellsouth.net

All notices required to be given to Concessionaire hereunder shall be sent to the following address:

**21.18  Interpretation.**  The language of this Agreement shall be construed according to its fair meaning, and not strictly for or against either City or Concessionaire.  This Agreement shall be construed and performed according to the laws of the State of Georgia.  In the event of a dispute with regard to interpretation of any provision of this Agreement, the parties agree to bring suit and be subject to the jurisdiction of the Fulton County Superior Court.

**21.19  Section Headings.**  The section headings contained herein are for the convenience of City and Concessionaire and are not to be used to construe the intent of this Agreement or any part thereof, nor to modify, amplify, or aid in the interpretation or construction of any of the provisions thereof.

**21.20  Reference to Clause or Section Entitled "_____."**  When reference in this Agreement is made to a specific clause with a specific title set forth in a section heading or section number, such reference will include all sections and subsections of such clause.

**21.21  Integrated Agreement, Modification.**  This Agreement contains all the agreements of the parties and cannot be further amended or modified except by written agreement.  If the parties hereto previously have entered into or do enter into any other lease, license, permit or agreement covering Premises or facilities at the Airport, this Agreement and the terms, conditions, provisions and covenants hereof shall apply only to the Premises herein particularly described, and this Agreement or any of the terms, conditions, provisions or covenants hereof shall not in any way or in any respect change, amend, modify, alter, enlarge, impair or prejudice any of the rights, privileges, duties or obligations of either of the parties hereto under or by reason of any other said lease, permit, license or other agreement between said parties.

**21.22  Force Majeure.**  Neither party shall be deemed to be in breach of this Agreement by reason of a failure to perform any of its obligations hereunder to the extent that such failure is caused by a Force Majeure Event. If either party claims the occurrence of a Force Majeure Event, such party must promptly give notice to the other of the existence of such Force Majeure Event, the nature and extent thereof, the obligation hereunder affected thereby and the actions to be taken to abate or terminate such event. Notwithstanding the existence of any Force Majeure Event, this Clause shall not apply to and Concessionaire shall not be relieved of its obligation to pay rent or other sums due hereunder, such obligation being absolute and unconditional.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF, The Parties, by their authorized representatives, have executed this Agreement as of the Effective Date.**

**CONCESSIONAIRE:**

By: _____

Name: Mitchell A. Martin

Title: Treasurer / Owner

**ATTEST:**

By: _____

Name: KENNETH SYPHOE

Title: Secretary/Assistant Secretary (SEAL)

**CITY:**

_____
Mayor

**APPROVED:**

_____
Interim Chief Procurement Officer

**APPROVED AS TO FORM:**

_____
Senior Assistant City Attorney

**ATTEST:**

_____
Municipal Clerk (SEAL)

**APPROVED:**

_____
Interim Aviation General Manager

# EXHIBIT A: SCOPE OF SERVICES AND MAP OF PREMISES

**EXHIBIT A: SCOPE OF SERVICES**

**FC-8484: FOOD AND BEVERAGE CONCESSIONS ON CONCOURSE C MIDPOINT AT HARTSFIELD-JACKSON ATLANTA INTERNATIONAL AIRPORT**

1.    **PROJECT DESCRIPTION**
   **Scope:**
   The design, finish, furnish, maintain and operate five (5) Concessions locations and one (1) food court (individually and collectively referred to herein as the "Premises") "C-F41"; "C-F42"; "C-F43"; "C-F44"; "C-F45"; "C-F46" on Concourse C at the Hartsfield Jackson Atlanta International Airport.

   **Location:**
   Concessionaire must design, construct, operate, maintain and manage five (5) Food and Beverage Concessions  location and one (1) food court (individually and collectively referred to herein as the "Premises") at Concourse C, Midpoint "C-F41"; "C-F42"; "C-F43"; "C-F44"; "C-F45"; "C-F46" at the Hartsfield Jackson Atlanta International Airport on a non-exclusive basis. The total square footage is approximately 8,105 square feet.

| Space No. | Location | Approximate Size |
|---|---|---|
| C-F41 | Midpoint | 1,201 sq. ft. |
| C-F42 | Midpoint | 1,295 sq. ft. |
| C-F43 | Midpoint | 900 sq. ft. |
| C-F44 | Midpoint | 428 sq. ft. |
| C-F45 | Midpoint | 398 sq. ft. |
| C-F46 | Midpoint | 3,890 sq. ft. |
|  |  |  |
| **Total square footage:** |  | **8,112  square feet** |

1.  **Permitted Uses Generally:**

The permitted use for these locations, as outlined in this section, shall be proven and successful concepts in other airports or similar locations. These suggested concepts were chosen on the basis of airport food and beverage trends and customer preferences derived from the airport food and beverage industry.  It is not permissible to build multiple concepts for any one of these locations.  Proponent will be required to design, develop construct and maintain the food court seating area.

Concessionaire will be required to operate and manage these locations providing food and beverage on a non-exclusive basis.   All items sold must meet Federal Aviation Administration (FAA) security regulations. Other than the items listed, no other product, merchandise or service shall be sold or offered by the Concessionaire without the written consent of the Aviation General Manager.  In the event any question or dispute arises as to

the sale of any specific item or category of items on the premises, the Concessionaire may submit a request in writing to the Aviation General Manager asking that the matter be reviewed.  The Aviation General Manager shall give a decision in writing and such determination is the final authority in the matter.  The Concessionaire shall abide by and conform to the decision of the General Manager.

The Aviation General Manager shall have the right, at his sole discretion, at any time prior to or during the term of the Lease, to expand, reduce or otherwise modify the products or menu offerings.

The menus should include freshly prepared ingredients, covering all day parts and include healthy options.

The Concessionaire and its sub-concessionaire(s) will also be responsible for cleaning and maintaining the "Premises" so as to provide an environment that is "opening day fresh" in appearance at all times.

Speed of service will be critical for these locations.  Efficient use of space and the flow of traffic/queuing should be addressed in the proposal for this high volume location. Additionally, standard beverages is defined as a variety of sodas (including at least two diet sodas, two caffeinated sodas and two decaffeinated sodas), at least one fruit juice, and bottle water.

**Specific Uses:**

> **Concept:  Quick Service - Southern Style Cuisine**
> **Space No.:  C-F41**
> **Location:  Concourse C Midpoint**
> **Approximate Size: 1,201 square feet**

<u>Concept Specifications</u>
- Concept represents the southern heritage and the love of southern flavors
- National,  Regional or Local brand quick service restaurant providing southern style cuisine

<u>Desired Menu</u>
- Menu should include freshly prepared breakfast, lunch, and dinner menu options, and no exceptions to the non-permitted menu
- BBQ (beef, chicken, & pork options)
- Sandwiches
- Seafood, such as catfish, crawfish, and shrimp
- Fresh vegetables and sides such as green beans, broccoli, potato salad, black-eyed peas, okra, candied yams, collard greens, grits macaroni & cheese and more.
- Restaurant should offer small salads, sides, and standard beverages

### Standard Specifications

- Food should be available in convenient "to go" packaging
- Standard requirements for compostable materials as included in previous request for proposals
- Beer and wine in single service containers (not poured from a tap) are optional
- Menu offerings shall be of high quality and offer good value to the customers
- There must be portion-appropriate menu items for children
- Adequate storage space for refrigerated and paper products due to high volumes must be contemplated in the design of the locations.
- Menu boards shall be large enough to be seen easily by passengers who are waiting in line prior to placing an order
- Healthy menu items are clearly marked on menus

### Non-Permitted Menu/Concepts

- Pre-packaged foods
- Candy and chewing gum
- Any and all sales from vending machines or other mechanical devices, including but not limited to: cigarettes, candy, maps, coffee, newspapers, stamps, phone cards, insurance policies, and dispensation of cash, money orders, and checks

---

**Concept:  Quick Service - Ethnic**
**Space No.:  C-F42**
**Location:  Concourse C Midpoint**
**Approximate Size:  1,295 square feet**

### Concept Specifications

- Utilization of ingredients common to many cultures in the east and Southeast regions of Asia; Utilization of ingredients common to many cultures in Mexico and parts of Spain
- National brand quick service restaurant providing Latin, Caribbean, or other ethnic cuisine style cuisine
- Sushi and Italian themed menus/offerings are strictly prohibited.

### Desired Menu

- Menu should include freshly prepared breakfast, lunch, and dinner menu options, and no exceptions to the non-permitted menu
- Eastern and Southeastern Asian dishes
- Mexican and/or Spanish style dishes
- Restaurant should offer small salads, sides, and standard beverages

---

**Standard Specifications**
- Food should be available in convenient "to go" packaging
- Standard requirements for compostable materials as included in previous request for proposals Beer and wine in single service containers (not poured from a tap) are optional
- Menu offerings shall be of high quality and offer good value to the customers
- There must be portion-appropriate menu items for children
- Adequate storage space for refrigerated and paper products due to high volumes must be contemplated in the design of the locations.
- Menu boards shall be large enough to be seen easily by passengers who are waiting in line prior to placing an order
- Healthy menu items are clearly marked on menus

**Non-Permitted Menu/Concepts**
- Pre-packaged foods
- No sushi or Italian menu items
- Candy and chewing gum
- Any and all sales from vending machines or other mechanical devices, including but not limited to: cigarettes, candy, maps, coffee, newspapers, stamps, phone cards, insurance policies, and dispensation of cash, money orders, and checks

---

**Concept:  Quick Service – Open**
**Space No.:  C-F43**
**Location:  Concourse C Midpoint**
**Approximate Size:  900 square feet**

**Concept Specifications**
- This location will be a recognized brand concept concentrating on a variety of high quality menu created to appeal to the modern domestic and international traveler.

**Desired Menus**
- Menu should include freshly prepared breakfast, lunch, and dinner menu options, and no exceptions to the non-permitted menu
- Non-branded coffee (excluding espresso and other specialty drinks)

**Standard Specifications**
- Food should be available in convenient "to go" packaging
- Standard requirements for compostable materials as included in previous request for proposals Beer and wine in single service containers (not poured from a tap) are optional
- Menu offerings shall be of high quality and offer good value to the customers
- There must be portion-appropriate menu items for children

- Restaurant should offer small salads, sides, and standard beverages
- Adequate storage space for refrigerated and paper products due to high volumes must be contemplated in the design of the locations.
- Menu boards shall be large enough to be seen easily by passengers who are waiting in line prior to placing an order
- Healthy menu items are clearly marked on menus

### Non-Permitted Menu/Concepts
- Italian concept
- Sushi concept
- Pre-packaged foods
- Candy and chewing gum
- Any and all sales from vending machines or other mechanical devices, including but not limited to: cigarettes, candy, maps, coffee, newspapers, stamps, phone cards, insurance policies, and dispensation of cash, money orders, and checks

---

**Concept:  Salad Bar**
**Space No.:  F-C44**
**Location:  Concourse C Midpoint**
**Approximate Size:  428 square feet**

### Concept Specifications
- This location will be a recognized salad bar concept concentrating on a variety of high quality product and merchandise designed to appeal to the modern domestic and international traveler.
- Local/Regional brand quick service restaurants featuring made-to-order salads and similar themed food offerings

### Desired Menu
- Menu should include made-to-order salads and pre-packaged sandwiches, pita bread sandwiches, wraps for (Chicken, egg, and/or tuna salads, etc.)

### Standard Specifications
- Food should be available in convenient "to go" packaging
- Standard requirements for compostable materials as included in previous request for proposals Menu offerings shall be of high quality and offer good value to the customers
- There must be portion-appropriate menu items for children
- Restaurant should offer standard beverages if necessary or applicable
- Adequate storage space for refrigerated and paper products due to high volumes must be contemplated in the design of the locations.

- Menu boards shall be large enough to be seen easily by passengers who are waiting in line prior to placing an order
- Healthy menu items are clearly marked on menus

## Non-Permitted Menu/Concepts
- Alcoholic Beverages
- Candy and chewing gum
- Any and all sales from vending machines or other mechanical devices, including but not limited to: cigarettes, candy, maps, coffee, newspapers, stamps, phone cards, insurance policies, and dispensation of cash, money orders, and checks

---

**Concept:  Nationally Branded Desserts**
**Space No.:  C-F45**
**Location:  Concourse C Midpoint**
**Approximate Size:  398 square feet**

## Concept Specifications
- This location will be a recognized dessert and snacks concept concentrating on a variety of high quality product and merchandise designed to appeal to the modern domestic and international traveler.
- National brand quick service dessert location focusing on ice cream, yogurt, cookies, candy and other snacks

## Desired Menus
- Menu should include takeaway dessert options such as on ice cream, yogurt, cookies, candy and/or other snacks
- Non-branded coffee (excluding espresso and other specialty drinks)
- Restaurant should also offer the Standard Beverages
- Food should be available in convenient "to go" packaging
- Menu offerings shall be of high quality and offer good value to the customers
- There must be portion-appropriate menu items for children
- All interesting snack food ideas welcome

## Standard Specifications
- Food should be available in convenient "to go" packaging
- Standard requirements for compostable materials as included in previous request for proposals
- Menu offerings shall be of high quality and offer good value to the customers
- There must be portion-appropriate menu items for children
- Restaurant should offer standard beverages if necessary or applicable

- Adequate storage space for refrigerated and paper products due to high volumes must be contemplated in the design of the locations.
- Menu boards shall be large enough to be seen easily by passengers who are waiting in line prior to placing an order
- Healthy menu items are clearly marked on menus

### Non-Permitted Menu/Concepts
- Alcoholic Beverages
- Any and all sales from vending machines or other mechanical devices, including but not limited to: cigarettes, candy, maps, coffee, newspapers, stamps, phone cards, insurance policies, and dispensation of cash, money orders, and checks

**Concept: Food Court**
**Space No.: C-F46**
**Location: Concourse C Midpoint**
**Approximate Size: 3,884 square feet**

The food court is a common area benefiting the customers of the food court. The food court is to be used for circulation, queuing, seating and condiment stations. It may not be used for displays, free standing signs, carts or other display/sale activities.

Universal food service condiments/supplies (i.e. salt, pepper, sugar, sugar substitutes, flatware, napkins etc.) will be available at strategically located condiment stations throughout the common food court area for the food court concessionaires. Concessionaire's specific condiments only can be dispensed from concessionaire's space (i.e. soy sauce, ketchup, red pepper flake, hot sauce, etc.) Management, maintenance and operations of the food court common area are the sole responsibility of the successful Concessionaire.

### Construction Schedule and Deadlines

Concessionaires are encouraged to provide a detailed explanation of the construction staging and phasing approach constructing this food and beverage location. The initial layout and design of all Concessionaire improvements should be made and installed within one hundred and eighty (180) days of the Commencement Date, or otherwise pursuant to a Transition Plan approved by the Aviation General Manager. The public visible area of the Premises shall be improved at a "Minimum Investment" of $350.00 per square foot. The Premises and any subsequent refurbishments shall conform to the Department of Aviation Airport Design Criteria (the "Airport Design Criteria") which shall be made available to Concessionaire upon the Airport's website (www.atlanta-airport.com) and shall be subject to change from time to time by the Aviation General Manager.

**Approval of Conceptual Design:**

Prior to the commencement of initial construction, or subsequent refurbishment of, or other work with respect to Concessionaire Improvements, Concessionaire must submit detailed plans and specifications to the Aviation General Manager for approval. Concessionaire must include with its plans and specifications a detailed layout of the overall equipment.  Approval by City will extend to and include architectural and aesthetic matters and the City reserves the right to reject any designs submitted and to require Concessionaire to resubmit designs and equipment proposals until they meet City's approval.

**Airport Infrastructure Upgrades:**
The Airport's infrastructure may require that additional equipment may be needed during construction of the Leased premises to satisfy current codes, ordinances or airport construction requirements. This equipment could include a 1,500 gallon grease interceptor, electrical grounding plates and/or stainless steel waste lines.  If it is determined that this equipment is required for the concession space being developed, concessionaire must, at its sole initial expense, design, construct and install these improvements.

## MAP OF PREMISES



LEASED AREA
8114 78 SF

| Hartsfield-Jackson Atlanta International Airport | FOOD COURT AREA PHASA LEASE AGREEMENT C CONCOURSE - BOARDING LEVEL | EXHIBIT 'A' | 1 20"-5 |

# EXHIBIT A.1: FINANCIAL OFFER FORM



<u>EXHIBIT A.1</u>

<u>FINANCIAL OFFER FORM</u>

FC-8484:  Food and Beverage Concessions on Concourse C Midpoint at Hartsfield-Jackson
Atlanta International Airport

The undersigned having (a) examined carefully the accompanying Instructions to
Proponents ("Instructions"), and the form of the Concessions Lease Agreement
("Agreement") at Hartsfield-Jackson Atlanta International Airport ("Airport"), (b) visited the
Airport, (c) become familiar with all terms and conditions specified in the Instructions and
the Agreement and with the proposed operation of the Food and Beverage Concessions on
Concourse C Midpoint location, hereby submits this Financial Offer Form for compensation
and privilege of performing the Services required and allowed under the Agreement at the
Airport to be paid to the City by the undersigned in consideration of the execution of said
Agreement by the City and the performance of all terms and conditions therein agreed by
the Concessionaire on its part to be kept and performed.

The Proponent must offer a minimum rent to be paid to the City for the first year of the
proposed Concessions Agreement (hereinafter "Minimum Annual Guarantee" or MAG) of at
least $620,000.  If a Proponent submits a lower First Year MAG than the First Year MAG
established above, the Proponent's proposal shall be deemed non Responsive.

The Proponent must also propose a percentage rent based on Gross Receipts. The minimum
percentage rent that the City will accept for the sale of Food and Beverage on the Premises
is fifteen percent (15%).  The minimum percentage rent that the City will accept for the sale
of Alcoholic Beverages on the Premises is eighteen percent (18%)
••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••
The amount of the first year's Minimum Annual Guarantee (MAG) is Dollars $ 1,815,308 .

Please sign the appropriate place:

Signature    _____

Title        Treasurer

Company      Global Concessions, Inc.

FC-8484, Food and Beverage Concessions on Concourse C Midpoint                     Page 132

# EXHIBIT B: CITY COUNCIL RESOLUTION

CITY COUNCIL
ATLANTA, GEORGIA

16-R-4680

A RESOLUTION
BY TRANSPORTATION COMMITTEE

A RESOLUTION AUTHORIZING THE MAYOR TO AWARD AND
EXECUTE AN AIRPORT CONCESSIONS LEASE AGREEMENT IN
RESPONSE TO FC-8510 BRANDED COFFEE CONCESSION ON
CONCOURSE A WITH ATLANTA AIRPORT CONCESSIONS, LLC, FC-
8511 BRANDED HAMBURGER CONCESSION ON CONCOURSE A
WITH CI/HH BETTER BURGER, LLC, FC-8512 BRANDED
HAMBURGER ON CONCOURSE B WITH HBF VERGE PARTNERS I
JV, LLC AND FC-8484 FOOD AND BEVERAGE CONCESSIONS ON
CONCOURSE C MIDPOINT WITH GLOBAL CONCESSIONS, INC. AT
HARTSFIELD-JACKSON ATLANTA INTERNATIONAL AIRPORT;
AND FOR OTHER PURPOSES.

WHEREAS, the City of Atlanta ("City") owns and operates Hartsfield-Jackson Atlanta
International Airport ("Airport"); and

WHEREAS, the Department of Procurement solicited proposals for FC-8510 Branded
Coffee Concession on Concourse A, FC-8511 Branded Hamburger Concession on
Concourse A, FC-8512 Branded Hamburger Concession on Concourse B and FC-8484
Food and Beverage Concessions on Concourse C Midpoint on behalf of the Department
of Aviation; and

WHEREAS, Seven (7) qualified firms submitted proposals for FC-8510 and Seven (7)
qualified firms submitted proposals for FC-8511 in response to the solicitation for the
right to provide Food and Beverage Concessions on Concourse A. Ten (10) qualified
firms submitted proposals for FC-8512 in response to the solicitation for the right to
provide Food and Beverage Concessions on Concourse B. five (5) qualified firms
submitted proposals for FC-8484 in response to the solicitation for the right to provide
Food and Beverage Concessions on Concourse C; and

WHEREAS, the proposals were received and evaluated and the Aviation General
Manager and the Chief Procurement Officer have recommended that FC-8510 Branded
Coffee Concession on Concourse A be awarded to Atlanta Airport Concessions, LLC,
FC-8511 Branded Hamburger Concession on Concourse A be awarded to CI/HH Better
Burger, LLC, FC-8512 Branded Hamburger Concession on Concourse B be awarded to
HBF Verge Partners I JV, LLC, FC-8484 Food and Beverage Concessions on Concourse
C Midpoint be awarded to Global Concessions, Inc.; and

WHEREAS, the City has determined that it is desirable and in the best interest to make
such recommended awards.

NOW, THEREFORE BE IT RESOLVED BY THE COUNCIL OF THE CITY OF ATLANTA, that the Mayor is authorized to award and execute a Concessions Lease Agreements for the following: FC-8510 Branded Coffee Concession on Concourse A with Atlanta Airport Concessions, LLC, FC-8511 Branded Hamburger Concession on Concourse A with CI/HH Better Burger, LLC, FC-8512 Branded Hamburger Concession on Concourse B with HBF Verge Partners I JV, LLC, FC-8484 Food and Beverage Concessions on Concourse C Midpoint with Global Concessions, Inc.

BE IT FURTHER RESOLVED this Concession Lease Agreement will expire on April 30, 2025. This expiration date coincides with the other Food & Beverage Concession Contracts throughout Hartsfield-Jackson Atlanta International Airport.

BE IT FURTHER RESOLVED that the City Attorney is directed to prepare an appropriate agreement for execution by the Mayor, with same to be approved as to form by the City Attorney.

BE IT FURTHER RESOLVED that the City Attorney is directed to prepare appropriate any documentation for execution by the Mayor.

BE IT FINALLY RESOLVED that said agreement shall not become binding on the City, nor will the City incur any liability under it, until it has been executed by the Mayor, attested to by the Municipal Clerk, approved by the City Attorney as to form and delivered to the appropriate concessionaire.

A true copy,

*Rhonda Dauphin Johnson*
Municipal Clerk

ADOPTED by the Atlanta City Council
APPROVED as per City Charter Section 2-403

NOV 21, 2016
NOV 30, 2016

# EXHIBIT C: DEFINITIONS

**EXHIBIT C**

**DEFINITIONS**

**When used in the Contract Documents, the following capitalized terms have the following meanings:**

1. "Applicable Law(s)" means all federal, state or local statutes, laws ordinances, codes, rules, regulations, policies, standards, executive orders, consent orders, orders and guidance from regulatory agencies, judicial decrees, decisions and judgments, permits, licenses, reporting or other governmental requirements or policies of any kind by which a Party may be bound, then in effect or which come into effect during the time the Services are being performed, and any present or future amendments to those Applicable Laws, including those which specifically relate to: (a) the business of City; (b) the business of Contractor or Contractor's subcontractors; (c) the Lease Agreement and the Lease Agreement Documents; or (d) the performance of the Services under this Lease Agreement or any Task Order.

2. "Charges" means the amounts payable by City to Contractor under this Lease Agreement.

3. "City Security Policies" means the policies set forth in **Exhibit G**.

4. "Code" means the Code of Ordinances for the City of Atlanta, Georgia, as amended.

5. "Confidential Information" means all information, including, but not limited to, business or financial information, plans, strategies, forecasts, forecast assumptions, proprietary business practices and methods, marketing information and material, customer, supplier, and employee information, and all information concerning relationships with customers, suppliers and employees, proprietary ideas, concepts, know-how, methodologies, specifications, operations, processes and systems manuals, profiles, system and management architectures, diagrams, graphs, models, sketches, technical data, research and all other information related to a Party's past, present or future business activities or operations, now known or later discovered or developed, furnished or made available by or on behalf of one Party to the other or otherwise obtained by a Party from any source in connection with this Lease Agreement, including: (i) all information of a Party to which the other has had or will have access; (ii) all information of a Third Party, including customers and suppliers; (iii) all information entered or to be entered into software or equipment by or on behalf of a Party, as well as information obtained or derived from this information, including any such information as stored in, accessed or transmitted through or processed by equipment or software; and (iv) all information whose disclosure is exempted or restricted under Applicable Law. Confidential Information does not include information that is: (a) subject to public disclosure under Applicable Law such as the Georgia Open Records Act

or the Federal Freedom of Information Act; (b) publicly available or becomes so in the future without restriction and through no fault or action of the receiving Party or its agents; (c) rightfully received by either Party from a Third Party and not accompanied by confidentiality obligations; (d) already in the receiving Party's possession and lawfully received from sources other than the disclosing Party; (e) independently developed by the receiving Party without use of or reference to the Confidential Information of the disclosing Party; or (f) approved in writing for release or disclosure without restriction by the disclosing Party.

6. "Contract Documents" include this Agreement and the Exhibits, Addenda, Appendices and other documents attached hereto or referenced herein as well as any authorized changes or addenda hereto.

7. "Force Majeure Event(s)" means acts of strike or labor troubles, unavailability of materials or utilities, acts of war, domestic and/or international terrorism, insurrection, invasion, civil riots or rebellions, quarantines, embargoes, action or interference of governmental authorities and other similar unusual governmental actions, extraordinary elements of nature or acts of God or any other cause whether similar or dissimilar to the foregoing which is reasonably beyond the control or the parties.

8. "Tenant" when capitalized, shall mean the "Concessionaire".

# EXHIBIT D: INSURANCE & BONDING REQUIREMENTS

**EXHIBIT D**
**INSURANCE & BONDING REQUIREMENTS**
**FC-8484 FOOD & BEVERAGE CONCESSIONS CONCOURSE C MIDPOINT**

**A.    Preamble**

The following requirements apply to all work under the Agreement.  Compliance is required by Service Provider.  To the extent permitted by applicable law, the City of Atlanta ("City") reserves the right to adjust or waive any insurance or bonding requirements contained in this Exhibit D and applicable to the Agreement. For all purposes hereunder, including but not limited to any Additional Insured Endorsements, the City shall include the City of Atlanta, its elected officials, officers, agents, and employees.

**1.    Evidence of Insurance and Bonding Required Before Work Begins**

No work under the Agreement may be commenced until all insurance and bonding requirements contained in this Exhibit D, or required by applicable law, have been complied with and evidence of such compliance satisfactory to City as to form and content has been filed with City.

At the time Service Provider submits to City its executed Agreement, Service Provider must satisfy all insurance and bonding requirements required by this Exhibit D and applicable by law, and provide the required written documentation to City evidencing such compliance.  In the event that Service Provider does not comply with such submittal requirements within the time period established by the solicitation documents applicable to the Agreement, City may, in addition to any other rights City may have under the solicitation documents applicable to the Agreement or under applicable law, make a claim against any proposal security provided by Service Provider.

If the Service Provider is an entity (e.g., corporation, limited liability company, etc.) or a partnership (e.g., general partnership, limited partnership, joint venture, etc.) then Service Provider shall tender insurance certificates and bonds in the name of Service Provider's entity or partnership as the primary insured.

**2.    Project Number & Name**

The project number (**FC-8484**) and name (**Food & Beverage Concessions – Concourse C Midpoint**) must be referenced in the description section of the insurance certificate.

**3.    Minimum Financial Security Requirements**

All companies providing insurance required by this Exhibit D must meet certain minimum financial security requirements.  These requirements must conform to the ratings published by

A.M. Best & Co. in the current Best's Key Rating Guide - Property-Casualty. Upon request, the Service Provider must submit the ratings for each company to the City.

For all agreements, regardless of size, companies providing insurance or bonds under the agreement must meet the following requirements:

i) Best's Rating not less than A-;
ii) Best's Financial Size Category not less than Class VII;
iii) Companies must be authorized to conduct and transact insurance contracts by the Insurance Commissioner, State of Georgia; and
iv) All performance and payment bonds must be underwritten by a U.S. Treasury Circular 570 listed company.

If the issuing company does not meet these minimum requirements, or for any other reason is or becomes unsatisfactory to City, City will notify Service Provider in writing. Service Provider must promptly obtain a new policy or bond issued by an insurer acceptable to City and submit to City evidence of its compliance with these conditions.

Service Provider's failure to comply with all insurance and bonding requirements set forth in this Exhibit D and applicable to the Agreement will not relieve Service Provider from any liability under the Agreement. Service Provider's obligations to comply with all insurance and bonding requirements set forth in Exhibit D and applicable to the Agreement will not be construed to conflict with or limit Service Provider's indemnification obligations under the Agreement.

4.    **Insurance and Bonds Required for Duration of Contract**

All insurance and bonds required by this Exhibit D must be maintained during the entire term of the Agreement, including any renewal or extension terms, and until all work has been completed to the satisfaction of City.

5.    **Notices of Cancellation & Renewal**

Service Provider must, notify the City of Atlanta in writing at the address listed below by mail, hand-delivery or facsimile transmission, within two (2) business days of any notices received from any insurance carriers providing insurance coverage or surety providing bonds under this Agreement and Exhibit D (including any attachments thereto) that Service Provider receives concerning the proposed cancellation, or termination of coverage or security:

Enterprise Risk Management
68 Mitchell St., Suite 9100
Atlanta, GA 30303
Facsimile No. (404) 658-7450

Confirmation of any mailed notices must be evidenced by return receipts of registered or certified mail.

Service Provider shall provide the City with evidence of required insurance and bonding prior to the commencement of this Agreement, and, thereafter, with a certificate and/or bonds evidencing renewals or changes thereto at least fifteen (15) days prior to the expiration of previously provided certificates and/or bonds.

6.    **Agent Acting as Authorized Representative**

Each and every agent acting as Authorized Representative on behalf of a company affording coverage under this Agreement shall warrant when signing the Acord Certificate of Insurance that specific authorization has been granted by the Companies for the Agent to bind coverage as required and to execute the Acord Certificates of Insurance as evidence of such coverage.

In addition, each and every agent shall warrant when signing the Acord Certificate of Insurance that the Agent is licensed to do business in the State of Georgia and that the Company or Companies are currently in good standing in the State of Georgia.

7.    **Certificate Holder**

The City of Atlanta must be named as certificate holder. All notices must be mailed to the attention of Enterprise Risk Management at 68 Mitchell Street, Suite, 9100, Atlanta, Georgia 30303.

8.    **Additional Insured Endorsements – Form CG 20 26 07 04 or Equivalent**

City shall be covered as an <u>Additional Insured</u>, as its interest may appear, under any and all insurance required pursuant to this Agreement, and such insurance shall be primary and non-contributory with respect to the <u>Additional Insured</u>. However, this requirement does not apply to Workers' Compensation or Professional Liability Insurance. Additional insured status extending to ongoing and completed operations per <u>CG 20 26 07 04</u> or their carrier equivalent shall be provided. Additional insured status shall be maintained following project completion equivalent to the statute of repose in the State of Georgia.

**NOTE: A copy of the Additional Insured Endorsement or its equivalent must be forwarded to the Risk Management Department as soon as practicable but in no event more than ten (10) days after the effective date of the Agreement.**

9.    **Mandatory Sub-Contractor/Consultant Compliance**

Service Provider must require and ensure that all of Service Provider's subcontractors operating under the Agreement at any level are sufficiently insured and bonded.

**10.    Self-Insured Retentions, Deductibles or Similar Obligations**

Any self-insured retention, deductible or similar obligation will be the sole responsibility of the Service Provider.

**11.    Waiver of Subrogation in favor of the City of Atlanta**

The certificates of Commercial General Liability Insurance and Commercial Automobile Liability Insurance tendered by the Service Provider must clearly indicate a waiver of subrogation in favor of the City of Atlanta.

**B.    Workers' Compensation and Employer's Liability Insurance**

Service Provider must procure and maintain Workers' Compensation and Employer's Liability Insurance in the following limits to cover each employee who is or may be engaged in work under the Agreement:

| | |
|---|---|
| Workers' Compensation  . . . . . . . . | Statutory |
| Employer's Liability: | |
| Bodily Injury by Accident/Disease | $1,000,000 each accident |
| Bodily Injury by Accident/Disease | $1,000,000 each employee |
| Bodily Injury by Accident/Disease | $1,000,000 policy limit |

**C.    Commercial General Liability Insurance**

Service Provider must procure and maintain Commercial General Liability Insurance on Form CG 00 00 01 (or equivalent) in an amount not less than **$1,000,000 per occurrence subject to a $2,000,000 aggregate**. The following indicated extensions of coverage must be provided:

- ☒ Contractual Liability
- ☒ Broad Form Property
- ☒ Damage Premises Operations
- ☒ Personal Injury
- ☒ Advertising Injury
- ☒ Medical Expense
- ☒ Additional Insured Endorsement (primary& non-contributing in favor of the City of Atlanta)
- ☒ Waiver of Subrogation in favor of the City of Atlanta

**D.    Commercial Automobile Liability Insurance**

Service Provider must procure and maintain Automobile Liability Insurance in an amount not less than **$1,000,000** Bodily Injury and Property Damage combined single limit. The following indicated extensions of coverage must be provided:



☒ Owned, Non-owned & Hired Vehicles
☒ Waiver of Subrogation in favor of the City of Atlanta

If Service Provider does not own any automobiles in the corporate name, non-owned vehicle coverage will apply and must be endorsed on either Service Provider's personal automobile policy or the Commercial General Liability coverage required under this **Exhibit D.**

Additionally, in accordance with Section 22-181(b) of Chapter 22, Code of Ordinances of the City of Atlanta, all vehicles <u>requiring access to the restricted areas of the airport</u> must be covered by an automobile liability policy in the minimum amount of **Ten Million Dollars ($10,000,000)** combined single limit for personal injury and property damage. The $10,000,000 limit of liability will also be imposed on any parties transporting workers, materials and/or equipment to the Airport site from parking lots or similar facilities.

**E.      Liquor Liability Insurance**
Lessee shall purchase Liquor Liability if Lessee is in the business of serving or selling alcohol for a fee with limits of at least $1,000,000 Per Occurrence Bodily Injury and Property Damage. Coverage may also be satisfied through an endorsement to your Commercial General Liability Policy.

**F.      Property Insurance**
Lessee shall procure and maintain Property Insurance covering all forms of risk on all Tenant Improvements and any other interests of Lessee, if applicable, in or about the Leased Premises, including inventory, supplies, and other property of Lessee located at said Premises, insuring against the perils of fire, lightning, extended coverage, perils vandalism, malicious mischief, glass breakage and sprinkler leakage, in an amount equal to the full replacement value of Tenant Improvements and any other interests of Lessee in or about said Premises.

**I.      Performance and Payment Bonds**

At, or prior to, Service Provider's execution of the Agreement, Service Provider must, at its own expense, deliver to the City a Performance and a Payment Bond each in an amount equal to one hundred percent (100%) of one (1) year value of the contract naming the City as co-obligee and issued by a surety company or companies in such form as approved by the City's Attorney as attached hereto at **Exhibit D-1**. The bonds must be renewed annually at one hundred percent (100%) of the then current year's value as specified in the Agreement. The bonds must be kept in full force and effect during the Term and any renewals. In lieu of a Performance Bond, Service Provider may submit to the City an Irrevocable Letter of Credit in a form acceptable to City, in its sole discretion.

1.      In addition, prior to the commencement of any construction work by or at the instance of Tenant within the Premises, Service Provider must provide to City a fixed price contract or contracts for all work to be performed within the Premises, which

contract(s) shall be insured by, and Tenant shall provide to the City, a Payment Bond in an amount equal to one hundred percent (100%) of the work specified in such contract(s) and acceptable to the City's Chief Financial Officer and in such form as approved by the City Attorney. The Payment Bond shall name the City as the Obligee, shall meet the other requirements of the Agreement, and shall remain in full force and effect until: (i) all Tenant Improvements are completely and fully paid for, (ii) certificates of occupancy have been issued for the Premises, (iii) final lien waivers have been obtained from all contractors and subcontractors; (iv) the City has approved the final construction of the Tenant Improvements; and (v) the applicable limitations period under Georgia law for the commencement of a suit against the Payment Bond has lapsed.

2.  The bonds must be issued as security for the faithful performance of this Agreement, including, maintenance and guarantee provisions, its covenants, stipulations and agreements of the Agreement, the payment of all bills and obligations arising out of the performance of its obligations under the Agreement, which bills and obligations might or would in any manner become a claim against the City, and guaranteeing all services and work set forth in the Agreement against faulty materials or poor workmanship, or both, in accordance with any warranty provisions of the Agreement.

3.  The surety company issuing the bonds must give the Aviation General Manager notice in writing by registered mail at least sixty (60) days prior to an anniversary date of the bonds of its intention not to renew or to terminate the bonds.

4.  A Corporate Surety that is satisfactory to City, authorized to do business in the State of Georgia, and listed in the latest issue of U.S. Treasury Circular 570 must execute the bonds.

5.  An agent of the Surety residing in the State of Georgia must execute the bonds. The date of the Bonds must be the same as the date of execution of the Agreement by City. The Surety must appoint an agent for service in Atlanta, Georgia, upon whom all notices must be shown on each Bond. The person executing the Bonds on behalf of the Surety must file with the Bonds a general power of attorney unlimited as to amount and type of Bonds covered by such power of attorney, and certified to by an official of said Surety. The Bonds must be on forms provided by City. The Agreement will not be executed by City until after the approval of the Bonds by City's Attorney.

6.  For additional information regarding Payment and Performance Bonds, please see **Exhibit D-1** attached hereto and incorporated herein by this reference.

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
12/13/2017

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | Cathy Hansard | | |
|---|---|---|---|---|
| Brown & Brown Insurance of GA Inc | PHONE (A/C, No, Ext): | | FAX (A/C, No): | |
| 3483 Satellite Blvd | E-MAIL ADDRESS: | chansard@bbatlanta.com | | |
| Suite 100 | | | | |
| Duluth                        GA 30096 | INSURER(S) AFFORDING COVERAGE | | | NAIC # |
| | INSURER A : | Citizens Insurance Company of America | | 31534 |
| INSURED | INSURER B : | Athmetica Financial Benefit Insurance Company | | 41840 |
| Global Concessions Inc | INSURER C : | The Hanover Insurance Company | | 22292 |
| PO Box 20905 | INSURER D : | Accident Fund General Insurance Company | | 12304 |
| | INSURER E : | | | |
| Atlanta                       GA 30320 | INSURER F : | | | |

## COVERAGES          CERTIFICATE NUMBER:  CL17121302517          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | ☒ COMMERCIAL GENERAL LIABILITY ☐ CLAIMS-MADE ☒ OCCUR | | | ZBAA51195703 | 12/31/2017 | 12/31/2018 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: ☒ POLICY ☐ PRO-JECT ☐ LOC ☐ OTHER | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| B | AUTOMOBILE LIABILITY ☒ ANY AUTO ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS ☐ HIRED AUTOS ONLY ☐ NON-OWNED AUTOS ONLY | | | AWA51195703 | 12/31/2017 | 12/31/2018 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | Uninsured motorist | $ |
| C | ☒ UMBRELLA LIAB ☒ OCCUR ☐ EXCESS LIAB ☐ CLAIMS-MADE | | | UHAA51195803 | 12/31/2017 | 12/31/2018 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | AGGREGATE | $ 9,000,000 |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ 9,000,000 |
| D | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY  Y/N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | WCV607975806 | 12/31/2017 | 12/31/2018 | ☐ PER STATUTE  ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
FC-8484 - Food & Beverage Concessions - Concourse C Midpoint Bantam & bddy, Leann Chin, Great Wraps, Krispy Kreme, Jack Daniels (Salad Works) C-F41 C-F42 C-F43, C-F44 C-F45 C-F46

## CERTIFICATE HOLDER                    CANCELLATION

| | |
|---|---|
| City of Atlanta Dept of Aviation  68 Mitchell St.  Atlanta                       GA 30320 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.  AUTHORIZED REPRESENTATIVE  *Linda A. Slack* |

ACORD 25 (2016/03)

© 1988-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD



June 14, 2018

Mr. Mitchell Martin
Treasurer
Global Concessions, Inc.
1693 Washington Rd.
East Point, Georgia 30344

Dear Mr. Martin,

I am pleased to announce that Chase Bank, Atlanta is excited for the opportunity to partner with you and the Global Concessions team for the $6,000,000 construction to permanent financing opportunity for Concourse C that is located at Hartsfield-Jackson Atlanta International Airport.

We are fully aware of the time line required to make this a smooth and seamless transaction, and commit to you as your financial institution, we will adhere to your commitments for financing.

In the meantime if you have additional questions of me, please do not hesitate to give me a call directly.

My direct dial is; (404) 926-2634. I look forward to hearing from you.

Thank you again for the opportunity.


Warmest Regards,

Angela M. Parks
Vice President
Business Banking

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 12/13/2017 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | Cathy Hansard | | |
|---|---|---|---|---|
| Brown & Brown Insurance of GA, Inc. | PHONE (A/C, No, Ext): | | FAX (A/C, No): | |
| 3483 Satellite Blvd. | E-MAIL ADDRESS: | chansard@bballanta.com | | |
| Suite 100 | | | | |
| Duluth                         GA  30096 | INSURER(S) AFFORDING COVERAGE | | | NAIC # |
| | INSURER A : | Citizens Insurance Company of America | | 31534 |
| INSURED | INSURER B : | Allmerica Financial Benefit Insurance Company | | 41840 |
| Global Concessions Inc | INSURER C : | The Hanover Insurance Company | | 22292 |
| Global II, LLC | INSURER D : | Accident Fund General Insurance Company | | 12304 |
| PO Box 20905 | INSURER E : | | | |
| Atlanta                        GA  30320 | INSURER F : | | | |

## COVERAGES          CERTIFICATE NUMBER:  CL17121302617          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | COMMERCIAL GENERAL LIABILITY ☐ CLAIMS-MADE ☒ OCCUR | | | ZBAA51195703 | 12/31/2017 | 12/31/2018 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: ☒ POLICY ☐ PRO-JECT ☐ LOC ☐ OTHER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| B | AUTOMOBILE LIABILITY ☒ ANY AUTO ☐ OWNED AUTOS ONLY ☐ HIRED AUTOS ONLY ☐ SCHEDULED AUTOS ☐ NON-OWNED AUTOS ONLY | | | AWAA51199703 | 12/31/2017 | 12/31/2018 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| C | ☒ UMBRELLA LIAB ☐ EXCESS LIAB ☒ OCCUR ☐ CLAIMS-MADE | | | UHAA51195803 | 12/31/2017 | 12/31/2018 | EACH OCCURRENCE | $ 9,000,000 |
| | | | | | | | AGGREGATE | $ 9,000,000 |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| D | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY      Y / N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N / A | | WCV6079758 | 12/31/2017 | 12/31/2018 | ☐ PER STATUTE  ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

FC-8484 - Food & Beverage Concessions - Concourse C Midpoint Bantam & biddy, Leann Chin, Great Wraps, Krispy Kreme, Jack Daniels, [Salad Works], C-F41, C-F42, C-F43, C-F44, C-F45, C-F46

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| City of Atlanta Dept of Aviation 68 Mitchell St. Atlanta                        GA  30320 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE *Linda A. Dafta* |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)          The ACORD name and logo are registered marks of ACORD

 **Rating Services** 

Rating Search: [ ] Search

Advanced Search

🖶 Print  📄 PDF  ❓ Help

# Accident Fund General Insurance Company

**A.M. Best #:** 013044    **NAIC #:** 12304    **FEIN #:** 203058200

**Mailing Address**
P.O. Box 40790
Lansing, MI 48901-7990
United States

View Additional Address
Information



Assigned to insurance companies that have, in our opinion, an excellent ability to meet their ongoing insurance obligations.

**Web:** www.accidentfund.com
**Phone:** 866-206-5851
**Fax:** 517-367-2925

View additional news, reports and products for this company.

Based on A.M. Best's analysis, 060081 - Blue Cross Blue Shield of MI Mutual Ins is the **AMB Ultimate Parent** and identifies the topmost entity of the corporate structure. View a list of operating insurance entities in this structure.

## Best's Credit Ratings

### Financial Strength Rating View Definition

| | |
|---|---|
| **Rating:** | A- (Excellent) |
| **Affiliation Code:** | r (Reinsured) |
| **Financial Size Category:** | XII ($1 Billion to $1.25 Billion) |
| **Outlook:** | Positive |
| **Action:** | Affirmed |
| **Effective Date:** | November 07, 2017 |
| **Initial Rating Date:** | May 01, 2006 |

### Long-Term Issuer Credit Rating View Definition

| | |
|---|---|
| **Long-Term:** | a- |
| **Outlook:** | Positive |
| **Action:** | Affirmed |
| **Effective Date:** | November 07, 2017 |
| **Initial Rating Date:** | February 04, 2008 |

### Best's Credit Rating Analyst

**Rating Issued by:** A.M. Best Rating Services, Inc.

**Senior Financial Analyst:** Gordon McLean
**Director:** Jacqalene Lentz, CPA

### Disclosure Information

**Disclosure Information Form**
View A.M. Best's Rating Disclosure Form

**Press Release**
A.M. Best Assigns Credit Ratings to Third Coast Insurance Company
November 07, 2017

u Denotes Under Review Best's Rating

## Rating History

A.M. Best has provided ratings & analysis on this company since 2006.

| Financial Strength Rating | | Long-Term Issuer Credit Rating | |
|---|---|---|---|
| **Effective Date** | **Rating** | **Effective Date** | **Rating** |
| 11/7/2017 | A- | 11/7/2017 | a- |
| 9/21/2017 | A- | 9/21/2017 | a- |
| 3/8/2017 | A- | 3/8/2017 | a- |
| 12/18/2015 | A- | 12/18/2015 | a- |
| 11/7/2014 | A- | 11/7/2014 | a- |
| 10/31/2013 | A- | 10/31/2013 | a- |

## Best's Credit Reports

 Best's Credit Report  (Download PDF) - Where applicable, includes Best's Financial Strength Rating and rationale along with comprehensive analytical commentary, detailed business overview and key financial data.
Report Revision Date: 11/7/2017 (represents the latest significant change).

 Historical Reports are available in Best's Credit Report Archive.

View additional news, reports and products for this company.



## Press Releases

| Date ▾ | Title |
|---|---|
| Nov 07, 2017 | A.M. Best Assigns Credit Ratings to Third Coast Insurance Company |
| Sep 21, 2017 | A.M. Best Revises Outlooks for Blue Cross Blue Shield of Michigan Mutual Insurance Company and Its Subsidiary |
| Dec 12, 2011 | A.M. Best Downgrades Ratings of Accident Fund Group and Its Members |
| Nov 02, 2010 | A.M. Best Revises Outlook to Negative for Accident Fund Group and Its Members |
| Feb 04, 2008 | A.M. Best Assigns Ratings to CompWest Insurance Company and Accident Fund Group |

### Find a Best's Credit Rating

Enter a Company Name    Go

Advanced Search



How to Get a
Best's Credit Rating    A+

Best's Credit Ratings
Mobile App

**European Union Disclosures**
A.M. Best - Europe Rating Services Limited (AMBERS), a subsidiary of A.M. Best Rating Services, Inc., is an External Credit Assessment Institution (ECAI) in the European Union (EU). Therefore, Credit Ratings issued and endorsed by AMBERS may be used for regulatory purposes in the EU as per Directive 2006/48/EC.

**Australian Disclosures**
A.M. Best Asia-Pacific Limited (AMBAP), Australian Registered Body Number (ARBN No.150375287), is a limited liability company incorporated and domiciled in Hong Kong. AMBAP is a wholesale Australian Financial Services (AFS) Licence holder (AFS No. 411055) under the Corporations Act 2001. Credit Ratings emanating from AMBAP are not intended for and must not be distributed to any person in Australia other than a wholesale client as defined in Chapter 7 of the Corporations Act. AMBAP does not authorize its Credit Ratings to be disseminated by a third-party in a manner that could reasonably be regarded as being intended to influence a retail client in making a decision in relation to a particular product or class of financial product. AMBAP Credit Ratings are intended for wholesale clients only, as defined.

Credit Ratings determined and disseminated by AMBAP are the opinion of AMBAP only and not any specific credit analyst. AMBAP Credit Ratings are statements of opinion and not statements of fact. They are not recommendations to buy, hold or sell any securities or any other form of financial product, including insurance policies and are not a recommendation to be used to make investment /purchasing decisions.

**Important Notice:** A.M. Best's Credit Ratings are independent and objective opinions, not statements of fact. A.M. Best is not an Investment Advisor, does not offer investment advice of any kind, nor does the company or its Ratings Analysts offer any form of structuring or financial advice. A.M. Best's credit opinions are not recommendations to buy, sell or hold securities, or to make any other investment decisions. For additional information regarding the use and limitations of Credit Rating opinions, as well as the rating process, information requirements and other rating related terms and definitions, please view Understanding Best's Credit

Ratings.

About  | Site Map  | Customer Service  | My Account  | Contact  | Careers  | Terms of Use  | Privacy Policy  | Security  | Legal & Licensing

Regulatory Affairs - Form NRSRO - Code of Conduct - Rating Methodology - Historical Performance Data

Copyright © 2018 A.M. Best Company, Inc. and/or its affiliates ALL RIGHTS RESERVED.

 **Rating Services** 

Rating Search: [                    ] [ Search ]          [ 🖨Print  📄PDF  ❓Help ]

Advanced Search

# Allmerica Financial Benefit Insurance Company

**A.M. Best #:** 011212   **NAIC #:** 41840   **FEIN #:** 232643430
**Administrative Office**            View Additional Address
440 Lincoln Street                   Information
Worcester, MA 01653-0002
United States

**Web:** www.hanover.com
**Phone:** 508-853-7200
**Fax:** 508-853-6332

Assigned to insurance companies **Financial Strength Rating** **A BEST A Excellent** that have, in our opinion, an excellent ability to meet their ongoing insurance obligations.

View additional news, reports and products for this company.

Based on A.M. Best's analysis, 058505 - The Hanover Insurance Group, Inc. is the AMB Ultimate Parent and identifies the topmost entity of the corporate structure. View a list of operating insurance entities in this structure.

## Best's Credit Ratings

### Financial Strength Rating View Definition

| | |
|---|---|
| **Rating:** | A (Excellent) |
| **Affiliation Code:** | r (Reinsured) |
| **Financial Size Category:** | XV (S2 Billion or greater) |
| **Outlook:** | Stable |
| **Action:** | Affirmed |
| **Effective Date:** | June 07, 2018 |
| **Initial Rating Date:** | June 03, 1996 |

### Best's Credit Rating Analyst

**Rating Issued by:** A.M. Best Rating Services, Inc.

**Senior Financial Analyst:** Michael T. Venezia

**Director:** Jacqalene Lentz, CPA

### Disclosure Information

**Disclosure Information Form**
View A.M. Best's Rating Disclosure Form

**Press Release**
A.M. Best Affirms Credit Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries
June 07, 2018

### Long-Term Issuer Credit Rating View Definition

| | |
|---|---|
| **Long-Term:** | a |
| **Outlook:** | Stable |
| **Action:** | Affirmed |
| **Effective Date:** | June 07, 2018 |
| **Initial Rating Date:** | May 04, 2005 |

u Denotes Under Review Best's Rating

## Rating History

A.M. Best has provided ratings & analysis on this company since 1996.

| Financial Strength Rating | | Long-Term Issuer Credit Rating | |
|---|---|---|---|
| **Effective Date** | **Rating** | **Effective Date** | **Rating** |
| 6/7/2018 | A | 6/7/2018 | a |
| 5/25/2017 | A | 5/25/2017 | a |
| 5/19/2016 | A | 5/19/2016 | a |
| 5/22/2015 | A | 5/22/2015 | a |
| 5/16/2014 | A | 5/16/2014 | a |

## Best's Credit Reports

 Best's Credit Report  (Download PDF) - Where applicable, includes Best's Financial Strength Rating and rationale along with comprehensive analytical commentary, detailed business overview and key financial data.
Report Revision Date: 6/27/2018 (represents the latest significant change).

 Historical Reports are available in Best's Credit Report Archive.

View additional news, reports and products for this company.

## Press Releases

| Date ▾ | Title |
|---|---|
| Jun 07, 2018 | A.M. Best Affirms Credit Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 25, 2017 | A.M. Best Affirms Credit Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 19, 2016 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 22, 2015 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 16, 2014 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 17, 2013 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| Jun 12, 2012 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| Jun 13, 2011 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 28, 2010 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 08, 2009 | A.M. Best Upgrades Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |

|◀ ◀ 1 2 ▶ ▶|    Page size: 10 ▾                                          20 items in 2 pages

## Find a Best's Credit Rating

Enter a Company Name                                                      Go

Advanced Search



How to Get a
Best's Credit Rating    (A+)

Best's Credit Ratings
Mobile App    (☐)

**European Union Disclosures**

A.M. Best - Europe Rating Services Limited (AMBERS), a subsidiary of A.M. Best Rating Services, Inc., is an External Credit Assessment Institution (ECAI) in the European Union (EU). Therefore, Credit Ratings issued and endorsed by AMBERS may be used for regulatory purposes in the EU as per Directive 2006/48/EC.

**Australian Disclosures**

A.M. Best Asia-Pacific Limited (AMBAP), Australian Registered Body Number (ARBN No.150375287), is a limited liability company incorporated and domiciled in Hong Kong. AMBAP is a wholesale Australian Financial Services (AFS) Licence holder (AFS No. 411055) under the Corporations Act 2001. Credit Ratings emanating from AMBAP are not intended for and must not be distributed to any person in Australia other than a wholesale client as defined in Chapter 7 of the Corporations Act. AMBAP does not authorize its Credit Ratings to be disseminated by a third-party in a manner that could reasonably be regarded as being intended to influence a retail client in making a decision in relation to a particular product or class of financial product. AMBAP Credit Ratings are intended for wholesale clients only, as defined.

Credit Ratings determined and disseminated by AMBAP are the opinion of AMBAP only and not any specific credit analyst. AMBAP Credit Ratings are statements of opinion and not statements of fact. They are not recommendations to buy, hold or sell any securities or any other form of financial product, including insurance policies and are not a recommendation to be used to make investment /purchasing decisions.

Important Notice: A.M. Best's Credit Ratings are independent and objective opinions, not statements of fact. A.M. Best is not an Investment Advisor, does not offer investment advice of any kind, nor does the company or its Ratings Analysts offer any form of structuring or financial advice. A.M. Best's credit opinions are not recommendations to buy, sell or hold securities, or to make any

other investment decisions. For additional information regarding the use and limitations of Credit Rating opinions, as well as the rating process, information requirements and other rating related terms and definitions, please view Understanding Best's Credit Ratings.

About | Site Map | Customer Service | My Account | Contact | Careers | Terms of Use | Privacy Policy | Security | Legal & Licensing

Regulatory Affairs - Form NRSRO - Code of Conduct - Rating Methodology - Historical Performance Data

Copyright © 2018 A.M. Best Company, Inc. and/or its affiliates ALL RIGHTS RESERVED.

 **Rating Services**

Rating Search: [          ] [Search]

Advanced Search

🖨 Print  📄 PDF  ❓ Help

# The Hanover Insurance Company

**A.M. Best #:** 002225    **NAIC #:** 22292    **FEIN #:** 135129825

**Administrative Office**
440 Lincoln Street
Worcester, MA 01653-0002
United States

View Additional Address
Information

**Web:** www.hanover.com
**Phone:** 508-853-7200
**Fax:** 508-853-6332

Assigned to insurance companies that have, in our opinion, an excellent ability to meet their ongoing insurance obligations.

**Financial Strength Rating**
BEST A Excellent

View additional news, reports and products for this company.

Based on A.M. Best's analysis, 058505 - The Hanover Insurance Group, Inc. is the AMB Ultimate Parent and identifies the topmost entity of the corporate structure. View a list of operating insurance entities in this structure.

## Best's Credit Ratings

### Financial Strength Rating View Definition

| | |
|---|---|
| **Rating:** | A (Excellent) |
| **Affiliation Code:** | g (Group) |
| **Financial Size Category:** | XV ($2 Billion or greater) |
| **Outlook:** | Stable |
| **Action:** | Affirmed |
| **Effective Date:** | June 07, 2018 |
| **Initial Rating Date:** | December 31, 1907 |

### Long-Term Issuer Credit Rating View Definition

| | |
|---|---|
| **Long-Term:** | a |
| **Outlook:** | Stable |
| **Action:** | Affirmed |
| **Effective Date:** | June 07, 2018 |
| **Initial Rating Date:** | May 04, 2005 |

### Best's Credit Rating Analyst

**Rating Issued by:** A.M. Best Rating Services, Inc.

**Senior Financial Analyst:** Michael T. Venezia

**Director:** Jacqalene Lentz, CPA

### Disclosure Information

**Disclosure Information Form**
View A.M. Best's Rating Disclosure Form

**Press Release**
A.M. Best Affirms Credit Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries
June 07, 2018

u Denotes Under Review Best's Rating

## Rating History

A.M. Best has provided ratings & analysis on this company since 1907.

| Financial Strength Rating | | Long-Term Issuer Credit Rating | |
|---|---|---|---|
| **Effective Date** | **Rating** | **Effective Date** | **Rating** |
| 6/7/2018 | A | 6/7/2018 | a |
| 5/25/2017 | A | 5/25/2017 | a |
| 5/19/2016 | A | 5/19/2016 | a |
| 5/22/2015 | A | 5/22/2015 | a |
| 5/16/2014 | A | 5/16/2014 | a |

## Best's Credit Reports

 Best's Credit Report  (Download PDF) - Where applicable, includes Best's Financial Strength Rating and rationale along with comprehensive analytical commentary, detailed business overview and key financial data.
Report Revision Date: 6/27/2018 (represents the latest significant change).
 Historical Reports are available in Best's Credit Report Archive.

View additional news, reports and products for this company.

## Press Releases

| Date ⌄ | Title |
| --- | --- |
| Jun 07, 2018 | A.M. Best Affirms Credit Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 25, 2017 | A.M. Best Affirms Credit Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| Jun 28, 2016 | A.M. Best Assigns Ratings to The Hanover Atlantic Insurance Company, Ltd. |
| May 19, 2016 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 22, 2015 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 16, 2014 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 17, 2013 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| Jun 12, 2012 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| Jun 13, 2011 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 28, 2010 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |

|◄  ◄  1  2  3  ►  ►|   Page size: 10 ▾                                      21 items in 3 pages

## Find a Best's Credit Rating

Enter a Company Name                                                          Go

Advanced Search



How to Get a Best's Credit Rating

Best's Credit Ratings Mobile App

**European Union Disclosures**

A.M. Best - Europe Rating Services Limited (AMBERS), a subsidiary of A.M. Best Rating Services, Inc., is an External Credit Assessment Institution (ECAI) in the European Union (EU). Therefore, Credit Ratings issued and endorsed by AMBERS may be used for regulatory purposes in the EU as per Directive 2006/48/EC.

**Australian Disclosures**

A.M. Best Asia-Pacific Limited (AMBAP), Australian Registered Body Number (ARBN No.150375287), is a limited liability company incorporated and domiciled in Hong Kong. AMBAP is a wholesale Australian Financial Services (AFS) Licence holder (AFS No. 411055) under the Corporations Act 2001. Credit Ratings emanating from AMBAP are not intended for and must not be distributed to any person in Australia other than a wholesale client as defined in Chapter 7 of the Corporations Act. AMBAP does not authorize its Credit Ratings to be disseminated by a third-party in a manner that could reasonably be regarded as being intended to influence a retail client in making a decision in relation to a particular product or class of financial product. AMBAP Credit Ratings are intended for wholesale clients only, as defined.

Credit Ratings determined and disseminated by AMBAP are the opinion of AMBAP only and not any specific credit analyst. AMBAP Credit Ratings are statements of opinion and not statements of fact. They are not recommendations to buy, hold or sell any securities or any other form of financial product, including insurance policies and are not a recommendation to be used to make investment /purchasing decisions.

**Important Notice**: A.M. Best's Credit Ratings are independent and objective opinions, not statements of fact. A.M. Best is not an Investment Advisor, does not offer investment advice of any kind, nor does the company or its Ratings Analysts offer any form of structuring or financial advice. A.M. Best's credit opinions are not recommendations to buy, sell or hold securities, or to make any

other investment decisions. For additional information regarding the use and limitations of Credit Rating opinions, as well as the rating process, information requirements and other rating related terms and definitions, please view Understanding Best's Credit Ratings.

About | Site Map | Customer Service | My Account | Contact | Careers | Terms of Use | Privacy Policy | Security | Legal & Licensing

Regulatory Affairs - Form NRSRO - Code of Conduct - Rating Methodology - Historical Performance Data

Copyright © 2018 A.M. Best Company, Inc. and/or its affiliates ALL RIGHTS RESERVED.



**Rating Services**



Rating Search: [            ]  Search        🖶Print  📄PDF  ❓Help

Advanced Search

# Citizens Insurance Company of America

A.M. Best #: 000264    NAIC #: 31534    FEIN #: 380421730

**Administrative Office**
440 Lincoln Street
Worcester, MA 01653-0002
United States

View Additional Address
Information

Assigned to insurance companies that have, in our opinion, an excellent ability to meet their ongoing insurance obligations.

Financial Strength Rating
A BEST
A Excellent

Web: www.hanover.com
Phone: 508-853-7200
Fax: 508-853-6332

View additional news, reports and products for this company.

Based on A.M. Best's analysis, 058505 – The Hanover Insurance Group, Inc. is the AMB Ultimate Parent and identifies the topmost entity of the corporate structure. View a list of operating insurance entities in this structure.

## Best's Credit Ratings

### Financial Strength Rating View Definition

| | |
|---|---|
| Rating: | A (Excellent) |
| Affiliation Code: | g (Group) |
| Financial Size Category: | XV ($2 Billion or greater) |
| Outlook: | Stable |
| Action: | Affirmed |
| Effective Date: | June 07, 2018 |
| Initial Rating Date: | June 30, 1922 |

### Best's Credit Rating Analyst

Rating Issued by: A.M. Best Rating Services, Inc.

Senior Financial Analyst: Michael T. Venezia

Director: Jacqalene Lentz, CPA

### Disclosure Information

Disclosure Information Form
View A.M. Best's Rating Disclosure Form

Press Release
A.M. Best Affirms Credit Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries
June 07, 2018

### Long-Term Issuer Credit Rating View Definition

| | |
|---|---|
| Long-Term: | a |
| Outlook: | Stable |
| Action: | Affirmed |
| Effective Date: | June 07, 2018 |
| Initial Rating Date: | May 04, 2005 |

u Denotes Under Review Best's Rating

## Rating History

A.M. Best has provided ratings & analysis on this company since 1922.

**Financial Strength Rating**

| Effective Date | Rating |
|---|---|
| 6/7/2018 | A |
| 5/25/2017 | A |
| 5/19/2016 | A |
| 5/22/2015 | A |
| 5/16/2014 | A |

**Long-Term Issuer Credit Rating**

| Effective Date | Rating |
|---|---|
| 6/7/2018 | a |
| 5/25/2017 | a |
| 5/19/2016 | a |
| 5/22/2015 | a |
| 5/16/2014 | a |

## Best's Credit Reports


Best's Credit Report (Download PDF) - Where applicable, includes Best's Financial Strength Rating and rationale along with comprehensive analytical commentary, detailed business overview and key financial data.
Report Revision Date: 6/27/2018 (represents the latest significant change).

Historical Reports are available in Best's Credit Report Archive.

View additional news, reports and products for this company.

## Press Releases

| Date ▾ | Title |
|---|---|
| Jun 07, 2018 | A.M. Best Affirms Credit Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 25, 2017 | A.M. Best Affirms Credit Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 19, 2016 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 22, 2015 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 16, 2014 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 17, 2013 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| Jun 12, 2012 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| Jun 13, 2011 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 28, 2010 | A.M. Best Affirms Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |
| May 08, 2009 | A.M. Best Upgrades Ratings of The Hanover Insurance Group, Inc. and Its Subsidiaries |

|◀ ◀ 1 2 ▶ ▶|   Page size: 10 ▾                                    17 items in 2 pages

## Find a Best's Credit Rating

Enter a Company Name                                                      [Go]

Advanced Search



How to Get a
Best's Credit Rating    A+



Best's Credit Ratings
Mobile App

**European Union Disclosures**
A.M. Best - Europe Rating Services Limited (AMBERS), a subsidiary of A.M. Best Rating Services, Inc., is an External Credit Assessment Institution (ECAI) in the European Union (EU). Therefore, Credit Ratings issued and endorsed by AMBERS may be used for regulatory purposes in the EU as per Directive 2006/48/EC.

**Australian Disclosures**
A.M. Best Asia-Pacific Limited (AMBAP), Australian Registered Body Number (ARBN No.150375287), is a limited liability company incorporated and domiciled in Hong Kong. AMBAP is a wholesale Australian Financial Services (AFS) Licence holder (AFS No. 411055) under the Corporations Act 2001. Credit Ratings emanating from AMBAP are not intended for and must not be distributed to any person in Australia other than a wholesale client as defined in Chapter 7 of the Corporations Act. AMBAP does not authorize its Credit Ratings to be disseminated by a third-party in a manner that could reasonably be regarded as being intended to influence a retail client in making a decision in relation to a particular product or class of financial product. AMBAP Credit Ratings are intended for wholesale clients only, as defined.

Credit Ratings determined and disseminated by AMBAP are the opinion of AMBAP only and not any specific credit analyst. AMBAP Credit Ratings are statements of opinion and not statements of fact. They are not recommendations to buy, hold or sell any securities or any other form of financial product, including insurance policies and are not a recommendation to be used to make investment /purchasing decisions.

**Important Notice**: A.M. Best's Credit Ratings are independent and objective opinions, not statements of fact. A.M. Best is not an Investment Advisor, does not offer investment advice of any kind, nor does the company or its Ratings Analysts offer any form of structuring or financial advice. A.M. Best's credit opinions are not recommendations to buy, sell or hold securities, or to make any

other investment decisions. For additional information regarding the use and limitations of Credit Rating opinions, as well as the rating process, information requirements and other rating related terms and definitions, please view Understanding Best's Credit Ratings.

About | Site Map | Customer Service | My Account | Contact | Careers | Terms of Use | Privacy Policy | Security | Legal & Licensing

Regulatory Affairs - Form NRSRO - Code of Conduct - Rating Methodology - Historical Performance Data

Copyright © 2018 A.M. Best Company, Inc. and/or its affiliates ALL RIGHTS RESERVED.

# EXHIBIT D.1: PERFORMANCE & PAYMENT BONDS

**EXHIBIT D-1**
**<u>PERFORMANCE AND PAYMENT BONDS</u>**

1.   At, or prior to, Service Provider's execution of the Agreement, Service Provider must, at its own expense, deliver to the City a Performance and a Payment Bond each in an amount equal to one hundred percent (100%) of the first year's contract value as specified in the Agreement, naming the City as co-obligee and issued by a surety company or companies in such form as approved by the City's Attorney as attached hereto at **Exhibit D-1**. The bonds must be renewed annually at one hundred percent (100%) of the then current year's contract value as specified in the Agreement.  The bonds must be kept in full force and effect during the Term and any renewals.  In lieu of a Performance Bond, Service Provider may submit to the City an Irrevocable Letter of Credit in a form acceptable to City, in its sole discretion.

2.   The bonds must be issued as security for the faithful performance of this Agreement, including, maintenance and guarantee provisions, its covenants, stipulations and agreements of the Agreement, the payment of all bills and obligations arising out of the performance its obligations under the Agreement, which bills and obligations might or would in any manner become a claim against the City, and guaranteeing all services and work set forth in the Agreement against faulty materials or poor workmanship, or both, in accordance with any warranty provisions of the Agreement.

3.   The surety company issuing the bonds must give the City notice in writing by registered mail at least sixty (60) days prior to an anniversary date of the bonds of its intention not to renew or to terminate the bonds.

4.   A Corporate Surety that is satisfactory to City, authorized to do business in the State of Georgia, and listed in the latest issue of U.S. Treasury Circular 570 must execute the bonds.

5.   An agent of the Surety residing in the State of Georgia must execute the bonds.  The date of the Bonds must be the same as the date of execution of the Agreement by City.  The Surety must appoint an agent for service in Atlanta, Georgia upon whom all notices must be shown on each Bond.  The person executing the Bonds on behalf of the Surety must file with the Bonds a general power of attorney unlimited as to amount and type of Bonds covered by such power of attorney, and certified to by an official of said Surety.  The Bonds must be on forms provided by City.  The Agreement will not be executed by City until after the approval of the Bonds by City's Attorney.

Bond Term - 5/10/2018 - 5/10/2019
Bond No.: 1060918

## Payment Bond

| | |
|---|---|
| "City" | City of Atlanta, Georgia |
| "Project" | Food & Beverage Concessions – Concourse C Midpoint |
| "FC No." | 8484 |
| "Principal" | Global Concessions, Inc, P. O. Box 20905, Atlanta, GA 30320 |

Type of Organization ("X" one):
_____ Individual
_____ Partnership
_____ Joint Venture
___X___ Corporation

"Surety:"    (Name and Business Address)    The Hanover Insurance Company
440 Lincoln Street, Worcester, MA 01653

duly authorized by the Commissioner of Insurance of
the State of Georgia to transact surety business in the
State of Georgia.

"Agreement:"    Agreement between Principal and City, dated _1st___ day of _February_____ , 20_17_ , regarding
performance of Work relative to the Project.

"Penal Sum:"    One Million Eight Hundred Fifteen Thousand Three Hundred Eight Dollars and No/100s
$1,815,308.00

KNOW ALL MEN BY THESE PRESENTS, that we, the Principal and Surety hereto, as named above, are
held and firmly bound to the City in the above Penal Sum for the payment of which well and truly to be made
we bind ourselves, our heirs, executors, administrators, successors, jointly and severally. Principal and Surety
agree that the Penal Sum shall be equal to or greater than one hundred percent (100%) of the total Minimum Annual
Guarantee ("MAG") as specified in the Agreement for the first year of the Term as defined therein. If this bond is
renewed annually as described below, then Principal and Surety agree that the Penal Sum shall equal or exceed
the MAG as specified in the Agreement for the same 12-month period of the annual bond.

WHEREAS, the Principal and the City entered into the Agreement identified above;

NOW, THEREFORE, the conditions of this obligation are such that if the Principal shall faithfully and fully comply
with, perform and fulfill all of the undertakings, covenants, conditions and all other of the terms and conditions of said
Agreement, including any and all duly authorized modifications of such Agreement, within the original term of such
Agreement and any extensions thereof, which shall include, but not be limited to any obligations created by way of
warranties and/or guarantees for workmanship and materials which warranty and/or guarantee may extend for a period
of time beyond completion of said Agreement, this obligation shall be void; otherwise, of full force and effect.

And the Surety to this bond, for value received, agrees that no modification, change, extension of time, alteration or
addition to the terms of the Agreement or to the Work to be performed thereunder shall in any way affect its obligation
on this bond, and it does hereby waive notice of any such modification, change, extension of time, alteration or
addition to the terms of the Agreement or the Work. Surety further agrees that it will provide City with at least 60
days' written notice by registered mail prior to any suspension, cancellation or termination of this bond; otherwise,
this bond shall remain in full force and effect for a minimum of one (1) year (i.e., twelve (12) full months) beginning
from the Effective Date of the Agreement. This bond may be renewed on an annual basis provided the renewal covers
the requisite Penal Sum as required above; and, in the event Surety declines to renew this bond, Surety agrees that it
will provide City with at least 60 days' written notice by registered mail prior to the expiration date of bond.

It is agreed that this bond is executed pursuant to and in accordance with the provision of O.C.G.A. Sections 13-10-1 and 36-82-101, *et seq.* and is intended to be and shall be construed to be a bond in compliance with the requirements thereof, though not restricted thereto.

IN WITNESS WHEREOF, the Principal and the Surety have caused these presents to be duly signed and sealed this 13th day of July , 20 18 .

PRINCIPAL: _Global Concessions, Inc._

President/Vice President (Sign)

Mitchell A. Martin
President/Vice President (Type or Print)

Attested to by:

Secretary/Assistant Secretary (Seal)

SURETY: _The Hanover Insurance Company_

By. _____
Attorney-in-Fact (Sign)

Jeffrey M. Wilson
Attorney-in-Fact (Type or Print)

APPROVED AS TO FORM

Senior Associate/Assistant City Attorney

APPROVED

City's Chief Financial Officer

---

### THE HANOVER INSURANCE COMPANY
### MASSACHUSETTS BAY INSURANCE COMPANY
### CITIZENS INSURANCE COMPANY OF AMERICA

*POWERS OF ATTORNEY*
*CERTIFIED COPY*

KNOW ALL MEN BY THESE PRESENTS: That THE HANOVER INSURANCE COMPANY and MASSACHUSETTS BAY INSURANCE COMPANY, both being corporations organized and existing under the laws of the State of New Hampshire, and CITIZENS INSURANCE COMPANY OF AMERICA, a corporation organized and existing under the laws of the State of Michigan, do hereby constitute and appoint

Mark W. Edwards, II, Ronald B. Gladrosich, Jeffrey M. Wilson, Robert R. Freel and/or Evondia H. Woessner

of Birmingham, AL  and  each is a true and lawful Attorney(s)-in-fact to sign, execute, seal, acknowledge and deliver for, and on its behalf, and as its act and deed any place within the United States, or, if the following line be filled in, only within the area therein designated

any and all bonds, recognizances, undertakings, contracts of indemnity or other writings obligatory in the nature thereof, as follows:

Any such obligations in the United States, not to exceed Forty Million and No/100 ($40,000,000) in any single instance

and said companies hereby ratify and confirm all and whatsoever said Attorney(s)-in-fact may lawfully do in the premises by virtue of these presents. These appointments are made under and by authority of the following Resolution passed by the Board of Directors of said Companies which resolutions are still in effect:

"RESOLVED, That the President or any Vice President, in conjunction with any Vice President, be and they are hereby authorized and empowered to appoint Attorneys-in-fact of the Company, in its name and as its acts, to execute and acknowledge for and on its behalf as Surety any and all bonds, recognizances, contracts of indemnity, waivers of citation and all other writings obligatory in the nature thereof, with power to attach thereto the seal of the Company. Any such writings so executed by such Attorneys-in-fact shall be as binding upon the Company as if they had been duly executed and acknowledged by the regularly elected officers of the Company in their own proper persons." (Adopted October 7, 1981 - The Hanover Insurance Company. Adopted April 14, 1982 - Massachusetts Bay Insurance Company; Adopted September 7, 2001 - Citizens Insurance Company of America)

IN WITNESS WHEREOF, THE HANOVER INSURANCE COMPANY, MASSACHUSETTS BAY INSURANCE COMPANY and CITIZENS INSURANCE COMPANY OF AMERICA have caused these presents to be sealed with their respective corporate seals, duly attested by two Vice Presidents, this 27th day of October 2011.

THE HANOVER INSURANCE COMPANY
MASSACHUSETTS BAY INSURANCE COMPANY
CITIZENS INSURANCE COMPANY OF AMERICA

Robert Thomas, Vice President

Mark Fitzgerald, Vice President

THE COMMONWEALTH OF MASSACHUSETTS )
COUNTY OF WORCESTER                 ) ss.

On this  27th day of October 2011 before me came the above named Vice Presidents of The Hanover Insurance Company, Massachusetts Bay Insurance Company and Citizens Insurance Company of America, to me personally known to be the individuals and officers described herein, and acknowledged that the seals affixed to the preceding instrument are the corporate seals of The Hanover Insurance Company, Massachusetts Bay Insurance Company and Citizens Insurance Company of America, respectively, and that the said corporate seals and their signatures as officers were duly affixed and subscribed to said instrument by the authority and direction of said Corporations.

BARBARA A. GARLICK
Notary Public
Commonwealth of Massachusetts
My Commission Expires Sept 21, 2018

Barbara A. Garlick, Notary Public
My Commission Expires September 21, 2018

I, the undersigned Vice President of The Hanover Insurance Company, Massachusetts Bay Insurance Company and Citizens Insurance Company of America, hereby certify that the above and foregoing is a full, true and correct copy of the Original Power of Attorney issued by said Companies, and do hereby further certify that the said Powers of Attorney are still in force and effect.

This Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of The Hanover Insurance Company, Massachusetts Bay Insurance Company and Citizens Insurance Company of America.

"RESOLVED, That any and all Powers of Attorney and Certified Copies of such Powers of Attorney and certification in respect thereto, granted and executed by the President or any Vice President in conjunction with any Vice President of the Company, shall be binding on the Company to the same extent as if all signatures therein were manually affixed, even though one or more of any such signatures thereon may be facsimile." (Adopted October 7, 1981 - The Hanover Insurance Company; Adopted April 14, 1982 - Massachusetts Bay Insurance Company; Adopted September 7, 2001 - Citizens Insurance Company of America)

GIVEN under my hand and the seals of said Companies, at Worcester, Massachusetts, this 13th day of  July, 2018

THE HANOVER INSURANCE COMPANY
MASSACHUSETTS BAY INSURANCE COMPANY
CITIZENS INSURANCE COMPANY OF AMERICA

Glenn Margosian, Vice President

## Performance Bond

"City"          City of Atlanta, Georgia
"Project"       Food & Beverage Concessions – Concourse C Midpoint
"FC No."        8484
"Principal"     Global Concessions, Inc., P. O. Box 20905, Atlanta, GA 30320
Type of Organization ("X" one):          _____ Individual
                                          _____ Partnership
                                          _____ Joint Venture
                                          __X__ Corporation

"Surety:"       (Name and Business Address)      The Hanover Insurance Company
                                                 440 Lincoln Street, Worcester, MA 01653

                                duly authorized by the Commissioner of Insurance of
                                  the State of Georgia to transact surety business in the
                                                State of Georgia.

"Agreement:"    Agreement between Principal and City, dated _1st___ day of _February_____, 20_17_, regarding
                performance of Work relative to the Project.

"Penal Sum:"    _One Million Eight Hundred Fifteen Thousand Three Hundred Eight Dollars and No/100s__
                $1,815,308.00

KNOW ALL MEN BY THESE PRESENTS, that we, the Principal and Surety hereto, as named above, are
held and firmly bound to the City in the above Penal Sum for the payment of which well and truly to be made
we bind ourselves, our heirs, executors, administrators, successors, jointly and severally. Principal and Surety
agree that the Penal Sum shall be equal to or greater than one hundred percent (100%) of the total Minimum Annual
Guarantee ("MAG") as specified in the Agreement for the first year of the Term as defined therein. If this bond is
renewed annually as described below, then Principal and Surety agree that the Penal Sum shall equal or exceed
the MAG as specified in the Agreement for the same 12-month period of the annual bond.

WHEREAS, the Principal and the City entered into the Agreement identified above;

NOW, THEREFORE, the conditions of this obligation are such that if the Principal shall faithfully and fully comply
with, perform and fulfill all of the undertakings, covenants, conditions and all other of the terms and conditions of said
Agreement, including any and all duly authorized modifications of such Agreement, within the original term of such
Agreement and any extensions thereof, which shall include, but not be limited to any obligations created by way of
warranties and/or guarantees for workmanship and materials which warranty and/or guarantee may extend for a period
of time beyond completion of said Agreement, this obligation shall be void; otherwise, of full force and effect.

And the Surety to this bond, for value received, agrees that no modification, change, extension of time, alteration or
addition to the terms of the Agreement or to the Work to be performed thereunder shall in any way affect its obligation
on this bond, and it does hereby waive notice of any such modification, change, extension of time, alteration or
addition to the terms of the Agreement or the Work. Surety further agrees that it will provide City with at least 60
days' written notice by registered mail prior to any suspension, cancellation or termination of this bond; otherwise,
this bond shall remain in full force and effect for a minimum of one (1) year (i.e., twelve (12) full months) beginning
from the Effective Date of the Agreement. This bond may be renewed on an annual basis provided the renewal covers
the requisite Penal Sum as required above; and, in the event Surety declines to renew this bond, Surety agrees that it
will provide City with at least 60 days' written notice by registered mail prior to the expiration date of bond.

It is agreed that this bond is executed pursuant to and in accordance with the provision of O.C.G.A. Sections 13-10-1 and 36-82-101, *et seq.* and is intended to be and shall be construed to be a bond in compliance with the requirements thereof, though not restricted thereto.

IN WITNESS WHEREOF, the Principal and the Surety have caused these presents to be duly signed and sealed this ___13th_____ day of __July_____, 20_18_.

PRINCIPAL: _Global Concessions, Inc._

President/Vice President (Sign)

___Mitchell  A.  Martin___
President/Vice President (Type or Print)

Attested to by:

Secretary/Assistant Secretary (Seal)

SURETY: _The Hanover Insurance Company_

By: _____
Attorney-in-Fact (Sign)

_Jeffrey M. Wilson_
Attorney-in-Fact (Type or Print)

APPROVED AS TO FORM

Senior Associate/Assistant City Attorney

APPROVED

_____
City's Chief Financial Officer

**THE HANOVER INSURANCE COMPANY**
**MASSACHUSETTS BAY INSURANCE COMPANY**
**CITIZENS INSURANCE COMPANY OF AMERICA**

*POWERS OF ATTORNEY*
*CERTIFIED COPY*

KNOW ALL MEN BY THESE PRESENTS: That THE HANOVER INSURANCE COMPANY and MASSACHUSETTS BAY INSURANCE COMPANY, both being corporations organized and existing under the laws of the State of New Hampshire, and CITIZENS INSURANCE COMPANY OF AMERICA, a corporation organized and existing under the laws of the State of Michigan, do hereby constitute and appoint

**Mark W. Edwards, II; Ronald B. Gladrosich, Jeffrey M. Wilson, Robert R. Freel and/or Evondia H. Woessner**

of Birmingham, AL and  each is a true and lawful Attorney(s)-in-fact to sign, execute, seal, acknowledge and deliver for,
and on its behalf, and as its act and deed any place within the United States, or, if the following line be filled in, only within the area therein designated

any and all bonds, recognizances, undertakings, contracts of indemnity or other writings obligatory in the nature thereof, as follows:

**Any such obligations in the United States, not to exceed Forty Million and No/100 ($40,000,000) in any single instance**

and said companies hereby ratify and confirm all and whatsoever said Attorney(s)-in-fact may lawfully do in the premises by virtue of these presents. These appointments are made under and by authority of the following Resolution passed by the Board of Directors of said Companies which resolutions are still in effect:

"RESOLVED, That the President or any Vice President, in conjunction with any Vice President, be and they are hereby authorized and empowered to appoint Attorneys-in-fact of the Company, in its name and as its acts, to execute and acknowledge for and on its behalf as Surety any and all bonds, recognizances, contracts of indemnity, waivers of citation and all other writings obligatory in the nature thereof, with power to attach thereto the seal of the Company. Any such writings so executed by such Attorneys-in-fact shall be as binding upon the Company as if they had been duly executed and acknowledged by the regularly elected officers of the Company in their own proper persons." (Adopted October 7, 1981 - The Hanover Insurance Company; Adopted April 14, 1982 - Massachusetts Bay Insurance Company; Adopted September 7, 2001 - Citizens Insurance Company of America)

IN WITNESS WHEREOF, THE HANOVER INSURANCE COMPANY, MASSACHUSETTS BAY INSURANCE COMPANY and CITIZENS INSURANCE COMPANY OF AMERICA have caused these presents to be sealed with their respective corporate seals, duly attested by two Vice Presidents, this 27th day of October 2011.

THE HANOVER INSURANCE COMPANY
MASSACHUSETTS BAY INSURANCE COMPANY
CITIZENS INSURANCE COMPANY OF AMERICA

Robert Thomas, Vice President

Mark Hazard, Vice President

THE COMMONWEALTH OF MASSACHUSETTS )
COUNTY OF WORCESTER ) ss.

On this  27th day of October 2011 before me came the above named Vice Presidents of The Hanover Insurance Company, Massachusetts Bay Insurance Company and Citizens Insurance Company of America, to me personally known to be the individuals and officers described herein, and acknowledged that the seals affixed to the preceding instrument are the corporate seals of The Hanover Insurance Company, Massachusetts Bay Insurance Company and Citizens Insurance Company of America, respectively, and that the said corporate seals and their signatures as officers were duly affixed and subscribed to said instrument by the authority and direction of said Corporations.

BARBARA A. GARLICK
Notary Public
Commonwealth of Massachusetts
My Commission Expires Sept. 21, 2018

Barbara A. Garlick, Notary Public
My Commission Expires September 21, 2018

I, the undersigned Vice President of The Hanover Insurance Company, Massachusetts Bay Insurance Company and Citizens Insurance Company of America, hereby certify that the above and foregoing is a full, true and correct copy of the Original Power of Attorney issued by said Companies, and do hereby further certify that the said Powers of Attorney are still in force and effect.

This Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of The Hanover Insurance Company, Massachusetts Bay Insurance Company and Citizens Insurance Company of America.

"RESOLVED, That any and all Powers of Attorney and Certified Copies of such Powers of Attorney and certification in respect thereto, granted and executed by the President or any Vice President in conjunction with any Vice President of the Company, shall be binding on the Company to the same extent as if all signatures therein were manually affixed, even though one or more of any such signatures thereon may be facsimile." (Adopted October 7, 1981 - The Hanover Insurance Company; Adopted April 14, 1982 - Massachusetts Bay Insurance Company; Adopted September 7, 2001 - Citizens Insurance Company of America)

GIVEN under my hand and the seals of said Companies, at Worcester, Massachusetts, this 13th day of  July, 2018

THE HANOVER INSURANCE COMPANY
MASSACHUSETTS BAY INSURANCE COMPANY
CITIZENS INSURANCE COMPANY OF AMERICA

Glenn Margosian, Vice President

# EXHIBIT E: BUSINESS PLAN

Form 2: Business Plan Form

Business Plan

Ten Year Projected Sales, Net Income and Cash Flow

Food and Beverage Concessions at Hartsfield-Jackson Atlanta International Airport FC-8484

Store Operator: Global Concessions, Inc ALL Units   Story Location: CF41, CF42, CF43, CF44, CF45, CF46
Store Name: Bantam & Biddy, Lrena Chile, Great Wraps, Krispy Krunch, Slab Works, Food Court

| Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Sales | 7,670,487 | 15,254,815 | 15,587,967 | 15,924,327 | 16,266,013 | 16,347,343 | 16,419,868 | 16,511,225 | 16,595,782 | 16,676,751 |
| Less Cost of Good Sold | 3,267,543 | 4,590,249 | 4,690,010 | 4,791,338 | 4,894,264 | 4,918,735 | 4,943,229 | 4,968,066 | 4,992,206 | 5,017,358 |
| Gross Margin | 5,223,863 | 10,664,583 | 10,897,957 | 11,132,989 | 11,371,749 | 11,428,608 | 11,435,751 | 11,543,180 | 11,600,896 | 11,658,999 |
| | | | | | | | | | | |
| Operations Expenses: | | | | | | | | | | |
| Rent to the City | 1,154,464 | 2,467,486 | 2,541,235 | 2,611,132 | 2,695,168 | 2,741,892 | 2,798,327 | 2,840,806 | 2,893,425 | 2,948,196 |
| Landscape Benefits | 237,174 | 485,344 | 494,789 | 504,261 | 514,084 | 516,489 | 518,996 | 531,691 | 524,897 | 576,552 |
| Employee Salaries/Wages | 1,543,393 | 3,189,779 | 3,214,309 | 3,340,092 | 3,365,848 | 3,374,549 | 3,390,922 | 3,487,377 | 3,423,914 | 3,449,633 |
| Utilities and Telephone | 36,997 | 63,911 | 64,038 | 64,166 | 64,296 | 64,427 | 64,559 | 64,693 | 64,828 | 64,965 |
| C&M/Maintenance/Cleaning/Supplies | 193,587 | 385,124 | 388,516 | 389,301 | 394,570 | 398,467 | 396,577 | 397,516 | 401,946 | 431,790 |
| Insurance | 35,588 | 71,634 | 71,777 | 71,914 | 72,056 | 72,200 | 72,345 | 72,492 | 72,641 | 71,791 |
| Marketing/Advertising | 178,808 | 349,137 | 357,159 | 365,287 | 373,530 | 375,389 | 377,265 | 379,151 | 381,047 | 381,951 |
| Franchise/Royalty Fees | 380,018 | 717,076 | 733,237 | 749,624 | 766,341 | 770,872 | 773,922 | 777,792 | 781,681 | 785,589 |
| General & Administration | 357,649 | 716,198 | 741,008 | 755,829 | 770,945 | 788,126 | 805,792 | 813,959 | 842,641 | 857,715 |
| Interest | 119,663 | 278,134 | 266,333 | 221,164 | 194,658 | 166,780 | 137,683 | 106,883 | 74,317 | 47,319 |
| Depreciation and Amortization | 274,751 | 737,310 | 743,917 | 747,981 | 751,265 | 775,004 | 789,181 | 683,692 | 689,964 | 698,230 |
| Other Operating Expense | 88,810 | 188,400 | 188,410 | 189,540 | 192,800 | 193,744 | 194,733 | 195,704 | 196,685 | 197,668 |
| Other Taxes and Licenses | 30,149 | 48,915 | 49,819 | 58,741 | 51,683 | 52,338 | 53,005 | 53,443 | 54,373 | 55,075 |
| Total Expenses | 4,612,671 | 9,693,897 | 9,844,630 | 10,017,031 | 10,197,995 | 10,281,410 | 10,365,998 | 10,325,080 | 10,349,479 | 10,477,448 |
| | | | | | | | | | | |
| Net Income | 610,195 | 971,634 | 1,053,337 | 1,105,957 | 1,173,754 | 1,147,198 | 1,128,653 | 1,218,100 | 1,218,417 | 1,179,153 |
| | | | | | | | | | | |
| Add: Depreciation and Amortization | 274,751 | 1,364,945 | 743,917 | 747,981 | 751,265 | 775,004 | 789,181 | 683,692 | 648,964 | 698,230 |
| Equals: Cash Flow from Operations | 884,945 | 1,718,803 | 1,797,254 | 1,855,939 | 1,926,819 | 1,922,207 | 1,909,835 | 1,901,791 | 1,849,387 | 1,877,683 |
| | | | | | | | | | | |
| Beginning Cash Balance | 7,895,129 | 1,364,945 | 3,594,379 | 3,862,218 | 5,163,418 | 5,163,418 | 6,590,181 | 8,232,279 | 9,470,485 | 10,651,796 |
| Add: Available Cash | 8,690,074 | 3,095,748 | 4,392,233 | 5,716,197 | 7,089,437 | 8,512,388 | 8,860,199 | 10,134,070 | 11,359,786 | 12,529,383 |
| Less: Debt Service (Principal Only) | 0 | 394,721 | 414,443 | 435,646 | 457,935 | 481,264 | 503,991 | 531,879 | 559,890 | 1,182,844 |
| Less: Allowed Debt Service (Fixed Cost) | 0 | 74,349 | 78,573 | 82,993 | 86,818 | 91,248 | 95,570 | 100,837 | 105,994 | 109,089 |
| Less: Capital Expenditures | 7,205,129 | 31,750 | 37,000 | 34,500 | 44,507 | 899,499 | 24,000 | 38,958 | 63,000 | 14,100 |
| Equals: Ending Cash Balance | 1,384,945 | 2,594,777 | 3,062,218 | 5,163,418 | 6,590,181 | 6,558,364 | 8,232,279 | 9,470,485 | 10,651,796 | 11,280,318 |

Assumptions:    Consolidation of all 5 units and food court. See individual projections for assumptions.

Business Plan
Ten Year Projected Sales, Net Income and Cash Flow
Food and Beverage Concessions at Hartsfield Jackson Atlanta International Airport FC-8484

Store Operator: Global Concessions, Inc.
Store Name: Bastian & Biddy
Store Location: C-F41

| Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Sales | 2,050,107 | 4,182,218 | 4,205,863 | 4,351,180 | 4,438,203 | 4,460,395 | 4,482,696 | 4,505,110 | 4,527,636 | 4,550,274 |
| Less:Cost of Good Sold | 615,032 | 1,254,665 | 1,279,759 | 1,305,354 | 1,331,461 | 1,338,118 | 1,344,809 | 1,351,533 | 1,358,291 | 1,365,082 |
| Gross Margin | 1,435,075 | 2,927,553 | 2,986,104 | 3,045,876 | 3,106,742 | 3,122,276 | 3,137,888 | 3,153,577 | 3,169,345 | 3,185,192 |
| Operations Expenses: | | | | | | | | | | |
| Rent to the City | 319,817 | 652,426 | 665,475 | 678,784 | 692,360 | 695,822 | 699,301 | 702,797 | 706,311 | 709,843 |
| Employee Benefits | 57,630 | 117,222 | 119,225 | 121,267 | 123,351 | 123,882 | 124,416 | 124,952 | 125,492 | 126,034 |
| Employee Salaries/Wages | 337,015 | 685,511 | 697,211 | 709,165 | 711,348 | 724,455 | 727,578 | 730,715 | 733,869 | 737,038 |
| Utilities and Telephone | 8,404 | 16,977 | 16,994 | 17,011 | 17,028 | 17,045 | 17,062 | 17,079 | 17,096 | 17,113 |
| CAM/Maintenance/Cleaning Supplies/IT | 91,753 | 192,212 | 192,793 | 193,455 | 194,883 | 207,798 | 192,167 | 191,189 | 190,221 | 189,335 |
| Insurance | 8,344 | 16,855 | 16,871 | 16,880 | 16,906 | 16,922 | 16,939 | 16,956 | 16,973 | 16,990 |
| Marketing/Advertising | 41,002 | 83,644 | 85,317 | 87,024 | 88,764 | 89,308 | 89,654 | 90,102 | 90,553 | 91,005 |
| Franchise/Royalty Fees | 82,004 | 167,289 | 170,635 | 174,047 | 177,528 | 178,416 | 179,308 | 180,204 | 181,105 | 182,011 |
| General & Administration | 110,451 | 224,181 | 228,665 | 233,238 | 237,903 | 239,092 | 240,288 | 241,489 | 242,697 | 243,910 |
| Interest | 27,163 | 61,479 | 56,023 | 50,287 | 44,259 | 37,932 | 31,260 | 24,258 | 16,898 | 10,775 |
| Depreciation and Amortization | 37,791 | 151,510 | 152,010 | 152,224 | 154,307 | 192,163 | 192,788 | 169,454 | 169,847 | 178,402 |
| Other Operating Expense | | | | | | | | | | |
| Other Taxes and Licenses | 6,283 | 12,566 | 12,817 | 13,873 | 13,335 | 13,601 | 13,873 | 14,151 | 14,434 | 14,723 |
| Total Expenses | 1,128,456 | 2,381,981 | 2,414,044 | 2,446,464 | 2,481,990 | 2,536,326 | 2,524,753 | 2,503,448 | 2,595,497 | 2,517,100 |
| Net Income | 306,619 | 545,572 | 572,059 | 599,362 | 624,851 | 585,950 | 613,135 | 658,129 | 663,847 | 648,012 |
| Add: Depreciation and Amortization | 37,791 | 151,510 | 152,010 | 152,224 | 154,307 | 192,163 | 192,788 | 169,454 | 169,847 | 178,402 |
| Equals: Cash Flow From Operations | 344,210 | 697,082 | 724,069 | 751,586 | 779,159 | 778,113 | 805,922 | 819,583 | 833,695 | 846,414 |
| Beginning Cash Balance | 1,761,008 | 444,210 | 1,010,324 | 1,595,853 | 2,201,991 | 2,821,439 | 3,202,506 | 3,841,059 | 4,482,337 | 5,131,361 |
| Add: Available Cash | 2,105,218 | 1,141,292 | 1,734,393 | 2,347,440 | 2,983,150 | 3,599,552 | 4,008,429 | 4,660,642 | 5,316,032 | 5,978,775 |
| Less: Debt Service (Principal Only) | 106,644 | 112,100 | 117,835 | 123,864 | 130,201 | 136,862 | 136,862 | 143,864 | 151,224 | 151,224 |
| Less: Allocated Debt Service (Food Court) | 21,824 | 21,824 | 22,940 | 24,114 | 25,348 | 26,645 | 28,008 | 29,441 | 30,947 | 61,046 |
| Less: Capital Expenditures | 1,661,000 | 2,500 | 3,500 | 1,500 | 12,500 | 240,200 | 2,500 | 5,000 | 1,500 | 1,100 |
| Equals: Ending Cash Balance | 444,210 | 1,010,324 | 1,595,853 | 2,201,991 | 2,821,439 | 3,202,506 | 3,841,059 | 4,482,337 | 5,132,361 | 5,618,322 |

Assumptions:        See attached:

Business Plan

Ten Year Projected Sales, Net Income and Cash Flow

Food and Beverage Concessions at Hartsfield Jackson Atlanta International Airport FC-8484

| | | |
|---|---|---|
| Store Operator: | Global Concessions, Inc | Store Location: |
| Store Name: | LLEAAN CHIN | C-#42 |

| Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Sales | 1,090,128 | 4,880,260 | 4,161,865 | 4,245,103 | 4,338,065 | 4,331,655 | 4,373,413 | 4,395,280 | 4,417,256 | 4,439,343 |
| Less Cost of Good Sold | 600,828 | 1,224,078 | 1,248,548 | 1,273,531 | 1,299,001 | 1,305,096 | 1,312,034 | 1,318,564 | 1,325,177 | 1,331,803 |
| Gross Margin | 1,090,809 | 2,856,182 | 2,913,306 | 2,971,572 | 3,031,063 | 3,046,158 | 3,061,309 | 3,076,646 | 3,092,079 | 3,107,540 |
| | | | | | | | | | | |
| Operations Expenses: | | | | | | | | | | |
| Rent to the City | 312,020 | 634,521 | 668,347 | 701,764 | 716,852 | 771,695 | 812,379 | 852,998 | 895,648 | 940,431 |
| Employee Benefits | 63,004 | 128,528 | 131,099 | 133,721 | 136,395 | 137,077 | 137,763 | 138,451 | 139,144 | 139,839 |
| Employee Salaries/Wages | 360,013 | 724,447 | 749,136 | 764,118 | 779,401 | 783,298 | 787,214 | 791,150 | 795,106 | 799,082 |
| Utilities and Telephone | 8,384 | 8,813 | 8,821 | 8,830 | 8,839 | 8,848 | 8,857 | 8,866 | 8,874 | 8,883 |
| CAM/Maintenance/Cleaning /Supplies/RE | 96,037 | 199,424 | 199,973 | 200,645 | 202,099 | 216,111 | 199,186 | 198,210 | 198,210 | 198,310 |
| Insurance | 18,916 | 21,831 | 21,853 | 21,875 | 21,897 | 21,919 | 21,941 | 21,963 | 21,985 | 22,007 |
| Marketing/Advertising | 40,003 | 81,605 | 81,237 | 84,982 | 86,600 | 87,033 | 87,468 | 87,906 | 88,345 | 88,787 |
| Franchise/Royalty Fees | 100,006 | 204,013 | 208,093 | 212,255 | 216,500 | 217,583 | 218,671 | 218,764 | 229,863 | 221,947 |
| General & Administration | 110,670 | 224,656 | 229,047 | 233,628 | 238,300 | 245,449 | 251,813 | 248,397 | 268,281 | 276,355 |
| Interest | 26,185 | 59,719 | 54,419 | 48,848 | 42,992 | 36,836 | 30,365 | 23,564 | 16,414 | 10,667 |
| Depreciation and Amortization | 39,399 | 144,978 | 166,121 | 147,335 | 147,335 | 142,338 | 282,141 | 179,887 | 186,379 | 281,129 |
| Other Operating Expense | | | | | | | | | | |
| Other Taxes and Licenses | 6,300 | 12,400 | 12,648 | 11,901 | 13,159 | 13,422 | 13,691 | 13,964 | 14,244 | 14,539 |
| Total Expenses | 1,113,475 | 2,456,834 | 2,512,751 | 2,578,821 | 2,636,369 | 2,683,509 | 2,773,488 | 2,797,141 | 2,853,551 | 2,931,685 |
| | | | | | | | | | | |
| Net Income | 316,615 | 399,348 | 400,553 | 408,750 | 480,634 | 362,648 | 287,781 | 279,555 | 238,559 | 185,854 |
| Add: Depreciation and Amortization | 39,399 | 144,978 | 166,121 | 147,335 | 147,335 | 142,338 | 283,141 | 179,887 | 186,379 | 281,129 |
| Equals: Cash Flow from Operations | 266,014 | 544,316 | 566,674 | 548,085 | 547,969 | 584,987 | 499,841 | 499,243 | 434,937 | 366,983 |
| | | | | | | | | | | |
| Beginning Cash Balance | 1,713,456 | 366,013 | 781,154 | 1,190,845 | 1,594,888 | 1,997,861 | 2,093,961 | 2,412,352 | 2,711,298 | 1,847,172 |
| Add: Available Cash | 1,979,470 | 910,341 | 1,327,828 | 1,738,950 | 2,142,858 | 2,582,748 | 2,584,802 | 2,881,714 | 3,136,148 | 3,334,155 |
| Less: Debt Service (Principal Only) | 0 | 103,591 | 108,890 | 114,461 | 138,318 | 126,073 | 132,944 | 129,245 | 146,895 | 289,766 |
| Less: Adherised Debt Service (based Gross) | | 19,096 | 18,073 | 21,108 | 22,179 | 13,314 | 24,587 | 23,761 | 57,079 | 53,615 |
| Less: Capital Expenditures | 1,613,456 | 6,500 | 8,000 | 8,500 | 2,500 | 198,000 | 5,000 | 5,000 | 19,000 | 3,500 |
| Equals: Ending Cash Balance | 366,015 | 781,154 | 1,190,845 | 1,594,888 | 1,997,861 | 2,093,961 | 2,412,357 | 2,711,298 | 2,947,172 | 2,987,473 |

Assumptions:

See attached:

Business Plan

Ten Year Projected Sales, Net Income and Cash Flow

Food and Beverage Concessions at Hartsfield-Jackson Atlanta International Airport FC-8484

| Store Operator: | Global Concessions, Inc | | | Store Location: | | C-FAJ | | | |
| Store Name: | Great Wraps | | | | | | | | |

| Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Sales | 1,680,173 | 3,264,353 | 3,329,640 | 3,396,233 | 3,464,157 | 3,481,678 | 3,496,886 | 3,516,380 | 3,533,962 | 3,551,632 |
| Less Cost of Good Sold | 488,052 | 979,306 | 998,892 | 1,018,870 | 1,039,247 | 1,044,443 | 1,049,666 | 1,054,914 | 1,060,189 | 1,065,490 |
| Gross Margins | 1,138,121 | 2,285,047 | 2,330,748 | 2,377,363 | 2,424,910 | 2,437,035 | 2,449,230 | 2,461,666 | 2,473,773 | 2,486,142 |
| **Operation Expenses:** | | | | | | | | | | |
| Rent to the City | 269,627 | 509,239 | 519,424 | 529,812 | 540,489 | 543,111 | 545,816 | 548,555 | 551,298 | 554,055 |
| Employee Benefits | 65,671 | 133,969 | 136,648 | 139,381 | 142,169 | 142,880 | 143,594 | 144,312 | 145,034 | 145,759 |
| Employee Salaries/Wages | 384,042 | 783,445 | 799,114 | 815,096 | 831,398 | 835,555 | 839,733 | 843,931 | 848,151 | 852,392 |
| Utilities and Telephone | 7,125 | 14,393 | 14,497 | 14,431 | 14,434 | 14,450 | 14,465 | 14,479 | 14,494 | 14,508 |
| CAM/Maintenance/Cleaning /Supplies/IT | 71,745 | 148,598 | 148,951 | 149,447 | 150,457 | 160,196 | 148,572 | 147,824 | 147,035 | 146,360 |
| Insurance | 7,586 | 15,314 | 15,140 | 15,355 | 15,570 | 15,366 | 15,401 | 15,416 | 15,432 | 15,447 |
| Marketing/Advertising | 32,843 | 65,287 | 66,593 | 67,925 | 69,283 | 69,630 | 69,978 | 70,318 | 70,679 | 71,033 |
| Franchise/Royalty Fees | 64,067 | 130,574 | 133,186 | 135,849 | 138,566 | 139,259 | 139,955 | 140,655 | 141,358 | 142,065 |
| General & Administration | 85,224 | 173,208 | 176,672 | 180,206 | 183,810 | 189,124 | 195,004 | 200,854 | 206,879 | 208,948 |
| Interest | 21,807 | 49,356 | 44,976 | 40,371 | 35,531 | 30,444 | 25,096 | 19,475 | 13,566 | 8,650 |
| Depreciation and Amortization | 65,153 | 139,147 | 140,290 | 141,576 | 142,576 | 155,093 | 155,718 | 135,623 | 138,944 | 146,138 |
| Other Operating Expenses | | | | | | | | | | |
| Other Taxes and Licenses | 6,283 | 12,566 | 12,817 | 13,073 | 13,335 | 13,401 | 13,468 | 13,536 | 13,603 | 13,671 |
| Total Expenses | 1,060,373 | 2,175,105 | 2,208,417 | 2,242,513 | 2,277,339 | 2,308,728 | 2,306,810 | 2,294,918 | 2,300,464 | 2,319,827 |
| Net Income | 59,748 | 109,942 | 122,331 | 134,851 | 147,571 | 128,307 | 142,410 | 166,678 | 167,310 | 167,115 |
| Add: Depreciation and Amortization | 65,153 | 139,147 | 140,290 | 141,576 | 142,576 | 155,093 | 155,718 | 135,623 | 138,944 | 146,138 |
| Equals: Cash Flow From Operations | 124,902 | 249,089 | 262,621 | 276,426 | 290,146 | 283,400 | 298,128 | 302,101 | 306,254 | 313,254 |
| Beginning Cash Balance | 1,433,477 | 224,901 | 364,414 | 510,686 | 664,210 | 828,646 | 806,202 | 949,546 | 1,128,596 | 1,200,185 |
| Add: Available Cash | 1,558,379 | 473,990 | 627,035 | 787,112 | 954,356 | 1,112,046 | 1,104,330 | 1,371,647 | 1,434,850 | 1,593,438 |
| Less: Debt Service (Principal Only) | 0 | 85,615 | 89,995 | 94,599 | 99,439 | 104,527 | 109,874 | 115,496 | 121,495 | 239,684 |
| Less: Allocated Debt Service (Food Court) | | 17,461 | 18,354 | 19,293 | 26,280 | 21,318 | 22,499 | 23,555 | 24,760 | 48,842 |
| Less: Capital Expenditures | 1,333,477 | 6,540 | 8,890 | 9,000 | 4,000 | 180,000 | 2,500 | 4,000 | 8,500 | 3,500 |
| Equals: Ending Cash Balance | 224,901 | 364,414 | 510,686 | 664,210 | 828,646 | 806,202 | 949,546 | 1,128,596 | 1,200,185 | 1,201,612 |

Assumptions:   See attached:

Business Plan
Ten Year Projected Sales, Net Income and Cash Flow
Food and Beverage Concessions at Hartsfield Jackson Atlanta International Airport FC-8484

Store Operator: Global Concessions, Inc.
Store Name: Krispy Kreme
Store Location: C-F44

| Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Sales | 1,870,000 | 2,200,000 | 2,270,000 | 2,349,000 | 2,610,000 | 2,612,050 | 2,634,160 | 2,646,331 | 2,458,563 | 2,478,856 |
| Less:Cost of Good Sold | 327,420 | 673,100 | 694,620 | 716,040 | 737,460 | 741,147 | 744,853 | 748,577 | 752,320 | 756,082 |
| Gross Margins | 742,580 | 1,526,900 | 1,575,380 | 1,623,960 | 1,672,540 | 1,680,903 | 1,689,307 | 1,697,754 | 1,706,243 | 1,714,774 |
| | | | | | | | | | | |
| Operations Expenses: | | | | | | | | | | |
| Rent to the City | 160,590 | 446,000 | 454,000 | 460,000 | 482,000 | 484,410 | 486,833 | 489,266 | 491,713 | 494,171 |
| Employee Salaries/Wages/Benefits | 191,510 | 382,800 | 363,300 | 383,760 | 383,190 | 397,528 | 389,446 | 391,413 | 397,378 | 395,337 |
| Utilities and Telephone | 5,119 | 16,249 | 18,351 | 10,361 | 19,371 | 10,381 | 10,392 | 10,483 | 10,413 | 10,413 |
| CAM/Maintenance/Cleaning/Supplies/IT | 52,410 | 195,600 | 108,960 | 189,900 | 115,600 | 116,258 | 116,840 | 117,424 | 118,011 | 118,601 |
| Insurance | 3,666 | 7,228 | 7,295 | 7,382 | 7,369 | 7,317 | 7,314 | 7,331 | 7,339 | 7,346 |
| Marketing/Advertising | 41,850 | 88,000 | 90,800 | 93,600 | 96,600 | 96,882 | 97,346 | 97,853 | 98,343 | 98,834 |
| Franchise/Royalty Fees | 74,900 | 154,000 | 158,900 | 163,800 | 168,700 | 169,544 | 178,391 | 171,243 | 172,099 | 172,968 |
| General & Administrative | 11,770 | 24,300 | 24,970 | 25,669 | 25,979 | 26,758 | 27,561 | 28,388 | 29,239 | 30,117 |
| Interest | 12,583 | 28,481 | 25,953 | 23,396 | 20,503 | 17,568 | 14,482 | 11,238 | 7,828 | 4,992 |
| Depreciation and Amortization | 26,750 | 52,800 | 54,600 | 53,829 | 53,020 | 53,285 | 53,553 | 53,819 | 54,088 | 54,359 |
| Other Operating Expenses | 88,810 | 188,600 | 188,410 | 189,540 | 192,600 | 193,764 | 194,733 | 195,706 | 196,685 | 197,668 |
| Other Taxes and Licenses | 3,709 | 3,709 | 3,709 | 3,709 | 3,709 | 3,727 | 3,746 | 3,765 | 3,784 | 3,802 |
| Total Expenses | 674,589 | 1,477,617 | 1,491,027 | 1,513,637 | 1,559,661 | 1,547,411 | 1,572,481 | 1,577,849 | 1,582,912 | 1,588,611 |
| | | | | | | | | | | |
| Net Income | 68,071 | 49,183 | 84,353 | 91,323 | 112,878 | 113,480 | 116,623 | 119,904 | 123,331 | 134,163 |
| | | | | | | | | | | |
| Add: Depreciation and Amortization | 26,750 | 52,800 | 54,600 | 53,820 | 53,020 | 53,285 | 53,553 | 53,819 | 54,088 | 54,359 |
| Equals: Cash Flow from Operations | 94,821 | 101,983 | 138,833 | 145,143 | 165,899 | 166,765 | 170,175 | 173,724 | 177,419 | 188,512 |
| | | | | | | | | | | |
| Beginning Cash Balance | 869,477 | 194,821 | 236,317 | 375,849 | 457,158 | 391,827 | 479,519 | 490,396 | 581,465 | 676,461 |
| Add: Available Cash | 964,298 | 296,804 | 375,849 | 457,158 | 557,925 | 644,304 | 660,571 | 755,309 | 853,921 | 998,782 |
| Less: Debt Service (Principal Only) | 0 | 49,964 | 51,931 | 54,588 | 57,381 | 60,317 | 63,403 | 66,646 | 70,054 | 136,193 |
| Less: Absorbed Debt Service (Fixed Court) | 769,477 | 8,184 | 8,643 | 9,043 | 9,505 | 9,992 | 10,501 | 11,040 | 11,605 | 12,193 |
| Less: Capital Expenditures | 1,000 | 2,000 | 2,500 | 1,000 | 11,590 | 83,600 | 5,000 | 1,200 | 1,000 | 1,000 |
| Equals: Ending Cash Balance | 194,821 | 236,217 | 311,015 | 392,017 | 479,519 | 490,396 | 581,465 | 676,461 | 779,260 | 788,697 |

Assumptions:        See attached:

Business Plan
Ten Year Projected Sales, Net Income and Cash Flow
Food and Beverage Concessions at Hartsfield-Jackson Atlanta International Airport FC-8484

Intra Operator Stars Items.    Global Concessions, Inc    Select markets    More (un)Wani    C-F45

| Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Sales | 750,000 | 1,530,000 | 1,540,599 | 1,591,811 | 1,612,648 | 1,631,760 | 1,639,915 | 1,648,124 | 1,656,365 | 1,664,647 |
| Less Cost of Goods Sold | 235,000 | 499,000 | 468,180 | 477,543 | 487,094 | 489,530 | 491,977 | 494,437 | 496,910 | 499,394 |
| Gross Margins | 515,000 | 1,071,000 | 1,072,420 | 1,114,268 | 1,125,553 | 1,142,236 | 1,147,947 | 1,153,687 | 1,159,456 | 1,165,253 |
| Operations Expenses: | | | | | | | | | | |
| Rent to the City | 112,500 | 229,500 | 234,090 | 238,772 | 243,547 | 244,765 | 245,989 | 247,219 | 248,455 | 249,697 |
| Employee Benefits | 31,500 | 64,260 | 65,545 | 66,856 | 68,193 | 68,534 | 68,877 | 69,211 | 69,567 | 69,915 |
| Employees Salaries/Wages | 180,000 | 367,200 | 374,544 | 382,035 | 389,675 | 391,624 | 393,582 | 395,550 | 397,528 | 399,515 |
| Utilities and Telephone | 4,941 | 10,081 | 10,893 | 10,101 | 10,113 | 10,123 | 10,133 | 10,143 | 10,154 | 10,164 |
| C&M/Maintenance/Cleaning/Supplies/IT | 34,993 | 71,344 | 72,481 | 72,629 | 73,067 | 77,373 | 72,233 | 71,962 | 71,862 | 71,549 |
| Insurance | 3,355 | 6,777 | 6,784 | 6,799 | 6,797 | 6,804 | 6,811 | 6,817 | 6,824 | 6,811 |
| Marketing/Advertising | 15,000 | 30,609 | 31,212 | 31,836 | 32,473 | 32,615 | 32,798 | 32,962 | 33,137 | 33,293 |
| Franchise/Royalty Fees | 30,000 | 61,200 | 62,424 | 63,672 | 64,946 | 65,271 | 65,597 | 65,925 | 66,255 | 66,586 |
| General & Administration | 39,427 | 80,854 | 81,655 | 83,188 | 84,954 | 87,502 | 90,137 | 92,431 | 95,616 | 98,484 |
| Interest | 12,485 | 28,259 | 25,751 | 23,114 | 20,343 | 17,431 | 14,369 | 11,150 | 7,767 | 4,953 |
| Depreciation and Amortization | 17,838 | 72,781 | 74,495 | 75,995 | 76,912 | 92,546 | 92,854 | 84,164 | 89,235 | 91,140 |
| Other Operating Expense | | | | | | | | | | |
| Other Taxes and Licenses | 5,750 | 5,750 | 5,845 | 5,982 | 6,107 | 6,122 | 6,163 | 6,194 | 6,225 | 6,256 |
| Total Expenses | 487,839 | 1,028,787 | 1,044,858 | 1,061,864 | 1,077,322 | 1,100,740 | 1,099,533 | 1,094,079 | 1,100,814 | 1,108,460 |
| Net Income | 27,161 | 42,293 | 47,562 | 52,284 | 57,431 | 41,496 | 48,414 | 59,608 | 54,847 | 56,858 |
| Add: Depreciation and Amortization | 17,838 | 72,781 | 74,495 | 75,995 | 76,912 | 92,546 | 92,854 | 84,164 | 89,235 | 91,140 |
| Equals: Cash Flow from Operations | 54,999 | 115,074 | 122,057 | 129,199 | 136,343 | 134,842 | 141,268 | 143,772 | 164,076 | 148,810 |
| Beginning Cash Balance | 865,479 | 916,478 | 881,879 | 232,799 | 388,391 | 372,696 | 357,300 | 417,657 | 471,763 | 521,723 |
| Add: Available Cash | 916,478 | 378,073 | 334,928 | 381,998 | 444,635 | 586,716 | 498,569 | 541,219 | 615,838 | 649,733 |
| Less Debt Service (Principal Only) | 0 | 49,019 | 51,526 | 54,163 | 54,934 | 59,846 | 62,908 | 66,127 | 69,510 | 177,116 |
| Less: Allocated Debt Service (Fixed Cost) | | 8,184 | 8,603 | 9,045 | 9,565 | 9,992 | 10,593 | 11,048 | 11,645 | 12,891 |
| Less: Capital Expenditures | 763,479 | 18,000 | 12,000 | 18,500 | 5,500 | 79,600 | 7,900 | 12,500 | 13,800 | 2,500 |
| Equals: Ending Cash Balance | 154,999 | 281,870 | 153,799 | 368,391 | 372,696 | 357,300 | 417,657 | 471,763 | 521,723 | 507,234 |

Assumptions:    See attached!

Business Plan
Ten Year Projected Sales, Net Income and Cash Flow
and Beverage Concessions at Hartsfield Jackson Atlanta International Airport FC

Store Operator: Global Concessions, Inc
Store Name: Food Court
Store Location: Hartsfield Jackson Atlanta International Airport FC

C-F46

| Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Less:Cost of Good Sold | | | | | | | | | | |
| Gross Margin | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Operations Expenses:** | | | | | | | | | | |
| Rent to the City | 19,370 | 41,364 | 42,192 | 43,036 | 43,896 | 44,116 | 44,336 | 44,558 | 44,781 | 45,005 |
| Employee Benefits | 110,684 | 236,168 | 241,095 | 245,917 | 250,836 | 252,090 | 253,350 | 254,617 | 255,890 | 257,170 |
| Employee Salaries/Wages | 1,653 | 3,307 | 3,373 | 3,440 | 3,509 | 3,579 | 3,651 | 3,724 | 3,798 | 3,874 |
| Utilities | -154,450 | -333,864 | -334,530 | -336,846 | -341,585 | -387,370 | -333,741 | -319,233 | -335,485 | -322,345 |
| CAM/Maintenance/Cleaning /Supplies/IT | 1,779 | 3,559 | 3,630 | 3,703 | 3,777 | 3,852 | 3,929 | 4,008 | 4,088 | 4,170 |
| Insurance | | | | | | | | | | |
| Marketing/Advertising | | | | | | | | | | |
| Franchise/Royalty Fees | | | | | | | | | | |
| General & Administration | 19,039 | 43,092 | 39,267 | 35,247 | 31,022 | 26,590 | 21,511 | 17,003 | 11,844 | 7,553 |
| Interest | 87,819 | 176,103 | 176,511 | 177,018 | 178,115 | 139,685 | 91,130 | 60,824 | 30,471 | 27,042 |
| Depreciation and Amortization | 1,925 | 1,925 | 1,964 | 2,003 | 2,043 | 2,053 | 2,663 | 2,074 | 2,084 | 2,094 |
| Other Operating Expense | 87,819 | 172,853 | 173,531 | 173,531 | 171,611 | 84,685 | 87,630 | 57,574 | 21,471 | 14,542 |
| Other Taxes and Licenses | | | | | | | | | | |
| Total Expenses | -87,819 | -172,853 | -173,531 | -173,531 | -171,612 | -84,685 | -87,630 | -57,574 | -27,471 | -24,542 |
| Net Income | 87,819 | 176,103 | 176,531 | 177,031 | 178,115 | 139,685 | 91,130 | 60,824 | 30,471 | 27,042 |
| Add: Depreciation and Amortization | 0 | 3,250 | 3,000 | 3,500 | 6,503 | 55,000 | 3,500 | 3,250 | 3,000 | 2,500 |
| Equals: Cash Flow from Operations | 1,164,232 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Beginning Cash Balance | 1,164,232 | 3,250 | 3,000 | 3,500 | 6,503 | 55,000 | 3,500 | 3,250 | 3,000 | 2,500 |
| Add: Available Cash | (74,749) | 74,749 | 78,573 | 82,591 | 86,318 | 91,260 | 95,929 | 100,837 | 105,996 | 209,089 |
| Less: Debt Service (Principal Only) | | (78,573) | (78,573) | (82,593) | (86,818) | (91,260) | (95,929) | (100,837) | (105,996) | (209,089) |
| Less: Allocated Debt Service (Revenue Centers) | 1,164,232 | 3,250 | 3,000 | 3,500 | 6,503 | 55,000 | 3,500 | 3,250 | 3,000 | 2,500 |
| Less: Capital Expenditures | (B) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |
| Equals: Ending Cash Balance | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |

# EXHIBIT F: CONCESSIONS COMPLIANCE STANDARDS

TO REVIEW THIS EXHIBIT GO TO:

www.atl.com

SELECT BUSINESS INFORMATION;
SELECT DOING BUSINESS WITH THE AIRPORT; AND
CONCESSIONS COMPLIANCE STANDARDS

# EXHIBIT G: AIRPORT ACCESS, SECURITY & SAFETY MEASURES

**EXHIBIT G**

**AIRPORT ACCESS, SECURITY AND SAFETY MEASURES**
**(AS APPLICABLE)**

1. **Work in Progress.** Contractor shall be responsible for and shall bear any and all risk of loss or damage to work in progress and, pursuant to the Section titled "TITLE AND RISK OF LOSS," to equipment and materials.

2. **Maintenance.** Contractor shall maintain the Work including any provisionally accepted portions thereof and including any portions occupied by City or put into service until final acceptance of the Work as a whole. Use shall not constitute acceptance, relieve Contractor of its responsibilities, or act as a wavier by the City of any terms of this Agreement (see specification section SP-4B, Extended Maintenance).

3. **Material Handling.** Contractor's responsibility for materials and plant equipment required for the performance of this Agreement shall include:

    **3.1** Receiving and unloading;

    **3.2** Storing in a secure place and in a manner subject to City's review. Outside storage of materials and equipment subject to degradation by the elements shall be in weather tight enclosures provided by Contractor;

    **3.3** Delivering from storage to construction site all materials and plant equipment as required; and

    **3.4** Maintaining complete and accurate records for City's inspection of all materials and plant equipment received, stored and issued for use in the performance of this Agreement.

4. **Security.** Contractor shall at all times conduct all operations under this Agreement in a manner to avoid the risk of loss, theft, or damage by vandalism, sabotage or any other means to any equipment, materials, work or other property at the Jobsite. Contractor shall continuously inspect all equipment, materials and work to discover and determine any conditions which might involve such risks and shall be solely responsible for discovery, determination and correction of any such conditions.

5. **Airport Security Requirements.** Contractor shall comply with the Transportation Security Administration ("TSA") and the City's security requirements for the Airport. Contractor shall cooperate with the TSA and the City on all security matters and shall promptly comply with any Project security arrangements established by City. Such compliance with these security requirements shall not relieve Contractor of its responsibility for maintaining proper security for the above-noted items, nor shall it be construed as limiting in any manner Contractor's obligation with respect to all applicable state, federal and local laws and regulations and its



duty to undertake reasonable action to establish and maintain secure conditions at the Jobsite.

6. **Preventing Unauthorized Access.** The Airport has been secured to prevent unauthorized access to the Air Operations Area ("AOA"), the secured area, the sterile area and other controlled areas of the Airport. Contractor shall cooperate to the fullest extent with the TSA and DOA to maintain the integrity of the security system. The Contractor shall control its operations and the operations of its subcontractors and all suppliers so as to provide for the free and unobstructed movement of aircraft, aircraft operations personnel and equipment in the AOA, the secured area, the sterile area and other controlled areas of the Airport as defined herein.

7. **Transportation Security Administration/Responsibility of Contractor.** In order to comply with the TSA and DOA security requirements, Contractor shall be responsible for informing itself as to current, ongoing, and changing requirements, and for remaining in compliance with those requirements throughout this Agreement. The security requirements are as follows and from time to time may change as required by the TSA and/or DOA.

   **7.1 Security Identification Display Area (SIDA).** The Security Identification Display Area ("**SIDA**") is defined in the Airport Security Program as any area that requires individuals to continuously display Airport issued or Airport approved identification badges. Personnel associated with construction contracts in the AOA secured area or sterile area of the Airport shall display SIDA badges at all times. The TSA and the DOA require all personnel to display SIDA badges in areas controlled for security purposes at all times.

   **7.2 FBI/CHRC Checks.** To obtain a SIDA badge, each individual must successfully undergo a Security Threat Assessment and a Federal Bureau of Investigation ("**FBI**") fingerprint based Criminal History Records Check ("**CHRC**") which must reveal no convictions of disqualifying crimes within the last ten years as defined in Transportation Security Regulation, TSR Part 1542.209. Each individual must also attend a security awareness course conducted by the DOA Security Division. Each employee must present two proper forms of identification and citizenship/employment eligibility documents if necessary. Contractor shall be responsible for all fees associated with obtaining a SIDA badge (i.e., badge and fingerprint fees as determined by DOA). The current cost for the CHRC is $50.00 per individual. The current cost for badge is $60.00 per individual. Cost for lost badges is $60.00 for each replacement badge.

      **7.2.1** In order to obtain up-to-date costs for the CHRC and for badging, Contractor shall contact the DOA Security office at (404) 530-6667 prior to sending individuals to the DOA Security office for badging. Contractor/Escorting Requirements are specified in subsection below.

**7.3 Displaying Badges.** Employees and those of all subcontractors must display a DOA issued badge showing Contractor's name and an employee number. All personnel shall be required to wear this badge at all times while within the secured areas of the Airport.

**7.4 Badging Records and Process.** Contractor shall maintain an up-to-date record of all badge holders showing name, address, sex, height, weight, color of eyes and badge number. Contractor will be required to furnish this information to the DOA upon request.

    **7.4.1** The Badging process may begin upon the Contractor's receipt of a formal Notice to Proceed (NTP) from the City and may take up to fourteen (14) calendar days to complete. Access to secured areas shall be denied until such time as the Contractor has completed the badging process.

    **7.4.2** If applicable, an Administrative NTP may be presented to the DOA Security Division by the Contractor in order to initiate the badging process for the Contractor's employees.

    **7.4.3** The Contractor shall appoint one of its employees as an Authorized Signatory and submit his or her name, on the Contractor's letterhead, to the DOA Security Division. The submittal letter shall indicate the Project Name, Agreement Number, Point of Contact, Telephone and Fax number, list of subcontractors including subcontractors' Authorized Signatory nature of the work to be performed by Contractor, and each subcontractor, location and duration, time frame(s), and justification for vehicle access, if required. A copy of the Contractor's Insurance Certificate shall accompany the letter. Once badged, the Contractor's Authorized Signatory shall be responsible for the badging process of his/her company employees.

    **7.4.4** Each Subcontractor identified in the Contractor's letter shall appoint one of its employees as an Authorized Signatory and submit his or her name through the Contractor, to the DOA Security Division. A copy of the Subcontractor's Insurance certificate shall accompany the letter. Once badged, the Subcontractor's Authorized Signatory shall be responsible for the badging process of his/her company employees.

    **7.4.5** Processing time for badging, at the badging office after completion of the CHRC, will last approximately one (1) hour. Processing time for Authorized Signatories will last an additional hour for briefing by the DOA Security Division. Authorized Signatory briefing sessions will be conducted only on Wednesdays at 2p.m. in the DOA Security office.

7.4.6    Each person applying for badging shall complete and submit all forms required by the DOA Security Division. All required forms will be provided to the Authorized Signatory at the time of the briefing at the DOA Security office.

7.4.7    Each person applying for a badge shall also submit to fingerprinting upon the submittal of said forms. Fingerprints will be utilized for a ten (10) year FBI-based criminal history records check for each individual employee.

7.4.8    Pursuant to TSR § 1542.209 certain felony convictions within the most recent ten (10) year period, may cause disqualification. A list of disqualifying Felony convictions is available in the offices of the DOA Security Division and in the TSR Regulations.

7.4.9    The Authorized Signatory will be notified when the results of the fingerprint checks are completed. Upon notification and approval, Contractor's and subcontractor's approved employees may return to the DOA Security Office, during posted hours, for photographing and badging. This process may take up to sixty (60) minutes.

7.4.10    Badges issued to Contractor and subcontractor employees and agents shall expire upon the happening of one (1) of the following events, whichever occurs first:

7.4.10.1 Completion of Agreement or subcontract, unless extended by the City;

7.4.10.2 Expiration of Insurance coverage, as indicated on the Contractor's Insurance certificate;

7.4.10.3 Employee's driver's license expiration date; or

7.4.10.4 Two (2) years from the issuance of the badge.

7.4.11    Contractor and its subcontractor shall be responsible for making arrangements, ahead of time, to extend badges, when necessary. A letter, directed to both the DOA Assistant General Manager of Public Safety & Security and the DOA Director of Security, explaining the reason(s) for the badge extension on Contractor's letterhead will be required. Extension requests must be approved in writing by the DOA prior to extension of the badges.

7.4.12    Contractor's questions concerning Airport Security shall be directed to (404) 530-6667.

8. **Drivers.** All drivers operating vehicles within the AOA must obtain, in addition to the DOA Security badge, a DOA Ramp Certification. Ramp Certification will be evidenced by a "D" designation placed on the face of the badge by the DOA Security Division.

> 8.1 **Ramp Certification.** City will require Airport Driver Safety Training and Ramp Certification for all personnel required to operate a motor vehicle in the AOA. This can be obtained by completing an Airport Driver Safety Training Course administered by the DOA Security Division. Contractor shall contact the DOA Security Office at (404) 530-6667 during normal business hours for more information.

> 8.2 Except as set forth below, all vehicles operating within the AOA shall carry a minimum liability insurance coverage amount of TEN MILLION DOLLARS ($10,000,000.00).

> 8.3 Contractor shall mark all vehicles and construction equipment, including those of subcontractors, in a manner as required by the Department of Aviation and consistent with Transportation Security Regulations (TSR).

> 8.4 All vehicles operating within the AOA must display permanent signage, legible and visible from a sight distance of five hundred (500) feet on both sides of the vehicle. MAGNETIC SIGNS ARE PROHIBITED FROM USE IN THE AOA.

9. **Protocols for Contractor Escorting.** Prime contractor must incorporate escorting protocol with Security Plan submitted for approval by the DOA Security Manager. The DOA Security Manager must approve any exceptions. Contractor must attach a map of work area(s) and routes to access the work area(s) to project security plan submitted to the DOA Security Division for approval. Contractor may contact DOA Security Manager at (404) 530–6667 during normal operating hours.

> 9.1 All escorted vehicles and personnel must remain under the direction of authorized escorting personnel at all times.

> 9.2 Contractor and escorted personnel shall have no Terminal or Concourse access.

> 9.3 Escorting is limited to an approved Airport SIDA badged prime Contractor or an approved Airport SIDA badged escorting subcontractor approved by the DOA Security Manager to perform escorting duties. The individuals involved in escorting shall perform no other services other than escorting while in service. No other subcontractors will be allowed to escort any vehicle(s).

> 9.4 Escorting person(s) must have a SIDA badge and be approved to conduct escorts.

> 9.5 Designated badged prime Contractor employees approved or designated badged escorting subcontractor must escort prime Contractor employees and subcontractors' employees to all work sites. Once at the work site, badged



employees, prime or subcontractors, may supervise unbadged employees, not to exceed five (5) employees per one (1) SIDA badged employee.

**9.6** All personnel (badged or escorted) must have an employee photo ID displayed on the outermost garment, waist high or above. The employee badge must contain the employee's name, Contractor's name and project number or name. All escorted personnel must remain under the control of person(s) with an SIDA badge with escort privileges at all times while in the SIDA, Secure, or Sterile Areas.

**9.7** Maximum vehicular escort—one (1) prime contractor vehicle or approved badged escorting subcontractor is permitted to escort two (2) subcontractor vehicles.

**9.8** All vehicles requiring escort must access and egress the SIDA through Pre-approved gates. Vehicles requiring escort shall not be permitted access or egress through any other entry or exit point for any reason whatsoever.

**9.9** All escorted vehicles must obtain a permit, valid for up to ten (10) hours, at Gate 59 or other approved vehicle access point. The obtaining of a permit, however, shall not relieve a vehicle from the requirement of being escorted as set forth herein.

**9.10** In the event an escorted vehicle requires a time limit extension, the vehicle, and its original operator, must return to Gate 59 or approved vehicle access point to obtain a time limit extension to complete work in the SIDA, Secure, or Sterile Areas. Time limit extension shall not exceed an additional ten (10) hour period under any circumstances.

## 10. Construction Contracts Within Sterile Area (Inside Terminal, Concourses)

**10.1** Highest level of Security required.

**10.2** All employees of prime Contractor, and its subcontractors, must be badged to work in the sterile area.

**10.3** If escorting of unbadged Contractors and or subcontractors is required, an approved sponsor agency (DOA, AATC, HACM, HCM, etc.) must perform escort full time.

**10.4** For any work requiring access to the sterile area (beyond the Passenger Screening Checkpoint area and on Concourses), a tool inventory must be conducted daily by the prime Contractor or designated representative. A copy of this inventory should be provided to the construction manager or project manager for verification. In general, tools will not be allowed to pass through the checkpoint area.

**11. Restricted AOA Access.** Contractor shall allow passage into the AOA or secured area through its access point to persons, vehicles, and equipment displaying identification of the DOA or provide an escort for each person or vehicle not displaying proper identification. Escort vehicles must be insured as specified per Exhibit D; Insurance. Escorted vehicles need not



carry the aforementioned coverage but must carry the minimum amounts of insurance required by Georgia Law. However, Insurance coverage of escort vehicles must provide coverage as specified by **Exhibit D** for vehicles being escorted.

12. **Visual Aids**.    In the event of the possibility of contact with the AOA or secured area, Contractor shall establish a system of visual aids for marking and delineating the limits of required clearances adjacent to active runways, taxiways, and NAVAIDS during both day and night time work, subject to City's approval prior to the start of any work under this Agreement. The approved system of marking and delineating shall be installed, maintained and protected at all times.

13. **Tools and Materials.** Contractor shall create and maintain an inventory of all tools and materials utilized within the SIDA, Secure Area, Sterile Area, Federal Inspection Service (FIS), and AOA.

   13.1 All tools and materials shall be stored and maintained in a secured manner to prevent unauthorized use, within pre-designated areas within the secured areas of the airport. Storage designations shall be obtained by the Contractor and/or subcontractor, prior to mobilization, by contacting the DOA Properties Division at (404) 209-2945. Change requests for storage designation may be approved only through the DOA Properties Division with notification and concurrence from the DOA Security Division. Failure to comply with this requirement may result in the termination of Contractor's or subcontractor's contract and disqualification from working on construction contracts within secured areas of the Airport.

   13.2 All tools and materials must be secured to prevent unauthorized use at all times within the secured areas of the Airport and/or the AOA. Failure to comply with this requirement may result in the termination of Contractor's or subcontractor's contract and disqualification from working on construction contracts within secured areas of the Airport.

   13.3 Any and all job-specific or unusual tools and/or materials shall be presented to the security authority at point of entry gate when accessing and/or egressing the SIDA and/or AOA. Failure to comply with this requirement may result in the termination of Contractor's or subcontractor's contract and disqualification from working on construction contracts within secured areas of the Airport.

   13.4 All vehicles shall remain subject to search while within the secured areas of the Airport and/or the AOA at all times. Vehicles may also be searched prior to entry to the secured areas of the Airport. The possession of weapons and other prohibited items may result in criminal or civil charges in accordance with applicable laws.

14. **Dumpsters.**  Contractors and subcontractors shall be allowed no more than one (1) open dumpster per Agreement work area. Any and all other job-site dumpsters must remain securely covered and fastened at all times.



14.1 Trash must be removed daily.

14.2 No dumpster shall be permitted in the Terminal area for any reason whatsoever.

14.3 The Contractor shall be responsible for trash removal from dumpsters within the AOA. Contractor shall clear debris on a daily basis not later than the end of shift.

14.4 Dump trucks shall access and egress the AOA through pre-approved gates. Failure to comply with this requirement may result in the termination of Contractor's or subcontractor's contract and disqualification from working on projects within the secured areas of the Airport.

15. **Terminal/Curbside.** A maximum of two (2) Contractor vehicles <u>or</u> two (2) subcontractor vehicles may be permitted in a work area at any given time, subject to the approval of the Atlanta Police Department and the DOA Security. In the event one (1) Contractor vehicle is present, then no more than one (1) subcontractor vehicle may be present at the same time, and vice versa.

15.1 Debris removal may be allowed from curbside with special permission by the DOA Security Department.

15.2 When parked at curbside, at least one (1) badged employee must remain with the vehicle at all times. Vehicles must be removed as expeditiously as possible in all cases.

15.3 Areas surrounding vehicles accessing curbsides must be kept clean at all times.

15.4 For purposes of obtaining Terminal or Curbside access, the APD Airport Section shall be contacted by dialing (404) 530-6630 24 hours in advance of the desired access time.

16. **Staging Areas.** The Contractor's Construction staging area shall be identified on the plans.

17. **Federal Inspection Service Areas.** For any or all work conducted within Federal Inspection Service (FIS) areas, Contractor shall submit FIS Authorization requests to the **U. S. Customs & Border Protection (404) 765-2303.** The request shall detail the names of employees, description and area of work, work schedule, and any other relevant information to the DOA Security Department.

17.1 Contractor shall be responsible for obtaining the appropriate approvals and special SIDA badge FIS access decals from the appropriate Federal authorities. Special SIDA badge FIS access decals will not be required in if one (1) or more U.S. Customs Agent(s) are present at the work site at all times.



18. **Security Checkpoints**. Contractor and subcontractors shall maintain awareness among all employees, and at all times, that all Security Checkpoints are now under Federal jurisdiction rather than privately contracted Security agents. In general, contractors will not be allowed to carry tools and construction materials through the passenger security screening points.

    18.1 Questions regarding Federal Security Checkpoints shall be directed to (404) 763-7437 or (404) 530-2150.

19. **Restrictions on Operations.** Contractor shall plan and conduct its operations so as not to enter upon lands in their natural state unless authorized by City. Contractor shall not damage, close or obstruct any utility installation, highway, road or other property until permits and City's permission therefore have been obtained. Contractor shall not disrupt or otherwise interfere with the operation of any pipeline, telephone, electric transmission line, ditch or structure unless specifically authorized by this Agreement. Contractor shall not damage or destroy cultivated and planted areas, or vegetation such as trees, plants, shrubs, and grass on or adjacent to the premises which, as determined by City, do not interfere with the performance of this Agreement. The City will be responsible for furnishing all rights-of-ways upon which the Work is to be constructed in advance of the Contractor's operation.

20. **Cooperation with Agencies.** Contractor shall cooperate with the owner of any public or private utility service, FAA or National Oceanic and Atmospheric Administration (NOAA), or a utility service of another government agency that may be authorized by the owner to construct, reconstruct or maintain such utility services or facilities during the progress of the Work. In addition, Contractor shall control its operations to prevent the unscheduled interruption of such utility services and facilities.

21. **Location of Services.** The City does not guarantee the accuracy or the completeness of the location information relating to existing utility services, facilities, or structures that may be shown on the plans or encountered in the Work. Any inaccuracy or omission in such information shall not relieve Contractor of its responsibility to protect such existing features from damage or unscheduled interruption of service.

22. **Notice to Owner/Operators.** Prior to commencing the work in the general vicinity of an existing utility service or facility, Contractor shall notify each owner/operator in writing of activities which might affect its interests. If, in Contractor's opinion, the owner/operator's assistance is needed to locate the utility service or facility or the presence of a representative of the owner/operator is desirable to observe the work, such advice should be included in the notification. Contractor shall furnish a copy of such written notices to City.

23. **Excavation Methods.** Where the outside limits of an underground utility service have been located and staked on the ground, Contractor shall use excavation methods acceptable to City as may be required to insure protection from damage due to Contractor's operations.

24. **Damage to Services.** Should Contractor damage or interrupt the operation of a utility service or facility by accident or otherwise, it shall immediately notify in writing the owner/operator,

appropriate public safety authorities and City and shall take all reasonable measures to prevent further damage or interruption of service. Contractor in such events shall cooperate with the utility service of facility owner and City continuously until such damage has been repaired and service restored.

25. **Failure to Protect Property.** Contractor shall not be entitled to any extension of time or compensation on account of Contractor's failure to protect all facilities, equipment, materials and other property as described herein. All costs in connection with any Improvements or restoration necessary or required by reason of unauthorized obstruction, damage or use shall be borne by Contractor.

26. **Utility Contractor Licensing Requirements.** Contractor shall comply with the requirements of state law, including, but not limited to, O.C.G.A. § 43-14-8.2 (b)(1) which states that:

After June 30, 1994, no sole proprietorship, partnership, or corporation shall have the right to engage in the business of utility contracting unless such business holds a utility contractor license and there is regularly connected with such business a person or persons who holds a valid utility manager certificate issued under this chapter. Such utility manager must be actually engaged in the performance of such business on a full-time basis and oversee the utility contracting work of all employees of the business. In cases where a sole proprietorship, partnership, or corporation has more than one permanent office, then each permanent office shall be registered with the division and at least one person who holds a valid utility manager certificate issued under this chapter shall be stationed in each office on a full-time basis and shall oversee the utility contracting work of all employees of that office.

# EXHIBIT H: CONSTRUCTION SAFETY & HEALTH PLAN (NON-OCIP)

### Concessions Site–Specific Safety/Security Manual Guidelines

Section 1 – This section should include a commitment letter signed by the President of your company. The following items must be addressed by this letter:

    a. Company commitment to and philosophy on safety.

    b. Company acknowledgement that they will commit to drug free workplace.

    c. Company acknowledgement that they will comply with OSHA Standards 29 CFR 1926, 29 CFR 1910, 46 CFR (if applicable), and all TSA, DOA, and FAA security requirements.

    d. Project Safety Representative's name and lines of authority, his authority regarding safety matters.

    e. The following attachments should follow the commitment letter:

        1. Project Safety Representative and Alternate Safety Representative's resumes.

        2. Contact List for Supervisory Staff:

            i. Name

            ii. Job Title

            iii. Office Telephone Number

            iv. Cellular Telephone Number

            v. E-mail address

        3. List of Subcontractors:

            i. Name of Subcontractor

            ii. Address

            iii. Contact Person

            iv. Office Telephone Number

            v. Cellular Telephone Number

            vi. E-mail address

Section 2 – This section should include your company disciplinary policy.

Section 3 – This section should include your company drug policy.

Section 4 – This section should include the site specific job hazard analysis for your concessions project. It should take the tasks in your scope of work, analyze the hazards and list the proposed safety measures to abate those hazards.

Section 5 – This section should include your health and safety program administration. How you intend to conduct the onsite, day to day operations of your program and roles/responsibilities of those in your organization. Compliance with state, federal and local jurisdictions, commitment to safety education and training, how you handle new hire training, employee responsibilities, first aid, CPR, etc. Include in this section how you will address the items included in 29 CFR 1926 Subpart C General Safety and Health Provisions.

Section 6 – This section should be broken up into safety categories. At a minimum it should include sections on the following:

    a. Safe Work Practices

    b. Housekeeping

    c. Personal Protective Equipment

    d. Respiratory Protection

    e. Hearing Protection

      f.      Fall Protection
      g.      Fire Prevention
      h.      Ladder, Stairway and Ramp Safety
      i.      Scaffolding
      j.      Electrical Safety
      k.      Lockout Tagout Procedures
      l.      Tool safety
      m.      Personal hoists/manlifts
      n.      Welding and Cutting
      o.      Compressed Gas Cylinders
      p.      Excavation and Trenching
      q.      Mobile Equipment Operation and Operator Training
      r.      Trucking
      s.      Steel Erection
      t.      Cranes & Rigging
      u.      Hazardous Material Handling
      v.      Hazard Communication Compliance
      w.      Confined Space Entry Program
      x.      Concrete and Masonry Construction
      y.      Demolition
      z.      Explosives
      aa.    Work Zone Safety – MUTCD
      bb.    Miscellaneous – (Include any applicable items not covered above needed to successfully complete your contract.

Note: All items in Section 6 may not be used in the course of your construction. If an item is not relevant, you may leave it out of your plan, but indicate under that item that it is not needed for your project. There may also be items not included above that are relevant, but which are not included above. Those items must still be addressed in your plan.

A failure to include items in your safety plan which may be needed later will not relieve you of the responsibility to comply with the OSHA or MSHA standards that would apply and we reserve the right to require a supplemental safety submission to address that specific issue.

Section 7- Site Security: This section should detail your plan to maintain a secured site for your project. At a minimum the plan should identify scope of work of the project and include sections on the following:
      a.  Airport access to the space (through Gate 59 if accessing through the airfield)
      b.  Show the parking area for vehicles supporting construction
      c.  Show the store access points (through construction doors if required)
      d.  How is the site to be secured (Lock and Key type)
      e.  Explain detail of a tool inventory checklist and methodology/procedures to ensure tools are inventoried, stored and maintained in a secure manner

     f.   Identify any potential impacts to security devices (blocking or interfering with cameras, card readers, etc…) during construction
     g.   Normal work hours for the project
     h.   Security Emergency Contact List
     i.   Explain escorting procedures for individuals and vehicles

Section 8 – This section will include your Asbestos Abatement plan. (If applicable)

*Please provide both a hard and electronic copy of this document.

# EXHIBIT I: DISPUTE RESOLUTION PROCEDURES

**EXHIBIT I**

**DISPUTE RESOLUTION PROCEDURES**

1. The parties are fully committed to working with each other throughout the Project and agree to communicate regularly with each other at all times so as to avoid or minimize disputes or disagreements.  If disputes or disagreements do arise, Service Provider and City each commit to resolving such disputes or disagreements in an amicable, professional and expeditious manner so as to avoid unnecessary losses, delays and disruptions to the Services.

2. If a dispute or disagreement cannot be resolved informally Service Provider Authorized Representative and Authorized City Representative, upon the request of either party, shall meet as soon as conveniently possible, but in no case later than thirty (30) days after such a request is made, to attempt to resolve such dispute or disagreement.  Prior to any meetings between the Authorized Representatives, the parties will exchange relevant information that will assist the parties in resolving their dispute or disagreement.

# APPENDIX A:
# OFFICE OF CONTRACT COMPLIANCE REQUIREMENTS



## CITY OF ATLANTA

SUITE 1700
55 TRINITY AVENUE. SW
ATLANTA, GA 30303
(404) 330-6010  Fax: (404) 658-7359
Internet Home Page: www.atlantaga.gov

Kasim Reed
Mayor

OFFICE OF CONTRACT COMPLIANCE
Larry Scott
Director
lscott@atlantaga.gov

### CITY OF ATLANTA

### AIRPORT CONCESSIONS DISADVANTAGED BUSINESS ENTERPRISE

### POLICY STATEMENT

It is the policy of the City of Atlanta to ensure that ACDBEs, as defined in 49 CFR Parts 23 and 26, have an equal opportunity to receive and participate in DOT-assisted contracts.  It is also the City of Atlanta's policy:

1.  To ensure non-discrimination in the award and administration of DOT assisted Opportunities;

2.  To create a level playing field on which ACDBEs can compete fairly for DOT Assisted contracts;

3.  To ensure that the ACDBE program is narrowly tailored in accordance with applicable law;

4.  To ensure that only firms that fully meet 49 CFR Parts 23 and 26 eligibility standards are permitted to participate as ACDBEs;

5.  To help remove barriers to the participation of ACDBEs in DOT assisted contracts; and

6.  To assist the development of firms that can compete successfully in the market place outside the ACDBE program.

1

## IMPLEMENTATION OF ACDBE POLICY
### CONTRACT GOALS

The City of Atlanta establishes contract goals only on those contracts that have subcontracting and/or joint venture possibilities. The size of the contract goal is adopted on a project by project basis, impacted by the circumstances of each such contract (e.g. type and location of work, availability of ACDBEs to perform the particular type of work), in relation to the City's annual DBE goal.

The City of Atlanta expresses its contract goals as a percentage of the total amount of each particular DOT-assisted contract.

Each solicitation for which a contract goal has been established requires the bidders/offerors to submit the following information as part of their bid or offer:

1. The names, addresses and phone numbers of ACDBE firms that will participate in the contract;

2. A description of the work that each ACDBE will perform;

3. The dollar amount of the participation of each ACDBE firm's participation;

4. Written and signed documentation of commitment to use a ACDBE subcontractor whose participation is submitted to meet a contract goal;

5. Written and signed confirmation from the ACDBE that it is participating in the contract as provided in the prime contractor's commitment; and,

6. If the contract goal is not met, evidence of good faith efforts to meet the goal.

The City of Atlanta has designated the Office of Contract Compliance as its DBE Liaison Office. The address of OCC is 55 Trinity Avenue, Ste. 1700, Atlanta, Georgia 30303. The phone number is (404) 330-6010.

Each contracting opportunity at the airport is individually evaluated and the individual contract goal is adjusted as appropriate in relation to the City's Annual DBE goal. The City of Atlanta will express its contract goal as a percentage of the total amount of each individual DOT-assisted contract.

2

## GOOD FAITH EFFORTS

The City of Atlanta treats bidder/offerors' compliance with good faith effort requirements as a matter of responsiveness. Compliance of bidders with the ACDBE requirements, including good faith efforts, will be evaluated according to the standards of 49 CFR Parts 23 and 26.

## DEMONSTRATION OF GOOD FAITH EFFORTS

The obligation of the bidder/offeror is to make good faith efforts to meet the goal. The bidder/offeror can demonstrate that it has done so either by meeting the contract goal or documenting its good faith efforts. Examples of good faith efforts are found at 49 CFR Parts 23 and 26 Appendix A and are attached to this document.

OCC is responsible for determining whether a bidder/offeror who has not met the contract goal has documented sufficient good faith efforts to be regarded as responsive. In determining whether a bidder/offeror is responsive to the ACDBE goals, OCC will consider whether the information submitted by that bidder/offeror is complete, accurate and adequately documents the bidder's/offeror's good faith efforts. Bidders who are informed that they have not met the "good faith efforts" requirements are entitled to administrative reconsideration of that determination, per 49 CFR 26.53(d).

3

## AIRPORT CONCESSIONS DISADVANTAGED BUSINESS ENTERPRISE
## CONTRACT GOALS

**PROJECT # FC-8484, Food & Beverage Concessions Concourse C Midpoint at Hartsfield-Jackson Atlanta International Airport**

The Airport Concessions Disadvantaged Business Enterprise (ACDBE) contract goal for this project is:

# 41.0%

ACDBE participation may be in the form of a prime contractor, joint venture, or sub-contractor arrangement. The above referenced goal will be measured against **total gross revenue earned (prior to the deduction of any expenses, e.g., advertising, insurance, equipment, etc.)** throughout the life of the project.

***NOTE:** Once a successful proponent has been identified, OCC will work with that proponent to ensure that opportunities are maximized in the utilization of **certified ACDBE** firms during the construction build-out of the concession space(s), as well as any on-going supply opportunities. Participation in these areas must be contemplated independently, and not be included in the participation plan proponents submit in their efforts to meet the 36.0% goal stated above.

## MONITORING OF ACDBE POLICY

The City of Atlanta will require prime contractors to maintain records, documents, and receipts of gross revenue attributed to ACDBEs for three years following the performance of the contract. Those records must be made available for inspection upon request by any authorized representative of the City of Atlanta or DOT. This reporting requirement also extends to any certified DBE subcontractor.

The City of Atlanta will keep a running tally of actual gross receipts attributed to the ACDBE firms from the time of the contract award.

The City of Atlanta's Office of Contract Compliance, or its designee, will perform interim audits of gross receipts and contract payments to ACDBEs if applicable. The audit will review payments to ACDBE subcontractors to ensure that the actual amount paid to ACDBE subcontractors equals or exceeds the dollar amounts stated in the schedule of ACDBE participation.

4

## ACDBE PROGRAM REMINDERS

1.  <u>ACDBE Plan.</u> All proposals must contain a ACDBE Participation plan in accordance with the goals set forth above. The ACDBE plan must identify each ACDBE's name, address, and contact name, work description, and contract amount.

2.  <u>Subcontractor and Supplier Participation.</u> On projects with subcontractor and supplier opportunities, disadvantaged business enterprise participation may only be met through certified businesses that meet the standards of 49 CFR Parts 23 and 26, Subparts D and E. Each prime contractor must meet the requirements of the ACDBE program.

3.  <u>Failure to Meet ACDBE Goals.</u> Any bidder unable to meet the ACDBE goals must document the good faith efforts it made to meet the goals. Documentation must follow the requirements of the ACDBE plan pursuant to 49 CFR Parts 23 and 26 etc. If the City determines that good faith efforts were not made, the bidder is entitled to administrative reconsideration under 49 CFR 26.53.

4.  <u>Certification.</u> As of March 1, 2004, the City no longer does DBE Certification. DBE Certifications are now handled by the GA Department of Transportation (GA DOT). The contact number for GA DOT is (404) 656-5267

5.  <u>Reporting.</u> The successful bidder must submit monthly ACDBE participation reports to OCC, in a form prescribed by the Office of Contract Compliance.

6.  <u>ACDBE Concession Program.</u> The ACDBE Concession Program is governed by the provisions of "49 CFR Parts 23 and 26".

7.  <u>Contract Assurance.</u> The Concessionaire shall not discriminate on the basis of race, color, national origin, sex, religion, or sexual orientation in the performance of this contract. The contractor shall carry out applicable requirements of 49 CFR Part 26 in the award and administration of DOT assisted contracts. Failure by the contractor to carry out these requirements is a material breach of this contract, which may result in the termination of this contract or such other remedy as the City of Atlanta deems appropriate. Anti discrimination provisions based upon religion and sexual orientation are not included by or enforceable through 49 CFR Parts 23 and 26 but are enforceable through the City of Atlanta regulations.

5

## EQUAL EMPLOYMENT OPPORTUNITY POLICY

**PROJECT # FC-8484, Food & Beverage Concessions Concourse C Midpoint at Hartsfield-Jackson Atlanta International Airport**

### IMPLEMENTATION OF EEO POLICY

The City effectuates its EEO policy by adopting racial and gender workforce goals for every contractor performing work for the City of Atlanta on federally funded projects. These goals are derived from the work force demographics set forth by the United States Department of Labor Federal Office of Contract Compliance. These goals are not included in or enforceable through 49 CFR Part 26.

### A FIRM 'S WORK FORCE CONSISTING OF LESS THAN TWENTY-FIVE (25) EMPLOYEES IS EXEMPT FROM THE FOLLOWING EEO REQUIREMENTS

The Office of Federal Contract Compliance Programs (OFCCP) is the office of the United States Department of Labor that has responsibility for administration and enforcement of the Equal Employment Opportunity requirements under the contract compliance program which is authorized by Executive Order 11246 as amended, Section 503 of the Rehabilitation Act of 1973, and the Vietnam Era Veterans Readjustment Act of 1974. The programs mentioned above prohibit Federal contractors and sub-contractors from employment discrimination based on Race, Sex, National Origin, Religion, Sexual Orientation, and against persons with Disabilities or Vietnam Era Veterans, and requires such contractors to take affirmative action to ensure equal employment opportunity.

### BUSINESS DEVELOPMENT PROGRAMS

Though the ACDBE program primarily focuses on ACDBE participation at the subcontractor level, it is also important to provide ACDBEs with experience, training and skill development at the prime contractor level. The City of Atlanta encourages joint ventures between a prime contractor and an ACDBE, or a mentor protégé agreement between a prime contractor and a ACDBE whenever feasible on applicable contracts. The general description of the joint venture and mentor-protégé agreements is found on **Attachment 1 and Attachment 2** hereto and in the Atlanta Code of Ordinances.

6

CITY OF ATLANTA CONTRACT COMPLIANCE CERTIFICATE

The undersigned has prepared and submitted all the documents attached herein. The documents have been prepared with a full understanding of the City's goals and objectives with respect to increased opportunity in the proposed work to o undertaken in performance of this project. It is the company's intent to achieve the airport Concessions Disadvantaged Business Enterprise goals, the Equal Employment Opportunity goals, and the First Source Jobs Employment goals.

All information and representations contained herein and submitted with this bid or proposal are true and correct.

Witness

Signature
Company Authorized Representative

Date: Dec 6, 2015

Company Name: Global Concessions, Inc.

FC Number: FC-8484

Project Name: Food and Beverage Concessions on Concourse C - Midpoint

ACDBE FORM-1

7

FC-8484, Food and Beverage Concessions on Concourse C Midpoint                    Page 155

## SUBCONTRACTOR CONTACT FORM

List all subcontractors or suppliers (Both ACDBE and Non-ACDBE Certified) that were contacted regarding this project.

| Name of Sub-contractor/Supplier | Contact Name, Address and Phone Number | City Of Atlanta Business License? (Yes or No) | Type of Work Solicited for | Business Ownership for code below | Certification No. and Expiration Date | Result of Contact |
|---|---|---|---|---|---|---|
| E.M.C. Clean Energy | Tuzette Hill ... | Yes | Grease Trap (Biodiesel) | DBE (Pending) | — | Available for Services |
| Young Int'l Development | Wesley Young ... Atlanta, GA | No | Marketing/PR&R | DBE | Vendor# 2Yo3025 | Available for Services |
| Earn Ella Shelter (National Business Technologies-A-Tech) | Michael Lake ... | No | Published Design (Pending) | DBE (Pending) | — | Available for Services |
| (National Business Technologies) | ... | Yes | Printing/Graphics | DBE | Vendor# 013633 | Available for Services |
| DEKAH Security | Earl Backhous ... | No | Support Security | — | — | Available for Services |
| Capitol Signs | Paul Munoz ... Lilburn, GA | No | Leather Goods | — | — | Available for Services |
| Atlantic Fixture | ... | Yes | Equipment (Storepond) | — | — | Available for Services |

ACDBE FORM-2 (Page 1 of 2)

| Name of Sub-contractor/ Supplier | Contact Name, Address and Phone Number | City Of Atlanta Business License? (Yes or No) | Type of Work Solicited for | Business Ownership (see code below) | Certification No. and Expiration Date | Results of Contact |
|---|---|---|---|---|---|---|
| Brandys Friday | Brandi Mayo 25 Sophia Place Atlanta, GA 30318 (404)555-0187 | No | Graphic Design | — | — | Available for Services |
| Green olive Media | Kristen Alicia 321 17th Street Atlanta, GA 18301 (404)555-1927 | Yes | Graphic Design | — | — | Available for Services |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

Business Ownership Code: AABE – African American Business Enterprise, HABE – Hispanic Business Enterprise, FBE – Female Business Enterprise, APABE – Asian (Pacific Islander) American Business Enterprise

***Note: COA M/FBE certifications does not count for DBE program goals. Firms must be certified to the GA DOT.

Company Name: _Global Concessions, Inc._   Project Name: _Food and Beverage Concession_   FC#: _8484_

Signature: _[signature]_   Date: _January 6, 2016_

***Note: COA M/FBE certifications does not count for DBE program goals. Firms must be certified by the GA DOT.

ACDBE FORM-2  (Page 2 of 2)

## AIRPORT CONCESSIONS DISADVANTAGED BUSINESS ENTERPRISE SUBCONTRACTOR PROJECT PLAN
### SUBCONTRACTOR/SUPPLIER UTILIZATION

List all Majority and Airport Concessions Disadvantaged Business Enterprises (ACDBE) subcontractors/suppliers, including lower tiers, to be used on this project.

| Name of Sub-contractor/ Supplier | Contact Name, Address and Phone Number | City of Atlanta Business License? (yes or no) | NIAC Code | Type of Work to be Performed | Ethnicity of ACDBE Ownership (see code below) | ACDBE Certification No. and Expiration Date | Dollar ($) Value of Work and Scope of Work | Percentage (%) of Total Bid Amount |
|---|---|---|---|---|---|---|---|---|
| Global Concessions, Inc | Terrance Harris P.O. Box 10565 Atlanta, GA 30310 (404) 209-0907 | Yes | 722211 | F+B Concession own-operate | AABE | Vendor ID# 101.95 No Expiration mynthly | $67,308, yr. No expiration mynthly | 100 % |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Total    ACDBE%   100

Code: AABE - African American Business Enterprise, HABE - Hispanic American Business Enterprise, FBE - Female Business Enterprise, ABE - Asian (Pacific Islander) American Business Enterprise.    ***Note... EBO certification does not qualify for DBE projects.

Preparent's Co. Name: Global Concessions, Inc.    Project Name: Food and Beverage Concession on Concourse C

Preparent's Contact Number: (404) 209-0907    Signature: _____    FC#: 54484

(Please Print)    Date: January 4, 2016

Terrance D. Holder

ACDBE FORM-3

Keith Golden, P.E., Commissioner



**GEORGIA DEPARTMENT OF TRANSPORTATION**
One Georgia Center, 600 West Peachtree Street, NW
Atlanta, Georgia 30308
Telephone: (404) 631-1000

May 29, 2013

Terrance D. Harps, President
Global Concessions, Inc.
7700 Spine Rd., 3rd Flr., Concourse T
Atlanta, Georgia 30320

ANNIVERSARY DATE: Annually on May 29

Terrance D. Harps:

The Georgia Department of Transportation has reviewed your Georgia Uniform Certification Disadvantaged Business Enterprise (ACDBE/DBE) application. Our evaluation of the information submitted with your request for certification indicates that your firm has met the criteria outlined in Federal Regulations 49 CFR, Part 23 and 26.

DBE Certification will be continuous; however, it is contingent upon the firm maintaining its eligibility annually through this office. You will receive an Annual Affidavit for Continuing Eligibility (AFCE) and request for Personal Financial Statement (PFS) approximately thirty days prior to your firm's certification anniversary date. The Annual Affidavit for Continuing Eligibility and PFS document must be completed, signed and returned to our office before your anniversary date in order to continue your firm's eligibility as an ACDBE/DBE.

Your firm will be listed in Georgia's UCP DBE Directory which can be accessed through the Department's website: www.dot.ga.gov. Prime contractors and consultants can verify your firm's DBE certification status and identify the work area(s) for which the firm is DBE eligible through this Directory.

<u>Your Vendor ID Code is:</u>    2GL715

Your firm has been certified to provide the following services as outlined in the North American Industry Classification System (NAICS):

NAICS Code   722211       Limited-Service Restaurant
NACIS Code   722213       Snack and Nonalcoholic Beverage Bars
NAICS Code   722310       Food Service Contractors

<u>It is your obligation to notify GUCP of any changes in ownership and/or control of your company</u>. If at any time during the year there is a change in ownership and/or control of your firm, you are required to notify this office of such change in writing by sworn affidavit and with supporting documents within thirty (30) days. Changes also include but are not limited to officers, directors, management, key personnel, scope of work performed, daily operations, ongoing business relationships with other firms or individuals, or the physical location of your firm.

Failure to do so will be deemed a failure, on your part, to cooperate and will result in immediate actions to remove DBE certification in accordance with *49 CFR Part 26, Section 26.83 (j)* of the Federal DOT Regulation.

Sincerely,

Kimberly A. King
EEO Director

Betty C. Mason
EEO Assistant Administrator – DBE Program

KAK/YLC

(THIS PAGE SHALL BE SUBMITTED FOR EACH ACDBE FIRM)

LETTER OF INTENT

*Airport Concessions Disadvantage Business Enterprise*

Proponent          Name: Global Concessions, Inc.
                   Address: P. O. Box 20905
                   City: Atlanta          State: Georgia          Zip: 30320

ACDBE Firm:        ACDBE Firm: Global Concessions, Inc.
                   Address: P. O. Box 20905
                   City: Atlanta          State: Georgia          Zip: 30320

ACDBE Contact Person:  Name: Terrance D. Harps    Phone: (770) 322-0029

                   Expiration Date of ACDBE Certification: Request - May 2016

ACDBE is performing as: ☒ Prime Concessionaire   ☐ Sub concessionaire   ☐ Joint Venture

| Work Item(s) to be performed by ACDBE | Description of Work Item | Quantity | Total |
|---|---|---|---|
| ALL | 100% OWN | 100% | $15,256,831 |
|  | + operate |  | annually |
|  | BY ACDBE |  |  |
|  | GLOBAL Concessions |  |  |

This proponent is committed to utilizing the above-named ACDBE firm for the work described above.
The estimated participation is as follows:

ACDBE contract amount: $ 15,256,831    Percent of total contract: 100    %

**AFFIRMATION:**
The above-named ACDBE firm affirms that it will perform the portion of the contract for the estimated dollar value as stated above.

By: Terrance D. Harps                      President
    (Print name)                           (Title)
                                           December 1, 2015
    (Signature)                            (Date)

* In the event the proponent does not receive award of the prime contract, any and all representations in this Letter of Intent and Affirmation shall be null and void.

ACDBE FORM-4

FC-8484, Food and Beverage Concessions on Concourse C Midpoint                    Page 159

FIRST SOURCE JOBS INFORMATION FORM

Company Name: **Global Concessions, Inc.**

FC Number: **FC-8484**

Project Name: Food and Beverage Concessions on Concourse C - Midpoint

The following entry-level positions will become available as a result of the above referenced
contract with the City of Atlanta:

1. Sales Associate

2. Line Cook

3. Line Server

4. Bartender

5. Utility

Include a job description and all required qualifications for each position listed above.

Identify a company representative and contact phone number who will be responsible for
coordinating with the First Source Jobs Program.

Company Representative: **Valorie Salahuddin**

Phone: **(404) 209-0907, ext. 4**

FORM 5

13

## Job Description

**Title:**        SALES ASSOCIATE

**Reports to:**    General Manager/ Assistant Manager/Floor Supervisor

### Summary of Position:

Provide friendly, responsive service to create an exceptional experience for all of our guests. Each Sales Associate's primary objective is to provide *EXCEPTIONAL* customer service, and ensure repeat customers.

### Duties & Responsibilities:

- Count money in cash drawer at the beginning of shift to ensure that amounts are correct and that there is adequate change.
- Welcome and greet guests. Make all our guests feel comfortable and let them know you're there to personally take care of them.
- Make recommendations you genuinely feel your guests will enjoy.
- Answer questions about our food, beverages and other items.
- Take food and beverage orders from guests, enter orders in our point-of-sale system, which relays orders to the grill/prep area.
- Deliver food and beverages to guests in a timely matter.
- Prepare final bill, present check to guest, accept payment, process credit card charges, vouchers or make change (if applicable).
- Perform side work at the start and end of each shift as required by service station assignment.
- Maintain clean service areas.
- Ensure guests are satisfied with the food and service. Respond promptly and courteously to any requests.
- Be ready and willing to assist co-workers as situations arise.
- Thank guests for their visit, and invite them to return.
- Be available to fill in as needed to ensure the smooth and efficient operation of the restaurant as directed by the General Manager, Assistant Manager or Shift Leader.

Global Concessions, Inc.                1                Sales Associate Description

**Qualifications:**

- Be able to communicate and understand the predominant language(s) of our guests.
- Must have a basic knowledge of dining room and service procedures and functions.
- Possess basic math skills and have the ability to handle money and operate a point-of-sale system.
- Be able to work in a standing position for long periods of time (up to 5 hours).
- Be able to safely lift and easily maneuver trays of food frequently weighing up to 20 to 25 pounds.

---

Global Concessions, Inc.                          2                     Sales Associate Description

## Job Description

**Title:**       **LINE COOK**

**Reports to:**   **Manager/General Manager**

### Summary of Position:

Accurately and efficiently cook meats, fish, vegetables, soups and other hot food products as
well as prepare and portion food products prior to cooking. Also perform other duties in the areas
of food and final plate preparation including plating and garnishing of cooked items and
preparing appropriate garnishes for all hot menu item plates.

### Duties & Responsibilities:

- Prepares a variety of meats, seafood, poultry, vegetables and other food items for cooking
  in broilers, ovens, grills, fryers and a variety of other kitchen equipment.
- Assumes 100% responsibility for quality of products served.
- Knows and complies consistently with our standard portion sizes, cooking methods,
  quality standards and kitchen rules, policies and procedures.
- Stocks and maintains sufficient levels of food products at line stations to assure a smooth
  service period.
- Portions food products prior to cooking according to standard portion sizes and recipe
  specifications.
- Maintains a clean and sanitary work station area including tables, shelves, grills, broilers,
  fryers, pasta cookers, sauté burners, convection oven, flat top range and refrigeration
  equipment.
- Prepares item for broiling, grilling, frying, sautéing or other cooking methods by
  portioning, battering, breading, seasoning and/or marinating.
- Follows proper plate presentation and garnish set up for all dishes.
- Handles, stores and rotates all products properly.
- Assists in food prep assignments during off-peak periods as needed.
- Closes the kitchen properly and follows the closing checklist for kitchen stations. Assists
  others in closing the kitchen.
- Attends all scheduled employee meetings and brings suggestions for improvement.
- Performs other related duties as assigned by the Kitchen Manager or manager-on-duty.

Global Concessions, Inc.          1          Line Cook Description

## Qualifications:

- A minimum of 2 years of experience in kitchen preparation and cooking.
- At least 6 months experience in a similar capacity.
- Must be able to communicate clearly with managers, kitchen and dining room personnel.
- Be able to reach, bend, stoop and frequently lift up to 40 pounds.
- Be able to work in a standing position for long periods of time (up to 9 hours).

Global Concessions, Inc.                    2                    Line Cook Description

## Job Description

**Title:**  LINE SERVER

**Reports to:**  General Manager/ Assistant Manager/ Floor Supervisor

### Summary of Position:

Provide friendly, responsive service to create an exceptional dining experience for all of our guests. Each server's primary objective is to provide *EXCEPTIONAL* customer service, and ensure repeat visits.

### Duties & Responsibilities:

- Welcome and greet guests. Make all our guests feel comfortable and let them know you're there to personally take care of them.

- Serve food to customers and package take-out foods.

- Inform guests of specials and menu changes.

- Make recommendations you genuinely feel your guests will enjoy.

- Answer questions about food, beverages and other restaurant functions and services.

- Store food in assigned containers and storage areas in order to prevent spoilage.

- Inform supervisors when equipment is faulty and when supplies and food are getting low and afterwards order needed items.

- Sanitize and clean work areas, dishes, silverware, equipment and utensils.

- Carry equipment and utensils as well as food supplies to and from storage.

- Wash, cut and peel various foods, such as vegetables and fruits, to prepare for cooking or serving.

- Assist kitchen staff and cooks with various tasks when needed, and provide cooks with needed items.

- Portion, wrap the food and place it directly on plates for service to guests.

- Use electric or manual appliances to clean, slice, peel, and trim foods.

- Receive and store equipment, utensils and food supplies in cupboards, refrigerators and

---

Global Concessions, Inc.                    1                    Line Server Description

other storage areas.

- Prepare different kinds of foods, such as vegetables, desserts, meats, etc according to customers' orders or instructions following approved procedures.
- Weigh or measure ingredients; strain and stir soups and sauces.
- Remove and clean kitchen garbage containers.
- Mix ingredients for vegetable salads, molded fruit salads, green salads and pasta salads.
- Make special sauces and dressings as condiments for sandwiches.
- Keep records of the quantities of items and food used.
- Cut, grind, or slice meat, seafood and poultry to prepare for cooking.
- Pack leftover food from dishes into garbage containers.
- Stock refrigerators and cupboards, and tend buffet meals and salad bars.
- Sweep and mop kitchen floor, and vacuum dining area.
- Load glasses, dishes and tableware into dishwashing machines.
- Distribute food to food runners to serve to customers.

## Qualifications:

- Be able to communicate and understand the predominant language(s) of our guests.
- Must have a basic knowledge of dining room and service procedures and functions.
- Possess basic math skills and have the ability to handle money and operate a point-of-sale system.
- Be able to work in a standing position for long periods of time (up to 5 hours).
- Be able to safely lift and easily maneuver trays of food frequently weighing up to 20 to 25 pounds.

Global Concessions, Inc.                    2                    Line Server Description

## Job Description

**Title:**        BARTENDER

**Reports to:**    General Manager/ Assistant Manager/ Lead Bartender

### Summary of Position:

Provide timely, accurate and friendly service while preparing the highest quality beverages for our guests.

### Duties & Responsibilities:

- Take beverage orders from guests and servers.
- Prepare and serve alcoholic and non-alcoholic drinks consistent with the Restaurant's standard drink recipes.
- Record drink orders accurately and immediately after receipt into the register system.
- Accept guest payment, process credit card charges and make change (if applicable).
- Wash and sterilize glassware.
- Prepare garnishes for drinks and replenish snacks, appetizers for bar patrons.
- Maintains bottles and glasses in an attractive and functional manner to support efficient drink preparation and promotion of beverages.
- Clear and reset items in bar area.
- Present drink menus, make recommendations and answer questions regarding beverages.
- Maintain cleanliness in all areas of the bar including counters, sinks, utensils, shelves and storage areas.
- Receive and serve food orders to guests seated at the bar.
- Report all equipment problems and bar maintenance issues to restaurant manager.
- Assist the restocking and replenishment of bar inventory and supplies.
- Be available to fill in as needed to ensure the smooth and efficient operation of the restaurant as directed by the General Manager, Assistant Manager, or Lead Bartender.

### Qualifications:

- Be 21 years of age.
- Be able to communicate and understand the predominant language(s) of our guests.

---

Global Concessions, Inc.                        1                    Bartender Description

- Have working knowledge of beer, wine and liquor and common drink recipes.
- Possess basic math skills and have the ability to handle money and operate a cash register.
- Be able to work in a standing position for long periods of time (up to 5 hours).
- Be able to reach, bend, stoop and frequently lift up to 40 pounds.

Global Concessions, Inc.                    2                    Bartender Description

## Job Description

**Title:**        UTILITY

**Reports to:**   Kitchen Manager/ General Manager/Assistant Manager

### Summary of Position:

Wash and clean tableware, pots, pans, cooking equipment, floors and all other surfaces. Keep the restaurant and equipment clean and organized.

### Duties & Responsibilities:

- Keep the dishes, pots, pans, and other cooking equipment clean and report any functional or mechanical problems in the store immediately.
- Wash and store all tableware and kitchenware.
- Keep Front and Back of the House clean and organized.
- Maintain adequate levels of clean tableware for dining room and kitchen.
- Bag and haul trash to dumpster at designed times.
- Handle tableware carefully to prevent breakage and loss.
- Maintain adequate levels of dish detergents and cleaning supplies.
- Clean food preparation and production areas as required.
- Be available to fill in as needed to ensure the smooth and efficient operation of the restaurant as directed by the restaurant manager or immediate supervisor.

### Qualifications:

- No previous restaurant experience required.
- Be able to work in hot, wet, humid and loud environment for long periods of time.
- Be physically able to lift, reach, bend and stoop.
- Be able to working in a standing position for long periods of time (up to 5 hours).
- Be able to safely lift bags, cases and stacks weighing up to 60 pounds up to 30 times per shift.

Global Concessions, Inc.                                        Utility Description

THIS AGREEMENT REGARDING THE USE OF THE FIRST SOURCE JOBS
PROGRAM BY CONTRACTORS WITH THE CITY OF ATLANTA TO FILL ENTRY
LEVEL JOBS is made and entered into by _Global Concessions, Inc._

This _____1st_____ day of _December_, 201 5,.

The City of Atlanta requires the immediate beneficiary or primary contractor for every eligible project to
enter into a First Source Jobs employment agreement. The contractor agrees to the following terms and
conditions:

- The first source for finding employees to fill all entry level jobs created by the eligible
  project will be the First Source Program.

- The contractor will make every effort to fill 50% of the entry level jobs created by this
  eligible project with applicants from the First Source Program.

- The contractor shall make good faith effort to reach the goal of this employment agreement.

- Details as to the number and description of each entry level job must me provided with the
  bid.

- The contractor shall comply with the spirit of the First Source Jobs Policy beyond the
  duration of this agreement and continue to make good faith attempts to hire employees of
  similar backgrounds to those participating in the First Source Program

- The contractor as a condition of transfer, assignment or otherwise shall require the transferee
  to agree in writing to the terms of this employment Agreement.

Upon a determination that a beneficiary or contractor has failed to comply with the terms of this
Agreement, the City may impose the following penalties based on the severity of the non-compliance:

- The City of Atlanta may withhold payment from the contractor.

- The City of Atlanta may withhold 10 percent of all future payments on the contract until the
  contractor is in compliance

- The City of Atlanta may refuse all future bids on city projects or applications for financial
  assistance in any form from the City until the contractor demonstrated that the First Source
  requirements have been met, or cancellation of the eligible project.

- The City of Atlanta may cancel the eligible project.

All terms stated herein can be found in the City of Atlanta Code of Ordinances Sections 5-5002 through
5-5005.

The undersigned hereby agrees to the terms and conditions set forth in this agreement.

_____
Contractor

FORM 6
14

## ATTACHMENT I

**"Components of a Joint Venture Agreement with ACDBE Participation as Counted under 49 CFR 26.55 (b)"**

For credit forward toward the contract goal under Part 26, a joint venture agreement with a certified disadvantaged business enterprise should include at a minimum:

* The initial capital investment of each venture partner.

* The proportional allocation of profits and losses to each venture partner.

* The sharing of the right to control the ownership and management of the joint venture.

* A description of the distinct and clearly defined portion of the work to be performed by the ACDBE.

* The method of and responsibility for accounting.

* The methods by which disputes are resolved.

* All other pertinent factors of the joint venture.

15

FC-8484, Food and Beverage Concessions on Concourse C Midpoint                    Page 163

ATTACHMENT 2

DISADVANTAGED BUSINESS ENTERPRISE PROGRAM
MENTOR PROTÉGÉ INITIATIVES

The mentor-protégé program is an initiative, in accordance with Appendix D to 49 CFR Part 26, to encourage and develop certified Disadvantaged Business Enterprises in contracting with city government in areas that Disadvantaged Business Enterprises have historically been underrepresented due to various discriminatory barriers. This program, implemented on projects with a projected value of 5 million dollars or more, will enable prime contractors of all ethnic and gender categories to provide technical, administrative, and other assistance to smaller, developing businesses. Companies must successfully complete the Disadvantaged Business Enterprise certification process in order to participate as a protégé in this program. Additionally, participation as a certified Disadvantaged Business Enterprise protégé team member will not preclude the inclusion of the same certified Disadvantaged Business Enterprise team member as a self performing subcontractor in the DBE plan. The subcontracting by the certified Disadvantaged Business Enterprise protégé team member will be applied toward the satisfaction of the DBE goals in accordance with 49 CFR 26, Subpart C, 26.55.

Examples of good faith efforts are found in 49 CFR Parts 23 and 26, Appendix A that is attached to this package.

"Components of a Mentor-Protégé Agreement with DBE Participation as Counted under 49 CFR 26.55"

The Mentor-Protégé agreement between a prime contractor and the DBE protégé will provide an excellent development opportunity for the disadvantaged business enterprise protégé. Under the guidance of the mentor, the protégé will gain valuable knowledge and experience that will ultimately enhance the capabilities of the protégé. Additionally, the protégé has the opportunity to gain this knowledge and experience without exposing itself to the normal business risks that are associated with projects of this size.

As part of the City's Part 26 DBE program and subject to 49 CFR 26.35 and Appendix D, a mentor may meet up to half of the contract goal for this contract by using a DBE protégé as a self performing subcontractor through a formal mentor-protégé program. The successful prime for this project remains obligated to meet the entire contract goal for this project, including whatever portion of the goal that cannot be met by the protégé. Only independent DBE firms already certified by the City at this time (see "Certification", page DBE 2) may participate as protégés.

The mentor may not (1) enter into a mentor-protégé agreement as a substitute for compliance with the DBE program, (2) use such an agreement to circumvent the obligations of the DBE program, (3) create a new firm to serve as a protégé (4) require a potential protégé to pay the mentor for the privilege of participating in the agreement, or (5) bar the protégé from performing work on this contract.

To meet the requirements of Part 26, the mentor-protégé team must present a written development plan and formal agreement between the parties to the City of Atlanta prior to executing the final contract.

16

The agreement should include, but is not limited to the following information:

- The type of collaboration, training and assistance to be provided. The areas of assistance encouraged include, but are not limited to, bonding and insurance support, management and scheduling support.

- The specific rights and responsibilities of the Mentor and the Protégé.

- Names or titles of the individuals from the Mentor responsible for working directly with the Protégé in the areas identified above.

- Names or titles of the individuals from the Protégé responsible for working directly with the Mentor in the areas listed above.

- The term of the agreement.

- A system to monitor and evaluate the effectiveness of the Mentor Protégé agreement.

- A plan detailing how the Mentor plans to include the Protégé on non-governmental projects, governmental projects, and DOT-assisted projects during the term of the agreement.

- Protege shall not subcontract any of their work to the mentor firm or to other contractors without the approval of the OCC. Subcontracted work will not be counted toward DBE goals except as specified by Part 26.

- Mentor and Protege representatives may not bid or otherwise participate independently on a contract in which the Mentor Protege team is bidding or participating as a team.

- Work self performed by the protégé may be used to fulfill up to one half of the DBE contract goal on this project.

- DBE credit will not be awarded to a non-DBE mentor firm for using its own protégé firm for more than every other contract performed by the protégé.

- Staff members from the Office of Contract Compliance will be available to review draft mentor-protégé agreements for compliance with this section.

17

FC-8484, Food and Beverage Concessions on Concourse C Midpoint                                         Page 265

**Additional Resources Proponents May Contact in an Effort to Identify DBE Participants**

Atlanta Minority Business
Development Center
Clem Wilmont
Project Director
1599-A Memorial Drive, SE
Suite 134
Atlanta, GA 30317
Phone: 404-329-4567
E-mail: cwilmont@AtlMBDC.com

Atlanta Public Schools
Carolyn Lyons
Outreach Coordinator
Contract Compliance
1631 La France Street
Atlanta, GA 30307
Phone: 404-371-7130
Fax: 404-371-7126
Email: clyons@atlanta.k12.ga.us

Cobb County
Janice Cook
Department of Transportation
463 Commerce Park Drive, Suite 112
Marietta, GA 30060-2737
Phone: 770-528-3690
Fax: 770-528-4360
Email: janice.cook@cobbcounty.org

Dekalb County
Terry Phillips
Contract Compliance Officer
1300 Commerce Drive
Room 202
Decatur, GA 30030
Phone:        404-371-2737
Email: tcphill@co.dekalb.ga.us

U.S. Small Business Administration
Dinora Gonzalez
Economic Development Specialist
233 Peachtree Street, NE
Suite 1900
Atlanta, GA 30303
Phone: 404-331-0100 ext. 410
Email: dinora.gonzalez-sunk@sba.com

Georgia Technology Authority
Thomas Hester
Contracting Officer
100 Peachtree Street
Suite 2300
Atlanta, GA 30303
Phone: 404-463-2333
E-mail: tdhester@gta.ga.gov

Governor's Small Business Center
Gail Webb
Governmental and Outreach
Community Administrator
200 Piedmont Avenue
1336 West Tower
Atlanta, GA 30334
Phone: 404-656-6315
Toll-Free: 800 495-0053
Email: gsbc@dcau.ga.gov

Minority Business Development Agency
Sunny Guilder
Chief Business Development
401 West Peachtree Street, NW
Suite 1715
Atlanta, GA 30308-3516
Phone: 404-730-3300
Email: sguilder@mbda.gov

Gwinnett County
Debra Green
Purchasing Director
75 Langley Drive
Lawrenceville, GA 30045
Phone: 770-822-8720
Fax: 770-822-8725 or 770-822-8726
Email: greende@co.gwinnett.ga.us

18

FC-8484, Food and Beverage Concessions on Concourse C Midpoint                Page 166

# APPENDIX C: ILLEGAL IMMIGRATION REFORM & ENFORCEMENT ACT AFFIDAVITS

Contractor Affidavit under O.C.G.A. § 13-10-91(b)(1)

By executing this Contractor Affidavit, the undersigned contractor verifies its compliance with O.C.G.A. § 13-10-91, stating affirmatively that the individual, firm or corporation which is engaged in the physical performance of services on behalf of the City of Atlanta has registered with, is authorized to use and uses the federal work authorization program commonly known as E-Verify, or any subsequent replacement program, in accordance with the applicable provisions and deadlines established in O.C.G.A. § 13-10-91. Furthermore, the undersigned contractor will continue to use the federal work authorization program throughout the contract period and the undersigned contractor will contract for physical performance of services in satisfaction of such contract only with subcontractors who present an affidavit to the contractor with the information required by O.C.G.A. § 13-10-91(b). Contractor hereby attests that its federal work authorization user identification number and date of authorization are as follows:

___408558_____          May 31, 2011
Federal Work Authorization User Identification Number       Date of Authorization

Name of Contractor:  Global Concessions, Inc.

Name of Project: Food and Beverage Concessions on Concourse C - FC-8484

Name of Public Employer:  City of Atlanta

I hereby declare under penalty of perjury that the forgoing is true and correct.

Executed on _Dec_, _1_, 20_15_ in _Atlanta_ (city), _Georgia_ (state)

_____
Signature of Authorized Officer or Agent

Valorie Salahuddin
Printed name and Title of Authorized Officer or Agent

SUBSCRIBED AND SWORN BEFORE
ME ON THIS THE 1st, DAY OF December, 2015.

_____
NOTARY PUBLIC
My Commission Expires: 9/16/16

FC-8484, Food and Beverage Concessions on Concourse C Midpoint                    Page 26

Control No.   K021319

# STATE OF GEORGIA

### Secretary of State

Corporations Division
315 West Tower
#2 Martin Luther King, Jr. Dr.
Atlanta, Georgia 30334-1530

## CERTIFICATE
## OF
## EXISTENCE

I, Karen C Handel, Secretary of State and the Corporations Commissioner of the state of Georgia, hereby certify under the seal of my office that

### GLOBAL CONCESSIONS, INC.

**Domestic Profit Corporation**

was formed or was authorized to transact business on 11/20/1990 in Georgia. Said entity is in compliance with the applicable filing and annual registration provisions of Title 14 of the Official Code of Georgia Annotated and has not filed articles of dissolution, certificate of cancellation or any other similar document with the office of the Secretary of State.

This certificate relates only to the legal existence of the above-named entity as of the date issued. It does not certify whether or not a notice of intent to dissolve, an application for withdrawal, a statement of commencement of winding up or any other similar document has been filed or is pending with the Secretary of State.

This certificate is issued pursuant to Title 14 of the Official Code of Georgia Annotated and is prima-facie evidence that said entity is in existence or is authorized to transact business in this state.



WITNESS my hand and official seal of the City of Atlanta and the State of Georgia on 31st day of July, 2009

*Karen C Handel*

Karen C Handel
Secretary of State

Certification Number: 4516317-1    Reference:
Verify this certificate online at http://corp.sos.state.ga.us/corp/soskb/verify.asp

# APPENDIX D: GEORGIA DEPARTMENT OF REVENUE FORM RD-1062

RD-1062 (Rev. 7/14)





1513604011

### Disclosure Authorization Form

(Submit this form to the Department Division which is handling your inquiry)

*Print or Type*

| 1. Taxpayer Information<br>Taxpayer(s) name(s) and address | *Enter only those that apply*<br>Federal Employer ID No. |
|---|---|
| | Social Security No. |
| | Georgia State Tax ID No. |
| | Georgia Sales Tax Registration No. |
| Daytime Telephone Number | Georgia Withholding Tax No. |
| 2. Appointee Information<br>Appointee name and address | *Provide one of the following identification numbers*<br>State and State Attorney Bar Number |
| | Social Security or other identification number<br>*(for other ID provide number and type)* |
| | State and Certified Public Accountant Number |
| Daytime Telephone Number | |

**3. Tax Matters.** The appointee is authorized to receive confidential information for the tax matter listed below:

| Tax Type | Year(s) or Period (s) |
|---|---|
| Personal Income Tax | |
| Sales and Use Tax | |
| Corporate Income Tax | |
| Withholding Tax | |
| Other *(specify)* | |

**4. Revocation of Earlier Authorization(s).** This disclosure authorization form does not revoke any prior authorization forms on file with the Department unless the following box is checked: ☐   If the box is checked, the revocation will be effective as to all earlier authorizations on file with the Department of Revenue except *(please specify)*:

**5. Signature of or for the Taxpayer.** I hereby certify that the Georgia Department of Revenue is authorized to disclose and/or discuss confidential information or records concerning the undersigned taxpayer to the appointee named above for the tax type(s) and period(s) named above. If signed by a corporate officer, member, partner, trustee or executor/executrix, I certify that I have the authority to execute this authorization form on behalf of the taxpayer. I understand that to willfully prepare or present a document that is fraudulent or false is a misdemeanor under O.C.G.A. § 48-1-6.

Signature: _____   Date: _____

Print Name: _____   Title *(if applicable)*: _____

The person signing as or for the taxpayer appeared this day before a notary public and acknowledged this disclosure authorization form as a voluntary act or deed.

_____
Signature of Notary                Date              NOTARY SEAL

1

RD1062
Disclosure Authorization Form

Purpose of Form
A taxpayer may use Form RD1062 to authorize the Georgia Department of Revenue to disclose and/or discuss confidential tax information for such taxpayer with an appointee for a specific tax type(s) and period(s). Form RD1062 cannot be used as a Power of Attorney and thus does not grant the appointee any powers of representation.

Filing Instructions
Taxpayers should submit Form RD1062 to the appropriate taxing division. Taxpayers should only use this form when submitting a specific request for information.

Specific Instructions
*Section 1 - Taxpayer Information*
Individuals - Enter your name, address, and any applicable identification numbers.

*Section 2 - Appointee*
Enter the appointee's name, address, and any applicable identification numbers.

*Section 3 - Authorization*
Enter the tax type(s) and specific period(s) or year(s) for which the authorization is granted. A general reference to "all years" or "all periods" is not acceptable.

*Section 4 - Retention/Revocation of Prior Disclosure Authorization Forms*
All existing disclosure authorization forms previously filed by the taxpayer **will not** be revoked unless the taxpayer checks the box on this line. If the taxpayer checks off this box but does not want to revoke all existing disclosure authorization forms, the taxpayer should either specify the forms that the department should retain or attach a copy of such existing form(s).

A taxpayer may revoke a disclosure authorization form without authorizing a new appointee by filing with the department either:
(1) A statement of revocation signed by the taxpayer indicating that the authority of the previous disclosure authorization form is revoked along with the name and address of each appointee whose authority is revoked; or
(2) A copy of the disclosure authorization form to be revoked clearly marked "REVOKED."

It is important to note that the filing of a Form RD1062 disclosure authorization form will not revoke any Power of Attorney that is in effect.

*Section 5 - Signature of Taxpayer*

| Taxpayer | Who must sign |
|---|---|
| Individuals | The individual/sole proprietor must sign. |
| Corporations | A corporate officer or a person designated by a corporate officer must sign. |
| Partnerships | A partner having authority to act in the name of the partnership must sign. |
| Trusts | A Trustee must sign. |
| Estates | An Executor/Executrix or the personal representative of the estate must sign. |
| Limited Liability Companies | A member having authority to act in the name of the company must sign. |

2

FC-8484 Food and Beverage C Midpoint – Global Concessions



**Hartsfield-Jackson**
Atlanta International Airport.

**Keisha Lance Bottoms**
Mayor

**Balram "B" Bheodari**
Interim Airport
General Manager

## EXHIBIT A.3

## CONFIRMATION OF AGREEMENT DATES

THIS CONFIRMATION OF AGREEMENT DATES is provided by CITY OF ATLANTA ("City") to SunTrust Banks N.A. ("Concessionaire"), as follows:

a.   September 5, 2018   is the Commencement Date (date of execution) of the Agreement

b.   September 13, 2018  is the Effective Date (exclusive use of space) of the Agreement

c.   September 4, 2028   is the Expiration Date of the Agreement

DATES as of  September 20          , 2018

CONCESSIONAIRE:

By: _____

Name:   Terrance D Harps
Authorized Representative



**City of Atlanta | Department of Aviation** | P.O. Box 20509 | Atlanta, GA USA 30320-2509 | Tel: (404) 530-6600
www.atl.com  @atlairport

# EXHIBIT C

**HARTSFIELD-JACKSON ATLANTA INTERNATIONAL AIRPORT**

**TEMPORARY SPACE PERMIT**

This Temporary Space Permit ("Permit") is between the City of Atlanta ("City") and Global
Concessions ("Permittee"). Permittee agrees to the following terms and conditions as specified
herein.

| | |
|---|---|
| **PERMITTEE NAME:** | **GLOBAL CONCESSIONS**<br>(Hereinafter referred to as the "Permittee") |
| **PERMITTEE STREET ADDRESS:** | **6000 N. TERMINAL PKWY**<br>**ATLANTA, GA 30344** |
| **PERMITTEE TELEPHONE NUMBER:** | **404-771-6979** |
| **PERMITTEE LEGAL REPRESENTATIVE:** | **TERRY HARPS** |

LOCATION/SPACE:    Area located on Domestic terminal, Concourse C, E, F, and are described in the attached Exhibit A.  (Hereinafter referred to as the "Premises").

1.   378.09 SF – Group B
2.   1,512.30 SF – Group C
3.   1,829.94 SF – Group C
4.   31.32 SF – Group B
5.   473.63 SF – Group B
6.   727.27 SF – Group C
7.   1,535.85 SF – Group C

Total: 6,488.40 SF

PURPOSE:    This space will be used for office/storage space to function as a place where day-to-day company business is transacted and for no other purpose (hereinafter referred to as the "Use" or "Purpose").

**PERMIT FEE:**    **$336,432.52 annually**
[Note: This amount does not include the M & O and shared charges, see sections 6b.]

**EFFECTIVE DATE:**    **JULY 1, 2023**

**TERM:**    **Month-to-Month**

I, as representative for the Permittee, certify that the above information is true, and Permittee agrees to abide by the terms and conditions as stated in this Permit.

**PERMITTEE'S INITIALS:**

**TERMS AND CONDITIONS**

1. <u>**Use of Premises**</u>

   The Aviation General Manager at the Hartsfield-Jackson Atlanta International Airport (the "Airport") hereby grants this Permit for the use of Premises, subject to the terms and Conditions of this Permit, and applicable federal, state and local laws, regulations, rules, codes, ordinances, and executive orders, solely to conduct the Purpose as stated above and for no other use.  This Permit does not grant any real property leasehold rights.  This Permit may not be assigned or transferred.

2. <u>**Access**</u>

   Permittee shall have access to the Premises, subject to the rules and regulations of the Airport, including but not limited to, the security and safety rules of the Federal Aviation Administration ("FAA"), Air Traffic Controllers and the City of Atlanta (the "City"). The City reserves the right to enter the Premises during the Term of this Permit for maintenance, repair, emergencies and inspection.

3. <u>**Condition of the Premises**</u>

   Permittee, by signing this Permit, accepts the Premises in its "as-is" condition.  City makes no warranty either express or implied, as to the condition of the Premises or that the Premises will be suitable for Permittee's Purpose or needs.

   At the term of the Permit, the space must be vacated, left in broom-swept condition, Permittee's signage removed, and the locks have been changed to the City's.

4. <u>**Modifications to Premises / Signage Requirement**</u>

   Permittee must obtain the written consent of the Aviation General Manager prior to the commencement of any modifications, repairs, improvements, or any charges (hereinafter sometimes referred to collectively as "modifications" or "improvements") to the Premises. Permittee must submit a request for modifications to the Aviation General Manager, along with detailed plans, specifications, schematic renderings, materials, color board(s), detailed layout and any other applicable documents or drawings.

   Permittee shall accomplish all necessary repairs, improvements and/or modifications as may be required for its Use at no expense to the City.  The City will not reimburse Permittee for any costs incurred in connection therewith. City shall take title to all permanently affixed improvements immediately upon installation or construction. If the Aviation General Manager requires the removal of the improvements, Permittee must restore the Premises to its original condition as it was at the commencement of the Permit.

2

Permittee shall install signage at the entrance of each leased location within thirty (30) days after receiving the fully executed Permit. If applicable, signage should be waterproof if it is exposed to the elements. Signage must display the Permittee's name and a 24-hour contact phone number at no expense to the City.

5.  **Term**

This Permit is for a Month-to-Month term, not to exceed **JUNE 30, 2024**. In no event shall the term of this Permit exceed one (1) year without written consent from the Department of Aviation.

6.  **Fee and Charges**

a.  **Permit Fee.** Permittee shall pay a Permit Fee for the Use of the Premises during the Term. The Permit Fee is **$91.28** per square foot for the **378.09** square feet on the Domestic Terminal, **$34,512.06** annually, or **$2,876.00** monthly. The Permit Fee is **$45.64** per square foot for the **1,512.30** square feet on the Domestic Terminal, **$69,021.37** annually, or **$5,751.78** monthly. The Permit Fee is **$45.64** per square foot for the **1,829.94** square feet on Concourse C, **$83,518.46** annually, or **$6,959.87** monthly. The Permit Fee is **$91.28** per square foot for the **31.32** square feet on Concourse E, **$2,858.89** annually, or **$238.24** monthly. The Permit Fee is **$91.28** per square foot for the **473.63** square feet on Concourse E, **$43,232.95** annually, or **$3,602.75** monthly. The Permit Fee is **$45.64** per square foot for the **727.27** square feet on the AGTS Level of Concourse F, **$33,192.60** annually, or **$2,766.05** monthly. The Permit Fee is **$45.64** per square foot for the **1,535.85** square feet on the AGTS Level of Concourse F, **$70,096.19** annually, or **$5,841.35** monthly. Permit Fees are subject to escalation at the sole discretion of the Aviation General Manager by giving written notice to Permittee at least 15 days prior to the effective date of the new Permit Fee. The Permit Fee is due in advance whether or not an invoice is issued to Permittee.

b.  **Maintenance and Operations.** Permittee shall pay maintenance and operations ("M&O") charges, including utilities, in connection with Permittee's Use of the Premises, whether furnished by City or purchased by City on behalf of Permittee or furnished to Permittee by independent contractors. Permittee shall be invoiced separately for all such M&O charges by the Atlanta Airlines Terminal Corporation ("AATC").

c.  **Shared Costs.** Permittee shall also pay additional charges for the Use of the Premises arising from an allocation of shared costs including, but not limited to, the Automated Guideway Transit Service, security, police, fire and insurance. These fees shall be due no later than 10 days from the date of the invoice.

7.  **Security Deposit**

No Security Deposit shall be required for this Permit

8.  **Place of Payment and Late Fee**

a.     All amounts due pursuant to this Permit shall be payable to:

        (1)    **CITY OF ATLANTA,** DEPARTMENT OF AVIATION,
              P. O. BOX 920500, ATLANTA, GA 30392

        (2)    **ELECTRONIC FUNDS TRANSFER (EFT)**, Bank: Wells Fargo
              Bank, Routing Number: 121000248,
              Account Number: 2000132044372

b.     Any amount that is not paid within 30 days of the due date is subject to a late payment penalty calculated at the rate of 10% per month (or fraction thereof) of the unpaid balance until paid. The date payments are received by the City shall be determined by the United States Postal Service cancellation date on the envelope transmitting the payment.

c.     The termination of this Permit shall not relieve Permittee of any liabilities or obligations hereunder which have accrued on or prior to the effective date of the cancellation or termination. Permittee shall not abate, suspend, postpone, set off, or discontinue any payments of fees payable hereunder.

**9.    <ins>Termination</ins>**

a.     The City may terminate this Permit with or without cause, at any time, upon 30 days prior written notice to Permittee.

b.     The City may terminate this Permit at any time if Permittee is in breach of any of its obligation(s) pursuant to this Permit, which breach continues for more than 30 days after notice to Permittee of such breach.

c.     This Permit is automatically terminated if Permittee becomes bankrupt, makes or proposes to make any arrangement for the benefit of creditors, has been adjudicated insolvent, has applied for reorganization of debts, has applied for the appointment of a receiver of its assets or to conduct its operations or has applied for the appointment of a receiver of its assets or to conduct its operations or has applied for a voluntary winding up or liquidation of its business.

**10.    <ins>Indemnity and Insurance</ins>**

a.     Permittee agrees to defend, indemnify and hold harmless the City, its officers, agents, officials, and employees (hereinafter, collectively referred to as the "Indemnified Parties") from and against all liability for bodily injuries to or deaths of persons or damage to property arising from Permittee's Use pursuant to this Permit. Permittee also agrees to indemnify and hold harmless the Indemnified Parties from and against all claims sustained or alleged to have been sustained in connection with or to have arisen out of or resulting from the performance pursuant to this Permit by Permittee, or its officers, agents, employees, contractors or subcontractors. Permittee further agrees that its liability to indemnify and hold harmless the Indemnified Parties shall not be limited to the limits or terms of the

4

liability insurance required pursuant to this Permit. Each party hereto shall give to the other prompt and timely written notice of any claim made or suit instituted coming to its knowledge which in any way directly or indirectly, contingently or otherwise, affects or might affect either, and each shall have the right to participate in the defense of the same to the extent of its own interest. This Indemnity and Insurance Section shall survive any termination or expiration of this Permit.

**b.**    Any and all companies providing insurance required pursuant to this Permit must meet certain minimum financial security requirements as set forth below. These requirements conform to the ratings published by A.M. Best & Co. in the current Best's Key rating Guide-Property-Casualty. The rating for each company must be indicated on the Certificate of Insurance form. Each of the companies providing insurance pursuant to this Permit must have current, the following:

(1)    Best's Rating not less than A-; and
(2)    Best's Financial Size Category not less than Class IX; and
(3)    Authorization issued by the Insurance Commissioner, State of Georgia, to conduct, transact and enter into insurance contracts.

If the issuing company does not meet these minimum requirements, or for any other reason within reason shall be or become unsatisfactory to the City, written notification shall be mailed by City to Permittee, who shall upon notification obtain a new policy issued by an insurer acceptable to the City, and shall submit evidence of the same to the Aviation General Manager as required herein.

**c.**    Upon failure of Permittee to furnish, deliver and maintain such insurance as herein provided after five (5) days from receipt of written notice from City of such failure, Permittee shall be in default and, in addition to City's other remedies, this Permit, at the election of City, may be terminated.

**d.**    Any and all insurance required pursuant to this Permit shall be maintained during the entire Term of this Permit, including any extension, thereto.  City shall have the right to inquire into the adequacy of the insurance coverage set forth in this Permit and to require adjustments as necessary.  Each and every agent acting as an authorized representative on behalf of a company affording coverage pursuant to this Permit shall warrant when signing the certificate of insurance that specific authorization has been granted by such company or companies for the agent to bind coverage as required and to execute the certificate of insurance as evidence of such coverage. Each agent, contractor, and/or subcontractor of the Permittee must meet the same insurance requirements.

Permittee must, within 2 business days of receipt, forward to the City, at the address listed below by mail, hand-delivery, or facsimile transmission, all notices received from the carriers providing insurance under this Permit that concern the proposed cancellation, or termination of coverage of any insurance policies. All notices under this provision shall be sent to:

5

City of Atlanta,
Attn: Risk Management
68 Mitchell St. Suite 9100
Atlanta, GA 30303
Facsimile # (404) 658-7450

Confirmation of any mailed notices must be evidenced by return receipts of registered or certified mail.

Permittee shall provide the City with evidence of required insurance prior to the commencement of this Permit, and, thereafter, with a certificate evidencing renewals or changes to the required policies of insurance at least fifteen (15) days prior to the expiration of such policies.

e.   City must be covered as Additional Insured under all liability insurance (except worker's compensation and property insurance for which Permittee and Permittee's carriers must waive all rights of subrogation against City) and such insurance must be primary with respect to the Additional Insured. Confirmation of additional insured status and the waiver of subragatory rights must unconditionally appear on any certificate of insurance provided by Permittee as evidence of Permittee's compliance. Permittee must also submit to City an Additional Insured Endorsement Evidencing City's rights as an Additional Insured for each policy of insurance under which it is required to be an additional insured.

f.    **Required Minimum Insurance Amount**

(i)   **Worker's Compensation**                     Statutory
      **Employer's liability**:
      Bodily injury by accident/disease      $1,000,000 each accident
      Bodily injury by accident/disease      $1,000,000 each employee
      Bodily injury by accident/disease      $1,000,000 policy limit

(ii)  **General Liability**
      Bodily Injury and Property Damage: $10 Million combined single limit

      The following specific extensions of coverage shall be provided and indicated on the Certificate of Insurance.

      (1)    Comprehensive Form
      (2)    Contractual Insurance (Blanket or specific to this Permit)
      (3)    Personal Injury

| | (4) | Broad Form Property Damage |
| | (5) | Premises-Operations |
| | (6) | Independent Contractors' Contractual Liability on a blanket basis or Contractual Liabilities specifically covering this Permit |
| | (7) | Additional Insured Endorsement (primary & non-contributing in favor of the City of Atlanta |
| | (8) | Waiver of Subrogation in favor of the City of Atlanta. |

(iii)   **Vehicle and Aircraft (including Helicopter) Liability**
Bodily Injury and Property Damage: $10 Million for each policy

The following specific extensions of coverage shall be provided and indicated on the Certificate of Insurance:

| | (1) | Comprehensive Form |
| | (2) | Owned, hired, leased and non-owned vehicles to be covered |
| | (3) | Specific liability for vehicles operated on the Airfield |

(iv)   **Property Insurance**
In an amount equal to the full replacement value of any and all property of Permittee and covering all forms of risk with respect to Permittee's inventory, supplies, and all other property of Permittee located at the Premises, insuring against the perils of fire, lightning, vandalism, malicious mischief, glass breakage, and sprinkler leakage.

Waiver of Subrogation in Favor of City.

**11.**   <u>**Compliance with all Laws**</u>

Permittee shall obey all federal, state, local, and Airport rules and regulations, as may be amended from time to time, governing the conduct and operations at airports. Permittee shall obtain and maintain at its own expense, all present and future permits and licenses required by all local, federal, state and local authorities, pertaining to the performance of its operations.

**12.**   <u>**Permittee Obligations with Respect to Environmental Matters**</u>

**a.**   During the Term of this Permit, (i) Permittee shall at its own cost comply with all federal, state, and local environmental laws and regulations and (ii) Permittee shall not take any action that would subject the Premises to permit requirements under any applicable environmental laws for storage, treatment or disposal of Hazardous Materials. As used herein, the term "Hazardous Material" means any hazardous or toxic substance, material, or waste that is or becomes regulated by any local

governmental authority or the United States Government. The term "Hazardous Materials" includes, without limitation, any material or substance that is (i) defined as a "hazardous waste, extremely hazardous waste" or "restricted hazardous waste," or similar term under any laws now or hereafter enacted by the United States, the State of Georgia or any political subdivision thereof, or (ii) designated as a "hazardous substance" pursuant to Section 311 of the Federal Water Pollution Control Act (33 U.S.C. §1317), or (iii) defined as a "hazardous waste" pursuant to Section 1004 of the Federal Resources Conservation and Recovery Act, 42 U.S.C. § 6911 et seq. (42 U.S.C.§ 903), or (iv) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.* (42 U.S.C. § 9601 *et seq.)* (42 U.S.C. § 9601).

**b.**     Except in compliance with all applicable legal requirements, Permittee shall not allow the entrance of Hazardous Materials from the Premises into any sewage and stormwater drainage system. Other than those materials necessary for the operation of the proposed services, Permittee shall not cause or permit any Hazardous Materials to be placed, held, stored, processed, treated, released or disposed of on or at the Premises. Permittee hereby indemnifies City from and against any breach of Permittee of the obligations stated in the preceding sentences, and agrees to defend and hold City harmless from and against any and all loss, damage, costs and/or expenses (including, without limitation, fines assessed against Permittee, City or others for whom City may be responsible, diminution in value of the Airport, damages for the loss or restriction on the use of rentable or usable space or of any amenity in the Airport, and sums paid in settlement of claims, attorney fees, consultant fees, and expert fees) which arise during or after the Term as a result of such breach. This indemnification of City by Permittee also includes, without limitation, costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal, or restoration work required by any Federal, State or local governmental agency or political subdivision because of Hazardous Materials present in the soil or groundwater which results from such breach. Without limiting the foregoing, if the presence of any Hazardous Materials in or about the Premises caused or permitted by Permittee results in any contamination, Permittee shall promptly take all actions at its sole expense as are necessary to return the Premises to the condition existing prior to the introduction of such Hazardous Materials. Notwithstanding the above, the Permittee must first obtain the City's approval of such actions and the City must approve the proposed contractors.

**c.**     City and its employees, representatives and agents shall have access to the Premises during reasonable hours in order to conduct periodic environmental inspections and tests for the determination of the presence of contamination by Hazardous Materials on or at the Premises.

13. **Non-Disturbance**

Any use of the Premises by Permittee or its officers, agents, contractors, officials and employees shall be conducted in an orderly and proper manner and shall not otherwise annoy, disturb, create a hazard, or be offensive to surrounding areas, or interfere with other projects on, or the operations of, the Airport. Permittee shall promptly comply and shall cause its officers, agents, contractors, officials and employees to promptly comply, with any request from the Aviation General Manager to correct such annoyance, disturbance, hazard or any other offensive or improper activities or operations. By execution of this Permit, the Permittee agrees that in the event Permittee, or its officers, agents, contractors, officials and employees, fails to so comply, the Aviation General Manager may exercise the right to stop any or all operations from being performed by or on behalf of Permittee until such compliance is achieved, without terminating this Permit and/or the Department of Aviation may impose a fine for the period of such non-compliance. The fine shall be 10% of the Permit Fee pursuant to this Permit. Permittee agrees that any decision by the Aviation General Manager to impose such a fine shall be final, binding and conclusive on such matter. City shall not be responsible for any expense or liability resulting from such stoppage or fine pursuant to this Section.

14. **Non-Discrimination**

Permittee agrees that no person shall be excluded from participation in, denied the benefits of, or otherwise discriminated against in connection with Permittee's Use pursuant to this Permit because of race, color, religion, national origin, sex, sexual orientation or age. Permittee shall use the Premises in compliance with all other requirements imposed by or pursuant to Title 49, Code of Federal Regulations, Department of Transportation, Subtitle A and as such Regulations may be amended.

15. **Integrated Agreement, Modification**

This Permit contains all the agreements of the parties with respect to the Premises and cannot be further amended or modified except by written agreement of the parties. If the parties hereto previously have entered into or do enter into any other agreement, license or permit covering premises or facilities at the Airport, this Permit and the terms, conditions, provisions and covenants hereof shall not in any way or in any respect change, amend, modify, alter, enlarge, impair or prejudice any of the rights, privileges, duties obligations of either of the parties hereto under or by reason of any other said agreement, permit, or license between said parties.

16. **<u>Notices</u>**

All notices shall be mailed, using certified mail, return receipt requested, or via overnight delivery by the nationally recognized carrier such as UPS or FedEx, to the respective parties at the following addresses:

IF TO CITY:                                    IF TO PERMITTEE:

CITY OF ATLANTA
**ATTENTION: KYM TRICE**                        **ATTENTION: TERRY HARPS**
COMMERCIAL PROPERTY MANAGEMENT                  OWNER

6000 N. TERMINAL PARKWAY                        6000 N. TERMINAL PKWY
P.O. BOX 20509                                  ATLANTA, GA 30344
ATLANTA, GA 30320


**CITY OF ATLANTA**                             **TERRY HARPS**

By: *Kym Trice*                                 By: _____

Title: Senior Property Specialist              Title: Owner


Date: 07/24/2023                                Date: 09/01/2023

# EXHIBIT D



# Customer Statement - May 6, 2025

Global Concessions Inc

6000 N Terminal Pkwy
T-118
Atlanta, GA 30337

| Invoice Number | Type | Activity Period | Trans Date | Due Date | Description | | Original Amount | Balance Due |
|---|---|---|---|---|---|---|---|---|
| ATL-20193790 | BLNS | Jul, 2019 | 6/19/2019 | 7/19/2019 | Concourse B&F FC-5467 | MAG | $110,729.42 | $110,729.42 |
| ATL-20194954 | BLNS | August, 2019 | 7/16/2019 | 8/15/2019 | Concourse B&F FC-5467 | MAG | $113,575.13 | $113,575.13 |
| ATL-20196185 | BLNS | September, 2019 | 8/15/2019 | 9/14/2019 | Concourse B&F FC-5467 | MAG | $113,575.13 | $113,575.13 |
| ATL-20197578 | BLNS | October, 2019 | 9/17/2019 | 10/17/2019 | Concourse B&F FC-5467 | MAG | $113,575.13 | $113,575.13 |
| ATL-20199402 | BLNS | September, 2019 | 10/21/2019 | 11/20/2019 | Concourse B&F FC-5467 | Percentage Rent | $15,602.45 | $15,602.45 |
| ATL-20200505 | BLNS | December, 2019 | 11/14/2019 | 12/14/2019 | Concourse B&F FC-5467 | MAG | $113,575.13 | $113,575.13 |
| ATL-20200924 | BLNS | October, 2019 | 11/26/2019 | 12/26/2019 | Concourse B&F FC-5467 | Percentage Rent | $18,807.48 | $18,807.48 |
| ATL-20201623 | BLNS | January, 2020 | 12/16/2019 | 1/15/2020 | Concourse B&F FC-5467 | MAG | $113,575.13 | $113,575.13 |
| ATL-20202780 | BLNS | February, 2020 | 1/14/2020 | 2/13/2020 | Concourse B&F FC-5467 | MAG | $113,575.13 | $113,575.13 |
| FY24 -12807 | BLIN | January, 2024 | 12/18/2023 | 1/1/2024 | Concourse B&F FC-5467 | MAG | $81,937.16 | $81,937.16 |
| FY24 -13014 | BLIN | November, 2023 | 12/22/2023 | 12/22/2023 | Concourse B&F FC-5467 | Percentage Rent | $27,976.24 | $27,976.24 |
| FY24 -13242 | BLIN | February, 2024 | 1/16/2024 | 2/1/2024 | Concourse B&F FC-5467 | MAG | $81,937.16 | $81,937.16 |
| FY24 -13509 | BLIN | December, 2023 | 1/26/2024 | 1/26/2024 | Concourse B&F FC-5467 | Percentage Rent | $22,270.12 | $22,270.12 |
| FY24 -13835 | BLIN | March, 2024 | 2/15/2024 | 3/1/2024 | Concourse B&F FC-5467 | MAG | $62,188.81 | $62,188.81 |
| FY24 -14369 | BLIN | April, 2024 | 3/15/2024 | 4/1/2024 | Concourse B&F FC-5467 | MAG | $81,937.16 | $81,937.16 |
| FY24 -15437 | BLIN | June, 2024 | 5/15/2024 | 6/1/2024 | Concourse B&F FC-5467 | MAG | $81,937.16 | $81,937.16 |
| FY24 -15624 | BLIN | April, 2024 | 5/28/2024 | 5/28/2024 | Concourse B&F FC-5467 | Percentage Rent | $46,761.35 | $46,761.35 |
| FY24 -16037 | BLIN | May, 2024 | 6/21/2024 | 6/21/2024 | Concourse B&F FC-5467 | Percentage Rent | $51,641.70 | $51,641.70 |
| FY25 -16179 | BLIN | July, 2024 | 6/28/2024 | 7/1/2024 | Concourse B&F FC-5467 | MAG | $81,937.16 | $81,937.16 |
| FY25 -16759 | BLIN | June, 2024 | 7/29/2024 | 7/29/2024 | Concourse B&F FC-5467 | Percentage Rent | $47,254.36 | $47,254.36 |
| FY25 -17153 | BLIN | September, 2024 | 8/23/2024 | 9/1/2024 | Concourse B&F FC-5467 | MAG | $97,610.82 | $97,610.82 |



## Customer Statement - May 6, 2025

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| FY25 -18371 | BLIN | September, 2024 | 10/23/2024 | 10/23/2024 | Concourse B&F FC-5467 | Percentage Rent | $20,715.69 | $20,715.69 |
| FY25 -19631 | BLIN | January, 2025 | 1/16/2025 | 1/1/2025 | Concourse B&F FC-5467 | MAG | $97,610.82 | $97,610.82 |
| FY25 -19903 | BLIN | February, 2025 | 1/23/2025 | 2/1/2025 | Concourse B&F FC-5467 | MAG | $97,610.82 | $97,610.82 |
| FY25 -20462 | BLIN | January, 2025 | 2/24/2025 | 2/24/2025 | Concourse B&F FC-5467 | Percentage Rent | $3,828.56 | $3,828.56 |
| FY25 -20238 | BLIN | March, 2025 | 2/13/2025 | 3/1/2025 | Concourse B&F FC-5467 | MAG | $97,610.82 | $97,610.82 |
| FY25 -20443 | BLIN | February, 2025 | 2/24/2025 | 3/26/2025 | Concourse B&F FC-5467 | Fine Lease Violation | $1,000.00 | $1,000.00 |
| FY25 -20727 | BLIN | April, 2025 | 3/17/2025 | 4/1/2025 | Concourse B&F FC-5467 | MAG | $97,610.82 | $97,610.82 |
| FY25 -21067 | BLIN | February, 2025 | 3/28/2025 | 3/28/2025 | Concourse B&F FC-5467 | Percentage Rent | $5,950.70 | $5,950.70 |
| FY25 -21409 | BLIN | May, 2025 | 4/18/2025 | 5/1/2025 | Concourse B&F FC-5467 | MAG | $97,610.82 | $97,610.82 |
| FY25 -21546 | BLIN | March, 2025 | 4/23/2025 | 4/23/2025 | Concourse B&F FC-5467 | Percentage Rent | $20,243.12 | $20,243.12 |
| | | | | | **Concourse B&F FC-5467 Total** | | $2,131,771.50 | $2,131,771.50 |
| ATL-19192444 | BLNS | June, 2019 | 5/14/2019 | 6/13/2019 | Concourse C FC-8484 | MAG | $151,275.67 | $65,650.06 |
| ATL-20193791 | BLNS | July, 2019 | 6/19/2019 | 7/19/2019 | Concourse C FC-8484 | MAG | $151,275.67 | $151,275.67 |
| ATL-20194956 | BLNS | August, 2019 | 7/16/2019 | 8/15/2019 | Concourse C FC-8484 | MAG | $151,275.67 | $151,275.67 |
| ATL-20196187 | BLNS | September, 2019 | 8/15/2019 | 9/14/2019 | Concourse C FC-8484 | MAG | $151,275.67 | $151,275.67 |
| ATL-20197580 | BLNS | October, 2019 | 9/17/2019 | 10/17/2019 | Concourse C FC-8484 | MAG | $151,275.67 | $151,275.67 |
| ATL-20200507 | BLNS | December, 2019 | 11/14/2019 | 12/14/2019 | Concourse C FC-8484 | MAG | $151,275.67 | $151,275.67 |
| ATL-20201625 | BLNS | January, 2020 | 12/16/2019 | 1/15/2020 | Concourse C FC-8484 | MAG | $151,275.67 | $151,275.67 |
| ATL-20202781 | BLNS | February, 2020 | 1/14/2020 | 2/13/2020 | Concourse C FC-8484 | MAG | $151,275.67 | $151,275.67 |
| FY24 -12807 | BLIN | January, 2024 | 12/18/2023 | 1/1/2024 | Concourse C FC-8484 | MAG | $67,462.90 | $67,462.90 |
| FY24 -13014 | BLIN | November, 2023 | 12/22/2023 | 12/22/2023 | Concourse C FC-8484 | Percentage Rent | $41,653.49 | $41,653.49 |
| FY24 -13242 | BLIN | February, 2024 | 1/16/2024 | 2/1/2024 | Concourse C FC-8484 | MAG | $67,462.90 | $67,462.90 |
| FY24 -13509 | BLIN | December, 2023 | 1/26/2024 | 1/26/2024 | Concourse C FC-8484 | Percentage Rent | $42,535.51 | $42,535.51 |
| FY24 -13835 | BLIN | March, 2024 | 2/15/2024 | 3/1/2024 | Concourse C FC-8484 | MAG | $67,462.90 | $67,462.90 |
| FY24 -14369 | BLIN | April, 2024 | 3/15/2024 | 4/1/2024 | Concourse C FC-8484 | MAG | $67,462.90 | $67,462.90 |
| FY24 -15437 | BLIN | June, 2024 | 5/15/2024 | 6/1/2024 | Concourse C FC-8484 | MAG | $67,462.90 | $67,462.90 |
| FY24 -15624 | BLIN | April, 2024 | 5/28/2024 | 5/28/2024 | Concourse C FC-8484 | Percentage Rent | $60,971.26 | $60,971.26 |
| FY24 -16037 | BLIN | May, 2024 | 6/21/2024 | 6/21/2024 | Concourse C FC-8484 | Percentage Rent | $81,048.35 | $81,048.35 |

Invoice Number is Required with Payment, Thank You!

For inquiries: billing.inquiry@atl.com

Remit To:
**City Of Atlanta Department of Aviation P.O. Box 920500 Atlanta GA 30392-0500**



## Customer Statement - May 6, 2025

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| FY25 -16179 | BLIN | July, 2024 | 6/28/2024 | 7/1/2024 | Concourse C FC-8484 | MAG | $67,462.90 | $67,462.90 |
| FY25 -16759 | BLIN | June, 2024 | 7/29/2024 | 7/29/2024 | Concourse C FC-8484 | Percentage Rent | $85,374.84 | $85,374.84 |
| FY25 -17219 | BLNS | July, 2024 | 8/23/2024 | 8/23/2024 | Concourse C FC-8484 | Percentage Rent | $78,572.52 | $69,850.31 |
| FY25 -17153 | BLIN | September, 2024 | 8/23/2024 | 9/1/2024 | Concourse C FC-8484 | MAG | $97,652.29 | $97,652.29 |
| FY25 -18371 | BLIN | September, 2024 | 10/23/2024 | 10/23/2024 | Concourse C FC-8484 | Percentage Rent | $39,484.25 | $39,484.25 |
| FY25 -18654 | BLIN | December, 2024 | 11/15/2024 | 12/1/2024 | Concourse C FC-8484 | MAG | $97,652.29 | $50,000.11 |
| FY25 -19631 | BLIN | January, 2025 | 1/16/2025 | 1/1/2025 | Concourse C FC-8484 | MAG | $97,652.29 | $97,652.29 |
| FY25 -19903 | BLIN | February, 2025 | 1/23/2025 | 2/1/2025 | Concourse C FC-8484 | MAG | $97,652.29 | $97,652.29 |
| FY25 -20462 | BLIN | January, 2025 | 2/24/2025 | 2/24/2025 | Concourse C FC-8484 | Percentage Rent | $17,567.55 | $17,567.55 |
| FY25 -20238 | BLIN | March, 2025 | 2/13/2025 | 3/1/2025 | Concourse C FC-8484 | MAG | $97,652.29 | $97,652.29 |
| FY25 -20727 | BLIN | April, 2025 | 3/17/2025 | 4/1/2025 | Concourse C FC-8484 | MAG | $97,652.29 | $97,652.29 |
| FY25 -21067 | BLIN | February, 2025 | 3/28/2025 | 3/28/2025 | Concourse C FC-8484 | Percentage Rent | $7,166.43 | $7,166.43 |
| FY25 -21409 | BLIN | May, 2025 | 4/18/2025 | 5/1/2025 | Concourse C FC-8484 | MAG | $97,652.29 | $97,652.29 |
| FY25 -21546 | BLIN | March, 2025 | 4/23/2025 | 4/23/2025 | Concourse C FC-8484 | Percentage Rent | $34,527.62 | $34,527.62 |
| | | | | | **Concourse C FC-8484 Total** | | $2,787,450.61 | $2,645,650.61 |
| ATL-20193727 | BLNS | July, 2019 | 6/19/2019 | 7/19/2019 | Terminal Rents | Space Storage | $20,887.05 | $20,887.05 |
| ATL-20199102 | BLNS | November, 2019 | 10/15/2019 | 11/14/2019 | Terminal Rents | Space Storage | $22,981.44 | $22,981.44 |
| ATL-20200506 | BLNS | December, 2019 | 11/14/2019 | 12/14/2019 | Terminal Rents | Space Storage | $22,981.44 | $22,981.44 |
| ATL-20201624 | BLNS | January, 2020 | 12/16/2019 | 1/15/2020 | Terminal Rents | Space Storage | $22,981.44 | $22,981.44 |
| FY24 -12807 | BLIN | January, 2024 | 12/18/2023 | 1/1/2024 | Terminal Rents | Space Storage | $28,036.04 | $28,036.04 |
| FY24 -13242 | BLIN | February, 2024 | 1/16/2024 | 2/1/2024 | Terminal Rents | Space Storage | $28,036.04 | $28,036.04 |
| FY24 -14369 | BLIN | April, 2024 | 3/15/2024 | 4/1/2024 | Terminal Rents | Space Storage | $28,036.04 | $28,036.04 |
| FY24 -15437 | BLIN | June, 2024 | 5/15/2024 | 6/1/2024 | Terminal Rents | Space Storage | $28,036.04 | $28,036.04 |
| FY25 -16179 | BLIN | July, 2024 | 6/28/2024 | 7/1/2024 | Terminal Rents | Space Storage | $33,558.49 | $33,558.49 |
| FY25 -16581 | BLIN | August, 2024 | 7/18/2024 | 8/1/2024 | Terminal Rents | Space Storage | $28,960.92 | $28,960.92 |
| FY25 -17153 | BLIN | September, 2024 | 8/23/2024 | 9/1/2024 | Terminal Rents | Space Storage | $28,960.92 | $28,960.92 |
| FY25 -17639 | BLIN | October, 2024 | 9/18/2024 | 10/1/2024 | Terminal Rents | Space Storage | $28,962.03 | $28,962.03 |
| FY25 -18188 | BLIN | November, 2024 | 10/16/2024 | 11/1/2024 | Terminal Rents | Space Storage | $28,961.52 | $28,961.52 |



## Customer Statement - May 6, 2025

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| FY25 -18654 | BLIN | December, 2024 | 11/15/2024 | 12/1/2024 | Terminal Rents | Space Storage | | $28,960.92 | $22,076.17 |
| FY25 -19631 | BLIN | January, 2025 | 1/16/2025 | 1/1/2025 | Terminal Rents | Space Storage | | $27,704.51 | $21,118.44 |
| FY25 -19903 | BLIN | February, 2025 | 1/23/2025 | 2/1/2025 | Terminal Rents | Space Storage | | $21,118.44 | $21,118.44 |
| FY25 -20238 | BLIN | March, 2025 | 2/13/2025 | 3/1/2025 | Terminal Rents | Space Storage | | $21,118.44 | $21,118.44 |
| FY25 -20727 | BLIN | April, 2025 | 3/17/2025 | 4/1/2025 | Terminal Rents | Space Storage | | $21,118.44 | $21,118.44 |
| FY25 -21409 | BLIN | May, 2025 | 4/18/2025 | 5/1/2025 | Terminal Rents | Space Storage | | $21,118.44 | $21,118.44 |
| FY25 -19365 | BLIN | December, 2024 | 12/31/2024 | 12/31/2024 | Terminal Rents | Space Storage FY24 Year End True Up | | $12,824.16 | $12,824.16 |
| | | | | | **Terminal Rents Total** | | | $505,342.76 | $491,871.94 |
| | | | | | **Grand Total** | | | $5,424,564.87 | $5,269,094.05 |

Invoice Number is Required with Payment, Thank You!

For inquiries: billing.inquiry@atl.com

Remit To:

**City Of Atlanta Department of Aviation P.O. Box 920500 Atlanta GA 30392-0500**